**UNITED STATES DISTRICT COURT**
**DISTRICT OF VERMONT**

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2023 DEC 18  AM 8: 15

CLERK

BY____*LAW*____
DEPUTY CLERK

2:23-cv-710

VERMONT FEDERATION OF SPORTSMEN'S
CLUBS,

POWDERHORN OUTDOOR SPORTS CENTER,
INC.,

JPC, INC. (D/B/A BLACK DOG SHOOTING
SUPPLIES),

PAUL DAME, and

MARSHA J. THOMPSON

      *Plaintiffs,*

   **v.**

MATTHEW BIRMINGHAM, Director of the
Vermont State Police, in his Official and Personal
Capacities,

CHARITY CLARK, Attorney General of the State
of Vermont, in her Official and Personal
Capacities, and

SARAH GEORGE, State's Attorney for
Chittenden County, in her Official and Personal
Capacities,

      *Defendants.*

## COMPLAINT FOR MONETARY, INJUNCTIVE, AND DECLARATORY RELIEF

## I.    Introduction

1.    This is an action under 42 U.S.C. § 1983 and *Ex parte Young*, 209 U.S. 123

(1908), in which the Plaintiffs seek various forms of relief arising from unconstitutional

enactments of the Vermont Legislature, which include provisions Defendants are charged with enforcing and intend to enforce against Plaintiffs and others.[1]

2.    This is a pre-enforcement challenge relating to two Vermont laws that improperly restrict the Second Amendment rights of law-abiding citizens. The first of these unconstitutional laws makes it a crime to keep and bear common firearm magazines typically possessed for lawful purposes, limiting citizens to only 10 rounds for a rifle and 15 rounds for a pistol. The second makes it a crime to transfer any firearm without waiting at least 72 hours and as much as 7 business days. Based on the text, history, and tradition of the Second Amendment, these laws are unconstitutional. Plaintiffs are entitled to preliminary and permanent relief against such unconstitutional enactments, which Defendants are charged with enforcing.

3.    As famously recounted in John Greenleaf Whittier's poem *The Green Mountaineer*, Vermont has a long history of bearing arms – "Our leaders themselves are own fellow men, who can handle the sword, and the scythe, and the pen!" That poem called on Vermonters to "Come down with [their] rifles" to join the American revolutionaries on the battlefield, and Vermont's history with firearms began before Vermont elected to join the United States in 1791. The familiarity of Ethan Allen and the Green Mountain Boys with firearms in common use in Vermont was critical in ensuring the independence of both the Republic of Vermont and the United States.

4.    From the earliest days of Vermont history, Vermonters protected their property from the claims of various governments. Since 1777, when it was an

---

[1] Plaintiffs bring this Complaint based on personal knowledge as to all facts relating to the Plaintiffs directly, and on information and belief as to all other matters.

independent state, Vermont has protected the right of individuals to engage in lawful, firearms-related pursuits, such as self-defense, hunting, and recreational shooting.

5.    Upon joining the United States in 1791, Vermonters gained the protections of the Second Amendment for their rights to self-defense. The Fourteenth Amendment makes the Second Amendment right to keep and bear arms for the purpose of self-defense applicable to the states. *McDonald v. City of Chicago*, 561 U.S. 742, 744 (2010). (rights "fundamental to the American scheme of ordered liberty" and "deeply rooted in this Nation's history and tradition" apply to the states through the Fourteenth Amendment) (cleaned up). "The Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2156 (2023), citing *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008).

6.    Despite the explicit constitutional protections of the Second Amendment and increasingly emphatic Supreme Court decisions recognizing that the Second Amendment provides an individual right to commonly used firearms for self-defense, the Vermont General Assembly reacted by enacting statutes that run afoul of this binding jurisprudence and erode a cornerstone of the Bill of Rights:

   a. First, in 2018, the General Assembly banned the sale, purchase, and possession of magazines for long guns that have a capacity of more than 10 rounds, and magazines for handguns that have a capacity of more than 15 rounds. 13 V.S.A. § 4021.

   b. Second, in 2023, the General Assembly enacted a statute that requires law-abiding and otherwise qualified citizens attempting to purchase a firearm to wait at least 72 hours before they can possess the firearm. During this 72-hour

period, no governmental activity occurs and no purpose is served except to keep citizens from obtaining or possessing a firearm. 13 V.S.A. § 4019a.

7.     Along with millions of law-abiding Americans, Vermonters use long gun magazines capable of holding more than 10 rounds of ammunition and handgun magazines capable of holding more than 15 rounds. Indeed, these magazines that are now illegal were not only common in Vermont for great portions of its history, but have been standard equipment on some of the most popular firearms in the country. There is nothing unusual or uncommonly "large" about their capacity; if anything, they are best described as standard capacity magazines.[2]

8.     As with the magazine ban, there is no precedent or historical practice to support a law that denies Vermonters' rights to responsibly purchase, possess, and carry firearms for at least 72 hours or any other period of time, except as punishment for a crime.

9.     A right delayed is a right denied. Yet, Vermont law delays the ability of law-abiding citizens to exercise their Second Amendment rights for no administrative or other legitimate governmental purpose. It is delay for delay's sake. This purposeful and purposeless obstruction to fundamental and deeply rooted rights, such as those protected by the Second Amendment, is unconstitutional. See *District of Columbia v. Heller*, 554 U.S. at 582, 591, 595, 626, 683 (2008) (holding ban on the possession of an immediately operable firearm unconstitutional and analogizing the Second Amendment to the First and Fourth Amendments); *CBS v. Davis*, 510 U.S. 1315, 1315

---

[2] Due to the parlance of legislators and certain judicial decisions cited herein, Plaintiffs will occasionally refer to "Large Capacity Magazines" or "LCMs," but do not thereby concede that such magazines actually have a large capacity.

4

(1994) (delay of broadcast constitutes irreparable harm under the First Amendment); *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 47 (1991) ("Delay for delay's sake" is presumptively unconstitutional in the context of the Fourth Amendment), *United States v. Smith*, 967 F.3d 198 (2d Cir. 2020) (needless detention of property without a warrant violates the Fourth Amendment), *United States v. Sharpe*, 470 U.S. 675, 686 (1985) (relating to detention of an individual pursuant to a *Terry* stop, and tying the reasonableness of the delay to the need to accomplish governmental business during such delay).

10.     The General Assembly's recent enactments have made law-abiding Vermont citizens more vulnerable to criminal attack by depriving them of commonly-owned ammunition magazines and forcing them to wait at least 72 hours in order to exercise rights protected by the Second Amendment.

11.     Defensive use of guns by crime victims is common. "Almost all national survey estimates" on the defensive use of guns by victims indicates they "are at least as common as offensive uses by criminals, with estimates of annual uses ranging from about 500,000 to more than 3 million per year, in the context of about 300,000 violent crimes involving firearms in 2008." Alan Leshner, et al., *Priorities for Research to Reduce the Threat of Firearm-Related Violence*, Institute of Medicine and National Research Council, 2013, at 15, http://tinyurl.com/mr274kuh.

12.     Any impediment to self-defense is especially pernicious in Vermont, due to the State's rural nature. Even well-populated areas of the State have lengthy police response times, especially late at night when police coverage is low or non-existent and violent criminals are most apt to attack.

13.     Plaintiffs seek nothing uncommon or out of the ordinary in the history of

Vermont, but seek only to exercise the rights that are theirs under the proudest

traditions of Vermont and of the United States.

14.     "Keeping and bearing arms was not only an abstract right, but also a

constant practice of Vermont's founding fathers." Stephen P. Halbrook, *The Right to

Bear Arms in the First State Bills of Rights: Pennsylvania, North Carolina, Vermont,

and Massachusetts*, 10 VT. L. REV. 255, 288 (1985). Two of the principal political

figures in Vermont's founding—Ethan Allen and his brother Ira—"carried a gun and a

brace of pistols on their persons as a common practice," *id*. at 292, and won Vermont's

independence by exercising the right to bear arms in defense of self and state, first

against the New York government and later against the British. *Id*. at 288–90.

15.     The State's arbitrary magazine ban and purposeless waiting period depart

from the traditions of firearm regulation in Vermont and the United States, and

impermissibly burden and infringe the fundamental rights of law-abiding Vermont

citizens to bear arms in their own defense. Accordingly, these laws are unconstitutional

and invalid, and this Court should strike them down and prevent Defendants from

enforcing them against law-abiding Vermonters.

## II.   Jurisdiction and Venue

16.     This Court has subject matter jurisdiction for violations of 42 U.S.C. §

1983 because such violations present a federal question under U.S. Const., Art. III, § 2

and 28 U.S.C. §1331.

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1343 (a)

(3) and (a)(4).

6

18.     This Court has subject matter jurisdiction to restrain the unconstitutional enforcement of state legislative acts pursuant to *Ex parte Young*, 209 U.S. at 142 ("Another Federal question is the alleged unconstitutionality of these acts.").

19.     This Court has jurisdiction to declare the rights of the parties pursuant to 28 U.S.C. § 2201.

20.     This Court has personal jurisdiction over each Defendant because they all reside in Vermont and maintain offices in Vermont.

21.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b)(1) and (b)(2).

## III.   Parties

22.     Plaintiff Vermont Federation of Sportsmen's Clubs ("VTFSC") is a Vermont nonprofit. It is an association of 45 sporting clubs across the State, with a combined membership of approximately 14,500 individuals. VTFSC's membership also consists of more than 2,200 individuals and 40 Federal Firearms Licensees (FFLs). Its principal place of business is 14 Stafford Avenue, Morrisville, VT 05661. VTFSC sues in its own right and as an organization that represents its members.

23.     Powderhorn Outdoor Sports Center, Inc. ("Powderhorn") is a for-profit enterprise incorporated under the laws of Vermont and licensed under federal law to engage in the business of selling firearms. Powderhorn sells rifles, shotguns, pistols, knives, magazines, ammunition, and firearm accessories. Powderhorn's principal place of business is 5755 Williston Rd, Williston, VT 05495. It sues on its own behalf and on a theory of third party standing, because Powderhorn is uniquely situated to represent the interests of its customers who seek to obtain banned magazines and firearms without a waiting period.

7

24.    JPC, Inc. d/b/a Black Dog Shooting Supplies ("Black Dog") is a for profit enterprise incorporated under the laws of Vermont and licensed under federal law to engage in the business of selling firearms. Black Dog sells rifles, shotguns, pistols, knives, magazines, ammunition, and firearm accessories. Its principal place of business is 233 South Main Street, Rutland, Vermont 05701. It sues on its own behalf and on a theory of third party standing, because Black Dog is uniquely situated to represent the interests of its customers who seek to obtain banned magazines and firearms without a waiting period.

25.    Plaintiff Paul Dame is a law-abiding citizen of the United States and a resident of the State of Vermont. He is also Chairman of the Vermont Republican Party. He resides in St. George, Vermont.

26.    Plaintiff Marsha J. Thompson is a law-abiding citizen of the United States and a resident and citizen of the State of Vermont. She resides in Hubbardton, Vermont. In the U.S. Army, where she served for 39 years until her retirement as a master sergeant, she was a firearms instructor for ten years. She was the first woman instructor for the Vermont Army National Guard's Small Arms Readiness Training Section. As part of that service, she also taught the Advanced Firearms Instructor Course, which she helped design. After retiring, she became certified as a National Rifle Association instructor in four categories: 1) pistol; 2) rifle; 3) self-protection in the home; and 4) safe storage. Around 2015, Ms. Thompson founded the Vermont Women's Shooting Association, which teaches firearms safety and shooting clinics to women.

27.    Defendant Matthew Birmingham is the Director of the Vermont State Police, and is sued in both his official and personal capacities. Pursuant to 20 V.S.A. § 1914, "[t]he Commissioner of Public Safety and the State Police shall be peace officers

8

and shall have the same powers with respect to criminal matters and the enforcement of the law relating to criminal matters as sheriffs, constables, and local police have in their respective jurisdictions. ... State Police shall be informing or complaining officers with the same powers possessed by sheriffs, deputy sheriffs, constables, or police officers of a city or incorporated village." As Director, it is Birmingham's duty to require his subordinates to serve as "complaining officers" with respect to violations of the law as set forth elsewhere herein. As Director, he exercises, delegates, or supervises all the powers and duties of the Department, which is charged under Vermont law with administering Vermont's criminal laws governing the sale, transfer, and possession of firearms. He is a policymaker within the meaning of *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978) and subsequent jurisprudence. His official address is: Vermont State Police Headquarters, 45 State Drive, Waterbury, VT 05671.

28.     Defendant Charity Clark is the Attorney General of Vermont, and is sued in both her official and personal capacities. Pursuant to 3 V.S.A. § 152, "the Attorney General shall... have the same authority throughout the state as a State's Attorney." Pursuant to 3 V.S.A. § 153 (a), the Attorney General has "general supervision" of criminal prosecutions in Vermont. As Attorney General, she is responsible for directing and supervising the prosecution of all offenses against Vermont's criminal law, including the laws governing ammunition magazines and the waiting period requirement that are at issue in this case. She is a policymaker within the meaning of *Monell*, 436 U.S. at 658 and subsequent jurisprudence. Her official address is: Office of the Attorney General, 109 State Street, Montpelier, VT 05609.

29.     Defendant Sarah George is the State's Attorney for the county of Chittenden, where Plaintiff Powderhorn has its principal place of business and where

9

Paul Dame resides. She is sued in both her personal and official capacities. As State's

Attorney, she is responsible for prosecuting, or directing and supervising the

prosecution of all offenses against Vermont's criminal law, including the laws governing

ammunition magazines and the waiting period requirement that are at issue in this case.

Pursuant to 24 V.S.A. 361 (a), "[a] State's Attorney shall prosecute for offenses

committed within his or her county, and all matters and causes cognizable by the

Supreme and Superior Courts on behalf of the State, [and shall] file informations and

prepare bills of indictment." Defendant George is therefore under an obligation to

prosecute any offense committed within Chittenden County. She is a policymaker within

the meaning of *Monell*, 436 U.S. at 658 and subsequent jurisprudence. Her official

address is: 32 Cherry Street, Suite 305, Burlington, VT 05401.

## IV.   Factual Allegations

***After Bruen, conduct covered by the plain text of the Second Amendment is
presumptively protected and it is the government's difficult burden to prove
any restrictions are part of a constitutional historical tradition.***

30.    The Second Amendment guarantees that "the right of the people to keep

and bears Arms, shall not be infringed." U.S. Const., Amend. II. The phrase "to keep and

bear Arms," according to *Heller* and its progeny, "guarantee[s] the *individual* right to

possess and carry weapons in case of confrontation." *Heller* at 592 (emphasis added).

Preserving the militia in order to guard against tyranny was not the Second

Amendment's only purpose; the right also extends to self-defense. *Heller,* 554 U.S. at

559; *McDonald*, 561 U.S. at 926-27 (*Heller* "stressed that the right was also valued

because the possession of firearms was thought to be essential for self-defense" and that

"self-defense was the central component of the right itself.") (quotations omitted).

31.     These rights are broad and protect "all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582. The right to keep and bear arms protects arms that were or are today "typically possessed by law-abiding citizens for lawful purposes." *Id.*, at 624-25; *Bruen*, 142 S.Ct. at 2132 (modern arms "that facilitate armed self-defense" are protected).

32.     If the plain text of the Second Amendment "covers an individual's conduct," then that conduct is "presumptively protect[ed]." *Bruen*, 142 S.Ct. at 2129-30. It then becomes the State's affirmative burden to "justify the [challenged] regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation" as understood at the founding. *Id.*

33.     It is *not* Plaintiffs' burden to produce their own evidence of the Nation's historical traditions. *Srour v. New York City*, 2023 U.S. Dist. LEXIS 190340, at *14 n.6 (S.D.N.Y. Oct. 24, 2023) ("*Bruen* was clear that this is in fact Defendants' burden.").

34.     "[W]hen it comes to interpreting the Constitution, not all history is created equal ... Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Bruen*, 142 S. Ct. at 2136 (2022) (internal citations omitted).

35.     A governmental practice "should guide our interpretation of an ambiguous constitutional provision" only "where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic." *Bruen*, 142 S. Ct. at 2137.

36.     Under the Supreme Court's approach, history more recent than the Founding and early days of the Republic is constitutionally irrelevant. "[T]o the extent later history contradicts what the text says, the text controls." *Id.* The Supreme Court

11

has "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.*

37.     Indeed, *Bruen* struck down a provision of New York law that had existed in some form or another since 1905. Thus, even a law's long history is irrelevant if such history is of more recent vintage than the Second Amendment itself. The recency of the Vermont efforts to regulate firearms underscores how inconsistent these laws are with the relevant history of firearms regulations.

## *Vermont law forbids ammunition magazines commonly-held for self-defense.*

38.     Vermont's magazine ban unconstitutionally prohibits the purchase or possession of some of the most common firearms in America.

39.     13 V.S.A. § 4021 provides that "[a] person shall not manufacture, possess, transfer, offer for sale, purchase, or receive, or import into this State a large capacity ammunition feeding device," which the statute defines generally as any ammunition feeding device that has the capacity to accept "more than 10 rounds of ammunition for a long gun," or "more than 15 rounds of ammunition for a hand gun." 13 V.S.A. § 4021 (a), (e)(1).

40.     The statutory definition of a "large capacity ammunition feeding device" describes magazines commonly in use for self-defense, to include magazines designed for use in and included as standard equipment with some of the best-selling models of firearms in the United States.

41.     13 V.S.A. § 4021 contains minor exceptions that, *inter alia*, grandfather the possession of magazines "lawfully possessed on or before the effective date [of April

12

11, 2018]" and allowed licensed dealers to lawfully sell their existing stock of magazines if they did so by October 1, 2018. See *id.* § 4021 (c)(1), (c)(2). These minor exceptions do not cure the law's broader constitutional defects and do not protect Plaintiffs from prosecution.

## *Repeating firearm technology existed before the Founding Era and was unregulated.*

42.     Whether a firearm is in "common use" for lawful purposes is the only relevant inquiry under *Heller* and *Bruen*. *Heller*, 557 U.S. at 627 (only firearms not in "common use" may be banned); *Bruen*, 142 S.Ct. at 2128, 2130. Although constitutionally irrelevant, a brief detail of the history of repeating firearm technology shows that it has been both common and unregulated for almost the entirety of this country's history.

43.     The concept of a repeating firearm (in which ammunition is automatically fed into the weapon from a container, detachable or fixed) dates to the earliest technology of firearms. When the Second Amendment was ratified, repeating, including magazine-fed, firearms had been around for a long time. David Kopel, *Firearms Technology and the Original Meaning of the Second Amendment*, Fee Stories, http://tinyurl.com/379wmv69 (last visited October 25, 2023).

44.     Additionally, repeaters, including those with magazines, could have capacities of over ten rounds at least a century before and during the ratification of the Second Amendment. Despite the existence of repeating firearm technology, firearms laws during this time were not directed towards limiting capacity. *Id.*

45.     By the 1630s, a Dutch gun making family, Kalthoff, began experimenting with a design that allowed up to fifteen shots to be fired in rapid succession. It utilized a

13

tubular magazine located in a pistol's butt or a fowling piece's stock to hold powder and balls. This system was so innovative it was reproduced and modified for over 150 years. Also, by mid-seventeenth century in Italy, magazine-fed repeaters were being developed. Jason J. Brown, *Deconstructing the Anti-Gun Second Amendment 'Musket' Myth*, NRA Blog, http://tinyurl.com/wnh89n77 (last visited November 11, 2023).

46.     The Musée de l'Armée exhibits the earliest example of this type of repeating firearm, which was made by Giacomo Berselli of Bologna in the late 1660s. Another of these firearms is on display at the Metropolitan Museum of Art. *Repeating Flintlock Pistol*, the Met, http://tinyurl.com/5yu63fab (last visited November 11, 2023).

47.     Michele Lorenzoni of Florence developed a magazine-fed repeater in the 1600s, known as the Lorenzoni system. See generally Kevin Sweeney, *In Search of Repeating Firearms in Colonial America,* Duke Center for Firearms Law, http://tinyurl.com/mr682fu8 (last visited December 14, 2023).

48.     The Puckle Gun was a tripod mounted multi-barreled flintlock firearm that held 11 rounds. It was patented by James Puckle in 1718—73 years before the Bill of Rights was ratified. Clare Fitzgerald, *Puckle Gun: the Early Machine Gun that fired both Round and Square Bullets*, War History Online, http://tinyurl.com/bds35xvx (last visited Nov. 11, 2023).

49.     The Belton flintlock was a repeating musket that was invented circa 1777 and was capable of shooting as many as 16 rounds in succession. Logan Metesh, *Fact Check: The Founding Fathers Did Know About Repeating Rifles*, Ammo Land, http://tinyurl.com/3s7s68ec (last visited December 14, 2023). Although later canceled, one hundred of an 8-round version were ordered by the Continental Army. *Id*. It was

14

one of numerous multi-shot firearms that were beginning to appear at the end of the
18th Century.

50.    Around 1779, the Girandoni air rifle was developed. It was a repeating arm
that could fire twenty-two rounds from a tubular magazine. Roughly 1,500 of these rifles
were in service with the Austrian military from 1780 to 1815. President Thomas
Jefferson thought so highly of the Girandoni air rifle that he sent one with the Lewis and
Clark Expedition (1804-1806) and it was used by Meriweather Lewis during the
expedition to defend against Indians, which, much like today, was accomplished by the
mere threat of the repeating rifle. According to various reports, whenever a new tribe
was encountered by the expedition, Lewis and Clark staged a grand entrance calculated
to impress (or intimidate). At some point in this process, Lewis would confidently
display his Girandoni and demonstrate its power. During one such encounter, as noted
in a trip journal, Captain Lewis discharged the gun several times "and the Indians ran
hastily to see the holes that the Balls had made which was discharged from it. At finding
the Balls had entered the Tree, they shouted aloud at the sight and the Execution that
suprized [sic] them exceedingly." Frederick Chiaventone, *The Girandoni Air Rifle: The
Lewis & Clark Expedition's Secret Weapon*, 14 Military Heritage 5, 8 (2013). There are
no fewer than 39 separate entries in the expedition's journals mentioning the Girandoni.
*Id.*

51.    In sum, repeating firearms existed during the Founding Era, were sought
after by both the military and the public, and were unregulated by any law. Any modern
notion that the "Founding Fathers" never envisioned higher capacity firearms than the
single shot musket of their day and that the Second Amendment was never intended to
offer protection for higher capacity firearms is without merit.

52.     This is so not only because the U.S. Supreme Court has made clear that the Second Amendment's "reference to 'arms' does not apply 'only [to] those arms in existence in the 18th century,'" *Bruen*, 142 S. Ct. at 2132, but also because the historical record amply demonstrates that modern firearms are not dissimilar from historical firearms known to exist in the Colonial and Revolutionary periods.

### *Historically, weapons with a capacity greater than 10 or 15 rounds have been both common and commonly-used for self-defense.*

53.     The Winchester Model 1892, depending on the cartridge, held up to 17 rounds and could be fired as fast as one could cycle the lever action and pull the trigger. More than a million were sold in the 1800s and used by hunters, ranchers, farmers, and pioneers both to put food on the table and for self-defense. Patti Miller, *A Look at the Past: Winchester Model 1892 Lever Action Rifle*, http://tinyurl.com/4m6yurwr (last visited Nov. 11, 2023).

54.     The most common 1892 with a capacity higher than ten rounds was the Spanish Tigre that was chambered in .44 Largo (.44-40 Win) with 12-round tubes as standard capacity. David Kopel, *Magazines over 10 rounds were well-known to the Founders*, Volokh Conspiracy,  http://tinyurl.com/3p264m9v (last visited October 25, 2023).

55.     The classic Winchester 1873, the "gun that won the West," held 15 rounds in the tubular magazine plus one in the chamber. The "24" version could hold 14 cartridges in its tube, plus one chambered. The "36" model could feed up to 21 rounds. *Id.*

56.     The 1860 Henry, which was commonly used for hunting and self-defense, had a standard capacity of 16 rounds in its magazine plus 1 in the chamber. David Kopel,

*Fast Reloading Guns of the 19th Century*, Volokh Conspiracy,

http://tinyurl.com/36r43jw9 (last visited October 25, 2023).

57.     The Winchester 1894, which sold more than 7 million rifles, had a capacity in many configurations exceeding 10 rounds. *Id.*

58.     The Marlin/Glenfield Model 60 is one of the most produced firearms of all time, and is still in production today. There have been over 11 million of them sold since 1960. They were even marketed by Sears and could be ordered from the catalog and shipped directly to a buyer's home. The standard, tube-fed capacity of the Model 60 is 14-rounds. Derek Odom, *Marlin 60 History: Why it was and Will Always be a Great Rifle to Buy*, Guns.com, http://tinyurl.com/yc6cp5y5 (last visited Nov. 11, 2023).

59.     The Remington Model 8 hit the market in 1900, and over one hundred thousand were produced in the ensuing decades. They were available with 5, 10, and 15 round magazines from the factory. The Model 8 also became popular as a defensive rifle after its adoption by the FBI. Dave Campbell, *The Remington Model 8: a Look Back*, American Rifleman, http://tinyurl.com/4vrf664f (last visited Nov. 11, 2023).

60.     The Browning BAR is also one of the most used hunting rifles of all time and was available from the factory with 20 round magazines. Variants of this same firearm were purchased by the U.S. military and issued to soldiers, even as tens of thousands were legally obtained by civilians. *A Brief History of the Browning BAR*, Browning, http://tinyurl.com/m7zpftn5 (last visited Nov. 11, 2023).

61.     As Pioneers, farmers, and ranchers headed West no one in the United States thought that these now-defined "large capacity" rifles posed an unusual danger, or did not belong in civilian hands, or could be regulated, much less outlawed. These

rifles were considered essential tools of the trade for everyone who hoped to survive the westward flow of "manifest destiny" and general westward expansion.

### *Vermont citizens, including Plaintiffs, are being denied access to modern firearms and magazines commonly used for self-defense.*

62.     In order to survive Second Amendment scrutiny, the government must prove that a firearm regulation that bans a type of weapon prohibits a "dangerous *and* unusual" weapon. *Heller*, 554 U.S. at 627 (emphasis added). This phrase is necessarily conjunctive, because all firearms are potentially dangerous. *Staples v. United States*, 511 U.S. 600, 611 (1994) ("despite their potential for harm, guns generally can be owned in perfect innocence."). Therefore, the "dangerous and unusual" test cannot be reframed as a "dangerous or unusual" test. *Duncan v. Bonta*, No. 17-cv-1017-BEN (JLB), 2023 U.S. Dist. LEXIS 169577 at *39 (S.D. Cal. Sep. 22, 2023). See also *Teter v. Lopez*, 76 F.4th 938, 950 (9th Cir. 2023) ("To determine whether a weapon is dangerous and unusual, we consider whether the weapon has uniquely dangerous propensities *and* whether the weapon is commonly possessed by law-abiding citizens for lawful purposes.") (*emphasis added*).

63.     The so-called "large-capacity magazines" that Vermont has banned are commonly and safely possessed by millions of law-abiding firearms owners nationwide. Yet even assuming, *arguendo*, that these magazines were dangerous, they nevertheless are not "unusual." Therefore, Vermont may not ban LCM's because it cannot prove LCMs are *both* dangerous *and* unusual.

64.     Americans own approximately 415 million firearms, including 171 million handguns, 146 million rifles, and 98 million shotguns. English, William, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* (May 13,

18

2022). Georgetown McDonough School of Business Research Paper No. 4109494, at 2, available at SSRN: https://ssrn.com/abstract=4109494.

65.     Nearly half of American gun owners own magazines that can hold more than ten rounds. *Id.* Handguns with a capacity of greater than 15 rounds are similarly widely deployed for lawful, constitutionally protected purposes.

66.     One of the best-selling rifles in the United States in recent decades has been the ArmaLite Rifle-15 (AR-15) and similar "copycat" designs manufactured by other companies.

67.     About one third of American gun owners own AR-15s or similar rifles, which are commonly equipped with a magazine that carries 30 rounds of ammunition. *Id.* at 33 *et seq.*

68.     Up to 44 million AR-15-style rifles and up to 542 million magazines with capacities exceeding 10 rounds are already in circulation in America. *Id.* at 2. These rifles and LCMs are not just common, they are ubiquitous.

69.     Of the Americans who report owning AR-15-style rifles, two-thirds use them for recreational target shooting, half use them for hunting, and a third use them for competitive shooting. *Id.* at 34. AR-15 style rifles and pistols are widely recommended as effective home defense weapons and they are widely owned by law-abiding citizens for that purpose.

70.     Plaintiff Thompson is a certified firearms instructor and she teaches that AR-15 style weapons are effective firearms for self-defense in the home, especially for people without a lot of experience or training with handguns. She also teaches that magazines with capacities greater than those now permitted by Vermont law are the best choice for home defense

71.     Sales data reinforces scholarly research about what types of firearms are common in America. For example, the Glock 17 is a common pistol sold in America since the 1980s. It is designed to carry a magazine with 17 rounds of ammunition. The best-selling pistol in November 2023 was the Kel-Tec P17, which is designed to carry a magazine containing 16 rounds of ammunition (plus one in the chamber). GUNS.COM, *Best Selling Handguns*, http://tinyurl.com/388sxx24 (last visited Dec. 14, 2023).

72.     The magazines Vermont has banned are also lawfully owned by the tens of millions across the United States. Indeed, rifle magazines capable of holding more than 10 rounds make up nearly half of the total stock of magazines owned by law-abiding citizens, and pistol magazines that hold more than 15 rounds come standard on many of the nation's most popular pistols. English, William, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* (May 13, 2022). Georgetown McDonough School of Business Research Paper No. 4109494, at 2, available at SSRN: https://ssrn.com/abstract=4109494.

73.     Roughly a third of firearms owners own or have owned a handgun magazine capable of holding more than 15 rounds, and roughly a fifth of firearms owners have owned a rifle magazine with a capacity of greater than 15 rounds. English, William, *2021 National Firearms Survey: Analysis of Magazine Ownership and Use*, Georgetown McDonough School of Business Research Paper No. 4444288, at 1, available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4444288.

74.     The top five best-selling rifles in November 2023 carry magazines containing over ten rounds of ammunition. These rifles were the FN FN-15 SRP G2, the Century Arms CGR, the Kel-Tec Sub 2000 (which accepts Glock handgun magazines),

the Smith & Wesson FPC, and the ATI Milsport. GUNS.COM, *Top Selling Rifles & Carbines*, last visited http://tinyurl.com/388sxx24 (last accessed Dec. 14. 2023).

75.     Many other long guns sold today come standard with magazines with more than 10 rounds capacity. These include the Kel-Tec KSG shotgun (14 rounds), the Tavor X95 (30 rounds), the Knights Armament SR-25 (20 rounds), SR-15 (30 rounds), Beretta ARX-100 (30 rounds), Sig Sauer 716 (20 rounds), HK MR556 (30 rounds), and about a dozen others that are sold throughout the United States. The AR-15 weapons platform, which comes standard with 30 round magazines, has hundreds of variants made by dozens of manufacturers.

76.     Additionally, several common shotguns have integral fixed magazines that are part of the gun, not readily removable without a gunsmith, that can carry more than 10 rounds of mini shotgun shells.

77.     Vermont's magazine ban effectively prohibits an entire class of firearms – rifles and pistols that hold and shoot more than 10 and 15 rounds, respectively. It is, however, binding precedent within this Circuit that such firearms and magazines are "in common use" within the meaning of *Heller. New York State Rifle & Pistol Assoc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) (assault weapons and large capacity magazines are in "common use"). Firearms in "common use" are protected by the Second Amendment and cannot be banned. *Heller* 554 U.S. at 628; *Bruen*, 142 S.Ct. at 2132 (the Second Amendment protects "modern instruments that facilitate armed self-defense").

78.     Indeed, as the Supreme Court held in *Bruen*, "[w]hatever the likelihood that handguns were considered 'dangerous and unusual' during the colonial period, they are indisputably in 'common use' for self-defense today... Thus, even if... colonial laws prohibited the carrying of handguns because they were considered 'dangerous and

21

unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today..." *Bruen*, 142 S. Ct. at 2143.

79.     As recently as 2015, while grappling with a New York statute that banned "assault weapons" and magazines with a capacity above 10 rounds, the Second Circuit acknowledged "[t]his much is clear: Americans own millions of the firearms that the legislation prohibits.... Even accepting the most conservative estimates cited by the parties and by *amici*, the assault weapons and large capacity magazines at issue are 'in common use' as that term was used in *Heller*." *Cuomo*, 804 F.3d at 255;[3] *Bruen*, 142 S.Ct. at 2143 (weapons in "common use" today are protected by the Second Amendment); *Heller*, 554 U.S. at 627 (only arms that are not "the sorts of weapons . . . in common use at the time" may be banned) (cleaned up).

80.     Therefore, regardless of whether the banned magazines (or the class of firearms able to shoot more than 10 or 15 rounds without reloading) may have been "dangerous and unusual" or "in common use" at some time in history is constitutionally irrelevant if such firearms are "in common use" today. It is indisputable, based on the statistics referenced above, *Cuomo*'s binding precedent, and common-sense, that Plaintiffs seek to possess and transfer weaponry that is in "common use" as that term was used in *Heller*.

---

[3] The *Cuomo* court upheld a ten-round limit for magazines, but struck down a seven-round "load limit" for such magazines. *Cuomo*, 804 F.3d at 264 (2d Cir. 2015). Insofar as both of those findings were based on intermediate scrutiny and the two-step tests expressly rejected in *Bruen*, the *Cuomo* case can no longer be cited for its ultimate result. The *Cuomo* court's factual findings regarding assault rifles and LCM's, however, are unaffected by *Bruen* and remain valid.

*Magazines are an integral part of firearms.*

81.     Magazine fed firearms are systems with many parts that must function perfectly together in order to operate properly, and the ammunition feeding device is critical to the overall performance and success of the firearm.

82.     To this day, especially in modern handguns, the magazine is often the cornerstone of a pistol's design. Engineers will start a new pistol project with the magazine. The ammunition feeding device must be optimized to reliably deliver cartridges into the operating system. The engineers must consider the dimensions of the cartridge, with specific attention to the cartridge case being either a straight wall or a tapered case, and angles at which the magazine presents cartridges to the action. The manner in which the magazine and action interface is critical. The remainder of the firearm design builds upon the foundation laid by the magazine's form.

83.     Many, if not most, modern rifles and pistols are built around a magazine designed to hold more than 10 and 15 rounds, respectively.

84.     A firearm without a functional magazine is of little use to an owner, and of little value to another consumer.

85.     The magazine is correctly considered an integral part of the firearm, not merely an accessory, and is required for the proper functioning of the firearm.

86.     A ban on magazines is effectively a ban on a class of firearms (those that shoot more than 10 and 15 rounds without reloading), and undermines the purpose of the Second Amendment and its plain text.

87.     The broader regulatory scheme is consistent with the commonsense notion that magazines are necessary and integral components of firearms. For example,

23

the magazine is considered a "component part" of the firearm and taxed on that basis. 27 C.F.R. 53.61 (b)(5)(ii).

### *Magazine size is a critical component of self-defense.*

88.     The majority of confrontations between criminals and armed persons defending themselves involve no firing of shots. In fact, 80 percent of defensive gun uses do not involve a shot being fired. Tim Hsaio, *Guns used more for self-defense than crimes*, Washington Times, Oct. 5, 2021, http://tinyurl.com/y8vnmzdz (last visited October 25, 2023). This statistic does not mean that an unloaded gun is useful for self-defense, rather it and common sense teaches that crime victims who are armed with more rounds are more likely to deter an attack and to never need to fire a shot. And for those criminals who are not deterred, the better armed crime victims are more likely to successfully defend themselves.

89.     As but one example of magazine size being critical for self-defense, and without limitation: In the early morning of August 14, 2014, the Coker family's home in Jacksonville, Florida was invaded by a gang member intent on armed robbery. Mr. Coker used all the ammunition in his 5-shot .38 special without disabling the attacker. Mr. Coker ended up in a wrestling match with the invader and luckily survived because his wife brought another gun to the fight and other gang members abandoned the robbery. Massad Ayoob, *Home Invasion: The Coker Family Incident,* American Handgunner, http://tinyurl.com/mujnzvw5 (last visited October 25, 2023). The lesson to be learned from this example is that it is better to have more, not fewer, rounds when defending yourself, especially against an armed attacker or attackers.

90.     The Coker example is emblematic of a broader principle that LCMs are more effective for self-defense and other lawful purposes than low-capacity magazines.

24

Those facing multiple assailants are especially likely to rely upon LCMs for self-defense. For the many millions of times firearms have been used in America for self-defense, it is difficult to know the number of times crime victims fire more than 10 rounds because the number of rounds fired is rarely reported and, if reported, is usually described only as "multiple shots fired." Under *Bruen*, however, it does not matter. All that matters is that rifles and pistols capable of holding and shooting more than 10 and 15 rounds, respectively, are "typically possessed" for lawful purposes. *Heller*, 554 U.S. at 624-25.

### *Vermont's waiting period impermissibly prevents law-abiding citizens from exercising their Second Amendment Rights.*

91.     13 V.S.A. §4019a prohibits the transfer of "a firearm to another person until 72 hours after the licensed dealer facilitating the transfer is provided with a unique identification number for the transfer by the National Instant Criminal background Check System (NICS) or seven business days have elapsed since the dealer contacted NICS to initiate the background check, whichever occurs first."

92.     Vermont's method of enforcing this statutory waiting period involves the threat of prosecution for the transferor and not the transferee. Thus, although the statute targets the constitutional right to keep and bear arms of Vermont citizens, its enforcement is aimed at third parties who necessarily already possess, but are prohibited from relinquishing, a particular firearm.

93.     No governmental activity occurs during this delay, which was initially proposed under the unsupported theory that the delay will reduce suicides. Later the legislature changed the bill's title to claim that it was also intended to reduce "community violence."

25

94.    From 2011 through 2020, (based on federal background checks) over 376,000 new firearms were purchased by Vermonters, in addition to an unknown number of re-sales, transfers, and lawful out-of-state purchases. *NICS Firearm Checks: Month/Year by State*, FBI.GOV, http://tinyurl.com/vd8dhsnf (last visited Nov. 5, 2023). Yet during this entire period, Vermont's rate of firearm suicides remained steady at around 10 per 100,000 residents. *WISQARS Fatal and Nonfatal Injury Reports*, CDC.GOV, https://wisqars.cdc.gov/reports/ (last visited Nov. 5, 2023). Nearly 400,000 gun purchases, unencumbered by a waiting period, had no impact on the state's firearm suicide rate, which means the new law will not achieve its asserted policy goal.

95.    There are no exceptions in Vermont's law for people who already own firearms or who have access to firearms, which precludes any possible public policy benefit for most purchasers in Vermont, where gun ownership is widespread. *Silvester v. Becerra*, 138 S. Ct. 945, 948-49 (2018) (Thomas, J, dissenting from denial of certiorari) ("'Common sense' tells us waiting periods for those who already own firearms are useless."). There are also no exceptions for non-suicidal people, or citizens with an immediate need for self-defense who wish to timely exercise their Second Amendment rights.

96.    Of course, none of these policy arguments matter. They are irrelevant because *Bruen* did away once and for all with the policy balancing tests that courts erroneously employed pre- and post-*Heller*. Indeed, Bruen expressly held that "[t]he Second Amendment 'is the very product of an interest balancing by the people,'" 142 S. Ct. at 2131, and the *Bruen* test leaves no further balancing to be conducted by the legislature or the courts. Even if the subjective balancing of interests was still allowed, Vermont's waiting period likely could not survive intermediate scrutiny or even rational

26

basis review. It most certainly cannot survive the robust test required by *Bruen*, which is guided by objective history.

### *There is no relevant history of firearms regulations governing magazine capacity, firearms in lawful "common use," or imposing waiting periods for the purchase of firearms.*

97.     Firearms regulation in the United States is not a history of faithful compliance with Constitutional guarantees, but is instead a shameful history of racism, bigotry, and oppression. To the extent they were adopted at all, firearm laws were largely motivated by race and directed towards restricting access to enslaved, Native, and free Black peoples, as well as other people of color.

98.     For example, in 1640, Virginia law stated, "that all such free Mulattoes, Negroes and Indians...shall appear without arms." Steve Ekwall, *The Racist Origins of US Gun Control*, http://tinyurl.com/55tz3b2d (last visited Nov. 2, 2023). South Carolina enacted similar bans in 1712. *Id.*

99.     Despite the existence of repeating firearms technology, Founding Era firearms laws were not directed toward limiting magazine capacity.

100.    Firearms capable of shooting more than 10 and 15 rounds without reloading are in "common use' today for lawful purposes, and the Supreme Court has held that there is no relevant historical support for banning such firearms.

101.    Founding Era laws also did not impose a waiting period before a law-abiding citizen could purchase a firearm. Vermont's waiting period for firearm purchasers is not just out of step with historical tradition, but also with jurisprudence arising from other state's similar attempts to impose such a waiting period. For example, in *Silvester*, 138 S. Ct. at 948-49 (2018) (Thomas, J., dissenting from denial of certiorari), Justice Thomas examined the then-extant waiting periods nationwide and

27

agreed with the District Court, which itself had "found that waiting periods do not have

a long historical pedigree." *Id.*

102.    The only difference between Vermont's waiting period and that imposed

by the State of California and rejected by the U.S. District Court in *Silvester v. Becerra*,

sub nom. *Silvester v. Harris*, 41 F. Supp. 3d 927 (E.D. Cal. 2014), is that California's

waiting period was of a slightly longer minimal duration (10 days).[4] In fact, a handgun

licensing requirement that prevented citizens from their right to immediately possess a

protected type of firearm was recently overturned because the government of Maryland

was unable to produce "relevantly similar" historical evidence to justify the law. *Md.*

*Shall Issue, Inc. v. Moore*, Nos. 21-2017, 21-2053, 2023 U.S. App. LEXIS 30955, *10

(4th Cir. Nov. 21, 2023) (striking down a Maryland "Handgun Qualification License"

regime).

## The Impact of the Ban on Plaintiffs

### *Vermont's magazine ban has caused injury to Plaintiffs by unconstitutionally infringing on their Second Amendment Rights.*

103.    The ammunition magazines now categorized as "large capacity" are and

have been commonly owned and used by law-abiding citizens in Vermont and

throughout the United States for lawful purposes, including self-defense and target

practice.

---

[4] Although the Ninth Circuit affirmed the Constitutionality of California's waiting period pre-*Bruen*, *Silvester v. Harris*, 843 F.3d 816 (9th Cir. 2016), even that court now acknowledges that its approach was abrogated by the *Bruen* decision and has no further vitality. *Baird v. Bonta*, No. 23-15016, 2023 U.S. App. LEXIS 23760, at *12 (9th Cir. Sep. 7, 2023) (explaining the history of Ninth Circuit jurisprudence and that "[i]n *Bruen*, the Supreme Court expressly rejected the use of such means-end scrutiny in the Second Amendment context.").

104.    All Plaintiffs desire to possess or have ready access to now-banned, but commonly-used firearms and ammunition magazines for defensive and other constitutionally protected purposes.

105.    All Plaintiffs regularly travel through and within Chittenden County, and/or conduct business in Chittenden County, and propose to engage in constitutionally protected conduct in Chittenden County and elsewhere in Vermont.

106.    All Plaintiffs reasonably fear prosecution, imprisonment, and other punishment if they purchase, possess, or transfer commonly-owned but now proscribed magazines within the borders of Vermont. 13 V.S.A. § 4021(b) (An individual who sells, transfers, or possesses a magazine in violation of the ban is subject to imprisonment for up to one year, a fine of up to $500, or both).

107.    All Plaintiffs anticipate wanting or needing to purchase magazines and firearms capable of holding more cartridges than are currently allowed by law and, for those who already have such magazines, needing to purchase additional prohibited magazines due to breakage, wear, as backup, or for new firearms.

108.    VTFSC is organized for the purpose of promoting and encouraging hunting, fishing, trapping, and competitive target shooting. It also educates the public and lobbies the government on issues related to these and other types of sportsmanship in Vermont. Because many of the activities promoted by VTFSC, and engaged in by their member clubs and those clubs' members, involve the use of magazines now deemed "large capacity," Vermont's ban on the purchase, transfer, or possession of these magazines is a direct affront to VTFSC's mission.

109.    VTFSC's 45 member clubs regularly conduct competitions, shooting matches, and other events that involve the use of the common magazines now

29

prohibited by Vermont. Because of the popularity of the events that involve these magazines, those member clubs reasonably fear that participation will be curtailed by Vermont's ban. While the ban allows individuals from other states that permit the possession of the prohibited magazines to bring them into Vermont for the purpose of participating in established shooting competitions, these clubs nonetheless reasonably expect a decrease in participation as the number of magazines legally owned within the State dwindles. Member clubs charge for participation in these events. Therefore, they reasonably fear that this decline in participation will harm their income.

110.   VTFSC's member clubs have as members thousands of law-abiding adult citizens who reside in Vermont. Many of those members desire to purchase and possess the banned magazines to use them for lawful purposes. These members do not fall within any of the exceptions enumerated in 13 V.S.A. § 4021(d). In this suit, VTFSC represents the interests of the members of its member-clubs, and who are too numerous to conveniently bring this action individually. In addition to their standing as citizens and taxpayers, those members' interests include their wish to exercise their constitutionally protected right to keep and bear arms without being subjected to criminal prosecution.

111.   Some of these members did not own any of the prohibited magazines as of Section 4021's effective date and would like to purchase them for lawful purposes but are now prevented from doing so by Vermont law. Some members who currently own prohibited magazines will be prevented from purchasing additional or replacement magazines when grandfathered magazines break. Some members expect to purchase new firearms that accommodate prohibited magazines or will only be able to acquire those that also come with small magazines.

30

112.    Many of these members previously purchased magazines and firearms equipped with now-banned magazines. But for Section 4021 and a reasonable fear of prosecution and punishment, they would continue to acquire, possess, and transfer banned magazines and firearms that only come with banned magazines. Section 4021's ban therefore infringes on the constitutional rights of these members.

113.    VTFSC's FFL members have previously sold magazines and firearms that come equipped with magazines that are now proscribed by Section 4021. Vermont law now prevents them from selling these magazines and firearms, which has harmed their profits and the constitutional rights of their customers. But for these laws and the fear of prosecution, these FFLs would stock and sell the otherwise available firearms and banned magazines. The FFL's also fear the loss of their federal firearms licenses if they violate state firearms laws.

114.    For many years, Powderhorn and Black Dog sold long-gun magazines with a capacity greater than 10, handgun magazines with a capacity greater than 15, and firearms that come equipped with magazines with capacities greater than allowed by Section 4021. These magazine and firearm sales have historically made up a substantial and profitable portion of Powderhorn's and Black Dog's businesses.

115.    Because of Vermont's 2018 ban, Powderhorn and Black Dog had to stop selling some of their most popular merchandise. Powderhorn and Black Dog have now been forbidden for more than five years from selling LCMs, including magazines that would otherwise be sold standard with common and popular firearms. The damage to Powderhorn's and Black Dog's constitutional rights and to their ability to serve customer demand grows with each passing day.

116.     Powderhorn and Black Dog seek to sell, as part of their businesses, commonly-used defensive firearms, such as those described above. Powderhorn and Black Dog allege that due to the magazine ban, they are currently forbidden to sell some of the most popular firearms in America from their retail locations in Vermont, and that their revenues have been harmed by the legal inability to sell these popular firearms. Powderhorn and Black Dog also allege that their sales have suffered because they are unable to offer for sale certain firearms in their most popular configuration with their designed magazine capacity. Powderhorn and Black Dog bring this action to protect the constitutional rights of their customers to acquire the prohibited magazines and these firearms as they were designed.

117.     Powderhorn and Black Dog would stock and sell the otherwise-available firearms and banned magazines, but for their fear of being prosecuted by Defendants and punished. Powderhorn and Black Dog, as FFLs, are also subject to administrative penalties, including the loss of their federal firearms licenses, if they violate state firearms law.

118.     Mr. Dame is a law-abiding citizen who meets all the qualifications required under state and federal law to purchase a firearm magazine—apart from the challenged ban—and he does not fall within any of the exceptions enumerated in 13 V.S.A. § 4021(d). He does not currently own a firearm, but he owns two banned (but grandfathered) magazines for an AR-15 he plans to purchase in the future. But for Vermont's restrictions and a reasonable fear of prosecution and punishment, when he does purchase firearms, Mr. Dame would purchase ones with magazines with capacities that are now prohibited by Vermont law. He would also purchase extra magazines with above allowed capacities.

119.    Ms. Thompson would, but for Vermont's restrictions and a reasonable fear

of prosecution and punishment, purchase firearms with designed magazine capacities

above those allowed under Vermont law. She would also purchase banned magazines for

both rifles and handguns. Ms. Thompson would purchase these firearms for herself and

for use in her shooting instruction classes. She would also recommend that her students

purchase firearms with magazines with capacities exceeding those allowed by law.

Additionally, she anticipates that her current supply of grandfathered, legal magazines

will break or wear out and that she will be unable to legally replace those items,

rendering her firearms inoperable or significantly limited in effectiveness.

## The Impact of the Waiting Period on Plaintiffs

### *Vermont's firearms transfer waiting period has caused injury to Plaintiffs by unconstitutionally infringing on their Second Amendment Rights.*

120.    Vermont's waiting period unconstitutionally delays law-abiding citizens

from taking possession of a firearm and impermissibly punishes FFLs and others who

transfer firearms.

121.    All Plaintiffs reasonably fear imprisonment and other punishment if they

transfer firearms in violation of the waiting period. 13 V.S.A. § 4019a(b) (Any person

who transfers a firearm in violation of the waiting period is subject to imprisonment for

up to one year, a fine of up to $500, or both). Plaintiffs face a credible threat of

prosecution not only because the laws complained of herein remain on the books, but

also because the defendants have taken oaths to enforce such laws.

122.    Second Circuit jurisprudence presumes that the government will enforce

the laws at issue in this case "in the absence of a disavowal by the government."

33

*Antonyuk v. Chiumento*, Nos. 22-2908, 22-2972, 22-2933, 22-2987, 22-3237, 2023 U.S.
App. LEXIS 32492, at *117 (2d Cir. Dec. 8, 2023) (cleaned up).

123.    But for Vermont's waiting period; and the reasonable fear of prosecution
of themselves or their transferor and subsequent punishment for violating such
provisions, Plaintiffs would acquire and transfer firearms without any governmentally-
imposed delay for in-home and outside self-defense and other lawful purposes.

124.    The State's decision to impose a delay on Plaintiffs' ability to exercise
Second Amendment rights is effectively a denial of such rights for a certain and non-
purposeful period of time. By way of analogy: if the State imposed a 72-hour ban on the
exercise of Freedom of Speech, it would not cure the constitutional injury to allow a
speaker to speak freely thereafter. In many instances, a right delayed is effectively a
right denied, and the later ability to exercise a right does not cure the harm that is
caused by the present inability to exercise that same right.

125.    VTFSC and its member clubs arrange and participate in events at which
specific types of firearms are used, including occasional events for which there is less
than 72 hours' notice, or previously posted events that are not noticed by interested
parties until within 72 hours of an event. Therefore, Vermont's waiting period deprives
VTFSC and its members (and its prospective members) of their constitutional rights by
diminishing the opportunity to participate in and enjoy all of the activities of the
organization.

126.    The waiting period also undermines VTFSC's fundraising efforts by it and
its member clubs. VTFSC's member clubs hold events at which firearms are auctioned
off or given away as prizes to otherwise-qualified and background-checked citizens.
Those clubs also host gun shows, which are a major source of revenue and recruitment.

An exception to the 72-hour waiting period for these gun shows is set to expire on July 1, 2024, 13 V.S.A. § 4019a(e)(3), which will prevent the transfer of firearms at these shows. Potential participants will be discouraged from attending these events by the prospect of having to drive all the way back to the venue to retrieve an awarded firearm. VTFSC and its member clubs reasonably fear that attendance at its events will be negatively impacted by the loss of these major draws, hurting their fundraising and recruitment.

127.    The VTFSC's clubs' members fear prosecution and face a credible threat of prosecution. But for the challenged law and the fear of prosecution, members would acquire and transfer firearms in violation of the waiting period requirement.

128.    Powderhorn and Black Dog are being forced by the new law to store and secure firearms for customers for at least 72 hours, which uses valuable storage space and creates an unnecessary financial and administrative burden on their businesses.

129.    The waiting period negatively impacts Powderhorn's and Black Dog's ability to sell firearms. Interested and lawful buyers of firearms are less likely to do business with Powderhorn and Black Dog because the law makes a return trip necessary and the delay discourages spontaneous purchases. These new restrictions will also curtail sales from sportsmen who have come to Vermont for the various hunting seasons and immediately want or need a new firearm. In fact, Powderhorn and Black Dog have lost sales and anticipate losing more due to the waiting period, especially long gun sales to out of state visitors.

130.    Powderhorn and Black Dog, as FFLs, in addition to the law's state criminal penalties, are also subject to federal administrative penalties, including the loss of their federal firearms license, if they violate state firearms law by failing to abide by the law's waiting period requirement.

131.    If not for this law and the credible threat of prosecution and punishment from Defendants, Powderhorn and Black Dog would deliver firearms purchased by their customers without waiting beyond the time needed to comply with the federal background check law.

132.    Powderhorn's and Black Dog's interests are aligned with their customers. Powderhorn and Black Dog want to sell firearms and transfer them immediately, and customers want to take immediate custody of the products that they have purchased. Because of the statutory enforcement method of the waiting period that primarily targets licensed dealers, Powderhorn and Black Dog sue to enforce the constitutional rights of their customers, and not simply to protect their own constitutional rights. Powderhorn and Black Dog are better able to vindicate the constitutional rights of their customers than those customers are in their individual capacities because Powderhorn and Black Dog would be the targets of potential prosecutions arising from the regulatory scheme that Vermont has enacted to prevent those customers from lawfully exercising their own rights.

133.    Furthermore, Powderhorn and Black Dog are injured again and again by the laws that are at issue in this case, but a customer might find it uneconomical to spend many thousands of dollars to sue for the right to immediately possess a firearm that costs less than a thousand dollars.

134.    Mr. Dame does not currently own a firearm, but plans to purchase firearms in the future, including long guns and pistols. He meets all the qualifications required under state and federal law to purchase a firearm and without the waiting period could purchase one on short notice. However, he fears he may need to obtain a firearm on short notice if there is a sudden threat of violence to him or his family due to

36

his political activities. He is the Chairman of the Vermont Republican Party and, unfortunately, threats of violence have become a common part of political discourse in the United States.

135.    Prior to passage of the waiting period law, Mr. Dame has relied on the fact that his Second Amendment rights entitle him to the ability to quickly purchase a firearm if needed for self-defense; he knew he could walk into a gun store and walk out with a new firearm that same day. But for the waiting period law, when Mr. Dame does purchase firearms, he would take immediate possession of those firearms after passing a federal background check.

136.    Mr. Dame has a young family and other financial priorities, but he fears the law will prevent him from purchasing a firearm in time to properly respond to a threat of violence against him or his family. As a result, he may be compelled by the law to purchase a firearm before he is ready, which would bring with it other obligations, such as the purchase of ammunition and a gun safe. 13 V.S.A. § 4024 (imposing criminal penalties for failure to store firearms in conformity with statute). These are time, resource, and responsibility commitments that he would not have to incur but for the Vermont laws at issue herein and Defendants' enforcement of such laws.

137.    Plaintiff Thompson intends to purchase firearms in the future for herself and for use in her firearms instruction classes. But for Vermont's waiting period she would make these purchases and immediately take possession of those firearms as soon as the federal background check cleared her for purchase. Under the new law, however, she will be forced to wait at least 72 hours before taking possession of her firearms and she will be required to take another trip to the gun store to obtain her new firearms. These delays unconstitutionally dilute, diminish, and interfere with her rights.

## V. Legal Arguments

138.    Plaintiffs are entitled to relief in the form of nominal damages, preliminary and permanent injunctive relief, declaratory relief, and an award of attorney's fees.

139.    Plaintiffs' entitlement to relief is grounded in both statutory and constitutional law.

### *Plaintiffs are Entitled to a Preliminary Injunction.*

140.    Plaintiffs are entitled to preliminary injunctive relief which will protect them from arrest and prosecution under unlawful statutes while this litigation is pending.

141.    "[T]o obtain a preliminary injunction against governmental action taken pursuant to a statute, the movant must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction. The movant also must show that the balance of equities tips in his or her favor." *Yang v. Kosinski*, 960 F.3d 119, 127 (2d Cir. 2020). When only governmental actors are Defendants, the balance-of-equities and public interest factors "merge." *Hartford Courant Co., LLC v. Carroll*, 986 F.3d 211, 224 (2d Cir. 2021) citing and quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009).

142.    Plaintiffs will be irreparably harmed absent a preliminary injunction because with each passing day they are further deprived of their constitutional rights as described herein, and because the chilling effect of enforcement of the unconstitutional edicts described herein is such that they are fearful to engage in lawful and protected conduct. There is a "presumption of irreparable injury that flows from a violation of constitutional rights." *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996).

143.    Plaintiffs will likely succeed on the merits of their claim because their proposed conduct is protected by the Second Amendment and because the State can demonstrate no relevant historical tradition of firearms regulation which is consistent with or analogous to the statutes at issue herein. Defendants have the burden of proof, but they cannot carry it. *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004) ("As the Government bears the burden of proof on the ultimate question of... constitutionality, [plaintiffs] must be deemed likely to prevail unless the Government has" carried that burden).

144.    Because only governmental actors are Defendants in this matter, the balance-of-equities and public interest factors "merge." *Hartford*, 986 F.3d at 224, citing and quoting *Nken*, 556 U.S. at 435. This is so because "[n]o public interest is served by maintaining an unconstitutional policy..." *Agudath Isr. v. Cuomo*, 983 F.3d 620, 637 (2d Cir. 2020), and because "[a]lthough... the State has an interest in administering its laws... that interest is diminished when the laws at issue likely impinge [a] federal constitutional right." *A.H. v. French*, 985 F.3d 165, 184 (2d Cir. 2021).

145.    Because each factor of the preliminary injunction analysis tips in Plaintiffs' favor, the balance of the equities also favors Plaintiffs, and they are entitled to issuance of a preliminary injunction against Defendants.

### *Plaintiffs are Entitled to a Permanent Injunction.*

146.    Enforcement of the Vermont statutes described herein violates Plaintiffs' rights under the Second Amendment, and the Due Process Clause by:

> a.  proscribing the acquisition, possession, and use of firearm magazines that are "typically possessed and commonly used by law-abiding citizens for lawful purposes" nationwide; and

39

      b.  preventing the transfer of firearms to law-abiding citizens for at least 72 hours and up to seven business days.

147.    If not enjoined by this Court, Defendants will enforce Vermont laws in derogation of Plaintiffs' constitutional rights, which will cause Plaintiffs to suffer constitutional injury.

148.    Absent a permanent injunction, Plaintiffs have no adequate remedy at law. Damages are indeterminate or unascertainable and, in any event, would not fully redress any harm suffered by Plaintiffs because they are unable to engage in constitutionally protected activity if these constitutionally offensive provisions of Vermont law are enforced by Defendants.

149.    An injunction is therefore appropriate under the inherent equitable powers of the Court.

150.    Additionally, Plaintiffs are entitled to injunctive relief under 42 U.S.C. § 1983 pursuant to *Shain v. Ellison*, 356 F.3d 211, 216 (2d Cir. 2004) (holding that "a plaintiff seeking injunctive relief [under Section 1983] must demonstrate both a likelihood of future harm [from unconstitutional conduct] and the existence of an official policy or its equivalent.").

151.    Here, all Plaintiffs seek injunctive relief as against all Defendants, because each Plaintiff will continue to face a credible fear of prosecution by Defendants if they engage in constitutionally protected activity as described herein and will continue to be chilled in the respective exercise of their constitutional rights in the absence of permanent injunctive relief.

***Plaintiffs are Entitled to Relief Under 42 U.S.C. § 1983.***

152.    In order to state a claim pursuant to 42 U.S.C. § 1983, a plaintiff must allege "(1) that some person has deprived him of a federal right, and (2) that the person who has deprived him of that right acted under color of state ... law." *Velez v. Levy*, 401 F.3d 75, 84 (2d Cir. 2005) (quoting *Gomez v. Toledo*, 446 U.S. 635, 640 (1980) (internal quotations omitted)). "Section 1983 is not itself a source of substantive rights[,] but merely provides a method for vindicating federal rights elsewhere conferred[.]" *Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).

153.    In this case, Plaintiffs allege that each Defendant has deprived each Plaintiff of federal rights under the Second Amendment and Due Process Clause. These deprivations are expected to continue indefinitely in the absence of judicial relief.

154.    Plaintiffs further allege that this deprivation is rooted in the enforcement of Vermont law. A sister court in this Circuit has already held that the Second Amendment is a federal right redressable under Section 1983. *Burke v. Vision Gov't Solutions, Inc.*, 433 F. Supp. 3d 380, 389 (D. Conn. 2020) (examining alleged violation of Second Amendment rights under the § 1983 framework, while declining to similarly analyze claims arising from the state constitution).

155.    All Defendants are "persons" within the meaning of Section 1983. To the extent that any Defendant is sued in an official capacity and this Court construes an official capacity claim as a *Monell* claim, see, e.g, *Lamothe v. Brown*, 2023 U.S. Dist. LEXIS 10408, *37 (D. Vt. 2023) ("claims against a government employee in his official capacity are treated as claims against the municipality."), Plaintiffs allege that each Defendant has an official policy and practice requiring their subordinates to enforce the

41

provisions of the Vermont statutes in their entirety and also allege that each Defendant is a policymaker in his or her own right. See, e.g., *McMillian v. Monroe Cnty*, 520 U.S. 781, 785 (1997) (officials who have the power to set policy on a particular issue are subject to liability under §1983 post-*Monell*).

## *Plaintiffs are entitled to nominal damages.*

156.    Even in the absence of actual damages from a violation of constitutional rights, the Second Circuit has consistently held that nominal damages should issue. *Vincent v. Annucci*, 63 F.4th 145, 151 (2d Cir. 2023) (internal citations omitted).

157.    Plaintiffs seek nominal damages against all Defendants in their personal capacities only.

158.    Plaintiffs do not seek nominal damages against any Defendant in his or her official capacity.

## *Defendants are liable in both their official and personal capacities.*

159.    Plaintiffs allege that each Defendant is personally liable under 42 U.S.C. § 1983. *Zawacki v. Colorado Springs*, 759 F. Supp. 655, 659 (D. Colo. 1991) ("Section 1983 personal capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law.").

160.    Plaintiffs additionally allege that each Defendant is liable in his or her official capacity pursuant to 42 U.S.C. § 1983. *Id.* See also *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 98 (2d Cir. 2020) (finding that *Monell* liability exists when an official acts on behalf of a governmental entity).

161.    Plaintiffs allege that each Defendant, acting under color of Vermont law, is depriving Plaintiffs of their rights as set forth herein, including but not limited to each Plaintiff's rights under the Second Amendment and the Due Process Clause, and that

such deprivations are expected to continue indefinitely in the absence of judicial relief. This gives rise to personal lability under 42 U.S.C. § 1983. *Id.* at 659-660.

162.    Plaintiffs additionally allege that the policy of Vermont, and of each Defendant's respective offices, and of Defendants themselves in their role as policymakers empowered by Vermont law, is to enforce the laws complained of herein, which are in derogation of the constitutional rights of each Plaintiff.

163.    Defendant Birmingham, as Director of the Vermont State Police, acts as a policymaker with respect to enforcement of criminal law in the State.

164.    The Attorney General of Vermont acts as a policymaker in setting the policy for enforcement of criminal law statewide, and also acts as a policymaker in supervising the actions of the State's Attorneys.

165.    Defendant George, as a State's Attorney, acts as a policymaker with respect to the enforcement of criminal law in Chittenden County.

166.    Plaintiffs acknowledge that "Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states." See *Quern v. Jordan*, 440 U.S. 332, 340-41, 99 S. Ct. 1139, 59 L. Ed. 2d 358 (1979). Therefore, to the extent any Defendant successfully claims he or she is a state actor entitled to the protection of the 11th Amendment, Plaintiffs nevertheless rely upon *Ex Parte Young*, as more fully set forth below, for the proposition that injunctive relief as against such Defendant is appropriate.

167.    Plaintiffs seek relief against all Defendants in both their personal and official capacities.

***Ex Parte Young empowers this Court to grant relief against Vermont and
its officials.***

168.    Generally, "[w]ithout a State's express waiver or an act by Congress under
Section 5 of the Fourteenth Amendment, the Eleventh Amendment bars federal courts
from adjudicating claims against a State, as well as its agencies and agents." *Will v.
Michigan Dep't of State Police*, 491 U.S. 58, 66 (1989).

169.    However, one critical exception to this general rule exists for claims for
prospective relief against state officials in their official capacities.  *74 Pinehurst LLC v.
New York*, 59 F.4th 557, 570 (2d Cir. 2023), citing *Ex parte Young*, 209 U.S. at 159-60.

170.    Plaintiffs seek, pursuant to *Ex Parte Young* and subsequent jurisprudence,
prospective relief against each Defendant in their official capacities in the form of an
order enjoining Defendants and their agents from taking actions to enforce the
provisions of 13 V.S.A. §§ 4019a and 4021 against Plaintiffs.

***Plaintiffs are entitled to a declaratory judgment.***

171.    Plaintiffs allege they are entitled to relief pursuant to Section 2201 of the
Declaratory Judgment Act, which empowers this Court to "declare the rights and other
legal relations of any interested party seeking such declaration." 28 U.S.C.A. § 2201 (a).

172.    This Court should exercise its jurisdiction to award a Declaratory
Judgment. *Continental Cas. Co. v. Coastal Sav. Bank*, 977 F.2d 734, 737 (2d Cir. 1992)
(a court is required to "entertain a declaratory judgment action: (1) when the judgment
will serve a useful purpose in clarifying and settling the legal relations in issue or (2)
when it will terminate and afford relief from uncertainty, insecurity, and controversy,
giving rise to the proceeding.") (quoting *Broadview Chem. Corp. v. Loctite Corp.*, 417
F.2d 998, 1001 (2d Cir. 1969)).

173.    Here, a Declaratory Judgment will serve a useful purpose in clarifying and settling the legal relationship between the parties because it will resolve the issue of whether Plaintiffs can be arrested, charged, or prosecuted for actions described herein consistent with the Constitution, or whether Plaintiffs' actual and proposed conduct is instead constitutionally protected.

## VI. Causes of Action

174.    Plaintiffs are entitled to relief under each of the following counts against every Defendant named herein in both their official and personal capacities.

175.    Plaintiffs raise both facial and as-applied challenges with respect to every constitutional claim set forth herein.

### Count One: Violation of the Second Amendment (Magazine Capacity)

176.    Plaintiffs reallege and incorporate by reference every preceding paragraph as if fully set forth herein.

177.    "[T]he Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense." *Bruen*, 142 S.Ct. at 2125.

178.    Vermont's magazine ban restricts a person's ability to purchase or acquire a firearm. These magazine size limits violate the Second Amendment.

179.    Because the Second Amendment plainly entitles the people to acquire the firearms that it guarantees them the right to keep and bear, Vermont law treads on ground "presumptively protect[ed]" by the Constitution, and Vermont "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S.Ct. at 2126.

180.    *Heller* and *Bruen* precisely determine the limits of the government's authority, "consistent with the Nation's historical tradition of firearm regulation," to

45

enact "a 'complete prohibition'" on a type of firearm. *Bruen*, 142 S. Ct. at 2128, 2130. It can enact and enforce such a ban, those decisions hold, *only* if the banned arms are not "the sorts of weapons . . . in common use at the time," so that its regulation falls within "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627 (cleaned up). But the ammunition magazines banned by Vermont *are* "in common use . . . for lawful purposes." *Id.* at 624 (cleaned up).

181.    *Bruen* squarely places the burden on *the government* to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation," 142 S. Ct. at 2130—including "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627. Therefore, it is Vermont's burden to show that the arms it has banned are "unusual," and thus *not* "in common use at the time" of the ban. *Id.*

182.    Vermont cannot meet this exacting standard because these magazines, meaning firearms capable of firing more than 10 and 15 rounds without reloading, are ubiquitous and "typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625. The banned magazines are "in common use at the time for lawful purposes," so they cannot be "dangerous *and* unusual." *Id.* at 624, 626, 627 (*emphasis added*). Since "[a] weapon may not be banned unless it is *both* dangerous *and* unusual," *Caetano*, 577 U.S. at 417 (Alito, J., concurring) (emphasis original), a firearm that is "in common use"—and hence not "unusual"—is protected by the Second Amendment and "may not be banned." *Id.*

183.    Insofar as the Plaintiffs allege violations of the Second Amendment, such violations are also inherently violations of the 14th Amendment, Equal Protection Clause

and the Due Process Clause, by virtue of which the Second Amendment applies to the states. *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010).

### Count Two: Violation of the Second Amendment (Waiting Period)

184.    Plaintiffs reallege and incorporate by reference every preceding paragraph as if fully set forth herein.

185.    "[T]he Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense." *Bruen*, 142 S.Ct. at 2125.

186.    Vermont's waiting period law restricts a person's ability to purchase or acquire a firearm.

187.    Because the Second Amendment plainly entitles the people to acquire the firearms that it guarantees them the right to keep and bear, Vermont's law treads on ground "presumptively protect[ed]" by the Constitution, and Vermont "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.

188.    Vermont cannot carry its burden because there is no "well-established and representative historical analogue" of the waiting period law.

189.    Only a few states have historically had a permit-to-purchase law which effected a *de facto* waiting period to purchase a firearm — and all of those came in the twentieth century. See David B. Kopel, *Background Checks for Firearms Sales and Loans: Law, History, and Policy*, 53 Harv. J. on Legis. 303, 360-61 (2016); Nicholas Gallo, *Misfire: How the North Carolina Pistol Purchase Permit System Misses the Mark of Constitutional Muster and Effectiveness*, 99 N.C. L. Rev. 529, 543 (2021).

190.    Before the 20th Century, there was not a single state law that imposed a waiting period for taking possession of a firearm. Any aberrant enactments of the few

states with such laws are far too recent and therefore irrelevant to a *Bruen* analysis. 142 S.Ct. at 2136, 2137 ("[W]hen it comes to interpreting the Constitution, not all history is created equal" and courts "must ... guard against giving postenactment history more weight than it can rightly bear.")

191.   The Fourth Circuit recently struck down a Maryland law that imposed a special licensing requirement for handguns because it deprived plaintiffs of their right to immediately possess a type of firearm protected by the Second Amendment and the government could not muster sufficient, "relevantly similar" historical evidence to justify its law. *Md. Shall Issue, Inc. v. Moore*, Nos. 21-2017, 21-2053, 2023 U.S. App. LEXIS 30955, *10 (4th Cir. Nov. 21, 2023) (striking down a Maryland "Handgun Qualification License" regime).

192.   Vermont's waiting period is even less constitutionally permissible than permit-to-purchase laws which delay firearms ownership, including the law struck down in *Moore, supra,* because Vermont's waiting period impermissibly burdens constitutional rights for no valid government purpose, such as waiting for an application to be processed. Instead, Vermont law imposes a time barrier for the express purpose of preventing citizens from exercising their Second Amendment rights.

193.   Vermont's waiting period law violates the Second Amendment by depriving law-abiding citizens of their constitutional right to keep and bear arms for at least 72 hours without any purpose, justification, or any valid historical precedent.

194.   Insofar as the Plaintiffs allege violations of the Second Amendment, such violations are also inherently violations of the 14th Amendment, Equal Protection Clause, and the Due Process Clause, by virtue of which the Second Amendment applies to the states. *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

## VII. Prayer for Relief

195.   Plaintiffs respectfully pray that this Court enter a judgment as follows:

a.   Declaring that the acts complained of herein, to wit 13 V.S.A. §§ 4019a and 4021, are unconstitutional and unenforceable, both facially and as applied to the Plaintiffs;

b.   Awarding a preliminary injunction to protect them from enforcement of unconstitutional Vermont laws by Defendants (and their officers, agents, and employees) while this suit is pending;

c.   Awarding a permanent injunction enjoining Defendants (and their officers, agents, and employees) from enforcing 13 V.S.A. §§ 4019a and 4021;

d.   Awarding nominal damages;

e.   Awarding Plaintiffs' attorney's fees, costs, and expenses reasonably incurred herein, pursuant to 42 U.S.C. §§1983 and 1988 and any other applicable provisions of law, equitable theory, or under the inherent power of the Court; and

f.   Awarding all other relief this Court deems just and proper.

Dated: December 15, 2023

Respectfully submitted,

HARDIN LAW OFFICE                          DIGENOVA & TOENSING, LLP

                                           By: _____
Matthew D. Hardin                              Brady Toensing
1725 Eye Street NW, Suite 300              1775 Eye Street NW, Suite 1150
Washington, DC 20006                       Washington, DC 20006
Phone: (202) 802-1948                      (202) 297-4245
Email: Matt@MatthewHardin.com              Brady@digtoe.com

*Attorney for Plaintiffs*                  *Attorneys for Plaintiffs*