**UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT**

VERMONT FEDERATION OF SPORTSMEN'S
CLUBS, *et al.*

        *Plaintiffs*,

    v.

MATTHEW BIRMINGHAM, *et al.*,

        *Defendants.*

Case No. 2:23-cv-710

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR A PRELIMINARY INJUNCTION

      Plaintiffs are entitled to a Preliminary Injunction to prevent Defendants from enforcing the challenged provisions of Vermont law against Plaintiffs while this litigation is pending.

## Introduction and Summary of the Argument

      As the Second Amendment rights secured by our Constitution have become confirmed and increasingly clarified and fortified by the Supreme Court in *District of Columbia v. Heller*, 554 U. S. 570 (2006), *McDonald v. Chicago*, 561 U. S. 742 (2008), and *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), Vermont's legislature chose to sail directly against constitutional headwinds by enacting unconstitutional restrictions on the rights of citizens to keep and bear commonly used firearms. These unconstitutional restrictions (1) ban firearm magazines with capacities above 10 rounds for rifles and 15 rounds for pistols (despite being commonly owned for lawful purposes), and (2) make it illegal to transfer a firearm to law-abiding citizens without waiting at least 72-hours after submission of the federal background check form (despite passing

1

the background check). These laws harm Plaintiffs because they abridge their Second Amendment rights, preventing them from acquiring, selling, or possessing banned magazines and preventing the transfer or possession of firearms without a waiting period.

The plain text of the Second Amendment extends to "all instruments that constitute bearable arms," *Bruen*, 142 S. Ct. at 2132; *i.e.*, "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Heller*, 554 U.S. at 581.  As a matter of history, *Heller* and *Bruen* establish that the only exception to this broadly protective amendment, is that "dangerous and unusual" arms are not protected. However, if an arm is "in common use," it inherently cannot be dangerous *and* unusual. This finding is dispositive according to the *Bruen* and *Heller* historical analyses. Under these binding precedents, other arguments – including policy arguments – are irrelevant.

Vermont law bans firearms chosen by millions of Americans for self-defense: those capable of holding and shooting more rounds than allowed by the magazine ban. But only dangerous *and* unusual weapons can be banned. The magazines at issue here are neither, but most certainly not "unusual." Thus, Vermont's ban is unconstitutional.

Similarly, the Second Amendment's plain text "covers" Plaintiffs' acquisition of firearms without having to wait at least 72 hours, and the waiting period's infringement of these rights is inconsistent with "this Nation's historical tradition of firearm regulation." *Bruen,* 142 S.Ct. at 2126. Therefore, the waiting period is also unconstitutional.

Because Plaintiffs are likely to succeed in showing violations of a fundamental constitutional right, the other injunction factors favor Plaintiff as well. Therefore, this Court should grant a preliminary injunction.

## Facts

Vermont enacted two laws restricting the use of firearms without *any* relevant historical firearm regulation pedigree. Plaintiffs challenge both.

First, in 2018, Vermont banned the sale, purchase, transfer, receipt, or possession of magazines with greater than 10 rounds capacity for rifles and 15 rounds for pistols. 13 V.S.A. § 4021.[1] Violators face up to one year imprisonment and a fine up to $500. *Id.* at 4021(b). Vermonters who owned banned magazines prior to the law's effective date are allowed to continue possessing *only* those magazines.[2]

The banned magazines and firearms designed to be equipped with them are possessed in the millions for lawful purposes. *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) (25 to 50 million so-called high-capacity handgun magazines – or possibly more – were in the United States by the year 2000), citing *Heller v. District of Columbia*, 670 F.3d 1244, 1261 (2011) (high-capacity rifles are similarly common). In other words, these magazines (and by extension firearms capable of holding and shooting more rounds than Vermont law allows) are "'in common use' as that term was used in *Heller*," and therefore cannot be banned. *See Id.* at 255; *Bruen*,

---

[1] Based on popularity, these magazines are best described as Standard Capacity Magazines. However, due to the parlance of legislators and caselaw, Plaintiffs will occasionally refer to the banned magazines as "Large Capacity Magazines" or "LCMs," but do not thereby concede that such magazines actually have a large capacity.

[2] The law also exempts a few individuals from the ban, including, *inter alia*, law enforcement, manufacturers, and certain out-of-state competitive shooters (but only if attending an organized competition). None of these exceptions apply to Plaintiffs.

142 S.Ct. at 2143 (weapons in "common use" today are protected by the Second Amendment).

Second, in 2023, Vermont imposed a waiting period of at least 72-hours between the submission of a federal background check application after the purchase of a firearm and the delivery of that firearm to the buyer, including those who pass the background check. 13 V.S.A. § 4019a. *No governmental activity takes place during this waiting period.* The law punishes the transferor of the firearm with up to one year imprisonment and a fine up to $500. *Id.* at 4019a(b). The waiting period is arbitrary and capricious, and flies in the face of Second Amendment jurisprudence, as even the Governor acknowledged in his statement allowing the bill to become law without his signature:

> I have significant concerns about the [waiting period's] constitutionality. My struggle with the overall bill lies in the fact that I, and all legislators, took an oath to 'not do any act or thing injurious to the constitution.' However, this matter is currently being taken up through constitutional legal tests across the country and will be decided in Federal Court.

2023 Vt. Sen. Journal 1951 (May 12, 2023).

Plaintiffs include: the Vermont Federation of Sportsmen's Clubs (VTFSC), a Vermont non-profit association that sues in its own right and as an organization that represents its members; Powderhorn Outdoor Sports Center, Inc. and JPM, Inc. (d/b/a Black Dog Shooting Supplies), federally-licensed Vermont firearms retailers that assert standing on behalf of themselves and their customers (through third party standing); Paul Dame, a law-abiding, Vermont citizen; and Marsha Thompson, also a law-abiding, Vermont citizen and a firearms instructor. But for these challenged laws and the reasonable fear of prosecution and punishment by Defendants, Plaintiffs would seek to do what these laws prohibit – acquire and transfer prohibited magazines and acquire and transfer firearms without having to wait at least 72-hours. All individual Plaintiffs

are adult citizens who are legally eligible to own firearms and wish to acquire and use firearms (including the banned firearms) for lawful purposes.

Defendants include: Matthew Birmingham, the Director of the Vermont State Police; Charity Clark, the Attorney General of Vermont; and Sarah George, the State's Attorney for Chittenden County. Defendants are obligated under Vermont law to enforce the challenged firearms laws against Plaintiffs, and have not disavowed the intent to do so.

Plaintiffs seek a preliminary injunction to ensure their federal rights are not violated while this litigation proceeds.

## Argument

## 1. Standard of Review.

Whether to grant a preliminary injunction is a question committed to the sound discretion of the district court. *A.H. v. French*, 985 F.3d 165, 175 (2d Cir. 2021). To obtain a preliminary injunction, movants must show:

- A likelihood of success on the merits
- Irreparable harm absent injunctive relief;
- That public interest weighs in favor of granting the injunction; and
- The balance of equities tips in their favor.

*Id.* at 176.

The movant's likelihood of success on the merits is the "the dominant, if not the dispositive, factor" to be considered in evaluating Plaintiffs' entitlement to a preliminary injunction. *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013), *see also New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 58-59 (2d Cir. 2020).

There is a "presumption of irreparable injury that flows from a violation of constitutional rights." *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996). Because the likelihood of success on a constitutional claim is analyzed as a separate factor, "it is the *alleged* violation of a constitutional right that triggers a finding of irreparable harm." *Id. (emphasis in original),* citing *Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir. 1992) and *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984).

Moreover, because only governmental actors are Defendants, the balance-of-equities and public interest factors "merge." *Hartford Courant Co., LLC v. Carroll*, 986 F.3d 211, 224 (2d Cir. 2021) citing and quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009). This policy is so because "[n]o public interest is served by maintaining an unconstitutional policy… ." *Agudath Isr. v. Cuomo*, 983 F.3d 620, 637 (2d Cir. 2020), and because "[a]lthough… the State has an interest in administering its laws… that interest is diminished when the laws at issue likely impinge [a] federal constitutional right." *A.H. v. French*, 985 F.3d 165, 184 (2d Cir. 2021).

## 2.  The preliminary injunction factors favor Plaintiffs.

Plaintiffs satisfy the preliminary injunction factors. Specifically, Plaintiffs have a likelihood of success on the merits. Additionally, Plaintiffs face irreparable harm from the enforcement of the statutes at issue. Because the government can have no interest in enforcing laws that violate fundamental constitutional rights, the balance of the equities and the public interest merge and favor a preliminary injunction. This Court should, therefore, grant this preliminary injunction to protect Plaintiffs' constitutional rights.

### A.  Plaintiffs are likely to succeed on the merits.

The "[l]ikelihood of success on the merits is … the dominant, if not the dispositive, factor." *N.Y. Progress*, 733 F.3d at 488. Plaintiffs need not prove with

absolute certainty that they will prevail to demonstrate their entitlement to an injunction: A "'likelihood of success' requires a demonstration of a 'better than fifty percent' chance of success." *Antonyuk v. Hochul*, 635 F. Supp. 3d 111, 125 (N.D.N.Y. 2022).

The Second Amendment guarantees that "the right of the people to keep and bears Arms, shall not be infringed." U.S. Const., Amend II. The phrase "to keep and bear Arms," according to *Heller* and its progeny, "guarantee[s] the *individual* right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592 (emphasis added). Preserving the militia in order to guard against tyranny was not the Second Amendment's only purpose; "most undoubtedly thought it even more important for self-defense and hunting." *Id.* at 559; *McDonald*, 561 U.S. at 787 (*Heller* "stressed that the right was also valued because the possession of firearms was thought to be essential for self-defense" and that "self-defense was the central component of the right itself") (quotations omitted). As with other fundamental rights from the Bill of Rights, Second Amendment rights are guaranteed and apply to the states through the Fourteenth Amendment. *McDonald,* 561 U.S. at 750. Rights "fundamental to the American scheme of ordered liberty" and "deeply rooted in this Nation's history and tradition" apply to the states through the Fourteenth Amendment *Id.* at 806 (Thomas, J., concurring) (cleaned up).

For Second Amendment analysis, *Bruen* created a two-part test that is centered on the amendment's text and history. 142 S.Ct. at 2126-30. The first part asks whether the plain text of the Second Amendment "covers an individual's conduct." *Id.* at 2126. If so, then "the Constitution presumptively protects that conduct" and the challenged regulation is unconstitutional unless, under the second part, the government can prove

the regulation "is consistent with this Nation's historical tradition of firearm regulation."
*Id.* Only if the government carries this significant burden "may a court conclude that the
individual's conduct falls outside the Second Amendment's 'unqualified command'" *Id.*
(quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n. 10 (1961)).

**(1)** ***Vermont's magazine ban prevents Plaintiffs from engaging in
conduct presumptively protected by the Second Amendment.***

The first *Bruen* question is whether the "plain text" of the Second Amendment
protects the right to acquire, possess, and use for lawful purposes the magazines banned
by Vermont. *Id.* at 2129–31. Supreme Court precedent gives clear direction on how to
answer that question: "the Second Amendment extends, prima facie, to all instruments
that constitute bearable arms, even those that were not in existence at the time of the
founding." *Heller*, 554 U.S. at 582.

Determining whether the Second Amendment extends, prima facie, to the
common magazines banned by Vermont requires little analysis. Because magazines, or
ammunition feeding devices (as the law defines them), qualify as a "thing that a man . . .
takes into his hands, or useth in wrath to cast at or strike another," the magazines
banned by Vermont easily fit within the Supreme Court's definition of "arms." *Id.* at 581.
Ammunition magazines capable of holding more than 10 and 15 rounds qualify as
"arms" and thus fall, prima facie, within the Second Amendment's "plain text."
*Association of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney General New Jersey*
("*ANJRPC*"), 910 F.3d 106, 116 (3d Cir. 2018), *abrogated on other grounds by Bruen*,
142 S. Ct. 2111 ("[b]ecause magazines feed ammunition into certain guns, and
ammunition is necessary for such a gun to function as intended, magazines are 'arms'
within the meaning of the Second Amendment."); *accord Bruen*, 142 S. Ct. at 2132

("[E]ven though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense."). After all, "[r]egulations that eliminate a person's ability to obtain or use ammunition could thereby make it impossible to use firearms for their core purpose." *ANJRPC*, 910 F.3d at 116 (cleaned up). In keeping with this logic, the Second Circuit has implicitly assumed that magazines are "arms" because it used the same "common use" methodology to examine bans on firearms and magazines. *Cuomo*, 804 F.3d at 255 ("Americans own millions of the firearms that the challenged legislation prohibits. The same is true of large-capacity magazines…").

"The Second Amendment's plain text thus presumptively guarantees" Plaintiffs the right to keep and bear the magazines at issue. Under *Bruen*, that means that the inquiry shifts from text to history, and the burden is placed on Vermont to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2130, 2135.

**(2)** ***Vermont cannot justify its ban as consistent with this Nation's historical tradition of firearms regulations.***

As with the inquiry into the Second Amendment's text, analyzing its history under *Bruen*'s second question is easy because binding Supreme Court precedent also provides dispositive directions. Under those directions, Vermont cannot meet its historical burden.

(a) *The banned magazines are in common use for lawful purposes.*

*Heller* and *Bruen* precisely determine the limits of the government's authority, "consistent with the Nation's historical tradition of firearm regulation," to enact "a 'complete prohibition'" on a type of firearm. *Bruen*, 142 S. Ct. at 2128, 2130. It can enact

and enforce such a ban, those decisions hold, *only* if the banned arms are not "the sorts of weapons . . . in common use at the time," so that its regulation falls within "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" *Heller*, 554 U.S. at 627 (cleaned up). The ammunition magazines banned by Vermont *are* "in common use . . . for lawful purposes." *See id*. at 624 (cleaned up).

Because *Bruen* squarely places the burden on *the government* to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation," 142 S. Ct. at 2130—including "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,' " *Heller*, 554 U.S. at 627—it falls *to* Vermont to show that the arms it has banned are "unusual," and thus *not* "in common use at the time."

To be sure, preliminary injunction movants "normally have the burden of demonstrating a sufficient likelihood of prevailing on the merits," *Reilly v. City of Harrisburg*, 858 F.3d 173, 180 (3d Cir. 2017). But the Supreme Court has held that this burden reverses when the government has the underlying burden of proof on a constitutional issue. *Ashcroft v. ACLU*, 542 U.S. 656, 666, 124 S. Ct. 2783, 2791-92 (2004) ("As the Government bears the burden of proof on the ultimate question of... constitutionality, [challengers] must be deemed likely to prevail unless the Government has" carried that burden). This is so because, as the Supreme Court explained in the wake of *Ashcroft*, "the burdens at the preliminary injunction stage track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006).

In any event, although the burden at this stage of the *Bruen* analysis does not rest on Plaintiffs, they are submitting with this motion substantial evidence establishing

that the banned magazines are in common use. Indeed, controlling precedent recognizes the commonality of these firearms and magazines. *Caetano v. Massachusetts*, 577 U.S. 411, 420  (2016) (200,000 stun guns enough to show common use), *Cuomo*, 804 F.3d at 255 ("millions" of banned firearms and magazines were in use).

There can be no question that firearm magazines capable of holding more than 10 and 15 rounds are in common use. This reality is evident, first, by the overwhelming popularity of the firearms that come standard with them. The AR-15, for example, is America's "most popular semi-automatic rifle," *Heller v. District of Columbia (Heller II)*, 670 F.3d 1244, 1287 (D.C. Cir. 2011) (Kavanaugh, J., dissenting), and over 24 million AR-15s and similar AR-style rifles are currently in circulation. *Commonly Owned: NSSF Announces Over 24 Million MSRS in Circulation*, NSSF (July 20, 2022), http://tinyurl.com/ycka5rnh; *see also* William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* at 1–2 (May 13, 2022),[3] http://tinyurl.com/bddafy3z (finding that an estimated 24.6 million American gun owners have owned AR-15s or similar rifles). These popular rifles come standard with 20- or 30-round ammunition magazines, *see Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1145 (S.D. Cal. 2019); David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 ALB. L. REV. 849, 859 (2015); GUN DIGEST 2023, 399, 401, 402, 404, 405, 406, 407 (Philip Massaro ed., 76th ed. 2022). Indeed, evidence indicates that 52% of recently acquired AR-style and other modern sporting rifles came equipped with 30-round magazines. NSSF, *Comprehensive Consumer Report: Modern Sporting Rifle*, NSSF REPORT, 31 (2022), http://tinyurl.com/n55hnz8k.

---

[3] For ease of reference, this study is filed herewith as Ex. F.

The ubiquity of 10- and 15-plus-round magazines is further confirmed by binding Second Circuit precedent. *Cuomo*, 804 F.3d at 255 (so-called assault weapons and large capacity magazines are "in common use" as that term was used in *Heller*).  Other courts have reached similar conclusions. *ANJRPC* held that magazines banned by New Jersey—those capable of holding more than ten rounds—were owned by the "millions, . . . often come factory standard with semi-automatic weapons, [and] are typically possessed by law-abiding citizens for hunting, pest-control, and occasionally self-defense." *ANJRPC*, 910 F.3d at 116; *see also Heller II*, 670 F.3d at 1261. (LCM's in "common use" per *Heller*).

Professor English's comprehensive survey provides more recent evidence supporting this conclusion: according to his study, Americans have owned as many as 542 million rifle and handgun magazines capable of holding more than 10 rounds—and approximately 382 million magazines that hold more than 15 rounds. *See* William English, *2021 National Firearms Survey: Analysis of Magazine Ownership and Use* at 23-25 (May 4, 2023), http://tinyurl.com/25zm7sdc.[4],[5]  And NSSF estimates that there are 79.2 million rifle magazines capable of holding 30 or more rounds in circulation today. *See* NSSF, *NSSF Releases Most Recent Firearm Production Figures* (Nov. 16, 2020), http://tinyurl.com/4xwcjmen. While Vermont's ban reaches the slightly different class of more-than-10 or 15-round magazines, this evidence shows such magazines are in common use by the hundreds of millions. *See National Firearms*

---

[4] For ease of reference, this study is filed herewith as Ex. G.

[5] Professor English estimates that approximately 39 million Americans have owned at least one magazine capable of holding more than 10 rounds; these owners further report that they have owned, on average, 4.4 handgun magazines and 5.4 rifle magazines with a capacity of more than 15 rounds.

*Survey, supra, at 19-20* (finding that Americans have owned 170 million handgun magazines holding more than 15 rounds and 214 million rifle magazines holding more than 15 rounds).

These ubiquitous magazines, which means firearms capable of firing more than 10 and 15 rounds, are "typically possessed by law-abiding citizens for lawful purposes." *See Heller*, 554 U.S. at 625. In Professor English's 2021 survey, recreational target shooting was the most common reason (cited by 66% of owners) for possessing an AR-style firearm, followed closely by home defense (61.9%) and hunting (50.5%). *See* William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* at 33-34 (May 13, 2023), http://tinyurl.com/ywfuy2yx. These findings are consistent with those of another recent survey of over 2,000 owners of such firearms, in which home-defense again followed (closely) only recreational target shooting as the most important reason for owning these types of firearms. *See* NSSR REPORT, *supra*, at 5. The Washington Post also reached essentially identical results, finding that 20% of current firearm owners own an AR-15 or similar style rifle, with 60% of AR owners reporting target shooting was a "major reason" for their owning the firearm and 30% citing it as a "minor reason." *Poll of current gun owners* at 1, WASH. POST-IPSOS (Mar. 27, 2023), http://tinyurl.com/5dmm7mne. Protection of self, family, and property was even *more* important in this survey, with 65% of owners citing it as a major reason and 26% noting it as a minor reason. *Id.*

The evidence demonstrates that Vermont's banned magazines are "in common use at the time for lawful purposes," so they cannot be "dangerous *and* unusual." *Heller*, 554 U.S. at 624, 626, 627 (*emphasis added*). *Heller* leaves no doubt that these two categories of arms are the opposite sides of the same coin: for the "historical tradition of

prohibiting the carrying of dangerous and unusual weapons," was the Court's whole justification in the first place for interpreting the Second Amendment as protecting arms "in common use." *Id.* at 627. And the Supreme Court could not have been clearer that these two categories of arms are mutually exclusive. After all, since "[a] weapon may not be banned unless it is *both* dangerous *and* unusual," a firearm that is "in common use"— and hence not "unusual"—is protected by the Second Amendment and "may not be banned." *Caetano*, 577 U.S. at 418 (Alito, J., concurring) (emphasis original). Therefore, any argument that the arms at issue here are unprotected even if they are commonly owned by law-abiding citizens because they are "unusually dangerous" is irrelevant.

**(3)** ***The banned magazines are in common use, therefore the ban is inconsistent with this Nation's history and tradition.***

Because the banned magazines are in common use for lawful purposes, Vermont cannot show that they fall within "the historical tradition" of restricting "dangerous and unusual weapons." *Heller*, 554 U.S. at 627. The analysis should end there because *Heller* and *Bruen* speak clearly and with one voice: where the government enacts a prohibition on arms, the *only* way it can "justify its regulation . . . [as] consistent with this Nation's historical tradition" is by demonstrating that the banned arms are "dangerous and unusual" and thus fall outside the Second Amendment's protection of "the possession and use of weapons that are in common use at the time," *Bruen*, 142 S. Ct. at 2126, 2128 (cleaned up). If the government cannot make that showing because the firearms at issue are in common use, while historical tradition may justify other types of restrictions on the who, how, when, and where of using the firearms, it does not justify a flat ban, as a matter of binding Supreme Court precedent.

This conclusion regarding the second step of *Bruen's* text-and-history standard merely recognizes that in some contexts—including an absolute ban on certain firearms—the application of that standard has already been decided by the Supreme Court. Any further examination of history and tradition is unnecessary or inappropriate, because the Supreme Court has already done the historical analysis, and its conclusions are binding.

In short, the Supreme Court has conclusively determined that with respect to "a flat ban" on weapons, under "this Nation's historical tradition of firearm regulation" such a ban may be justified *only* if it is limited to weapons not in common use. *Bruen*, 142 S. Ct. at 2126, 2131. Because Vermont cannot justify the challenged ban in that way, the ban is unconstitutional, and it would be error to proceed further. *See* Mark W. Smith, *What Part of 'In Common Use' Don't You Understand?: How Courts Have Defied* Heller *In Arms-ban Cases—Again* (June 18, 2023), http://tinyurl.com/mvwxyfy4.

Even if this threshold argument were (improperly) set aside, the State will still fall far short of providing an alternative historical justification for its ban. At the time of the Founding and for many decades thereafter, no State or jurisdiction enacted any general ban on any arm in common use. Indeed, the first general arms bans of *any* kind were on the sale or possession of machine guns that several states began to enact in 1927. The key period, however, for understanding the Second Amendment is ratification—1791—so evidence from the 20th Century comes far too late in the Nation's history to be relevant. *See* Mark W. Smith, *"Not all History is Created Equal": In the Post-Bruen World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868* (Oct. 1, 2022),

http://tinyurl.com/43j95yr9. The fact that there was not any general ban on arms in common use until over a century after the Second Amendment was ratified is dispositive. *See Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2258–59 (2020) (rejecting the argument that a constitutionally relevant tradition within the meaning of the First Amendment arose in the 19th Century).

Two principles—both established by binding and unequivocal Supreme Court precedent—necessitate the conclusion that 1791, not 1868, is the critical year—and *certainly* not the late 1920s. First, incorporated Bill of Rights provisions have the same meaning applied to the States as to the federal government. *See McDonald*, 561 U.S. at 765. It has been a bedrock principle of Bill of Rights jurisprudence for over five decades that while it is the Fourteenth Amendment that incorporates the Bill of Rights' guarantees against the States, once incorporated, those rights have exactly the same meaning against the States as they do against the federal government. The protections in the Bill of Rights are "to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment." *Malloy v. Hogan,* 378 U.S. 1, 10–11 (1964). The Court has repeatedly reiterated that fundamental rule in the ensuing years, most recently *in Bruen itself*: "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." 142 S. Ct. at 2137.

Second, as *Bruen* also makes clear, the Supreme Court has always treated ratification of the Bill of Rights as the key period for understanding the scope of the rights enumerated therein. *Id.* (collecting cases). Almost a century ago, it explained that the First Congress of 1789, is "a Congress whose constitutional decisions have always

been regarded, as they should be regarded, as of the greatest weight in the interpretation of that fundamental instrument," *Myers v. United States*, 272 U.S. 52, 174–75 (1926), and this practice is no less true in the context of the Bill of Rights, *see, e.g.*, *Lynch v. Donnelly*, 465 U.S. 668, 674 (1984) ("The interpretation of the Establishment Clause by Congress in 1789 takes on special significance in light of the Court's [reasoning in *Myers*].").

While *Bruen* "acknowledge[d] that there is an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)," it also stated that it did not "need [to] address this issue." 142 S. Ct. at 2138. The Court's decision not to wade into a "scholarly debate" cannot be read as changing or casting doubt on the longstanding precedent described above. And that precedent, common-sense, and logic dictate that 1791 is the critical date.

Justice Barrett's concurring opinion in *Bruen* provides further confirmation of the point. Justice Barrett strongly suggested that "Reconstruction-era history" is "simply too late," and she cautioned that "today's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights." *Id.* at 2163 (Barrett, J., concurring). The *Bruen* majority opinion is fully consistent with Justice Barrett's analysis. It treated evidence surrounding 1791 as generally dispositive of the contours of the Second Amendment. "[W]hen it comes to interpreting the Constitution, not all history is created equal." *Id.* at 2136. That is why courts "must … guard against giving postenactment history more weight than it can rightly bear." *Id.* "As [the Court] recognized in *Heller*

17

itself, because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'" *Id.* at 2137 (quoting *Heller*, 554 U.S. at 614). In fact, "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* (cleaned up) (emphasis in original). The relevant history is the Founding and Early Republic. During that time no jurisdiction enacted any sort of general ban on firearms in common use. Therefore, Vermont cannot carry its burden.

**(4)** ***Vermont's waiting period prevents Plaintiffs from engaging in conduct that is presumptively protected by the Second Amendment.***

Plaintiffs are also likely to succeed on the merits of their claims relating to the firearms transfer waiting period. Their proposed conduct is covered by the plain text of the Second Amendment under the first part of the *Bruen* test. Plaintiffs fall within the Amendment's definition of "the people" because they are law-abiding citizens who are legally eligible to own firearms. *Bruen*, 142 S.Ct. at 2134 ("'the people' whom the Second Amendment protects" includes, at a minimum, "ordinary, law-abiding, adult citizens").

Plaintiffs seek to keep and bear arms for lawful purposes without having to wait at least 72 hours to do so, but Vermont law prevents that conduct. *Heller*, 554 U.S. at 582, 584 ("keep" means to "have weapons" and "bear" means to "carry."); *Caetano*, 577 U.S. at 411 (the plain text "extends, prima facie, to all instruments that constitute bearable arms."); *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("As with purchasing ammunition and maintaining proficiency in firearms use, the core Second Amendment right to keep and bear arms 'wouldn't mean much' without the ability to acquire arms."), *quoting Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir.

2011). The law infringes on the Plaintiffs' ability "to possess and carry weapons in case of confrontation" which is a course of conduct that falls within the Amendment's plain text. *Heller*, 554 U.S. at 592. Therefore, Plaintiffs have made a prima facie showing that the waiting period violates the Second Amendment and is presumptively unconstitutional. This showing triggers the State's burden to prove the law "is consistent with this Nation's historical tradition of firearm regulation" as understood at the founding. *Bruen*, 142 S.Ct. at 2126. Vermont cannot carry its burden.

**(5)  *The waiting period is unconstitutional because Vermont cannot prove it is consistent with this Nation's historical tradition of firearm regulation.***

Part two of the *Bruen* test requires Vermont to provide relevant historical evidence to justify its waiting period. Thus, it must provide proof of historical regulations that are a "proper analogue" to its modern firearm regulation. *Bruen*, 142 S.Ct. at 2132. Whether those regulations are proper analogues requires that they be "relevantly similar." *Id.* (cleaned up). Relevant similarity is judged based on the "how and why" of the two regulations. *Id.* at 2132-33. The central concern when engaging in this "analogical inquiry" is "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133 (cleaned up). The government must "identify a well-established and representative historical analogue" and cannot satisfy its burden by resorting to historical "outliers." *Id.* (cleaned up).

Vermont will not be able to carry its burden because there is no relevant historical tradition of firearms regulation to support the proposition that Vermonters' rights to responsibly purchase, possess, and carry firearms may be routinely abridged for an arbitrary 72 hours or any amount of time, except as punishment for a crime. Yet,

Vermont law delays the ability of law-abiding citizens to exercise their Second Amendment rights for no administrative or other legitimate governmental purpose. It is delay for delay's sake. Defendants' purposeful and purposeless obstruction to fundamental and deeply rooted rights, such as those protected by the Second Amendment, is unconstitutional. *See Heller*, 554 U.S. at 591, 595, 626 (analogizing Second Amendment rights to First and Fourth Amendment rights).

This Court will be treading no new ground when it enjoins Defendants from enforcing Vermont's Second Amendment delay regime. The Supreme Court already rejected what was effectively a far shorter waiting period in *Heller*. 554 U.S. at 628 (holding a ban on the possession of an immediately operable firearm was unconstitutional; the relevant District of Columbia law required firearms to be stored in a disassembled state). Indicative of how such a ban will be viewed through the lens of the post-*Bruen* era, *Bruen*'s majority opinion author catalogued the then-extant waiting period laws nationwide and agreed with the District Court in finding "that waiting periods do not have a long historical pedigree." *Silvester v. Becerra*, 138 S. Ct. 945, 948-49 (2018) (Thomas, J., dissenting from denial of certiorari).[6] Indeed, the Fourth Circuit recently struck down a Maryland law that imposed a special licensing requirement for handguns because it deprived plaintiffs of their right to immediately possess a type of firearm protected by the Second Amendment and the government could not muster sufficient, "relevantly similar" historical evidence to justify its law. *Md. Shall Issue, Inc.*

---

[6] In *Silvester*, the Ninth Circuit had affirmed the constitutionality of California's waiting period, but did so using the now abrogated pre-*Bruen* intermediate scrutiny analysis at *Silvester v. Harris*, 843 F.3d 816 (9th Cir. 2016), the Ninth Circuit has now acknowledged its reasoning was vitiated by *Bruen* and has limited vitality. *Baird v. Bonta*, No. 23-15016, 2023 U.S. App. LEXIS 23760, at *12 (9th Cir. Sep. 7, 2023) (listing cases decided under the now-abrogated standard).

*v. Moore*, Nos. 21-2017, 21-2053, 2023 U.S. App. LEXIS 30955, *10 (4th Cir. Nov. 21, 2023) (striking down a Maryland "Handgun Qualification License" regime).

Vermont's waiting period is constitutionally even more problematic than Maryland's overturned law and other *de facto* waiting periods imposed by other states, because it is a waiting period without a purpose. Purposeless delay in the context of other rights protected by the Bill of Rights has been rejected by the Supreme Court. *County of Riverside v. McLaughlin*, 500 U.S. 44, 47 (1991) ("Delay for delay's sake" is presumptively unconstitutional in the context of the Fourth Amendment.); *CBS v. Davis*, 510 U.S. 1315, 1315 (1994) (delay of a broadcast constitutes irreparable harm under the First Amendment); *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 47 (1991) ("Delay for delay's sake" is presumptively unconstitutional in the context of the Fourth Amendment), *United States v. Smith*, 967 F.3d 198 (2d Cir. 2020) (needless detention of property without a warrant violates the Fourth Amendment), *United States v. Sharpe*, 470 U.S. 675, 686 (1985) (relating to detention of an individual pursuant to a *Terry* stop, and tying the reasonableness of the delay to the need to accomplish governmental business).

Only a few states have historically had a permit-to-purchase law which effected a *de jure* waiting period to purchase a firearm — and all of those came in the twentieth century. *See* David B. Kopel, *Background Checks for Firearms Sales and Loans: Law, History, and Policy*, 53 Harv. J. on Legis. 303, 360-61 (2016); Nicholas Gallo, *Misfire: How the North Carolina Pistol Purchase Permit System Misses the Mark of Constitutional Muster and Effectiveness*, 99 N.C. L. Rev. 529, 543 (2021). So, before the 20th Century, there was not a single state law that imposed a waiting period for taking possession of a firearm and the aberrant enactments of the few states with such laws are

far too recent and therefore irrelevant to a *Bruen* analysis. *Bruen,* 142 S.Ct. at 2136, 2137 ("[W]hen it comes to interpreting the Constitution, not all history is created equal" and courts "must … guard against giving postenactment history more weight than it can rightly bear.").

Vermont's stated purpose for enacting its waiting period was to "reduce suicide and community violence." Yet community violence has been around since the beginning of humanity, and a citizen's right to self-defense against it is a core purpose of the Second Amendment. *Heller*, 554 U.S. at 559 ("self-defense was the central component of the right itself."); *Silvester v. Becerra*, 138 S. Ct. at 948-49 (Thomas, J., dissenting from denial of certiorari) (there is "no consensus among States that waiting periods are needed and no consensus among experts that they deter gun violence."). Likewise, suicide is an ancient problem. So the State cannot claim that it is addressing any unprecedented concern with its unprecedented waiting period law.[7] To the extent suicide prevention was addressed in prior eras, it was ordinarily addressed through the criminal justice system (suicide was a crime at common law) or through institutionalization. There is no relevant historical evidence to support firearms waiting periods as a suicide or violence prevention measure, which means the state cannot carry its burden of proving a relevant tradition of analogous firearms regulation.

**B.    Plaintiffs Face Irreparable Harm Absent an Injunction.**

Plaintiffs will be irreparably harmed absent a preliminary injunction because with each passing day they are further deprived of their constitutional rights, and

---

[7] Ironically, during the same 2023 legislative session, Vermont expanded its assisted suicide law to allow non-Vermonters to kill themselves in the state. 18 V.S.A. § 5281 (removing residency requirement to become the first state to allow suicide tourism).

because the chilling effect of the threat of enforcement of Vermont's unconstitutional edicts is such that they are fearful to engage in otherwise lawful and protected conduct. *See, e.g.*, *Mitchell*, 748 F.2d at 806 (deprivation of a constitutional right is *per se* irreparable injury), and *Jolly*, 76 F.3d at 482 (there is a "presumption of irreparable injury that flows from a violation of constitutional rights."). The Second Circuit presumes the government will enforce these challenged laws "in the absence of a disavowal by the government." *Antonyuk v. Chiumento*, Nos. 22-2908, 22-2972, 22-2933, 22-2987, 22-3237, 2023 U.S. App. LEXIS 32492, at *117 (2d Cir. Dec. 8, 2023) (cleaned up). Sister courts have also held that "an ongoing constitutional violation" is particularly likely to constitute an irreparable injury. *See Hardy v. Fischer*, 701 F. Supp. 2d 614, 619 (S.D.N.Y. 2010), citing *Five Borough Bicycle Club v. City of New York*, 483 F. Supp. 2d 351, 361 (S.D.N.Y. 2007).

Each of the Plaintiffs have detailed their own experiences and how the challenged provisions have impacted and are impacting them in the attached declarations, which all Plaintiffs incorporate by reference here. Before the waiting period law, Paul Dame was confident that he could enter a gun store and leave with a firearm that same day. Ex. A. He is now harmed because the waiting period may force him to buy a firearm before a threat has arisen so he can ensure his ability to defend himself and his family against an immediate threat. This otherwise unnecessary purchase will bring with it other harms, such as the need to responsibly store the firearms in a household with young children. 13 V.S.A. § 4024 (imposing criminal penalties for failure to store firearms in conformity with statute.) And when he does buy a firearm, he will be forced by Vermont law to buy a smaller magazine than is in normal use for other law-abiding Americans. Likewise, Marsha Thompson is unable to buy firearms in their most popular and common

configuration, cannot purchase replacements for her grandfathered magazines, and must wait at least 72 hours before obtaining new firearms. Ex. B.

Powderhorn and Black Dog are prevented from selling some of the most common firearms in America, and are forced to forego sales and incur increased expenses due to the waiting period. Ex. C and D. And the VTFSC and the members of its member clubs suffer the same denial of access to protected firearms and are also forced to delay the exercise of their Second Amendment rights by the waiting period. Ex. E.

Many of the VTFSC's member clubs use firearm raffles during fundraising events as a major draw and source of revenue. Ex. E. These events will lose that draw when the waiting period exception for these events expires in July 2024. 13 V.S.A. § 4019a(e)(3). The appeal of these raffles comes from the immediate awarding and possession of the firearm. Would-be attendees will also be discouraged at the idea of having to wait 72 hours and then drive long distances to return to pick-up an awarded firearm. Some of its member clubs have also suffered declined attendance at shooting events that utilize banned magazines. All Plaintiffs are chilled in the exercise of their Second Amendment rights because of laws that are directly calculated to dilute and undermine those rights.

## C.    **Public Interest and the Balance of Equities Favor an Injunction.**

When the government is the opposing party, the public interest and balance of equities "factors merge." *Nken*, 556 U.S. at 435. The public interest favors issuance of a preliminary injunction "'because the Government does not have an interest in the unconstitutional enforcement of a law.'" *Airbnb, Inc. v. City of N.Y.*, 373 F. Supp. 3d 467, 500 (S.D.N.Y. 2019) (cleaned up). "[T]he public interest lies with the enforcement of the Constitution." *Ligon v. City of N.Y.*, 925 F. Supp. 2d 478, 541 (S.D.N.Y. 2013). The

"enforcement of an unconstitutional law is always contrary to the public interest."
*Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013).

Because the government can have no interest separate or distinct from the
interest of the public at large, the Court should focus on the underlying constitutionality
of the challenged enforcement of Vermont laws and determine there can be no
governmental interest in abrogating the Constitution. Plaintiffs have shown they are
likely to succeed on the merits, a task aided because the State carries a substantial
burden of proof. Yet even if this Court disagrees that Plaintiffs are likely to succeed on
the merits, Plaintiffs may nevertheless be entitled to a preliminary injunction provided
they "demonstrate[] 'a serious question going to the merits to make them a fair ground
for trial, with a balance of hardships tipping decidedly in the plaintiff's favor.'" *Ligon v.
City of N.Y.*, 925 F. Supp. 2d 478, 486 (S.D.N.Y. 2013), quoting *Red Earth LLC v.
United States*, 657 F.3d 138, 143 (2d Cir. 2011).

Any potential harm to the State or its officers from an injunction is intangible or
diffuse. Vermont will not be harmed by a temporary delay in enforcement of laws that
did not exist for the first two hundred thirty years of its history, and, if it is ultimately
successful, Vermont can always resume enforcement. Moreover, the State's interest in
enforcement of its laws is "diminished when the laws at issue likely impinge
federal constitutional right." *A.H.*, 985 F.3d at 184. The balance of equities necessarily
tips in the Plaintiffs favor insofar as the State's interest is "diminished."

Nor can the State be taken seriously if it claims immediate enforcement of its
laws are necessary to protect the public safety. The magazine ban did not prohibit the
ownership of millions of extant banned magazines, including many thousands in
Vermont that were grandfathered by the law. Banned magazines remain easily available

for purchase in many other states, including across the Connecticut River in New Hampshire. Indeed, Vermont's decision to grandfather thousands of pre-existing banned magazines illustrates there is no harm in lifting the ban during this litigation.

In contrast, the hardships on Plaintiffs are manifest and tangible: they cannot engage in constitutionally protected activity. Law-abiding citizens, like Plaintiffs, are also being denied access to the banned magazines (and firearms that only come with them). Plaintiffs are prevented from purchasing firearms for at least 72 hours, which is more than enough time for a threat to emerge that is now un-redressable. *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019) ("[T]he loss of [constitutional] freedoms, for even minimal periods of time," merits judicial redress.)

## Conclusion

Plaintiffs' conduct, which is covered by the Second Amendment's plain text, is presumptively protected by the Constitution. The government cannot carry its burden to prove these regulations are "consistent with this Nation's historical tradition of firearm regulation," *Bruen* at 2126, because the banned magazines are in common use for lawful purposes and there are no historically relevant analogues to the waiting period, which means they cannot be proscribed. Therefore, this Court should find that Plaintiffs' conduct falls within "the Second Amendment's unqualified command" and is protected. *Id.* The harms caused by these unconstitutional laws, which can never be in the public interest or survive a balancing of equities, is irreparable and ongoing. Therefore, the injunction factors all favor Plaintiffs and this Court should grant this motion for a Preliminary Injunction.

Dated: December 20, 2023

Respectfully submitted,


HARDIN LAW OFFICE

By: /s/ *Matthew D. Hardin*
    Matthew D. Hardin, Vt. Bar. 5815
1725 Eye Street NW, Suite 300
Washington, DC 20006
Phone: (202) 802-1948
Email: Matt@MatthewHardin.com

*Attorney for Plaintiff*


DIGENOVA & TOENSING, LLP

By: */s/ Brady C. Toensing*
    Brady C. Toensing
1775 Eye Street NW, Suite 1150
Washington, DC 20006
Phone: (202) 289-7701
Email: brady@digtoe.com

*Attorneys for Plaintiff*