# UNITED STATES DISTRICT COURT
# DISTRICT OF VERMONT

VERMONT FEDERATION OF SPORTSMEN'S CLUBS,

POWDERHORN OUTDOOR SPORTS CENTER, INC.,

JPC, INC. (D/B/A BLACK DOG SHOOTING SUPPLIES),

PAUL DAME, and

MARSHA J. THOMPSON

       Plaintiffs,

   v.

MATTHEW BIRMINGHAM, Director of the Vermont State Police, in his Official and Personal Capacities,

CHARITY CLARK, Attorney General of the State of Vermont, in her Official and Personal Capacities, and

SARAH GEORGE, State's Attorney for Chittenden County, in her Official and Personal Capacities,

      Defendants.

Civil Case No. 2:23-cv-00710

# DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................................1

Legal Standards ..........................................................................................................4

    Standard for facial challenges ..........................................................................4

    Preliminary injunction standard .......................................................................4

Argument ...................................................................................................................5

I.     The law governing Plaintiffs' Second Amendment Claims ...................................5

II.    Plaintiffs have not shown that they are likely to succeed on their claim of a Second
     Amendment right to possess magazines larger than 15 bullets for a handgun and
     10 bullets for a long gun ....................................................................................10

      A.    Plaintiffs have not shown that large-capacity magazines—which are not arms;
          are designed for offensive uses akin to military-style assault weapons; and are
          not commonly used  for self-defense—fall with the presumptive scope of the
          Second Amendment ................................................................................10

            1.    *Heller* and subsequent, binding precedent hold that the Second
                  Amendment right is "not a right to keep and carry any weapon
                  whatsoever in any manner whatsoever and for whatever purpose" .................11

            2.    Large-capacity magazines are not "arms" .......................................12

            3.    Even if LCMs are considered "arms," Plaintiffs have also not met their
                  burden of showing that LCMs are in common use for self-defense ...............14

             4.    The Second Amendment right to "keep and bear arms" does not extend to
                  ammunition magazines of this size because they are akin to military-style
                  offensive weapons ................................................................................16

      B.    Vermont's restriction on magazines larger than 15 for handguns and 10 for
          long guns falls easily within the historical tradition of firearms regulations ...........17

             1.    Plaintiffs' simplistic "common-use" argument is legally and factually
                  wrong .................................................................................................17

             2.    *Bruen* and *Antonyuk's* "more nuanced" approach to assessing the
                  historical record applies here ...............................................................19

i

      a.   Semi-automatic large-capacity magazines are a modern technological development ......................................................................................20

      b.   Mass shootings in settings like schools, shopping areas, and workplaces are a serious contemporary problem without a historical analog .............22

   3.   In both the Founding and Reconstruction Eras, governments enacted comparable regulations on gunpowder and on dangerous weapons that were justified for comparable reasons and had a comparable effect ..............23

  C.   Plaintiffs have not shown that § 4021 is facially unconstitutional ...........................25

III.   Plaintiffs have not shown that they are likely to succeed on their claim that the Second Amendment protects a right to immediately obtain a firearm...............................26

  A.   Plaintiffs have not established that the Second Amendment presumptively encompasses a right to immediately obtain a firearm................................................26

   1.   The plain text of the Second Amendment does not support Plaintiffs' position...........................................................................................................26

   2.   Binding precedent confirms that a 72-hour waiting period is not precluded by the Second Amendment ............................................................27

   3.   The Supreme Court has expressly approved of regulations of commercial firearms transactions ...............................................................................29

   4.   The Second Amendment cannot reasonably be understood as encompassing a right to immediate acquisition of a firearm because doing so was not realistic or practical in the late 1700s .................................29

  B.   Requiring a brief waiting period before acquiring a gun imposes an imperceptible burden, if any, on Second Amendment rights and falls well within the historical tradition of firearms regulations................................................30

IV.   Plaintiffs will not be irreparably harmed .........................................................................36

V.   The public interest weighs heavily against a preliminary injunction ..................................39

Conclusion ..........................................................................................................................40

# INTRODUCTION

Plaintiffs have not come close to justifying their request for preliminary relief enjoining Vermont's restriction on large-capacity magazines and its brief 72-hour waiting period to acquire a firearm. Their burden is a high one. Because they are asserting a facial constitutional challenge to state laws, they must show that "no set of circumstances exists" under which the law would be valid or that the law "lacks a plainly legitimate sweep." *Antonyuk v. Chiumento*, 89 F.4th 271, 313 (2d Cir. 2023). And they must satisfy the highest standard for a preliminary injunction, including a "strong" showing of irreparable harm and a "clear" or "substantial" showing of likelihood of success on the merits. *A.H. by & through Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021) (cleaned up). Plaintiffs have not done so. Their motion:

- fails to establish any credible threat of irreparable harm;

- ignores numerous unfavorable decisions;

- fails to address arguments adopted by multiple courts that have upheld similar laws;

- does not proffer any expert opinion, even though courts deciding similar cases routinely rely on expert opinions addressing firearms technology, both historical and current; the history of firearms regulation, markets, and use; current data on firearms use, including use for self-defense; and the contemporary impacts and social harms associated with large-capacity magazines, impulsive firearms purchases, and mass shootings; and

- disregards the Second Circuit's controlling Second Amendment precedent in *Antonyuk.*

Plaintiffs ask this Court to facially invalidate and enjoin two state statutes. The first, 13 V.S.A. § 4021, was adopted in 2018 to regulate "large capacity ammunition feeding device[s]." A "large capacity ammunition feeding device" is "a magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept . . . more than

1

10 rounds of ammunition for a long gun; or . . . more than 15 rounds of ammunition for a hand gun." *Id.* § 4021(e)(1). The statute, which took effect nearly six years ago, on April 11, 2018, banned the manufacture, possession, purchase, transfer, or sale of these devices after October 1, 2018. *Id.* § 4021(a). However, devices lawfully obtained prior to the statute's effective date may continue to be possessed. *Id.* § 4021(a). A violation is punishable by a fine or imprisonment up to one year. *Id.* § 4021(b).

Plaintiffs also ask the Court to facially invalidate and enjoin 13 V.S.A. § 4019a, which provides that:

> A person shall not transfer a firearm to another person until 72 hours after the licensed dealer facilitating the transfer is provided with a unique identification number for the transfer by the National Instant Criminal Background Check System (NICS) or seven business days have elapsed since the dealer contacted NICS to initiate the background check, whichever occurs first.

The waiting period does not apply to firearms that do not require a background check under 13 V.S.A. § 4019 or 18 U.S.C. § 922(t). 13 V.S.A. § 4019a(c). The statute, which took effect July 1, 2023, also temporarily exempts transfers at certain gun shows; that exemption ends July 1, 2024. *Id.* § 4019a(e).

These restrictions are modest and entirely consistent with the right of "individual self-defense" that is "the *central component* " of the Second Amendment right. *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 767 (2010). Accordingly, recent court decisions overwhelmingly contradict Plaintiffs' position. The Seventh Circuit and at least a half-dozen district courts have upheld large-capacity magazine (LCM) restrictions, including laws that are more restrictive than Vermont's. *See Bevis v. City of Naperville, Illinois*, 85 F.4th 1175, 1195 (7th Cir. 2023) (upholding ban on LCMs in excess of 10 rounds for a rifle and 15 rounds for a handgun); *Nat'l Ass'n for Gun Rts. v. Lamont*, No. CV 3:22-1118 (JBA), 2023 WL 4975979, at *2 (D. Conn. Aug.

3, 2023) (upholding ban on LCMs larger than 10 rounds) ("*NAGR v. Lamont*"); *Grant v. Lamont*, No. 3:22-CV-01223-JBA, 2023 WL 5533522 (D. Conn. Aug. 28, 2023) (same); *Capen v. Campbell*, No. CV 22-11431-FDS, 2023 WL 8851005 (D. Mass. Dec. 21, 2023) (same); *Oregon Firearms Fed'n v. Kotek Oregon All. for Gun Safety*, No. 2:22-CV-01815-IM, 2023 WL 4541027 (D. Or. July 14, 2023) (same); *Ocean State Tactical, LLC v. Rhode Island*, 646 F. Supp. 3d 368 (D.R.I. 2022) (same); *Hanson v. D.C.*, No. CV 22-2256 (RC), 2023 WL 3019777 (D.D.C. Apr. 20, 2023) (same); *Brumback v. Ferguson*, No. 1:22-CV-03093-MKD, 2023 WL 6221425 (E.D. Wash. Sept. 25, 2023) (same); *Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.*, 664 F. Supp. 3d 584 (D. Del. 2023) (upholding restriction on LCMs larger than 17 rounds).[1] The Second Circuit upheld New York's permit regime in *Antonyuk*—a holding that flat out precludes Plaintiffs' claim that waiting periods are impermissible. 89 F.4th at 315 & n.24. Colorado's waiting period for firearms purchases was recently upheld too. *Rocky Mountain Gun Owners v. Polis*, No. 23-CV-02563-JLK, 2023 WL 8446495 (D. Colo. Nov. 13, 2023) (upholding 3-day waiting period).

This Court should follow this well-reasoned body of precedent and deny Plaintiffs' motion.[2]

---

[1] Plaintiffs cite a single district court opinion that took the opposite view. Pls. Mem., Doc. No. 2-1, at 11 (citing *Duncan v. Bonta*, No. 17-cv-1017-BEN (JLB), 2023 U.S. Dist. LEXIS 169577 (S.D. Cal. Sep. 22, 2023). Not only is that decision an outlier, the Ninth Circuit granted the California Attorney General's motion for a stay pending appeal, in part because it found that California was likely to succeed on the merits of its appeal. *Duncan v. Bonta*, 83 F.4th 803, 806-07 (9th Cir. 2023). The appeal is currently pending.

[2] This Opposition is directed at Plaintiffs' request for preliminary injunctive relief. Defendants anticipate motion practice that addresses other shortcomings in Plaintiffs' complaint, including lack of standing and immunity defenses.

## LEGAL STANDARDS

***Standard for facial challenges.*** Plaintiffs have not been charged with violating either law. Their motion asks the Court to declare both statutes unconstitutional and enjoin their enforcement. Pls. Mem., Doc. No. 2-1, at 1-3, 8-22, 26; Compl., Doc. 1, at 49. Although Plaintiffs' complaint nominally asserts both facial and as-applied challenges, their claims and their preliminary injunction motion are classic facial challenges. *See Antonyuk,* 89 F.4th  at 313 (explaining that pre-enforcement challenge not specific to individual plaintiff was facial challenge).

"[F]acial challenges are the most difficult to mount successfully." *Id.* at 314. "To mount a successful facial challenge, the plaintiff must establish that no set of circumstances exists under which the law would be valid, or show that the law lacks a plainly legitimate sweep." *Id.* at 313 (cleaned up). That is, "a facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications." *Id.* (cleaned up). To succeed on these facial claims, Plaintiffs must show that *any* application of the LCM statute, even to a belt or drum that feeds scores or hundreds of bullets, is unconstitutional. And likewise they must show that a waiting period for *any* firearm at *any* time necessarily violates the Second Amendment. Plaintiffs do not even acknowledge this standard, much less try to meet it.

***Preliminary injunction standard.*** "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natl Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Ordinarily, a party seeking preliminary relief must at least establish: irreparable harm; a likelihood of success on the merits; that the public interest favors the party's position, and that the balance of equities tips in their favor. The standard here is even higher, because Plaintiffs seek a "mandatory" injunction that "modif[ies] the status quo." *A.H. by & through Hester v.*

4

*French*, 985 F.3d 165, 176 (2d Cir. 2021) (cleaned up). The requested injunction is "mandatory" because statutes are currently in effect and being enforced. *See id.* Plaintiffs accordingly must "make a strong showing of irreparable harm and demonstrate a clear or substantial likelihood of success on the merits." *Id.* (cleaned up).

## ARGUMENT

### I.   The law governing Plaintiffs' Second Amendment Claims.

Plaintiffs' Second Amendment claims are governed by the Second Circuit's recent decision in *Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023) and the Supreme Court's trio of twenty-first century Second Amendment cases: *District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); and *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). In *Heller*, the Supreme Court first recognized—over two hundred years after its adoption—that the Second Amendment protects an "individual right to keep and bear arms" for self-defense in case of confrontation. 554 U.S. at 595. The Court described "self-defense" as the "*central component*" of this right. *Id.* at 599. *Heller* further explained that the Second Amendment right is "not unlimited;"  is not "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose;" and should not be understood as protecting "those weapons not typically possessed by law-abiding citizens for lawful purposes." 554 U.S. at 595, 625-26. The Court also cautioned that nothing in *Heller* should be taken as casting doubt on "presumptively lawful" regulations such as "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27, 627 n.26.

5

The Court revisited the Second Amendment in *McDonald* and held that it is "fully applicable to the States." 561 U.S. at 750. The plurality opinion emphasized that the Second Amendment is not "subject to an entirely different body of rules than the other Bill of Rights guarantees," and explained that applying it to the States would "not imperil every law regulating firearms." *Id.* at 780, 786 (plurality opinion). *McDonald* also reiterated *Heller's* discussion of presumptively lawful and "longstanding" firearms regulations. *Id.*

Mostly recently, in *Bruen*, the Court set forth a two-step process for analyzing Second Amendment claims. As *Antonyuk* explains, *Bruen's* approach abrogated the framework that the Second Circuit and the other courts of appeals had adopted after *Heller* and *McDonald*. *See* 89 F.4th at 297-98. *Bruen* describes the new test as "rooted in the Second Amendment's text, as informed by history." 597 U.S. at 19. Citing *Bruen*, *Antonyuk* summarizes the test this way: first, a court must "consider whether 'the Second Amendment's plain text covers an individual's conduct.' If so, 'the Constitution presumptively protects that conduct.' To overcome that presumption, '[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.'" *Antonyuk*, 89 F.4th at 298 (citing *Bruen*, 597 U.S. at 24). *Bruen* thus "requires courts to engage in two analytical steps when assessing Second Amendment challenges: first, by interpreting the plain text of the Amendment as historically understood; and second, by determining whether the challenged law is consistent with this Nation's historical tradition of firearms regulation, as 'that delimits the outer bounds of the right to keep and bear arms.'" *Antonyuk*, 89 F.4th at 300 (citing *Bruen*, 597 U.S. at 19).

Applying this framework, the Court in *Bruen* held that New York's permitting regime for concealed-carry permits violated the Second Amendment. Citing *Heller*, the Court first held that plain text of the Second Amendment protected the plaintiffs' right to carry handguns outside the

home for self-defense: the plaintiffs were "ordinary, law-abiding, adult citizens" who wished to carry handguns that were "weapons 'in common use' today for self-defense." *Bruen*, 597 U.S. at 31-32 (quoting *Heller*, 554 U.S. at 580). Turning to the second step of the analysis, the Court held that New York had not justified its permitting regime as consistent with the historical tradition of firearms regulations. The problem with New York's regime was that the grant of a permit was discretionary and required the applicant to show some "special need" for a concealed carry license. While recognizing that governments had historically regulated aspects of carrying firearms, including intent, manner, and location, the "overwhelming weight" of historical evidence did not support this kind of discretionary assessment of need. *Id.* at 64-71. The Court distinguished New York's discretionary approach to permitting from more common "shall-issue" permit laws, which require permits to issue once applicants satisfy certain objective criteria, including background checks and safety training. *Id.* at 38 n.9. Nothing in its analysis, the Court explained, "should be interpreted to suggest the unconstitutionality" of those non-discretionary licensing requirements. *Id.*

*Antonyuk* synthesizes *Bruen*, *McDonald*, and *Heller*, explaining that "history and tradition give content to the indeterminate and underdetermined text of the Second Amendment: 'the right of the people to keep and bear Arms.'" 89 F.4th at 300 (quoting U.S. Const. Amend. II). The Second Amendment codifies a "pre-existing right," and "therefore can fairly be read to incorporate 'traditional limitations' that existed at or around ratification, unless historical context suggests otherwise." *Id.* That history confirms that the right is "not unlimited." *Id.* (quoting *Bruen*). The Second Circuit explains several implications of *Bruen's* approach:

1. History must be examined "with some care" because "history and tradition" do not create the constitutional right; rather, they "shed light" on its meaning. The focus is on our "whole experience as a Nation." 89 F.4th at 301.

2. A court must "identify the 'societal problem' that the challenged regulation seeks to address" and "ask whether past generations experienced that same problem and, if so, whether those generations addressed it in similar or different ways." *Id.* at 301.

3. The "absence of a distinctly similar historical regulation in the presented record" is not dispositive, and "novelty does not mean unconstitutionality." *Id.* at 301-02 (cleaned up). That's because legislatures do not generally legislate "to their constitutional limits" and would not need to "forbid behavior that is governed by custom, universal practice, or private warning." *Id.* at 301-02.

4. The "lack of a distinctly similar historical regulation" is also not "reliably dispositive" because our modern era simply does not resemble medieval England or the colonial period. *Id.* at 302. A "'more nuanced approach'" is necessary in cases concerning 'new circumstances' or 'modern regulations that were unimaginable at the founding,' such as regulations addressing 'unprecedented societal concerns or dramatic technological changes.'" *Id.* at 302 (quoting *Bruen*, 597 U.S. at 27-28).

5. When applying this "more nuanced approach," one approach courts may take is to reason by analogy, and consider whether historical regulations burdened a law-abiding citizen's right to armed self-defense in a comparable way or for a comparable reason. *Id.* While this approach is not a "'regulatory blank check,'" it is also not a "'regulatory straightjacket.'" *Id.* at 302 (quoting *Bruen*, 597 U.S. at 30).

6. Depending on the context, even a few instances of historically comparable regulations can be sufficient, particularly in the absence of evidence that the regulations' lawfulness was disputed. *Id.* at 303-04.

7. Because the Second Amendment applies to state governments through the 14th Amendment, evidence of history and tradition from the Reconstruction Era—and time periods before and after, but close to, that time—are also relevant to the historical analysis. *Id*. at 304-05.

A further point about *Bruen* and *Antonyuk* is particularly relevant here: both addressed restrictions on carrying (or "bearing") *handguns*. In *Heller*, the Supreme Court found that handguns specifically are in common use by law-abiding citizens for self-defense. *Heller*, 554 U.S. at 628-29  For that reason, *Bruen* includes only a brief discussion of the first step in the Second Amendment analysis. *See* 597 U.S. at 32-33 (no party disputes that "handguns are weapons 'in common use' today for self-defense"). And *Antonyuk* likewise does not meaningfully engage with step one. Other courts, however, have recognized that—consistent with *Heller, McDonald,* and *Bruen*—not every regulation of firearms is covered by the plain text of the Second Amendment. *See, e.g., Bevis*, 85 F.4th at 1195 (holding, at "first step of the *Bruen* analysis," that "assault weapons and high-capacity magazines are much more like machineguns and military-grade weaponry than they are like the many different types of firearms that are used for individual self-defense," and are not protected by Second Amendment); *Capen*, 2023 WL 8851005, at *18 (holding, at preliminary injunction stage,  that ammunition magazines are not "arms" and plaintiffs did not demonstrate that large-capacity magazines are protected by Second Amendment); *Oregon Firearms Fed'n*, 2023 WL 4541027, at *25-34 (holding that large-capacity magazines are not protected by Second Amendment).

**II. Plaintiffs have not shown that they are likely to succeed on their claim of a Second Amendment right to possess magazines larger than 15 bullets for a handgun and 10 bullets for a long gun.**

For Plaintiffs' facial challenge to § 4021 succeed, they must establish that the government cannot in any circumstance restrict possession of the large-capacity magazines regulated by the statute, namely, any magazine larger than 10 bullets for a long gun and larger than 15 bullets for a handgun. Their claim fails at both steps of the *Bruen* analysis. First, they have not shown that the plain text of the Second Amendment protects large-capacity magazines. Second, even if Plaintiffs had made the required showing, § 4021 falls comfortably within the historical tradition of regulating dangerous weapons and accessories that are not reasonably necessary to self-defense. Post-*Bruen*, courts in this circuit and elsewhere have overwhelmingly rejected similar claims. *See, e.g., Bevis*, 85 F.4th 1175, 1195; *Capen*, 2023 WL 8851005, at *18; *Nat'l Ass'n for Gun Rts. v. Lamont*, 2023 WL 4975979, at *2; *Grant v. Lamont*, 2023 WL 5533522, at *5-7; *Oregon Firearms Fed'n*, 2023 WL 4541027, at *1; *Ocean State Tactical*, 646 F. Supp. 3d at 373-74; *Hanson*, 2023 WL 3019777, at *1; *Brumback*, 2023 WL 6221425, at *1. Plaintiffs do not even cite these cases, much less try to rebut this body of persuasive, reasoned analysis upholding similar (and in many cases, more restrictive) laws.

**A. Plaintiffs have not shown that large-capacity magazines—which are not arms; are designed for offensive uses akin to military-style assault weapons; and are not commonly used for self-defense—fall with the presumptive scope of the Second Amendment.**

Under *Bruen* and applying settled law governing facial challenges and requests for preliminary injunctions, Plaintiffs bear the burden at step one of the *Bruen* analysis. That is, Plaintiffs must demonstrate that they are likely to succeed in showing that ammunition magazines larger than 15 bullets for a handgun and 10 bullets for a rifle fall within the Second Amendment's presumptive right to keep and bear arms for self-defense. Plaintiffs offer two legal arguments on this point—

arguments they advance without offering any historical, factual, or expert evidence or addressing a substantial body of contrary precedent. They say, first, that *Heller* establishes that any "bearable arm[]" is protected under the Second Amendment, and second, that magazines of any size must be considered protected "arms" because ammunition is needed for a gun to function. Pls. Mem. 8-9. Plaintiffs' cursory and unsupported arguments fall far short of meeting their burden. They are unlikely to succeed in making the required showing because: (1) they mis-read *Heller*; (2) large-capacity magazines are neither bearable arms nor needed to operate guns, and thus are not protected by the Second Amendment's text; (3) the Second Amendment does not presumptively extend protection to military-style offensive weapons; and (4) Plaintiffs have not met their burden for a facial challenge.

**1.** ***Heller*** **and subsequent, binding precedent hold that the Second Amendment right is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."** *Heller*, 554 U.S. at 626. Plaintiffs mischaracterize *Heller* when they argue that any "thing" that can be used to "cast at or strike another" is presumptively protected by the Second Amendment. Pls. Mem. 8. Their reading would mean that grenade launchers, M-16s, armor-piercing ammunition, and numerous other types of highly dangerous, military weaponry carries Second Amendment protection. *Heller,* however, said exactly the opposite: that "M-16 rifles" and "like" weapons may be banned. 554 U.S. at 627. And the Court reiterated this point in *McDonald*: "It is important to keep in mind that *Heller,* while striking down a law that prohibited the possession of handguns in the home, recognized that the right to keep and bear arms is not "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (2010). *Antonyuk* says the same.

*See* 89 F.4th at 295. Plaintiffs cannot meet their burden at step one merely by asserting that every conceivable weapon and form of ammunition is covered by the Second Amendment.

**2. Large-capacity magazines are not "arms."** Plaintiffs concededly devote "little analysis" (Pls. Mem. 8) to the key question of whether large-capacity magazines are "arms" for purposes of presumptive Second Amendment protection. Their conclusory assertions are, again, insufficient to meet their burden. To begin with, as multiple courts have recognized post-*Bruen*, historically the term "arms" did not refer to ammunition, cartridge cases, or other items analogous to modern ammunition magazines. *See, e.g., Capen*, 2023 WL 8851005, at *17 ("LCMs are not "arms" within the textual meaning of the Second Amendment"); *Ocean State Tactical*, 646 F. Supp. 3d at 386-87 ("LCMs, like other accessories to weapons, are not used in a way that casts at or strikes another"); *Oregon Firearms Fed'n*, 2023 WL 4541027, at *26 ("LCMs are not 'bearable arms' as that term is used in Second Amendment jurisprudence").The detailed and unrebutted declaration of Defendants' expert Dennis Baron shows that Plaintiffs' interpretation of "arms" is historically inaccurate. Dr. Baron, an expert in linguistics and historical language use, has engaged in a close historical study of historical textual databases to examine historical uses of the term "arms." Baron Dec. ¶¶ 6-10, 11. Based on that historical evidence, Dr. Baron explains that "during the Founding Era and the Reconstruction Era, 'arms' was used as a general term for weapons (typically swords, knives, rifles, and pistols), but did not include ammunition, ammunition containers, flints, scabbards, holsters, armor, or shields." *Id.* ¶ 11. The latter items "were included in the category 'accoutrements.'" *Id.* The term "arms" also did not "refer to parts of weapons, for example, the trigger of a gun, the hilt of a sword, or the cartridge box or fixed or removable magazine that holds the bullets." *Id.*

The term "magazine" was not used to refer to a container for ammunition until the late 1800s. *Id.* ¶¶ 25-27. During the Founding Era and long afterwards, a magazine was a designated (and heavily regulated) building for storing gunpowder. *Id.* ¶ 26. Dr. Baron identifies the terms "cartridge boxes" and "cartouch boxes" as the eighteenth and nineteenth century equivalents of an ammunition magazine. *Id.* ¶ 28. And he details extensive evidence of historical language usage showing that the term "arms" did not encompass or include these cartridge boxes or ammunition. *Id.* ¶¶ 31-62. Instead, historical sources show that the phrase "arms and accoutrements" was common, with "accoutrements" including cartridge boxes and ammunition, and that ammunition was often listed separately from arms and other military equipment. *Id.* ¶¶ 42-48, 59-62.

Plaintiffs insist that (all) ammunition magazines must be considered "arms" because ammunition is needed to "use" a firearm. Pls. Mem. 9. In making that argument, however, Plaintiffs ignore *Bruen's* focus, at step one, on the "plain text" of the Second Amendment. That is exactly what Dr. Baron's analysis does and that is why courts have rejected any ready assumption that large-capacity magazines are presumptively within the scope of the Second Amendment. Dr. Baron's analysis shows that other language was commonly used to include both firearms and magazines or ammunition—terms like "arms and accoutrements," which was "frequently" used to describe such equipment. Baron Dec. ¶ 12. The drafters of the Second Amendment did not use that broader language. And the narrower term "arms" would not have been understood to include accessories like ammunition, cartridge cases, or gunpowder. Baron Dec. ¶¶ 11-12.

Plaintiffs' argument also fails because they make an unsupported and illogical leap from a premise—that ammunition is needed to use a gun—to a conclusion—that large-capacity magazines thus must be protected "arms." Ammunition, like weapons, comes in many forms. Just as the protections extended to handguns are not extended to M-16s, likewise any protection

afforded to some ammunition need not and should not extend to every form, type, and delivery capacity of ammunition. Plaintiffs' extreme position would mean that 100-round drums of armor-piercing bullets fall within the Second Amendment's scope.

The *Capen* court rightly criticized this approach as applied to large-capacity magazines. *Capen*, 2023 WL 8851005, at *18. As *Capen* explains, large-capacity magazines are not necessary to operate firearms. *Id.* ("LCMs as a specific subset of that class [of magazines] are never necessary for a firearm to function."); *Oregon Firearms Fed'n*, 2023 WL 4541027, at *26 (same, citing evidence that magazines are interchangeable and most popular firearms are operable with a 10-round magazine); Dec. of Brindiana Warenda (Jan. 31, 2023), filed in *NAGR v. Lamont*, 3:22-CV-01118(JBA) (D. Ct.), ¶¶ 39-43 (explaining how magazines operate and concluding "Most firearms that accept large capacity magazines can also function using a magazine that has a capacity of under ten rounds.").[3] Thus, even accepting Plaintiffs' ahistorical approach to the meaning of "arms," Plaintiffs have not shown that large-capacity magazines are in any way needed to use firearms.

**3. Even if LCMs are considered "arms," Plaintiffs have also not met their burden of showing that LCMs are in common use for self-defense.** *See, e.g., NAGR v. Lamont*, 2023 WL 4975979, at *15 (burden on plaintiffs to produce "evidence that the specific firearms they seek to use and possess are in common use for self-defense"); *Oregon Firearms Fed'n*, 2023 WL 4541027, at *26 (asking whether plaintiffs showed that LCMs "are in common use for self-defense"). To the contrary, the record evidence overwhelmingly shows that LCMs are not in common use today for self-defense.

---

[3] The Warenda declaration was proffered as evidence in *NAGR v. Lamont* and is attached as Appendix A. Defendants are relying on it at this stage of the case and reserve the right to proffer an expert on these topics at the merits stage.

To begin with, Plaintiffs' rhetoric greatly overstates the ownership of LCMs. The overwhelming majority of Americans (70%) do not own any firearms. Donohue Dec. ¶¶ 30, 31. And many of those who own a gun do not own an assault weapon or LCM. *Id.* Indeed, even accepting Plaintiffs' questionable data, over half of gun owners have never possessed an LCM, which means that over 85% of Americans have never owned these devices. *Id.* ¶ 32.

Further, Dr. Allen and Professor Donohue both confirm that Americans simply do not fire anything close to 10 or 15 shots when using a weapon for self-defense. Dr. Allen's research shows that when someone fires a weapon in self-defense, the average number of shots fired is slightly over 2. *Id.* ¶¶ 12, 19. Dr. Allen's in-depth analysis of reported instances of armed self-defense found only two reports of a person firing more than ten shots in self-defense during the period 2011-2017 Allen Dec. ¶¶ 7-19. Her analysis included both media reports and the NRA's own database that tracks armed self-defense. *Id.* She also did an in-depth review of crime reports in a major city (Portland, OR) from 2019-2022. *Id.* ¶¶ 20-24. That study found no instances where a person fired 10 or more shots in self-defense. *Id.* Other courts have relied on similar evidence to find that "law-abiding citizens with ordinary self-defense needs simply do not commonly fire more than ten rounds when acting in self-defense." *Oregon Firearms Fed'n*, 2023 WL 4541027, at *32.

Similarly, Professor Donohue explains that guns are used in self-defense in only 0.8 percent of cases where someone is attacked, and in the "overwhelming majority" of those cases the gun is brandished but not fired. Donohue Dec. ¶¶ 111-13. He concludes that § 4021 has "little or no impact on the defensive capabilities of law-abiding citizens" given the "vanishingly small" fraction of scenarios in which more than 10 rounds even *could* be required. *Id.* ¶¶ 113-14. And it's not just that ordinary, law-abiding citizens don't need LCMs for self-defense; the fact is, assault-style weapons equipped with LCMs are dangerous and poorly suited for this kind of purpose. *Id.* ¶ 115.

15

A person who can't hit a target in two or three shots is spraying bullets that could hit anyone. Those bullets can hit family members, bystanders, and first responders, and they can easily penetrate walls and harm innocent people. *Id.* ¶ 115.

For all of these reasons, the Court should hold—consistent with other recent decisions—that LCMs are not in common use for self-defense. *See, e.g, NAGR v. Lamont*, 2023 WL 4975979, at 20-21; *Oregon Firearms Fed'n*, 2023 WL 4541027, at *32-33.

**4. The Second Amendment right to "keep and bear arms" does not extend to ammunition magazines of this size because they are akin to military-style offensive weapons.** In *Bevis*, the Seventh Circuit correctly held that the "Arms protected by the Second Amendment do not include weapons that may be reserved for military use." 85 F.4th at 1194. That is, certain types of weapons are excluded from constitutional protection "at the first step of the *Bruen* analysis." *Id.* at 1195. The Seventh Circuit put both "assault weapons and high-capacity magazines" in that category, explaining that they "are much more like machineguns and military-grade weaponry than they are like the many different types of firearms that are used for individual self-defense." *Id.*; *see also, e.g., Oregon Firearms Fed'n,* 2023 WL 4541027, at *34 (finding that "LCMs have uniquely dangerous propensities" and the LCMs sold to civilians are often the same ones used by the military); *NAGR. v. Lamont*, 2023 WL 4975979, at *24-26 (discussing militaristic characteristics of LCMs and assault weapons and finding that "LCMs are more suitable for military use than civilian self-defense").

The record here fully supports the Seventh Circuit's conclusion. As explained above, ordinary, legal magazines are unquestionably sufficient for self-defense. *See supra* § II.A.3..

What LCMs are used for, with tragic results, is to murder as many people as possible as quickly as possible. "LCMs enhance the lethality of shooting events." *Oregon Firearms Fed'n,* 2023 WL

4541027, at *34. They are frequently used in mass shootings, and the number of people killed and injured in a mass shooting is higher when LCMs are used. Allen Dec. ¶¶ 35, 36; *see also* Donohue Dec. ¶¶ 43-44 (describing recent uses of LCM's in mass shootings). Out of 115 mass shootings where the magazine size could be determined from public sources, over 60% involved an LCM. Allen Dec. ¶ 35. Dr. Allen's analysis of mass shooting data shows that on average, 25 people are shot and 10 people die in a mass shooting with LCMs, as opposed to 9 victims and 6 fatalities when LCMs aren't used. *Id.* ¶ 36. Other studies show similar outcomes. *Id.* ¶ 37.

The military may need the lethality of LCMs. Ordinary citizens do not. This Court should follow *Bevis* and hold that LCMs are not presumptively protected by the Second Amendment.

## B. Vermont's restriction on magazines larger than 15 for handguns and 10 for long guns falls easily within the historical tradition of firearms regulations.

Because LCMs are not within the presumptive reach of the Second Amendment, the Court need not go further to reject Plaintiffs' demand for a preliminary injunction. If the Court does address Bruen's step two, however, § 4021 should be upheld as "consistent with this Nation's historical tradition of firearms regulation." *Antonyuk*, 89 F.4th at 300.

### 1. Plaintiffs' simplistic "common-use" argument is legally and factually wrong.

Plaintiffs assert that banning LCMs is necessarily unconstitutional because LCMs are commonly owned by gun owners. To begin with, Plaintiffs get the burden wrong, *see* Pls. Mem. 10. As shown above, Plaintiffs have the burden at step one of the *Bruen* analysis to show that LCMs are both arms *and* in common use for self-defense—and they have not done so. *See supra* § II.A. 2.-3.. Regardless, Plaintiffs' simplistic "common use" argument is legally and factually flawed.

First, Plaintiffs equate § 4021 with a "flat ban" on the use of a class of firearms. Pls. Mem. 12-16. But Plaintiffs' framing is legally flawed, because an LCM is not an "arm," *see supra* § II.A.2.,

17

and § 4021 does not ban the use of any firearm. The statute merely restricts the capacity of an ammunition magazine that can be used *with* a firearm. Plaintiffs do not proffer any evidence that any class or type of firearm is unusable with an ordinary magazine. In fact, magazines of different sizes are interchangeable and handguns and rifles can readily be used with ordinary, legal magazines. *See* App. A, ¶¶ 39-43. Plaintiffs' position here is akin to saying that prohibiting silencers is a complete ban on any silenced gun or banning the obliteration of serial numbers is an absolute ban on unmarked guns. That is not the right framing for the Second Amendment analysis. An ammunition magazine is an accessory, not a firearm, and restrictions on the capacity of a magazine merely restrict *a single* manner of use, not all manners.

Second, although Plaintiffs claim to have "submitted substantial evidence establishing that the banned magazines are in common use," Pls. Mem. 9-10, in fact they have not proffered any such evidence. The surveys they cite are hearsay, not admissible evidence. Pls. Mem. 10-12. As Defendants' expert Professor Donohue explains, the cited article by William English has been subject to "devastating critique" by other scholars. Donohue Dec. ¶ 125; *see also id.* ¶¶ 32-33, 124-25 (detailing critiques of English). They also cite NSSF "data" (Pls. Mem. 11) but NSSF sources were criticized as unreliable in *Oregon Firearms Federation. See* 2023 WL 4541027, at *27. Plaintiffs identify no ground on which their survey "evidence" could be considered admissible evidence and it should therefore be disregarded.

Plaintiffs also wrongly argue that *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015), the Second Circuit's pre-*Bruen* decision that upheld a New York ban on LCMs, requires this Court to treat LCMs as commonly used for self-defense. *Cuomo* described LCMs as "commonly owned" but concluded that "reliable empirical evidence of lawful possession for lawful purposes was elusive beyond ownership statistics." *Cuomo*, 804 F.3d at 257. The *Cuomo*

court "assume[d] for the sake of argument" that LCMs were in common use for lawful purposes, and applying intermediate scrutiny, held the LCM ban was a permissible regulation. *Id. Cuomo's* approach to the Second Amendment has since been abrogated by *Bruen*. *See, e.g., Nat'l Ass'n for Gun Rts. v. Lamont,* 2023 WL 4975979, at *13.

*Cuomo*'s citation to "ownership statistics" is factually inapposite, because the Court was discussing LCMs larger than 10, and Vermont's law permits handgun LCMs with a capacity up to 15. More importantly, as the district court in *Lamont* recognized, *Cuomo* analyzed common use the wrong way. It "divided common use and typical possession into two questions" and gave those "terms distinct meanings." *NAGR v. Lamont*, 2023 WL 4975979, at *13. *Bruen*, however, framed the "relevant inquiry" as a single question: "whether the weapons are "'in common use' today *for self-defense.*" *Id.* (quoting *Bruen*, 597 U.S at 32). *Cuomo* did not decide that question.

Third, as explained above, the record evidence overwhelmingly shows that LCMs are not in common use today for self-defense. *See supra* § II.A.3. This Court should follow the approach of the Oregon District Court and "reject[] Plaintiffs' invitation to equate 'commonly owned' with "in common use today for self-defense." *Oregon Firearms Fed'n*, 2023 WL 4541027, at *28.

**2.   *Bruen* and *Antonyuk's* "more nuanced" approach to assessing the historical record applies here.**

As *Antonyuk* recognizes, the relevant historical analysis under *Bruen* depends in part on whether legislatures are addressing technology and modern circumstances that were unknown during the Founding Era and/or Reconstruction. *Antonyuk*, 89 F.4th at 301-03 ("lack of a distinctly similar historical regulation, though (again) no doubt relevant, may not be reliably dispositive in Second Amendment challenges to laws addressing modern concerns"). That is plainly true here: the lethality of semi-automatic firearms equipped with LCMs did not exist until the 20th century, and public mass shootings are different in kind, impact, and frequency from historical patterns of

gun violence. The Court should accordingly take a "more nuanced approach" when comparing §
4021 to the historical tradition of firearms regulation. *Id.* at 302; *see, e.g., Oregon Firearms Fed'n,*
2023 WL 4541027, at *36 (applying "more nuanced approach" to review of LCM ban).

**a. Semi-automatic large-capacity magazines are a modern technological development.**

Plaintiffs' allegation that modern semiautomatic weapons are "not dissimilar" to firearms in
use during the Founding Era, Compl. ¶ 52, is unsupported and wrong. Their complaint
(unsupported by affidavit or other admissible evidence) describes a handful of alleged historical
weapons. *Id.* ¶¶ 45-50. But, as Defendants' expert Dr. Spitzer explains, these weapons were
"experimental," "fraught" with problems, and "proven unfeasible." Spitzer Dec. ¶¶ 20-21, 25-46;
*see also, e.g., Oregon Firearms Fed'n,* at *37-38 (repeating firearms were "extremely rare" in
Founding Era). Dr. Baron's linguistic analysis of historical sources reaches the same conclusion:
"repeater" weapons were "rare," "curiosities," and not even available to, much less used by, the
general public. Baron Dec. ¶¶ 63-74. "[S]ingle shot guns were the ubiquitous firearm until after
the Civil War." Spitzer Dec. ¶ 47. Even with some technological advances, the standard infantry
gun throughout the Civil War was a single-shot muzzle-loader. *Id.* As for revolvers, although the
Colt multishot revolver became available in the 1830s, it saw only "limited use" during the Civil
War and did not find a market until after the war. *Id.* ¶¶ 48, 50. Likewise, the multishot Winchester
rifle—which was not semiautomatic—had limited military use and very little civilian market in
the Reconstruction Era. *Id.* ¶¶ 52-61. The Oregon District Court found that "large-capacity firearms
accounted for less than 0.002 percent of firearms in the United States at the time of the Fourteenth
Amendment." *Oregon Firearms Fed'n,* 2023 WL 4541027, at *38. True automatic weapons did
not come into common military use until World War 1 and only reached civilian markets after that
war. Spitzer Dec. ¶¶ 78-79 (describing emergence of Thompson submachine gun).

This history matters because, as Dr. Spitzer explains, our history of firearms regulations—unsurprisingly—does not show legislatures jumping to regulate devices that were barely known, expensive, primarily in military use, and not in general public use. *Id.* ¶¶ 68-75. Late 1700s legislators had no reason to pass laws governing multishot weapons that were very rare, experimental and barely functional. *See id.* ¶ 17 ("New gun laws are not enacted when firearm technologies are invented or conceived.  They are enacted when those technologies circulate sufficiently in society to spill over into criminal or other harmful use, presenting public safety concerns that governments attempt to address through their police and policy-making powers.").

Thus, the danger and lethality of semi-automatic weapons used with LCMs is an unprecedented modern development. Roth Dec. ¶¶ 40-50 (describing capabilities and lethality of semi-automatic weapons and LCMs). There is no plausible comparison between these weapons and the single-shot muskets in common use at the Founding and for a hundred-plus years thereafter. As Dr. Roth explains, those single-shot weapons "had significant limitations as murder weapons." Roth Dec. ¶ 16. They were liable to mis-fire and they only gave the user one shot; once that shot was fired, they had to be manually re-loaded, "which was a time-consuming process that required skill and experience." *Id.* And they could only be used impulsively if the weapon was already loaded for some other reason. *Id.* Gunowners typically cleaned and stored these guns unloaded, because leaving them loaded risked corrosion or misfire. *Id.* That is the factual backdrop for the passage of the Second Amendment. *See also NAGR v. Lamont*, 2023 WL 4975979, at *28-29. The Framers could not have conceived of the weaponry and firepower that allowed, as just one example, a single shooter to kill 59 people and injure hundreds more in Las Vegas in 2017. *See* Donohue Dec. ¶¶ 92,105. Modern semiautomatic weapons used with LCMs thus represent a "dramatic technological change[]," *Bruen*, 597 U.S. at 27, from the Founding and Reconstruction Eras. *See, e.g., Capen*,

2023 WL 8851005, at *18-19 (LCMs "represent a dramatic change in firearm technology"); *Oregon Firearms Fed'n,* 2023 WL 4541027, at *39 (modern LCMs "represent a dramatic technological change from the types of weapons available at the Founding and Reconstruction").

**b. Mass shootings in settings like schools, shopping areas, and workplaces are a serious contemporary problem without a historical analog.**

Our nation's epidemic of mass shootings is likewise a contemporary development unlike anything that was known in the Founding and Reconstruction Eras. The *Lamont* court aptly summed up this point: "mass shootings carried out with assault weapons and LCMs that result in mass fatalities are a modern societal problem" and "the development of semiautomatic fire has led to a level of casualties and injuries from firearm violence previously unseen in American history and has been spurred by factors and advances in technology that would have been unimaginable to the Founding Fathers." *NAGR v. Lamont,* 2023 WL 4975979, at *29. The Oregon District Court likewise concluded that mass shootings related to LCMs are "unprecedented":

> Incidents of mass shootings were rare even a half a century ago and have increased rapidly in very recent years. In the last decade, most mass shootings in which more than five individuals were killed involved LCMs. And the rise in these mass casualty events is placing an unprecedented pressure on society's medical institutions, which must now be prepared to handle mass casualty events at the expense of other patients. Though gun violence certainly has long plagued the United States, Defendants and Intervenor-Defendant have shown that these incidents of singular and concentrated violence against civilians are unprecedented.

*Oregon Firearms Fed'n,* 2023 WL 4541027, at *37.

The record here fully supports *Lamont's* holding. The "problem of public mass shootings in the United States is a serious and worsening national problem." Donohue Dec. ¶ 25. Mass shootings have been increasing since the federal assault weapons ban ended in 2004. *Id.* ¶¶ 36-37. FBI data on active shooter incidents shows a steep rise over the past 20 years. *Id.* ¶¶ 41-44. In 2021, there were 61 active shooter incidents—double the previous high of 30 in 2017. *Id.* ¶ 41.

Professor Donohue catalogs the overwhelming and unique harms inflicted by mass shooting events, including widespread casualties and life-altering non-fatal injuries; lasting trauma for survivors and first responders; and the loss of a sense of public safety and security. *Id.* ¶¶ 42-47, 59-65. He also explains how LCMs make mass shootings worse: firing more shots more quickly, without pausing to reload, means more people die or are grievously injured. Victims are often shot multiple times, making their injuries impossible to survive. *Id.* ¶¶ 58, 66, 94; *see also* Roth Dec. ¶¶ 54-56 (explaining that "with extended magazines, semiautomatic rifles cause an average of 299 percent more deaths and injuries than regular firearms [and] 185 percent more than semiautomatic rifles without extended magazines").

The modern epidemic of mass shootings is different in kind from anything experienced historically. Professor Roth chronicles how "[v]iolence among colonists was not a pressing problem on the eve of the Revolution," Roth Dec. ¶ 14, and that, due to the primitive state of gun technology, "firearms had a modest impact on homicide rates among colonists." *Id.* ¶ 18. Mass shootings carried out by individuals are "a criminological problem that did not exist in the Founding Era, nor during the first century of the nation's existence." *Id.* ¶ 61.

**3.   In both the Founding and Reconstruction Eras, governments enacted comparable regulations on gunpowder and on dangerous weapons that were justified for comparable reasons and had a comparable effect.**

As numerous courts have recognized, regulations that limit magazine capacity are analogous to historical regulations that banned new and dangerous weapons, limited concealed carry of weapons, and sharply restricted storage of gunpowder. *See, e.g., NAGR v. Lamont*, 2023 WL 4975979, at *31-33 (analogizing LCM ban to regulations on dangerous weapons and concealed carry); *Oregon Firearms Fed'n*, 2023 WL 4541027, at 39-46 (analogizing LCM ban to historical restrictions and prohibitions on trap guns, gunpowder storage, bowie knives, blunt objects,

concealed carry of pistols and revolvers, and semiautomatic and automatic weapons); *Capen*, 2023 WL 8851005, at 19 (also noting gunpowder regulations).

Professor Spitzer describes a well-worn historical "pattern" of weapons invention, military use, civilian use, use in crime, and regulation. It's common sense: New technologies are invented, often with military use in mind. Some technologies catch on in civilian markets and, if they "circulate sufficiently in society to pose a safety, violence, or criminological problem or threat, calls for government regulation or restriction then may lead to gun policy/law changes." Spitzer Dec. ¶ 17. Regulation of other types of weapons in the Framing and Reconstruction eras followed this pattern, and further undermines Plaintiffs' position. For example, as Bowie Knives became popular in the 1800s and started to be used in murders and other crimes, most states responded by barring or restricting them (and similar long-bladed knives). *Id.* ¶¶ 136-41, Ex. I. Professor Spitzer traces a similar timeline and pattern for clubs and other blunt weapons, *id.* ¶¶ 143-52, Exs. E, J, and trap guns, *id.* ¶¶ 159-63, Ex. F. These historical laws "sought to address the features of those weapons that made them particularly dangerous to public safety." *Oregon Firearms Fed'n*, 2023 WL 4541027, at 46. "[R]estrictions on LCMs are no different." *Id.*

In addition to weapons themselves, "[g]unpowder was widely and extensively regulated in the colonies and states. In fact, with one exception, every state in the country enacted one or more gunpowder laws from the seventeenth century through the start of the twentieth century." Spitzer Dec. ¶ 244. Beginning in the 1700s, and continuing through the next century, at least 21 states enacted specific licensing regimes for the possession, handling, and/or use of gun powder. *Id.* ¶¶ 204, 245. "[T]hese gunpowder regulations acted as a kind of limit on the amount of firepower that an individual could amass in a single place." *Oregon Firearms Fed'n*, 2023 WL 4541027, at 40. These laws "did not severely restrict the right to armed self-defense because an individual could

still purchase gunpowder," but a person "could not store that gunpowder in amounts that would place the public at risk by leading to a catastrophic explosive event." *Id.*

Professor Roth provides similar historical context, explaining that "during the lifetimes of Jefferson, Adams, Marshall, and Madison, the Founding Generation passed laws in a number of states that restricted the use or ownership of certain types of weapons after it became obvious that those weapons, including certain fighting knives and percussion-cap pistols, were being used in crime by people who carried them concealed on their persons and were thus contributing to rising crime rates." Roth Dec. ¶ 27. Professor Roth further explains that by the early 20th century, most states had banned or severely restricted concealed firearms. *Id.* ¶ 28. And as technological change accelerated in the 20th century, regulatory responses followed, with many states restricting magazine capacity in the 1920s and 1930s, and Congress restricting ownership of machine guns and submachine guns during that same time. *Id.* ¶ 47.

Vermont's restriction on LCMs is consistent with this historical tradition. The conclusion reached by the district court in Oregon applies equally here:

> Throughout this Nation's history, new technologies have led to the creation of particularly dangerous weapons. As those weapons became more common, they became tied with violence and criminality. In response, governments passed laws that sought to address the features of those weapons that made them particularly dangerous to public safety. [The statute's] restrictions on LCMs are no different, and are thus constitutional under *Bruen*'s history and tradition test.

*Oregon Firearms Fed'n*, 2023 WL 4541027, at 46.

## C.  Plaintiffs have not shown that § 4021 is facially unconstitutional.

Finally, Plaintiffs' facial challenge to § 4021 fails because Plaintiffs do not even attempt to show that the law is unconstitutional as applied to all LCMs. Section 4021 restricts drums, belts, and other ammunition-feeding devices that feed 50, 75, or 100 rounds of ammunition or more. Plaintiffs don't address these devices at all, much less  explain why, even accepting their preferred

Second Amendment framework, such devices would be constitutionally protected. Plaintiffs thus have not met their burden under *Antonyuk* to sustain a facial challenge. *Antonyuk,* 89 F.4th at 312 (holding that character requirement in permit statute "is not facially invalid because it is not unconstitutional in *all* its applications").

## III. Plaintiffs have not shown that they are likely to succeed on their claim that the Second Amendment protects a right to immediately obtain a firearm.

Plaintiffs challenge the constitutionality of a very brief waiting period to obtain a firearm after deciding to purchase it. The waiting period is only 72 hours (unless the completion of a background check is delayed, but Plaintiffs don't challenge that provision). Most Vermonters have to wait more than 72 hours to get an Amazon order delivered. Neither caselaw nor the historical record support Plaintiffs' characterization of the Second Amendment right as an unfettered right to immediately obtain a firearm.

## A. Plaintiffs have not established that the Second Amendment presumptively encompasses a right to immediately obtain a firearm.

In challenging Vermont's brief waiting period, Plaintiffs again minimize the importance of the first step of the *Bruen* analysis. They assert in conclusory fashion that a 72-hour waiting period to purchase a gun infringes on their right to "keep and bear" arms. Pls. Mem. 18-19. But they disregard the Second Amendment's text and the weight of authority—including Supreme Court precedent—approving of permit requirements that necessarily impose far greater delays.

**1. The plain text of the Second Amendment does not support Plaintiffs' position.** In *Heller*, the Supreme Court relied on Founding Era dictionaries that defined "keep" as meaning "to retain; not to lose," "to have in custody," and "to hold; to retain in one's power or possession." *Heller*, 554 U.S. at 582 (cleaned up). Citing similar dictionaries, it found that "to 'bear' meant to 'carry.'" *Id.* at 584. The Court ultimately construed the phrase "keep and bear arms" as "guarantee[ing] the

26

individual right to possess and carry weapons *in case of confrontation*." *Id.* at 592 (emphasis added). The 72-hour waiting period to *acquire* a firearm does not restrict that right. In the event "of confrontation," you are either carrying weapons or you aren't; you cannot pause the confrontation in order to purchase a firearm. Therefore, as the Colorado District Court held in *Rocky Mountain*,  "it is clear the relevant conduct impacted by the waiting period—the receipt of a paid-for firearm without delay—is not covered." *Rocky Mountain Gun Owners v. Polis*, No. 23-CV-02563-JLK, 2023 WL 8446495, at *8 (D. Colo. Nov. 13, 2023).

Like the plaintiffs in *Rocky Mountain*, Plaintiffs here mistakenly equate "keep" or "possess" with "acquire" or "obtain." *See id.* "But these terms are not equivalent." *Id.* As the *Rocky Mountain* court explained, to "'keep,' under the definitions provided in *Heller*, meant to retain an object one already possessed. It did not mean to receive a newly paid-for item, and it certainly did not mean to receive that item without delay. Likewise, 'hav[ing] weapons' indicates the weapons are already in one's possession, not that one is receiving them." *Id.*

Plaintiffs' conclusory assertions fall far short of meeting their burden under *Bruen's* step one. Their request to enjoin the waiting period should be denied on this ground alone.

**2. Binding precedent confirms that a 72-hour waiting period is not precluded by the Second Amendment.** Both the Supreme Court in *Bruen* and the Second Circuit in *Antonyuk* approved of permitting regimes that necessarily entailed waiting periods greater than 72 hours. In *Bruen*, the Supreme Court distinguished New York's discretionary permitting regime from common "shall-issue" permit laws, which require permits to issue once applicants satisfy certain objective criteria, including background checks and safety training. 597 U.S. at 38 n.9 (emphasis added). The Court instructed that nothing in its ruling "should be interpreted to suggest the unconstitutionality" of those non-discretionary licensing requirements. *Id. Bruen* thus recognized

that modest waiting periods are consistent with the Second Amendment, directing only that "abusive" permit regimes with "*lengthy* wait times" might be subject to challenge. *Id.* (emphasis added).

Consistent with *Bruen*, the Second Circuit substantially upheld New York's revised concealed-carry permit law in *Antonyuk*. Specifically, the Second Circuit rejected a facial challenge to the law's requirement of "good moral character." 89 F.4th at 312. In so holding, the Second Circuit expressly disagreed with the Fourth Circuit case that Plaintiffs rely on, *Maryland Shall Issue, Inc. v. Moore*, 86 F.4th 1038 (4th Cir. Nov. 21, 2023). *See Antonyuk*, 89 F.4th at 315 n.24. The Second Circuit found *Moore's* holding "that a thirty-day review period is per se an unconstitutional temporary deprivation of Second Amendment rights" "especially difficult to square" with *Bruen's* disapproval only of "lengthy" waiting periods. *See id.*[4] The Second Circuit reiterated its position in *Connecticut Citizens Def. League, Inc. v. Thody*, No. 23-724-CV, 2024 WL 177707, at *6 (2d Cir. Jan. 17, 2024) (summary order), rejecting a § 1983 damages claim based on alleged delay in issuing a gun permit. *Id.* The court noted the lack of precedent establishing that a seven-month delay in obtaining a permit violated the Second Amendment and observed that *Antonyuk* "questioned" the holding in *Moore* as inconsistent with *Bruen. Id.* at *6 n.4.

It follows logically that 13 V.S.A. § 4019a passes muster under *Bruen* and *Antonyuk*, since the law's brief 72-hour waiting period is far less than the 30-day period *Antonyuk* found was not the sort of "lengthy" waiting period disapproved in *Bruen*. Plaintiffs cannot show likelihood of success on the merits for this reason as well.

---

[4] Plaintiffs rely on and cite the panel decision in *Moore* without acknowledging that the Second Circuit disapproved its holding. Pls. Mem. 20-21. Further, the Fourth Circuit has granted rehearing en banc of that decision. *Maryland Shall Issue, Inc. v. Moore*, No. 21-2017 (L), 2024 WL 124290 (4th Cir. Jan. 11, 2024).

**3. The Supreme Court has expressly approved of regulations of commercial firearms transactions.** Plaintiffs also fail to address the fact that the Supreme Court in both *Heller* and *McDonald* expressly approved of "laws imposing conditions and qualifications on the commercial sale of arms," describing them as "presumptively lawful." *Heller*, 554 U.S. at 626–27 & n. 26; *see also McDonald,* 561 U.S. at 786 (similar). Justice Kavanaugh's concurrence in *Bruen*, joined by Chief Justice Roberts, reiterates this same "important point[]" in noting that the Second Amendment "allows a 'variety' of gun regulations." 597 U.S. at 79, 80-81 (Kavanaugh, J., concurring) (citing *Heller*, 554 U.S. at 636, 626-27 & n.26). Nothing in *Bruen* "call[s] into question that some regulatory measures are presumptively lawful, as first indicated in *Heller*." *Rocky Mountain*, 2023 WL 8446495, at *10; *cf. United States v. Price,* 635 F. Supp. 3d 455, 459 (S.D.W. Va. 2022) (noting that Supreme Court precedent has "left commercial regulations untouched" which "makes sense because commercial regulations that apply only to manufacturers and sellers do not implicate an individual's right of possession").

This is another separate and independent ground on which to reject Plaintiffs' facial challenge to the 72-hour waiting period. *Rocky Mountain*, 2023 WL 8446495, at *11 (waiting period requirement for commercial sale of firearm is presumptively lawful). Although § 4019a does not apply solely to commercial transactions, the Court can reject this facial challenge based on the statute's "plainly legitimate sweep"—its clear constitutional application to commercial transactions—without reaching any other issues at this time. *Antonyuk*, 89 F.4th at 317, –328.

**4. The Second Amendment cannot reasonably be understood as encompassing a right to immediate acquisition of a firearm because doing so was not realistic or practical in the late 1700s.** As the *Rocky Mountain* court found, reading any concept of immediate acquisition of "a firearm *without any delay*" into the Second Amendment is ahistorical. 2023 WL 8446495, at *8-9.

29

The "Founders would not have expected instant, widespread availability of the firearm of their choice." *Id.* at \*8. Relying on expert evidence (including from Professors Spitzer and Roth, who are both experts here as well), the court explained that there were no "'Guns-R-Us' outlets . . . in the 1600s, 1700s, or most of the 1800s" and "[r]apid, convenient gun sales processes" did not exist until the late nineteenth century." *Id.* at \*9 (quoting Spitzer Decl.); Spitzer Dec. ¶ 165. Guns only became "relatively cheap" and "easy to get" after technological advances, adoption of mass production techniques, and marketing campaigns. *Rocky Mountain*, 2023 WL 8446495, at \*9; *see* Spitzer Dec. ¶ 165; Roth Dec. ¶ 50 ("semiautomatic handgun can be purchased for less than $200 and equipped with a 33-round magazine for less than $15"). Marketing and distribution of expensive products like guns looked nothing like today's inventory-laden warehouse stores, shopping centers, and seemingly bottomless online marketplaces. In short, our modern experience of nearly instant availability of nearly any consumer good would have been wholly unfamiliar to the Founders.

For each and all of the above reasons, Plaintiffs cannot succeed on the merits, because the Second Amendment's plain text does not guarantee instant, point-of-sale access to firearms and thus allows states to impose waiting periods that, like Vermont's, are not unduly lengthy.

**B. Requiring a brief waiting period before acquiring a gun imposes an imperceptible burden, if any, on Second Amendment rights and falls well within the historical tradition of firearms regulations.**

Even if the Court concludes that the waiting period is presumptively within the Second Amendment's scope, Plaintiffs' claim still fails, because a short, 72-hour delay in acquiring a firearm is consistent with the historical tradition of how firearms were acquired and regulated. Plaintiffs' contrary argument boils down to this: governments did not specifically require waiting periods until the early 20th century and thus any such contemporary regulation must be

unconstitutional. Pls. Mem. 19-22. Plaintiffs' position is contrary to binding precedent and ignores a wealth of relevant historical practices.

**1.** Both *Bruen* and *Antonyuk* approve of licensing or permit requirements for carrying a firearm. *See supra* § III.A.2; *Bruen*,  597 U.S. at 38 n.9; *Antonyuk*, 89 F.4th at 312, 315 n.24. Obtaining a permit that requires a background check, completion of a training course, and/or establishing one's "good moral character" necessarily takes time—not just more, but significantly more time than Vermont's 72-hour waiting period.

**2.** Waiting periods address a widespread contemporary problem that would not have been familiar to the Founders: rash, impulsive decisions to purchase firearms and shoot people or commit suicide or both. To say, as Plaintiffs do, that nothing has changed in 250 years because homicides and suicides have always occurred is to ignore reality. In fact, as Professor Roth has shown, impulsive gun homicides were not common during the late 1700s or early 1800s. Homicide rates were low and guns were not often used in homicides. Professor Roth's findings show that guns were used in only 10-15% of the small number of homicides that did occur. Although many households had some kind of firearm, those typical muzzle-loading weapons were poorly adapted to murder or impulsive shooting. They had to be loaded to take a first shot—a process far more complicated than putting a bullet in a chamber—and reloaded to shoot again. And they were liable to misfire.

Further, Professor Spitzer has explained that "[r]apid, convenient gun sales processes did not exist in the U.S. until the end of the nineteenth century." Spitzer Dec. ¶ 165. Relying heavily on the same expert evidence contained in the Roth and Spitzer declarations here, Judge Kane concluded in *Rocky Mountain* that "[o]verall, the evidence shows that firearms were not as readily available for purchase and that impulsive gun homicides were much less prevalent at the time of

the founding and in the century that followed. Thus, it is logical that waiting-period laws were not adopted during that period." *Rocky Mountain Gun Owners v. Polis*, No. 23-CV-02563-JLK, 2023 WL 8446495, at *16 (D. Colo. Nov. 13, 2023).

Social science research conducted and summarized by Professor Donohue underscores the emergent and escalating nature of the prevalence of gun violence in the United States. From 2012 to 2022, the number of people in the U.S. killed by firearms increased 44 percent. Donohue Dec. ¶ 130. Of the over 48,000 firearm deaths in 2022, almost 60 percent were suicides. *Id.* And 55 percent of Americans who died by suicide in 2022 did so via the use of a firearm (a total of over 27,000). *Id.*

Several studies discussed by Professor Donohue confirm the common-sense conclusion that waiting period laws slow these alarming statistical trends and save lives. A study by Professor Donohue and his colleagues, using data spanning 1987-2019, found that waiting period "laws – even when they delay gun purchases for as little as 48 hours – are able to disrupt suicidal ideation and thereby significantly decrease firearm suicides. Specifically, we estimate that waiting period laws reduce suicides by 21-34 year olds by 6.1 percent." *Id.* ¶ 132. Another study, examining data from 1977-2014, concluded that waiting period laws reduced suicides by 7.4 percent. *Id.* ¶ 131. Professor Donohue points out that "[r]educing the 27,040 gun suicides in 2022 by this percentage would save 2001 lives.  In other words, a waiting period alone would save more lives by a wide margin than any plausible estimate of the impact of all defensive gun use across the nation." *Id.*

This logic applies with equal force to gun violence directed at others. In a particularly painful illustration, had sufficient time been available to complete a full background check on Dylann Roof, authorities would have realized he was a prohibited purchaser and blocked him from buying

a gun. With no waiting period in play, Roof was able to buy a gun and eventually use it to spray 77 rounds into a Charleston church and kill nine people. *Id.* ¶ 135.

**3.** Although the societal need to use waiting periods to curb rampant gun violence is a modern phenomenon post-dating the Founding and Reconstruction eras, two longstanding regulatory tools provide historical analogues to Section 4019a: laws regulating weapons and intoxication; and weapons licensing laws. *See* Spitzer Dec. ¶¶ 170-256.  Even though Plaintiffs' motion founders on step one of the *Bruen* analysis, these historical analogues handily "justify [Section 4019a] by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

Weapons and intoxication: "[D]espite the greater indulgence of drinking alcohol to excess in the colonial and early Federal periods, laws restricting or punishing the handling, carrying, or use of firearms while intoxicated appeared among the very earliest weapons regulations." *See* Spitzer Dec. ¶ 181. Beginning in the 1600s, states regulated both the carrying or use of firearms while intoxicated and the distribution of alcohol in settings where firearms were present. *Id.* ¶¶ 182-83. For example, a 1655 Virginia law made it generally illegal to "shoot any guns at drinking," with "marriages and funerals only excepted." *Id.* ¶ 184 (quoting 1655 Va. Acts 401, Acts of March 10, 1655, Act XII).

States continued enacting laws regulating or criminalizing firearm use while intoxicated or while consuming alcohol through the colonial period and into 20th century. *Id.* ¶¶ 185-94. Pennsylvania, for example, enacted a law in 1750 that imposed fines on "any public house keeper" for selling alcoholic beverages "to any such persons so assembled on pretense of . . . shooting matches." 1750 Pa. Laws 208, An Act For The More Effectual Preventing Accidents Which May Happen By Fire, And For Suppressing Idleness, Drunkenness, And Other Debaucheries, § II (cited

by Spitzer Dec. ¶ 187). In addition, in 1825, Tennessee granted a locality the authority to penalize "shooting and carrying guns" along with drinking, and in 1865 Kansas enacted a law to punish any found to carry a deadly weapon while "under the influence of intoxicating drink." Spitzer Dec. ¶ 188.

As Professor Spitzer's research shows, beginning in the 1600s, states were regulating or prohibiting people who were drinking or intoxicated from using or carrying weapons, including firearms. That means the Second Amendment was adopted against a background understanding that it was perfectly acceptable for states to impose the functional equivalent of waiting periods— temporary intervals during which a person was not allowed to use or carry a firearm. As the court in *Rocky Mountain* concluded based on the same evidence provided by Professor Spitzer, "the 'how' and the 'why' of the intoxication laws and the Waiting-Period Act are sufficiently similar to demonstrate that the Act is 'consistent with the Nation's historical tradition of firearm regulation.'" *Rocky Mountain*, 2023 WL 8446495, at *19 (quoting *Bruen*, 597 U.S. at 24).

<u>Weapons licensing</u>: In a related vein, Professor Spitzer also documents how "weapons licensing dates in America to the 1700s, and from the 1700s to the end of the 1800s, at least half of the states adopted some kind of weapons/firearms licensing scheme." *See* Spitzer Dec. ¶ 195. During that time period, states enacted licensing requirements for owning weapons, discharging firearms, and the handling of gunpowder and other explosives, among others. *Id.* ¶¶ 199-206. Pennsylvania was the earliest adopter; in 1713, Philadelphia "penalized various activities in the city including 'firing a Gun without license.'" *Id.* ¶ 233. A 1721 colony-wide law imposed "penalties and forfeitures" on anyone who engaged in various activities including firing "any gun or other fire arm" or selling or setting off various types of fireworks "without the governor's special

license." *Id.* Other states adopted similar discharge-licensing requirements throughout the 1800s. *Id.* ¶¶ 234-40.

Inherent in these licensing schemes was the reality that the process of applying for and obtaining a license would insert a temporal interval between the moment a law-abiding would-be gun owner initiated the process of obtaining a gun and the moment they received it. Further, as explained above, the practical realities of commerce at the time of the Second and Fourteenth Amendments resulted in a natural expectation that buying and taking possession of a firearm was not a "one-stop shopping" experience. *See supra* § III.A.4; Spitzer Dec. ¶ 165; *see also Rocky Mountain*, 2023 WL 8446495, at *8-9. The weapon had to be located or ordered, and, in an era before Fedex or Amazon were remotely conceivable, transportation was slow. The Framers and the ratifiers of the Fourteenth Amendment were, therefore, amply familiar with the concept of requiring people to obtain licenses, and therefore having to wait for the licensing process to play out, before possessing firearms. *See Rocky Mountain,* 2023 WL 8446495, at *19 ("[A]lthough these licensing laws are not implemented in the same way that a waiting period is, they are a secondary, but proper, analogue because they support that the Founders and Reconstruction generation would have accepted a modest delay on the delivery of a firearm in order to ensure that those receiving a firearm are law-abiding, responsible citizens.").

In sum, Section 4019a easily survives scrutiny under the step two of *Bruen* in light of the widespread adoption of laws regulating mixing guns and intoxication and the early licensing regimes. As the Second Circuit observed in *Antonyuk*, even a few instances of historically comparable regulations can be sufficient, particularly in the absence of evidence that the lawfulness of such regulations was disputed. 89 F.4th at 303-04. In this case, such instances abound in the undisputed historical record and amply demonstrate that Section 4019a "is consistent with

the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24; *see also Antonyuk*, 89 F.4th at 321 (assessing post-Civil War era state and local regulations and "find[ing] it impossible to read out of our historical tradition the longstanding and established restriction of concealed carry licenses by those who present a danger to themselves or others . . .simply because such regulations require some individualized application of a clearly delineated standard").

## IV. Plaintiffs will  not be irreparably harmed.

Plaintiffs' attempts to articulate irreparable harm absent an injunction fall far short of the "strong showing" the Second Circuit requires here. *A.H.*, 985 F.3d at 176. First, their conclusory assertion that "with each passing day they are further deprived of their constitutional rights," ECF 2-1 at 22, founders against their own delay in filing suit. Section 4021 predates *Bruen*, which was issued June 23, 2022, almost 18 months before plaintiffs filed this motion. And plaintiffs waited more than five months to challenge Section 4019a, which went into effect July 1, 2023. In the face of their own decision to hold off seeking relief, Plaintiffs' appeal to the background presumption of irreparable harm when constitutional rights are in issue, *see, e.g., Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996), rings hollow, especially given how unlikely they are to succeed on the merits.

Leaving Plaintiffs' delay in filing suit aside, their irreparable harm arguments are illogical in light of the specific statutes being challenged. First, as shown above, Vermont's magazine limits do not prevent anyone from possessing or carrying a wide array of firearms equipped with 10- or 15-round magazines. Nor does Section 4021 curb the number of those weapons anyone can possess or carry. As *Heller, McDonald,* and *Bruen* make crystal clear, self-defense is the crux of Plaintiffs' Second Amendment rights. It's simply not credible to argue, as Plaintiffs do, that their right to defend themselves is at risk because state law says that they can "only" use 10- or 15-round magazines in the unlimited number of the wide array of firearms they may lawfully possess and

carry. Courts have roundly rejected the idea that similar magazine capacity limits infringe on plaintiffs' Second Amendment rights. *See Ocean State Tactical,* 646 F. Supp. 3d at 400 (citing unrefuted testimony that no incidents had occurred in Rhode Island involving civilians firing "as many as 10 rounds in self-defense"); *Kolbe v. Hogan*, 849 F.3d 114,127 (4th Cir. 2017) (parties could not "identify a single incident in which a Marylander has . . . needed to fire more than ten rounds, to protect herself"); *Worman v. Healey*, 922 F.3d 26, 37 (1st Cir. 2019) ("[N]ot one of the plaintiffs or their six experts could identify . . . even a single example of a self-defense episode in which ten or more shots were fired."). The NRA Armed Citizen Database confirms as much, showing only 2 out of 736 incidents where more than 10 rounds were claimed to have been fired in self-defense. *See Oregon Firearms Fed'n, Inc. v. Brown*, No. 2:22-cv-01815-IM, 2022 WL 17454829, at *10 (D. Ore. Dec. 6, 2022). Plaintiffs here offer no evidence to the contrary and thus fail to show irreparable harm at all, let alone make the required "strong showing."

Their claim of irreparable harm as to Section 4019a fares no better. Their appeal to Plaintiff Paul Dame's circumstances vividly illustrates Defendants' point here. They note that, before Section 4019a, Mr. Dame was "confident" that he could make a same-day gun purchase. ECF 2-1 at 23. Under 4019a, Plaintiffs claim that Mr. Dame "is now harmed because the waiting period *may* force him to buy a firearm before a threat has arisen so he can ensure his ability to defend himself and his family against an *immediate threat*." *Id.* (emphasis added). There are two fatal flaws in Plaintiffs' logic: First, they concede that Mr. Dame's alleged harm is entirely speculative— "the waiting period *may* force him…," and thus far short of irreparable. *Id.; see, e.g., New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015) ("Irreparable harm means injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." (cleaned up)). Second, their argument flouts common sense:

Defense against an "immediate threat" cannot be achieved even if Mr. Dame could, in the face of such a threat, travel from his home to a gun store, buy and take possession of a gun, and return to his home. Finally, it is entirely within Mr. Dame's, or anyone's, ability to cure this supposed harm; even with Section 4019a in effect, he could buy dozens of guns long before this Court decides his motion.

Plaintiffs Powderhorn and Black Dog assert that they will suffer harm absent an injunction because they "are forced to forego sales and incur increased expenses." ECF 2-1 at 24. But it's well-settled that monetary harms are not irreparable. *See Ocean State Tactical,* 646 F. Supp. 3d at 400  (rejecting retail seller's claims of irreparable harm based on "economic injuries: financial harm from being unable to sell LCMs in-store, loss of business revenue from selling LCMs, having to find another business location from which to sell LCMs in-store, and the inability to sell models for which lower-capacity magazines are made."). What's more, their claim that the laws somehow prevent them "from selling some of the most common firearms in America," ECF 2-1 at 24, is illusory because magazine limits and waiting periods leave Vermonters free to buy any firearms otherwise allowed under law.

Finally, Plaintiffs' claim that VTFSC's clubs will suffer irreparable harm because the waiting period will make their fundraising raffles less popular is also entirely speculative and unsupported. They offer no backup for the conclusory assertion that the "appeal" of the raffles is "the immediate awarding and possession of the firearm." *Id.*

Plaintiffs have fallen far short of carrying their burden to make a "strong showing of irreparable harm." *A.H.*, 985 F.3d at 176. Their motion should be denied on this ground alone.

**V.  The public interest weighs heavily against a preliminary injunction**

The public interest weighs decisively against enjoining these state laws. First, the magazine limits serve the public by limiting the availability of military-grade magazines that increase the risks posed by mass shootings, as Defendants have amply demonstrated. *See supra* §II.B.2.a. (discussing Donohue and Roth on lethality resulting from use of LCMs). Rather than supplying any evidence to the contrary, Plaintiffs simply assert that the law can't possibly serve the public because Vermonters possess grandfathered LCMs. ECF 2-1 at 25. But that logic cannot prevail, since it would sweep aside any state law seeking to address a longstanding threat to public health and safety. Moreover, Plaintiffs' curious assertion that "Banned magazines remain easily available for purchase in many other states, including across the Connecticut River in New Hampshire," *id.* at 25-26, only amplifies the need for Section 4021 (and cynically assumes Vermonters will flout the law's prohibition on possession of LCMs). Further, Plaintiffs' blithe assertion that "Vermont can always resume enforcement" if the law is enjoined but ultimately upheld, *id.* at 25, ignores the reality that it would be impossible in practice to undo any LCM sales that took place during the injunction period.

Meanwhile, the magazine limits leave completely intact the self-defense right that animates the Supreme Court's interpretation of the Second Amendment, because 10 rounds is beyond sufficient for self-defense, *see supra* § II.A.3. (citing Allen and Donohue declarations), and the law leaves Vermonters free to possess and carry multiple firearms and multiple magazines. Section 4021 therefore advances public safety while preserving Vermonters' constitutional right to use firearms in self-defense. The public interest weighs heavily in Defendants' favor.

The public interest also strongly supports the waiting period law. Section 4019a's brief 72-hour waiting period is at most an infinitesimal burden on the Second Amendment right to bear arms for

self-defense, because any Vermonter who wants a firearm can have it three days from the moment they walk into a gun store. To counter that simple fact, plaintiffs need more than speculation that three days is "more than enough time for a threat to emerge that is now un-redressable." ECF 2-1 at 26. Further, plaintiffs' hypothetical doesn't make sense: For Plaintiffs' position to hold water, the hypothetical threat requiring a firearm for self-defense would have to arise in a way that would allow the person under threat to complete a same-day purchase of a gun but not a three-day purchase. It is difficult to image such a fact pattern in reality.

While the burden is de minimis, the waiting-period law serves an important public interest, by preventing impulse buying of firearms. Interposing the brief 72-hour interval between purchase and possession is a well-tailored measure likely to cut down on suicides and impulsive violence towards others. Donohue Dec. ¶¶ 28-29, 131-34. In sum, speculation that Plaintiffs may immediately need a firearm for some uncertain reason, at some uncertain time, under circumstances so specific they are unlikely ever to arise, does not come close to counter-balancing the State's interest in protecting public health and safety embodied in the challenged statutes.

## CONCLUSION

Plaintiffs' motion for a preliminary injunction should be denied.

Dated: February 21, 2024

Respectfully Submitted,

*/s/ David R. Groff*

David R. Groff
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, Vermont 05609-1001
(802) 828-1101
david.groff@vermont.gov

Bridget Asay
Michael Donofrio
STRIS & MAHER LLP
15 East State Street, Suite 2
Montpelier, Vermont 05602
(802) 858-4285
basay@stris.com
mdonofrio@stris.com

*Attorneys for Defendants*