# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

Civil Action 2:23-cv-710

VERMONT FEDERATION OF SPORTSMEN'S CLUBS,
POWDERHORN OUTDOOR SPORTS CENTER, INC.,
JPC, INC. (D/B/A BLACK DOG SHOOTING SUPPLIES),
PAUL DAME, and
MARSHA J. THOMPSON

      Plaintiffs,

      v.

MATTHEW BIRMINGHAM, Director of the Vermont State Police, in his Official and Personal
Capacities,
CHARITY CLARK, Attorney General of the State of Vermont, in her Official and Personal
Capacities, and
SARAH GEORGE, State's Attorney for Chittenden County, in her Official and Personal
      Capacities,

      Defendants.

---

## DECLARATION OF ROBERT SPITZER

I, Robert Spitzer, pursuant to 28 U.S.C. § 1746, do depose and state as follows:

1.  I have been asked to render an opinion on the history of firearms restrictions as they pertain to modern waiting periods and restrictions on large capacity ammunition magazines (LCMs).

2.  This declaration is based on my own research, knowledge, and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

3.  I have been retained by the Office of the Attorney General of the State of Vermont to render expert opinions in this case. I am being compensated at a rate of $500 per hour for my work, and $750 per hour for testimony and depositions.

## BACKGROUND AND QUALIFICATIONS

4.  I am a Distinguished Service Professor of Political Science Emeritus at the State University of New York at Cortland.  I was also a visiting professor at Cornell University for thirty years.  I am currently an Adjunct Professor at the College of William and Mary School of Law. I earned my Ph.D. in Government from Cornell University.  I reside in Williamsburg, Virginia.  A copy of my curriculum vitae is attached to this Declaration.

5.  I am the author of 16 books on American politics subjects, including six on gun policy. I have been studying and writing about gun policy for nearly forty years. My first publication on the subject appeared in 1985.[1] Since then, I have published six books and over one hundred articles, papers, and essays on gun policy. My expertise includes the history of gun laws, gun policy in American politics, and related historical, legal, political, and criminological issues. My book, *The Politics of Gun Control,* has been in print since its initial publication in 1995. It examines firearms policy in the United States through the lenses of history, law, politics, policy, and criminology. The ninth edition of the book was published last fall by Routledge Publishers (2024). My two most recent books on gun policy, *Guns across America* (Oxford University Press, 2015, 2017) and *The Gun Dilemma* (Oxford University Press, 2023), both deal extensively with the study of historical gun laws. I am frequently interviewed and quoted in the national and international media on gun-related matters. For nearly thirty years, I have been a member of both the National Rifle Association and of Brady (formerly, the Brady Campaign to Prevent Gun Violence).

---

[1] Robert J. Spitzer, *Shooting Down Gun Myths*, *America* 468–69 (June 8, 1985).

6. I have provided written testimony as an expert witness in *Worman v. Healey*, No. 1:17-10107-WGY (D. Mass.), which concerned the constitutionality of Massachusetts' restrictions on assault weapons.  I have co-authored amicus briefs in numerous cases, including *Nordyke v. King*, U.S. Court of Appeals, Ninth Circuit, 319 F.3d 1185 (2003); *Republic of Iraq et al. v. Beaty et. al.,* U.S. Supreme Court, 556 U.S. 848 (2009); *McDonald v. Chicago*, U.S. Supreme Court, 561 U.S. 742 (2010); *Ezell v. Chicago,* U.S. Court of Appeals for the Seventh Circuit, 651 F.3d 684 (2011); and *People of the State of Illinois v. Aguilar,* Illinois Supreme Court, No. 08 CR 12069 (2012). I have been invited to submit written testimony and serve as an expert witness in the following cases, in addition to this one:  *Hanson v. District of Columbia*, No. 1:22-cv-02256 (D.D.C.); *Brumback v. Ferguson*, No. 22-cv-3093 (E.D. Wash.); *Sullivan v. Ferguson*, No. 3:22-cv-05403 (W.D. Wash.); *Miller v. Bonta*, No. No. 3:19-cv-1537 (S.D. Cal.); *Duncan v. Bonta*, No. 17-cv-1017 (S.D. Cal.); *Fouts v. Bonta*, 19-cv-1662 (S.D. Cal.); *Rupp v. Bonta*, 17-cv-00746 (C.D. Cal.); *Gates et al. v. Polis*, No. 1:22-cv-01866 (D. Colo.); *Oakland Tactical Supply LLC v. Howell Township*, No.: 18-cv-13443 (E.D. Mich.); *State v. Misch*, No. 173-2-19 Bncr (Vt. Super. Ct. Bennington County); *National Association for Gun Rights, Inc. v. City of Highland Park*, 22-cv-4774 (N.D. Ill.); *National Association for Gun Rights & Capen v. Campbell*, No. 22-cv-11431 (D. Mass.); *Abbott et al. v. Connor*, No. 20-00360 (D. Haw.); *National Association for Gun Rights v. Shikada*, No. 1:22-cv-00404 (D. Haw.); *Santucci v. Honolulu*, No. 1:22-cv-00142 (D. Haw.); *Yukutake v. Shikada*, No. 1:22-cv-00323 (D. Haw.); *Nat'l Ass'n for Gun Rights v. Lopez*,  No. 1:22-CV-00404 (D. Haw.); *Abbot v. Lopez*, No. 20-00360 (D. Haw.); *Santucci v. City & County of Honolulu* , No. 1:22-cv-00142 (D. Haw.); *Yukutake v. Lopez*, No. 1:22-cv-00323 (D. Haw.); *Baird v. Bonta*, 19-cv-00617 (E.D. Cal.); *Nichols v. Newsom*, 11-cv-9916 (C.D.

Cal.); *Delaware State Sportsmen's Association, Inc. v. Delaware Department Of Safety And Homeland Security*, No. 1:22-cv-00951(D. Del.); *Mark Fitz, Grayguns, Inc. v. Rosenblum* No. 22-cv-01859 (D. Ore.); *Harrel v. Raoul*, No. 23-141, (S.D. Ill.); *Mitchell, et al. v. Atkins, et al*., 19-cv-5106 (W.D. Wash.); *Keneally et al., v. Raoul, et al*., 23-cv-50039 (N.D. Ill.); *McGregor v. County of Suffolk*, 2:23-cv-01130 (E.D.N.Y.); *Lane v. James*, 22-cv-10989 (S.D.N.Y.)*; Rocky Mountain Gun Owners, et. al. v. The Town of Superior*, 22-cv-02680 (D. Colo.); *Wiese v. Bonta*, 17-cv-00903 (E.D. Cal.); *Harrel v. Raoul*, Case No. 23-cv-141-SPM (S.D. Ill.); *Langley v. Kelly*, No. 23-cv-192-NJR (S.D. Ill.); *Barnett v. Raoul*, 23-cv-209-RJD (S.D. Ill.); *Federal Firearms Licensees of Illinois v. Pritzker*, 23-cv-215-NJR (S.D. Ill.); *Herrera v. Raoul*, 23-cv-532 (N.D. Ill.); *Banta v. Ferguson*, 23-cv-00112 (E.D. Wash.); *Hartford v. Ferguson*, 23-cv-05364 (W.D. Wash.); *RMGO/Mosgrove v. Polis*; *Koppel v. Bonta*, 8:23-cv-00813 (C.D. Cal.); *Jane Doe v. Bonta*, 8:23-cv-01324 (C.D. Cal.); *Calce v. City of New York*, Case 1:21-cv-08208-ER; *D.B. v. Sullivan*, No. 22-CV-282 (MAD)(CFH) (N.D.N.Y.); *Richey v. Sullivan*, Case No. 1:23CV344 (AMN-DJS) (N.D.N.Y.); *D.B. v. Sullivan*; *Commonwealth of Pennsylvania v. Tomlinson*.

7.  I have also presented written testimony to the U.S. Congress on "The Second Amendment: A Source of Individual Rights?" submitted to the Judiciary Committee, Subcommittee on the Constitution, Federalism, and Property Rights, U.S. Senate, Washington, D.C., September 23, 1998; "Perspectives on the 'Stand Your Ground' Movement," submitted to the Judiciary Committee, Subcommittee on the Constitution, Civil Rights and Human Rights, U.S. Senate, Washington, D.C., October 29, 2013; and "The Hearing Protection Act to Deregulate Gun Silencers," submitted to Committee on Natural Resources, Subcommittee on Federal Lands,

the U.S. House of Representatives, Hearings on the Sportsmen's Heritage and Recreational

Enhancement Act (SHARE Act), Washington, D.C., September 12, 2017.

**OUTLINE**

I.     Introduction
II.    Large Capacity Magazines Regulation
   A.  The History of Pre-Twentieth Century Technologies and Their Regulations
   B.  Early Multi-Shot Weapons Did Not Achieve Any Kind of Viability, Commercial Success, or Popularity
   C.  The Colt Revolver Did Not Achieve Popularity Until Decades After its Invention
   D.  The Winchester Repeating Rifle Did Not "Win the West"
   E.  The Rise of Post-Civil War Multi-Shot Handguns Was Accompanied by Escalating Firearm Violence and then Firearm Regulations
   F.  Regulatory History of Fully Automatic and Semi-Automatic Firearms
   G.  State-Level and Nationwide Attempts to Regulate Automatic and Semi-Automatic Firearms and Ammunition Feeding Devices
   H.  Lessons From the Regulation of Ammunition Feeding Devices
   I.  Clarifying Terms and Concepts About LCMs
   J.  Historical Restrictions on Knives, Blunt Weapons, Pistols, and Trap Guns
      1.  Historical Restrictions on the Bowie Knife and Similar Long-Bladed Knives
      2.  Historical Restrictions on Clubs and Other Blunt Weapons
      3.  Historical Restrictions on Pistol and Gun Carrying
      4.  Historical Restrictions on Trap Guns
III.   Gun Purchase Waiting Periods
   A.  Guns and Intoxication
   B.  Historical Weapons Licensing Laws
      1.  Licensing of Weapons Carrying or Possession
      2.  Permits for Firearms Discharge or Use of Explosives
      3.  Commercial Licensing
      4.  Licensing Restrictions on Gunpowder
      5.  Weapons Sellers Recording Purchases
      6.  Licensing Pertaining to Named Groups
IV.    Conclusion

## SUMMARY OF OPINIONS

### I.    INTRODUCTION

8.  This Declaration examines historical weapons regulations relevant to two current laws: those pertaining to restrictions on large capacity ammunition magazines, and those pertaining to the modern regulatory technique of firearm purchase waiting periods. In doing so, it will also respond to information presented in the Complaint for Monetary, Injunctive, and Declaratory Relief submitted in this case.[2]

### II.    LARGE CAPACITY MAGAZINES REGULATION

9.  The current controversy surrounding legislative efforts to restrict large capacity magazines (LCMs) would seem to be a purely contemporary matter, responding to the modern phenomenon of mass shootings.

10. The effort to restrict such magazines was sparked in part by a shooting at an elementary school in Stockton, California in 1989, when a man armed with an AK-47 and a handgun killed five children and wounded thirty-three others. The assailant fired a total of 105 rounds in about three minutes from a 75-round magazine and a 30-round magazine, both of which he emptied before killing himself.[3]

11. In 1994, Congress enacted a limited ten year ban on assault weapons and large capacity magazines (LCMs; those holding more than ten rounds).[4]

---

[2] Complaint for Monetary, Injunctive, and Declaratory Relief, *Vermont Federation of Sportsmen's Clubs et al. v. Birmingham, et al.* filed December 18, 2023, 2:23-cv-710.
[3] "A Report to Attorney General John K. Van de Kamp on Patrick Edward Purdy and the Cleveland School Killings," October 1989, 7-8, https://schoolshooters.info/sites/default/files/Purdy%20-%20official%20report.pdf
[4] Robert J. Spitzer, *The Politics of Gun Control,* 9th ed. (NY: Routledge 2024), 26-27, 214-21.

12. As of this writing, ten states plus the District of Columbia have enacted assault weapons restrictions, as have various localities around the country.[5] These jurisdictions represent approximately 109 million people, or approximately 32.7% of the U.S. population.[6]

13. Fourteen states plus the District of Columbia restrict LCMs.[7] These jurisdictions represent more than 115 million individuals, or approximately 34.5% of the U.S. population.[8]

---

[5] Giffords Law Center, Assault Weapons, https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/assault-weapons/; Robert J. Spitzer, *The Gun Dilemma* 14–15 (2023). The ten American states or entities with assault weapons bans are: California, Connecticut, Delaware, the District of Columbia, Hawaii, Illinois, Maryland, Massachusetts, New Jersey, New York, and Washington State. Illinois enacted its law, including an LCM limit, in early 2023. C. Mandler, *Illinois governor signs ban on assault weapons and high-capacity magazines*, *CBS News,* January 10, 2023, https://www.cbsnews.com/news/illinois-governor-signs-ban-on-assault-weapons-and-high-capacity-magazines/. The U.S. House of Representatives passed a renewed federal assault weapons ban with magazine limitations in 2022 (H.R. 1808, 117th Cong. (2022)). Delaware enacted its assault weapons and large-capacity magazine restrictions in June 2022. *See* Press Release, DE Office of the Governor, *Governor Carney Signs Package of Gun Safety Legislation* (June 30, 2022), https://news.delaware.gov/2022/06/30/governor-carney-signs-package-of-gun-safety-legislation/.
[6] See U.S. Census, National Population Totals and Components of Change: 20202022, https://www.census.gov/data/tables/time-series/demo/popest/2020s-national-total.html#par_textimage_2011805803 (2022 state population estimates). The total population in these jurisdictions is estimated to be 101,000,000 out of a U.S. total of about 333,000,000.
[7] Giffords Law Center, Large Capacity Magazines, https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/large-capacity-magazines/; Spitzer, *The Gun Dilemma* at 30. The fifteen jurisdictions are California, Colorado, Connecticut, Delaware, the District of Columbia, Hawaii, Illinois, Maryland, Massachusetts, New Jersey, New York, Oregon, Rhode Island, Vermont, and Washington. With four exceptions (Colorado, Delaware, Illinois, and Vermont), all of these restrictions impose a ten-round limit on magazines, as did the 1994 federal law. The Illinois and Vermont laws limit magazines for long guns to ten rounds, and handguns to fifteen. Colorado law limits all magazines to fifteen rounds. Delaware law limits all magazines to seventeen rounds. Litigation challenging most of these assault weapon and LCM restrictions is currently pending.
[8] U.S. Census, National Population Totals and Components of Change: 2020-2022, https://www.census.gov/data/tables/time-series/demo/popest/2020s-national-total.html#par_textimage_2011805803 (2022 state population estimates). The total population in these jurisdictions is estimated to be over 115,000,000 out of a U.S. total of about 333,000,000. In 2022, the U.S. House of Representatives passed a renewed nationwide assault weapons ban with LCM restrictions. H.R. 1808, 117th Cong. (2022).

14. These recent efforts to restrict assault weapons and LCMs are simply the latest chapter in a centuries-long effort to promote public safety, protect the public from harm, and to dampen weapons-related criminality. The pattern of criminal violence and concerns for public safety leading to weapons restrictions is not new; in fact, it can be traced back to the Nation's beginnings.[9] While the particular weapons technologies and public safety threats have changed over time, governmental responses to the dangers posed by certain weapons have remained constant.

15. The Complaint for Monetary, Injunctive, and Declaratory Relief filed in this case (hereafter, "the Complaint") asserts that: "There is no relevant history of firearms regulations governing magazine capacity, firearms in lawful 'common use' or imposing waiting periods for the purchase of firearms."[10] None of this is true, as the account below demonstrates.

16. Current restrictions on LCMs are, in fact, historically grounded. They are part of a pattern in America's history of legislative restrictions on particular weapons stretching back centuries that follow a specific pattern.

17. The pattern is: *First*, a new gun or gun technology is invented. *Second*, it may then be patented, though the patenting of a design or idea by no means assures that it will proceed beyond this point. *Third*, it is often developed with a focus on military applications and supplying military needs, not directly for civilian acquisition or use. *Fourth*, some military-designed weapons may then spread to, or be adapted to, civilian markets and use. *Fifth*, if such weapons or related technologies then circulate sufficiently in society to pose a safety,

---

[9] Robert J. Spitzer, "Understanding Gun Law History After *Bruen*: Moving Forward by Looking Back," *Fordham Urban Law Journal* 51(October 2023): 57-115.
[10] Complaint for Monetary, Injunctive, and Declaratory Relief, *Vermont Federation of Sportsmen's Clubs et al. v. Birmingham, et al.* filed December 18, 2023, 2:23-cv-710, 27.

violence, or criminological problem or threat, calls for government regulation or restriction

then may lead to gun policy/law changes. *New gun laws are not enacted when firearm*

*technologies are invented or conceived. They are enacted when those technologies circulate*

*sufficiently in society to spill over into criminal or other harmful use, presenting public safety*

*concerns that governments attempt to address through their police and policy-making*

*powers.*[11]

18. The analysis that follows examines pre-twentieth century experimental multishot firearms.

It then examines the history of legislative efforts to restrict ammunition feeding devices and

related efforts to restrict fully automatic and semi-automatic firearms, as the feeding devices

and weapons to accommodate them are inextricably linked. It then examines analogous

efforts to restrict fighting knives, clubs, weapons carrying, and trap guns.

A.    **The History of Pre-Twentieth Century Firearms Technologies and Their Regulations**

19. The historical evidence offered in the Complaint in this case consists mostly of a lengthy list

of experimental multi-shot weapons spanning several hundred years. Based on the mere fact

that these experimental weapons existed, the Complaint in this case jumps to an unwarranted

and unfounded conclusion: "Despite the existence of repeating firearm technology [in the

1700s], firearms laws during this time were not directed towards limiting capacity."[12] It

further asserts: "repeating firearms existed during the Founding Era, were sought after by

both the military and the public, and were unregulated by any law. Any modern notion that

the 'Founding Fathers' never envisioned higher capacity firearms than the single shot musket

---

[11] Spitzer, "Understanding Gun Law History After *Bruen*," 60, 70-71.
[12] Complaint, 13, ¶ 44.

of their day and that the Second Amendment was never intended to offer protection for higher capacity firearms is without merit."[13]

20. All of these early, experimental weapons mentioned in the Complaint were fraught with a series of problems that made the weapons unviable as I describe in this declaration.

21. These experimental weapons' did not actually circulate in civil society, much less in meaningful numbers, for the very reasons that these weapons were experimental and were proven unfeasible (though these experimental weapons helped pave the way for the eventual development of weapons in the late nineteenth century that were reliable, replicable, and that did eventually circulate in society).

22. The Complaint provides no evidence, arguments, or facts to support the supposition that America's leaders, or Americans generally, in the 1700s or 1800s would have opposed restrictions on multi-shot firearms or large capacity magazines.

23. The absence of such laws during this time period is attributable to the simple fact that no such policy enactments were contemplated, warranted, or necessary, since the multi-shot weapons of the time were experimental, unreliable, dangerous, were not replicated in meaningful (or any) numbers, and did not circulate in meaningful or even measurable numbers in society until the end of the nineteenth century, when materials, marketing, and technological developments finally made mass production of multi-shot weapons possible and profitable.

24. When that occurred, governments did indeed respond by enacting a wide array of weapons restrictions (see discussion below).[14] As Jacob D. Charles wrote, "the absence of evidence—

---

[13] Complaint, 15, ¶ 51.
[14] Robert J. Spitzer, "Understanding Gun Law History After *Bruen*: Moving Forward by Looking Back," *Fordham Urban Law Journal* 51 (October 2023): 86-102.

historical silence on a question—does not imply any sort of historical understanding that the government lacked power to act."[15]

### B. Early Multi-Shot Weapons Did Not Achieve Any Kind of Viability, Commercial Success, or Popularity

25. Experimental multi-shot guns indeed existed in the eighteenth century (with multi-shot experimental designs dating back as much as two centuries earlier). For example, a firearm from the late 1500s that could fire up to sixteen rounds is described in a book titled, *Firearms Curiosa*. But this book's very title indicates why this narrative is irrelevant to the modern gun debate. The definition of "curiosa" is something that is rare or unusual. As the book's author, Lewis Winant says, his book is about "oddity guns" and "peculiar guns."[16] That is, they were anything but common, ordinary, or found in general circulation. Winant's description of the sixteen shot gun from the 1500s is that "the first pull of the trigger" fires "nine Roman candle charges, a second pull will release the wheel on the rear lock and set off six more such charges, and finally a third pull will fire the one remaining shot."[17] A "Roman candle charge" was defined by Winant as one where "the operator had no control of the interval between shots; he could not stop the firing once he had started it."[18] In other words, this firing process was more like lighting the fuse of a string of firecrackers, where their ignition occurs in a manner that cannot be controlled by the operator once the initial charge is ignited.

---

[15] Jacob D. Charles, The Dead Hand of a Silent Past: Bruen, Gun Rights, and the Shackles of History (January 23, 2023). 73 Duke Law Journal 67 (2023), Pepperdine University Legal Studies Research Paper No. 2023/7, Available at SSRN: https://ssrn.com/abstract=4335545 or http://dx.doi.org/10.2139/ssrn.4335545

[16] Lewis Winant, *Firearms Curiosa* (New York: Bonanza Books, 1955), 8, 9.

[17] Winant, *Firearms Curiosa*, 168.

[18] Winant, *Firearms Curiosa*, 166.

26. Roman candle firing was one type of "superposed" or "superimposed" firing. The other type was controlled, where the gun "was charged with one load on top of another, but the operator had control of the interval between shots. It might have one movable lock or several fixed locks. Each shot would be fired by trigger pull, presumably when the operator felt he had the proper aim."[19] Winant concludes: "Of all the ideas for producing multishot firearms the scheme of superimposing loads in one barrel is probably the oldest, the most discredited, the most frequently recurring, and also the most readily accepted as new."[20] Several "multi-shot" guns invented prior to the perfection of the revolver and repeating rifle relied on this strategy, which had a number of defects all stemming from the difficulty of loading multiple charges in one barrel, with potentially catastrophic results should a charge go off before it was supposed to.

27. The Complaint lists a series of early, experimental multi-shot firearms, including the Puckle gun, the Belton gun, and the Girandoni air rifle,[21] all of which I examine below. But the Complaint consistently fails to note their terminal problems.

28. For example, the Complaint cites the example of the Lorenzoni gun, "a magazine-fed repeater"[22] developed in Italy (not America) in the 1600s. The Complaint cites information about the Lorenzoni from an article by historian Kevin Sweeney, but fails to note Sweeney's verdict about the Lorenzoni and its 1700s successor, Cookson's repeater: "Unfortunately, if the parts of a Lorenzoni gun lock did not fit tightly or if the shooter failed to lock it in the

---

[19] Winant, *Firearms Curiosa*, 166.
[20] Winant, *Firearms Curiosa*, 166.
[21] Complaint, 14-15, ¶¶ 48-50.
[22] Complaint, 14, ¶47.

proper position when firing, flame might leak back and explode the black powder stored in the gun's butt."[23]

29. As Sweeney concludes: "In eighteenth-century America, repeating firearms were not in common use. . . . At the time, it was still not possible to manufacture with precision and in any quantity firearms with closely fitting parts that could contain the destructive potential associated with the use of black powder as a propellant. The improvements needed to fabricate dependable repeaters in large numbers only resulted from a series of revolutionary technological changes during the 1800s."[24] In other words, the Lorenzoni was a failed, experimental weapon that never even existed in America.

30. Another early multi-shot gun, the "Puckle Gun," patented in 1718 in London by James Puckle, could fire nine rounds per minute (hardly comparable to the firing capabilities of semi- and fully automatic weapons of the twentieth and twenty-first centuries). The patent drawing of this weapon shows it sitting on a tripod on the ground.[25] It was not a hand-held weapon. In the patent, Puckle described it as "a portable Gun or Machine (by me lately invented) called a DEFENCE."[26]

31. The Puckle Gun was indeed a military weapon, as Winant says: "Of the oddities among military weapons none has received more publicity than the Puckle gun. . . . The Puckle invention was probably the first crank-operated machine gun. It embodied several elements that closely resemble construction features of Gatling, Hotchkiss and other manually-

---

[23] Kevin Sweeney, "In Search of Repeating Firearms in Eighteenth-Century America," Duke Center for Firearms Law, July 26, 2023, https://firearmslaw.duke.edu/2023/07/in-search-of-repeating-firearms-in-eighteenth-century-america
[24] Sweeney, "In Search of Repeating Firearms in Eighteenth-Century America."
[25] Winant, *Firearms Curiosa*, 220.
[26] Winant, *Firearms Curiosa*, 219.

operated machine guns." Winant continued, "It is doubtful that any of the Puckle guns that may have been actually produced ever saw service."[27]

32. A different account of this weapon says: "There is in fact no record of such a gun ever having been built,"[28] although there are claims to the contrary. A contemporaneous poet, commenting on 'Puckle's Machine Company', wrote 'Fear not, my friends, this terrible machine. They're only wounded who have shares therein.'"[29] This weapon "never advanced beyond the prototype stage."[30] Among its problems: "the flintlock mechanism[s] that ignited the cartridges were unreliable, which is highly important when trying to fire shots in rapid succession."[31]  As one analyst concluded, the gun "was absolutely rubbish and made zero sense."[32]  And it certainly never made its way to American shores.

33. In short, the Puckle Gun was an experimental weapon designed for military use, and the patent's reference to "DEFENCE" was clearly a reference to military defense, not personal defense. As this account confirms, it was likely never even manufactured beyond perhaps a prototype. It was a failed effort, even though later gun inventors learned from its failure.

34. The Complaint also mentions the Belton flintlock. Joseph Belton was an inventor who corresponded with Congress in 1777, claiming that he could produce and provide a flintlock that could fire as many as sixteen to twenty consecutive rounds without reloading. After

---

[27] Winant, *Firearms Curiosa*, 219-20.
[28] John Ellis, *The Social History of the Machine Gun* (NY: Pantheon, 1975), 13.
[29] Winant, *Firearms Curiosa*, 219-21. See also "The Puckle Gun: Repeating Firepower in 1718," December 25, 2016, https://www.youtube.com/watch?v=GPC7KiYDshw.
[30] Jim Rasenberger, Revolver: Sam Colt and the Six-Shooter That Changed America (NY: Scribner, 2021), 3.
[31] *See* Jack Dunhill, *The Puckle Gun: The First "Machine Gun" from 1718 That Fired Square Bullets*, IFLSCIENCE (Mar. 6, 2023), https://www.iflscience.com/the-puckle-gun-the-first-machine-gun-from-1718-that-fired-square-bullets-67831.
[32] Dunhill, The Puckle Gun.

showing preliminary interest on May 3, Congress balked at Belton's proposed "extraordinary allowance" and decided on May 15 that the idea "be dismissed."[33]  Belton reportedly demonstrated the rifle, which by his account fired projectiles a distance of 20 to 30 yards, to several government officials, including General Horatio Gates, Major General Benedict Arnold, and scientist David Rittenhouse.  These individuals, and some others, signed a cautiously worded letter submitted by Belton to Congress on July 10 saying that "Muskets of his Construction with some small alterations, or improvements might be Rendered, of great Service, in the Defense of lives, Redoubts, Ships &c, & even in the Field. . . ."[34]  That same day, however, Congress decided again that "the petition of Thomas [Joseph] Belton be dismissed."[35]

35. The problems with Belton's scheme were evident. It relied on "superposed loads" as a firing method, a "discredited" and dead-end technology (discussed earlier). Despite Belton's offer to demonstrate the gun, not only are there "no known surviving examples of Belton's gun," but "the only evidence" of the gun's existence is "the correspondence between Belton and Congress."[36]

---

[33] *Correspondence between John Belton and the Continental Congress*, WIKISOURCE, https://en.wikisource.org/wiki/Correspondence_between_John_Belton_and_the_Continental_Congress (last visited Sept. 13, 2023).

[34] Correspondence between John Belton and the Continental Congress.

[35] Correspondence between John Belton and the Continental Congress.

[36] *Belton Flintlock*, MIL. WIKI, https://military-history.fandom.com/wiki/Belton_flintlock (last visited Sept. 13, 2023). Harold L. Peterson similarly noted that the only evidence of the alleged existence or operation of the Belton gun was his "meager description" of it, from which "it is impossible to determine exactly how the Belton improvement operated." Harold L. Peterson, *Arms and Armor in Colonial America, 1526-1783* (Harrisburg, PA: The Stackpole Co., 1956), 218.

36. From this account, there is no reason to believe that the gun "had been produced, and was possible to produce in quantity" at a reasonable price.[37] In all, Belton's claims about his experimental weapon bore no relationship to actual firearms in circulation in America — since Belton's weapon was never proven feasible, much less reproduced, much less distributed — during this time. The Belton case provides no evidence for the unsupported claim that "our Founding Fathers . . . knew about repeating rifles" and therefore "the Second Amendment was. . .designed to protect the right to own a repeating rifle."[38]

37. Isaiah Jennings' multi-shot flintlock rifle from 1821, capable of firing up to twelve "superposed" shots before reloading,[39] is also sometimes cited as an early multi-shot gun. Yet according to *Flayderman's Guide to Antique American Firearms,* its production quantity was so small as to be "unknown" and therefore is "extremely rare," unsurprising since it

---

[37] David Kopel, *The Founders Were Well Aware of Continuing Advances in Arms Technology*, *The Volokh Conspiracy,* REASON.COM (May 26, 2023), https://reason.com/volokh/2023/05/26/the-founders-were-well-aware-of-continuing-advances-in-arms-technology/.

[38] Logan Metesh, *As a Matter of Fact, the Founding Fathers Did Know About Repeating Rifles*, TRUTH ABOUT GUNS (Nov. 24, 2019), https://www.thetruthaboutguns.com/founding-fathers-knew-repeating-rifles-bill-rights-drafted/; *see also* Dave Duringer, *Founding Fathers Knew About Repeating Rifles Before Bill of Rights*, LAWNEWS.TV (July 17, 2016), https://lawnews.tv/founding-fathers-knew-about-repeating-rifles-before-bill-of-rights/; Eli D. Camacho, *5 Myths About the 2nd Amendment and the AR-15*, MEDIUM (Apr. 2, 2018), https://medium.com/@EliDCamacho/5-myths-about-the-2nd-amendment-and-the-ar-15-a080a94e9a2c. Kopel makes the similar, meaningless claim that the country's Founders "were well aware" of these pioneering, experimental, but unproven multishot technologies, as though this "awareness" somehow means that they would have disapproved of contemporary regulations of multi-shot weapons. *See* Kopel, *supra* note 96. The Founders' "awareness" that such experimental weapons existed centered around their hope that the weapons might eventually be suitable for military use, a prospect that in any case never came to fruition. Kopel also conflates early American leaders' abiding interest in the government funding, advancing, and reproducing new weapons technologies for the country's military forces, on the one hand, with the notion that it had anything whatever to do with private citizen gun acquisition and use, on the other.

[39] David Kopel, "The History of Firearm Magazines and Magazine Prohibitions," 78 Albany L. Rev. 849, 853 (2015).

utilized fatally defective "superposed" firing (discussed earlier) relying on twelve individual touchholes.[40] By one account, "probably not more than 100 rifles of this type [were] manufactured."[41] Similar problems plagued or doomed multi-shot flintlock pistols of the early nineteenth century. According to Carl P. Russell: "Flintlock revolving pistols had been given trials and some practical use very early in the nineteenth century, but the loose priming powder in the pan of each cylinder constituted a hazard that was never eliminated."[42]

38. Another example often cited is the Girandoni (or Girardoni) air rifle, a military weapon developed in Europe for marksmen—highly skilled shooters—in the Austrian army that was capable of firing up to 20 rounds. One of these made its way to the U.S. where it was taken along on the Lewis and Clark expedition of 1804-1806.[43] But these guns were a rarity, as they were extremely expensive, fragile, and complex, and few were made—no more than about 1,500.

39. As one writer noted: "The Girandoni air rifle is a might-have been; a footnote to military history."[44] Indeed, the rifles never caught on as they proved to be impractical on the

---

[40] Norm Flayderman, *Flayderman's Guide to Antique American Firearms*, 9th ed. (Iola, IA: Gun Digest Books, 2007), 683.
[41] "Isaiah Jennings," https://www.littlegun.info/arme%20americaine/artisan%20i%20j%20k%20l/a%20jennings%20gb.htm
[42] Carl P. Russell, *Guns on the Early Frontier* (Lincoln, NE: University of Nebraska Press, 1957), 91.
[43] David Kopel, "The history of magazines holding 11 or more rounds: Amicus brief in 9th Circuit," *Washington Post,* May 29, 2014, https://www.washingtonpost.com/news/volokh-conspiracy/wp/2014/05/29/the-history-of-magazines-holding-11-or-more-rounds-amicus-brief-in-9th-circuit/. The Girandoni air gun taken by Lewis and Clark was never used in combat or battle, but to impress the Native Americans they encountered. Whenever they planned to fire the gun, they were careful to prepare it before encountering Native Americans so that they were not aware of the extensive pre-fire preparations needed. See Stephen E. Ambrose, *Undaunted Courage* (NY: Simon and Schuster, 1996), 158, 160, and passim.
[44] Mike Markowitz, "The Girandoni Air Rifle," *DefenseMediaNetwork*, May 14, 2013, https://www.defensemedianetwork.com/stories/the-girandoni-air-rifle/.

battlefield, and even more so for civilian use. To wit: "Leather gaskets needed to be constantly maintained and swelled with water to sustain pressure. Once empty the reservoirs required a significant effort and 1500 strokes to restore full power. A supply wagon was subsequently outfitted with a mounted pump to readily supply soldiers but this negated one of the key features—mobility.

40. The rudimentary fabrication methods of the day engineered weak threading on the reservoir neck and this was the ultimate downfall of the weapon. The reservoirs were delicate in the field and if the riveted brazed welds parted the weapon was rendered into an awkward club as a last resort."[45]

41. First introduced to the Austrian army in the late 1700s, "[t]he guns became inoperable after a very short time" of use and were "entirely phased out" by 1810.[46]

42. One American manufacturer, Isaiah Lukens of Pennsylvania, apparently produced perhaps four such weapons.[47] The rest were made and used in Europe, not America.

43. While Lewis and Clark did bring a Girandoni with them, they never intended to use it in combat or battle, and certainly never used it "to defend against Indians,"[48] as the Complaint in this case erroneously asserts, but to impress and deter the Native Americans they encountered (which it did). Whenever they planned to fire the gun, they were careful to

---

[45] John Paul Jarvis, "The Girandoni Air Rifle: Deadly Under Pressure," *GUNS.com,* March 15, 2011, https://www.guns.com/news/2011/03/15/the-girandoni-air-rifle-deadly-under-pressure.
[46] Frederick J. Chiaventone, "The Girandoni Air Rifle: The Lewis and Clark Expedition's Secret Weapon," *Warfare History Network,* January 2013), https://warfarehistorynetwork.com/article/lewis-and-clarks-girandoni-air-rifle/
[47] Nancy McClure, *Treasures from Our West: Lukens Air Rifle*, BUFFALO BILL CTR. OF THE WEST (Aug. 3, 2014), https://centerofthewest.org/2014/08/03/treasures-west-lukens-air-rifle/ [https://perma.cc/XU9T-EYZP].
[48] Complaint, 15, ¶ 50.

prepare it before encountering Native Americans so that they were not aware of the extensive pre-fire preparations needed.[49]

44. To take another example, the Volcanic repeating pistol, patented in 1854, was said to have the ability to fire ten or more rounds, though it has been dubbed "a failure."[50] The Volcanic Repeating Arms Company was founded in 1855, and it experimented with a number of design innovations. But the company was "short-lived" and went "defunct" in 1866, even though its partners included Horace Smith, Daniel B. Wesson, and Courtlandt Palmer.[51] Its patent and technological work were important for subsequent developments, especially for Smith and Wesson's later work, but the actual weapons produced by Volcanic were few, flawed, and experimental,[52] dubbed "radical defects" by Winchester himself.[53] In 1857 and 1858, Volcanic produced 3,200 "flawed" repeaters, most of which "collected dust for many decades" until the company finally sold them for fifty cents each to employees.[54]

45. Another example sometimes cited is the self-loading Mannlicher rifle of the 1880s. This weapon was another example of a multi-shot firearm that initially was a failure, but was significant in facilitating later technological advances. "Ferdinand von Mannlicher's Model 1885 self-loading rifle design" was "a failure, never seeing anything even resembling mass

---

[49] Stephen E. Ambrose, *Undaunted Courage* (NY: Simon & Schuster, 1996), 158, 160, and passim.

[50] T. Logan Metesh, "Volcanic Pistol: The First Repeating Pistol — and a Failure," Free Range American, June 8, 2023, https://freerangeamerican.us/volcanic-pistol/

[51] These are the three men who came together to form what became the Smith & Wesson gun company. Pamela Haag, *The Gunning of America* (NY: Basic Books, 2016), 51-52.

[52] "Volcanic Repeating Arms," https://military-history.fandom.com/wiki/Volcanic_Repeating_Arms, n.d.; Flayderman, *Flayderman's Guide to Antique American Firearms,* 303-5.

[53] Quoted in Haag, *The Gunning of America*, 56.

[54] Haag, *The Gunning of America*, 60.

production."[55] The true semi-automatic weapon did not become feasible and available until the beginning of the twentieth century, and the primary market was the military.[56]

46. The more well-known "pepperbox," a multi-shot firearm where the number of shots capable of being fired repeatedly coincided with the number of barrels bundled together, found some civilian market popularity in the early 1800s, but it was rapidly eclipsed by the superior Colt revolver, owing to pepperboxes' "frightening flaws."[57]  The reason: pepperboxes were "heavy, lumpy, and impractical."[58]  The addition of more barrels added more weight, and less practicality, to the gun, resulting in an inverse relationship between more barrels and less gun utility.  By another account, "because of its small bore, short range, and lack of accuracy, the pepperbox was by no means as satisfactory as a revolver for military use."[59]  Further, "[t]hey also had a nasty habit of discharging all their barrels at once.  No shooter could be certain he would not get two or three innocent bystanders, as well as his intended victim."[60] Indeed, the Colt revolver was "the first widely used multishot weapon,"[61] although it took decades for this and similar revolvers to catch on.

---

[55] Ian McCollum, "Mannlicher 1885 Semiauto Rifle," *Forgotten Weapons*, May 6, 2015, https://www.forgottenweapons.com/mannlicher-1885-semiauto-rifle/.
[56] Philip Schreier, "A Short History of the Semi-Automatic Firearm," *America's 1ˢᵗ Freedom,* July 2022, 32-39.
[57] *Pepperbox Pistols: Last Line of Defense*, Relic Record, https://relicrecord.com/blog/pepperbox-pistols-last-line-of-defense/
[58] Rasenberger, *Revolver,* 54.
[59] Lewis Winant, *Pepperbox Firearms* (New York: Greenberg Pub., 1952), 30.
[60] Larry Koller, *The Fireside Book of Guns* (NY: Simon and Schuster ed., 1959), 154. By another account, "it was a disconcerting but not uncommon experience to have all six barrels go off in unison." Winant, *supra* note 122, at 32.
[61] Rasenberger, *Revolver,* 401.

47. Thus, single shot guns were the ubiquitous firearm until after the Civil War, although some
long gun repeaters appeared late in the Civil War.[62] Even so, the "standard infantry weapon
[in the Civil War] remained the single-shot, muzzle-loaded weapon."[63] Historian James M.
McPherson concurred that, even though some repeating rifles appeared in the Civil War as
early as 1863, single-shot muzzle-loaders "remained the principal infantry weapons
throughout the war."[64]

### C.    The Colt Revolver Did Not Achieve Popularity Until Decades After its Invention

48. The Colt revolver was "the first widely used multishot weapon,"[65] although it took decades
after its invention for this and similar revolvers to catch on. The idea of an available,
affordable, reliable multi-shot firearm did not arise until the development of Colt's multi-shot
revolver in the 1830s. Indeed, Colt biographer Jim Rasenberger says that Colt's pistol was
the first practical firearm that could shoot more than one bullet without reloading.[66]

49. Even then, Colt could not readily manufacture multi-shot weapons for many years because he
could find no market for them, either from the government or the public. The government, in
fact, dismissed such firearms as mere "novelties."[67] After an 1837 test of Colt's gun and
others the government concluded that it was "entirely unsuited to the general purposes of the
service."[68] The government also rejected the weapon after tests in 1836, 1840, and 1850.

---

[62] Kopel, "The history of magazines holding 11 or more rounds"; Lee Kennett and James
LaVerne Anderson, *The Gun in America* (Westport, CT: Greenwood Press, 1975), 112-13.
[63] Donald M. Snow and Dennis M. Drew, *From Lexington to Desert Storm: War and Politics in
the American Experience* (Armonk, NY: M.E. Sharpe, 1994), 90.
[64] James M. McPherson, *Battle Cry of Freedom* (NY: Oxford University Press, 1988), 475.
[65] Rasenberger, *Revolver,* 401.
[66] Rasenberger, *Revolver,* 3-5, 401.
[67] Haag, *The Gunning of America*, 24.
[68] Rasenberger, *Revolver*, 136.

50. Colt's early failure to cultivate either a military or a civilian market in the U.S. drove him to bankruptcy and then to market his guns to European governments in the 1840s. The gun made appearances in the pre-Civil War West, yet even during the Civil War, "Colt's revolver was a sideshow through most of the war. . . ."[69] And though the Colt-type revolver "had proved itself, the official sidearm of the United States Army [in the Civil War] remained a single shot pistol."[70] It took the Colt's limited use during the Civil War to finally spur the post-Civil War proliferation of the Colt-type revolver and similar firearms into society.[71]

51. And as detailed below, once revolvers began to spread from the military to the civilian market following the Civil War, and became associated with lawless violence, they were swiftly met by laws and regulations aimed at curbing their possession and use.

### D.    The Winchester Repeating Rifle Did Not "Win the West"

52. Even the famous Winchester repeating rifle did not obtain popularity until the onset of the twentieth century, despite the fanciful claim that it "won the American West" (an erroneous claim that the Complaint repeats[72]).

53. Inventor Benjamin Henry claims credit for developing the first practical, lever action repeating rifle (patented in 1860), however his competitor Winchester "deftly gutted" the Henry Arms Company, coopting it to form the Winchester Arms Company in 1866, paving the way for Winchester's dominance.[73]

---

[69] Rasenberger, *Revolver,* 390.
[70] Kennett and Anderson, *The Gun in America*, 91.
[71] Haag, *The Gunning of America,* 34-37, 46-64. As Haag said, "the Civil War saved" the gun industrialists (65).
[72] Complaint, 16, ¶ 55.
[73] Haag, *The Gunning of America*, 96.

54. The Winchester rifle could fire up to fifteen rounds without reloading. Yet the widely known Winchester 1873, "was designed for sale to the Government as a military arm."[74] A gun whose legendary status wildly outdistanced its actual production and impact, it was nevertheless an important firearm in the late nineteenth century, although this "quintessential frontier rifle flourished later, in the 'post-frontier' early 1900s. Its celebrity biography backdated its diffusion and even its popularity."[75] In fact, the slogan stating that the Winchester "won the West" was invented by Winchester executive Edwin Pugsley as a marketing ploy in 1919.[76]

55. As historian Michael Vorenberg concluded: "Rifles holding more than 10 rounds made up a tiny fraction of all firearms in the United States during Reconstruction."[77] An analysis of production runs of Henrys and Winchesters from 1861-1871 concluded that they produced a total of 74,000 guns. Most of them—about 64,000—were sold to foreign militaries, leaving about 9,200 for domestic American sales. Of those, 8,500 were acquired by Union soldiers, leaving a very small supply of guns for domestic civilian acquisition.[78] By comparison, 845,713 Springfield "trap-door" single shot rifles were manufactured during this same time period.[79]

---

[74] Koller, *The Fireside Book of Guns*, 112.
[75] Haag, *The Gunning of America*, 179.
[76] Haag, *The Gunning of America*, 353.
[77] Declaration of Michael Vorenberg ¶42, *Ocean State Tactical v. Rhode Island*, No. 1:22-cv-00246-JJM-PAS, Dkt. 19-2 (D. R.I. Oct. 14, 2022).
[78] Herbert G. Houze, *Winchester Repeating Arms Company: Its History & Development from 1865 to 1981* (Iola, WI: Krause Publications, 2004), 21, 36–41, 51, 59, 65–66, 71, 73, 75; Tom Hall to D. C. Cronin, New Haven, May 18, 1951; Box 8, folder 16, Winchester Repeating Arms Company, Office files (MS:20), McCracken Research Library, Cody, WY.

[79] According to an account of the Springfield, "The end of the Trapdoor series came in 1892, when the government adopted a bolt-action repeating rifle known as the Krag-Jorgensen." "The Trap Door Rifle," National Park Service, July 22, 2020, https://www.nps.gov/spar/learn/historyculture/trapdoor-rifle.htm

56. Additionally, the Winchester was not a semi-automatic firearm; it was a lever-action rifle that required the shooter to manipulate a lever in a forward-and-back motion before each shot. And when the gun was emptied, it had to be manually reloaded, one round at a time.[80]

57. Winchester did not produce a true semi-automatic rifle—then called a "self-loading" rifle— until the Winchester Model 1903 was released in 1903.

58. Winchester did not produce a semi-automatic rifle with a detachable magazine until the Winchester Model 1905, two years later. The Model 1905 could receive a five or ten round box magazine. From 1905 to 1920 only about 30,000 of the guns were made. Even in World War I, soldiers primarily used bolt-action one shot rifles that could fire about twelve rounds per minute.[81]

59. The Winchester was by no means universally embraced by long gun users. Indeed, "a good many westerners would have nothing to do with the early Winchesters or other repeaters, for reasons they considered very sound, and not until the 1880s did the repeating rifle assert its dominance over the single-shot breechloader."[82]

60. According to A.C. Gould, writing in 1892, single-shot rifles were: "less complicated, and less liable to get out of order; will shoot a greater variety of ammunition; will shoot uncrimped

---

[80] Normally, a Remington-type rifle is loaded from a feed ramp on the side of the rifle.

[81] Robert Johnson and Geoffrey Ingersoll, "It's Incredible How Much Guns Have Advanced Since The Second Amendment," *Military & Defense,* December 17, 2012, https://finance.yahoo.com/news/incredible-much-guns-improved-since-174927324.html; Phil Bourjaily, "Blast From the Past: Winchester Model 1905," *Field & Stream,* January 11, 2019, https://www.fieldandstream.com/blast-from-past-winchester-model-1905/.

[82] Louis A. Garavaglia and Charles G. Worman, *Firearms of the American West, 1866-1894* (Albuquerque, NM: University of New Mexico Press, 1985), 129. Historian Michael Vorenberg says that "Henrys and Winchesters were. . . repeating rifles, but because they were in a class of their own, due to their high capacity, they were generally known only as Henrys or as Winchesters." Declaration of Michael Vorenberg ¶ 15.

ammunition, patched or unpatched bullets; will permit the use of a longer barrel; an explosive bullet can be used; a greater range of rear sights on tang can be used."[83]

61. Historian Vorenberg confirms this analysis: "There were civilians during Reconstruction who owned high-capacity rifles, to be sure. Yet almost all such civilians were 'frontiersmen' of the Western Territories, and the population of the Western Territories was tiny compared to the population of the United States as a whole. Furthermore, Henrys and Winchesters, the only high-capacity firearms of the era, were not the preferred firearms of the 'frontiersmen' of the region."[84]

### E. The Rise of Post-Civil War Multi-Shot Handguns Was Accompanied by Escalating Firearm Violence and then Firearm Regulations

62. Following the Civil War, revolvers were marketed to the civilian population in newspaper advertisements extolling their virtues. For example, when Smith & Wesson's near-monopoly over the manufacture of cartridge revolvers ended with the expiration of its Rollin White patent in 1870, "dozens of other [gun] makers"[85] entered the market. Soon these other manufacturers were producing abundant cheap revolvers at low cost to the consumer. As Kennett and Anderson noted, Colt's initial revolvers sold for $35, but by 1900 the "'two dollar pistol' was a fixture in American life."[86] Further, as the mail order business boomed from the 1870s on, companies like Montgomery Ward and Sears began selling revolvers through their catalogs—especially small, cheaper, lighter-weight models that cost less to

---

[83] Quoted in Garavaglia and Worman, *Firearms of the American West, 1866-1894*, 131.
[84] Declaration of Michael Vorenberg ¶ 97.
[85] Kennett and Anderson, *The Gun in America,* 98.
[86] Kennett and Anderson, *The Gun in America,* 99.

mail. Cheap handguns were advertised not only through catalogs, but also through newspaper and magazine advertisements.[87]

63. The rise in the circulation of multi-shot handguns in society following the Civil War was accompanied by escalating interpersonal violence associated with the weapons and, soon thereafter, the rapid spread of concealed carry restrictions (see Exhibits B and E).[88]

64. By the end of the nineteenth century, virtually every state in the country prohibited or severely restricted concealed gun and other weapons carrying.[89]

65. In the late 1800s and early 1900s several states and localities in effect barred possession of such weapons outright, regardless of other circumstances.[90]

66. It was only in the post-World War I era when multi-shot semi-automatic and fully automatic long guns began to circulate appreciably in society and came to be associated with criminal use that they became a regulatory and public policy concern, leading to the enactment of anti-

---

[87] Kennett and Anderson, *The Gun in America,* 99-100. See also Haag, *The Gunning of America*, 251-55.

[88] Dickson D. Bruce, *Violence and Culture in the Antebellum South* (Austin, TX: University of Texas Press, 1979); Roth, *American Homicide*, 218-19.

[89] Spitzer, "Gun Law History in the United States and Second Amendment Rights," 63-67.

[90] Illinois Act of Apr. 16, 1881, as codified in Ill. Stat. Ann., Crim. Code, chap. 38 (1885) 88; George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5 Page 172, Image 699 (1885) § 410; Geoffrey Andrew Holmes, Compiled Ordinances of the City of Council Bluffs, and Containing the Statutes Applicable to Cities of the First-Class, Organized under the Laws of Iowa Page 206-207, Image 209-210 (1887) § 105; William H. Baily, The Revised Ordinances of Nineteen Hundred of the City of Des Moines, Iowa Page 89-90, Image 89-90 (1900) § 209; 1911 N.Y. Laws 442-43, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 1; 1913 N.Y. Laws 1627-30, vol. III, ch. 608, § 1; 1915 N.D. Laws 96, ch. 83, §§ 1-3, 5; 1917 Cal. Sess. Law 221-225; 1923 Cal. Stat. 695; 1931 N.Y. Laws 1033, ch. 435, § 1. Not included in this list are other state laws that barred weapons possession to specific groups (enslaved persons, minors) or that criminalized weapons possession by individuals if they committed a crime with the listed weapons.

machine gun laws in at least 32 states, between eight and eleven state laws restricting semi-automatic firearms, and the first significant national gun regulatory law in 1934.[91]

67. As noted earlier, the problems with arguments claiming that historical multi-shot weapons were both viable and commonly possessed before the late nineteenth century are two-fold: they misrepresent the actual past of the weapons cited, and even more importantly fail to understand the connection between gun technology developments and the steps leading up to changes in weapons-related public policy to regulate threats posed by those developments.

68. The process of firearms regulation has occurred, both historically and in the modern era, through a series of sequential steps.

69. *First*, a new gun or gun technology must be invented.

70. *Second*, it is then normally patented, noting that there are many steps between a patent, actual gun production, distribution and dissemination. As Lewis Winant sardonically observed, "Many patents are granted for arms that die a-borning."[92] And as gun expert Jack O'Connor wrote, "many types of guns were invented, produced and discarded through the early years of the development of the United States."[93]

71. *Third*, in many cases, weapons development is historically tied to military need and military acquisition, not directly for civilian use or self-defense applications. Military weaponry is developed without consideration of potential civilian use and the consequences of dissemination in the civilian market.[94]

---

[91] Spitzer, "Understanding Gun Law History After *Bruen*," 64-67.
[92] Winant, *Firearms Curiosa*, 36.
[93] Jack O'Connor, *Complete Book of Rifles and Shotguns* (NY: Harper & Row, 1961), 42.
[94] Note that the third step, and perhaps the second, do not apply to non-firearms weapons discussed below—in particular the Bowie knife and various clubs. These weapons were mostly not developed for military use, though Bowie knives, for example, were carried by some soldiers

72. *Fourth*, some weapons may then spill over into, or be adapted to, civilian markets and use.

73. *Fifth*, if such weapons then circulate sufficiently to pose a public safety or criminal problem or threat, calls for government regulation or restriction then may lead to gun policy/law changes.[95]

74. This general sequence is echoed in works like the *Buyer's Guide to Assault Weapons*, a standard reference work on assault weapons.[96]

75. As explained above, the existence of new firearm designs and modifications does not equal technological viability or reliability, much less general availability, much less societal circulation and use of these weapons. Other weapons subject to government restriction in our history further illustrate these principles.

### F.   Regulatory History of Fully Automatic and Semi-Automatic Firearms

76. A clear example of the historical pattern leading to weapons regulation is provided by early twentieth-century restrictions related to fully automatic firearms.

77. While weapons capable of firing rounds in rapid succession can be traced to guns of the late nineteenth and early twentieth centuries, like the hand-cranked, multi-barreled Gatling gun which could fire up to 200 rounds per minute,[97] it and its successors were military weapons

---

during the Civil War. Knives and clubs are far simpler technologically compared to firearms (and of course do not rely on ammunition) and thus were much more easily made, reproduced, and circulated.

[95] Spitzer, "Understanding Gun Law History After *Bruen*," 60, 70-71.

[96] Phillip Peterson, *Buyer's Guide to Assault Weapons* (Iola, IA: Gun Digest Books, 2008), 4-7. Peterson's Foreword summarizes a similar relationship between weapons development and subsequent calls for regulation.

[97] The Gatling gun, a manually operated, hand-cranked machine gun, was adopted by the U.S. Army in 1866, and was utilized in warfare against Native Americans and in the Spanish-American War of 1898. Richard W. Stewart, *American Military History, Vol. I: The U.S. Army and the Forging of a Nation, 1775-1917* at 367-68 (Washington, D.C.: Center of Military History, 2008); Gatling Gun, *History.com*, September 9, 2021, https://www.history.com/topics/american-civil-war/gatling-gun.

designed to be used in combat and fired from a tripod or similar supporting apparatus, owing to the Gatling gun's size and weight. Strictly speaking, guns like the Gatling gun were not fully automatic as they did not fire a continuous stream of bullets while depressing a gun trigger.

78. The development of a fully automatic machine gun for battlefield use, capable of firing all of its rounds from a single barrel and with a single trigger pull, came to fruition during World War I. These tripod-mounted military guns, like the Maxim, operated to devastating effect on the battlefield. They initially fired 200-400 rounds per minute but later 400-600 rounds per minute from a gun weighing roughly 100 pounds.[98]

79. Out of World War I came a practical, lighter-weight, reliable, hand-held, fully automatic weapon: the Thompson submachine gun, widely known as the Tommy gun. Though it was developed for use in World War I as "purely a military weapon,"[99] it came too late in the war to have much effect. Its inventor, John Thompson, patented his .45 caliber gun in 1920.[100] It typically fired with either a 20–30 round stick magazine or a 100-round drum magazine.

80. The Tommy gun was initially unregulated after World War I. In an effort to boost anemic post-war sales, the manufacturer marketed the gun for civilian purchase. (The U.S. military

---

[98] Donald M. Snow and Dennis M. Drew, *From Lexington to Desert Storm: War and Politics in the American Experience* 127 (Armonk, NY: M.E. Sharpe, 1994); "How the Machine Gun Changed Combat During World War I," Norwich University Online, October 15, 2020, https://online.norwich.edu/academic-programs/resources/how-machine-gun-changed-combat-during-world-war-i.

[99] William J. Helmer, *The Gun That Made the Twenties Roar* (Highland Park, NJ: The Gun Room Press, 1969), 75.

[100] Matthew Moss, "From Gangland to the Battlefield — 15 Amazing Facts About the Thompson Submachine Gun," *Military History Now,* January 16, 2015, https://militaryhistorynow.com/2015/01/16/from-gangland-to-the-battlefield-15-amazing-facts-about-the-thompson-submachine-gun/.

showed little interest in acquiring the weapon, as the military largely demobilized and contracted sharply in size after the war.[101])

81. It was only at this point—in the early 1920s—that reliable hand-held automatic weapons were made available to civilians and began to circulate in society,[102] though sales in the early 1920s were sluggish. By 1925, Thompson's marketing company, Auto-Ordnance, had sold only about 3,000 of the 15,000 it had manufactured up to this point, including to police forces and individuals.[103]

82. This pattern of anemic sales typified the gun's commercial trajectory: "Despite its initial publicity and later notoriety, the Thompson submachine gun was a failure from the start."[104] This was especially true for sales to police forces, to whom Thompson and his company marketed the gun aggressively, even as criminals began adopting the gun. "As a criminal's weapon, the Tommy gun was an unqualified success. As a police weapon, it was such a flop that many law-enforcement officials wished sincerely that it had never come off the drawing board."[105]

83. For example, after the St. Valentine's Day massacre, a representative of Auto-Ordnance visited Chicago police captain John Stege to offer assistance. Captain Stege "practically ran him out of the office. . . .It was Stege's opinion that not even the police should be armed with

---

[101] Ellis, *The Social History of the Machine Gun*, 149–52; Helmer, *The Gun That Made the Twenties Roar*, 161-64.
[102] Peter Suciu, "The Thompson Submachine Gun: Made for the U.S. Postal Service?" *The National Interest*, July 3, 2020, https://nationalinterest.org/blog/reboot/thompson-submachine-gun-made-us-postal-service-164096.
[103] Kennett and Anderson, *The Gun in America*, 203. Helmer confirms the number of 3000 guns sold by 1925. *The Gun That Made the Twenties Roar*, 74. Helmer says that "sales declined steadily" after 1921; see 130.
[104] Helmer, *The Gun That Made the Twenties Roar*, 129.
[105] Helmer, *The Gun That Made the Twenties Roar,* 126. Helmer quotes numerous police officials denouncing the weapon as useless for the police; see 126-28.

machine guns," an opinion shared "by many other lawmen in the country."[106] Another police chief explained why: "It is not possible for a police officer to open a machine gun up on a crowded street . . . because you are going to kill possibly ten innocent people to one criminal."[107]

84. Poor military and law enforcement sales forced the company to "peddle the new gun in peacetime" by trying "to think up something else it might be good for." Their conclusion was to market the gun as "good for anything"[108] as seen by this 1922 advertisement from Auto-Ordnance:

---

[106] Helmer, *The Gun That Made the Twenties Roar*, 126.
[107] Helmer, *The Gun That Made the Twenties Roar,* 126. The gun's rare actual use by police confirmed this fear. In an attack on John Dillinger, for example, FBI agents "mistakenly shot three innocent customers." (128).
[108] Helmer, *The Gun That Made the Twenties Roar*, 75.



# The Thompson Submachine Gun
## *The Most Effective Portable Fire Arm In Existence*

THE ideal weapon for the protection of large estates, ranches, plantations, etc. A combination machine gun and semi-automatic shoulder rifle in the form of a pistol. A compact, tremendously powerful, yet simply operated machine gun weighing only *seven* pounds and having only *thirty* parts. Full automatic, fired from the hip, 1,500 shots per minute. Semi-automatic, fitted with a stock and fired from the shoulder, 50 shots per minute. Magazines hold 50 and 100 cartridges.

THE Thompson Submachine Gun incorporates the simplicity and infallibility of a hand loaded weapon with the effectiveness of a machine gun. It is simple, safe, sturdy, and sure in action. In addition to its increasingly wide use for protection purposes by banks, industrial plants, railroads, mines, ranches, plantations, etc., it has been adopted by leading Police and Constabulary Forces, throughout the world and is unsurpassed for military purposes.

*Information and prices promptly supplied on request*

### AUTO-ORDNANCE CORPORATION
302 Broadway   *Cable address: Autordco*   New York City

85. Another automatic weapon developed for World War I was the Browning Automatic Rifle
(BAR). It fired a .30-06 caliber round, could receive a 20-round box magazine, and could fire
up to 650 rounds per minute. The BAR, a fully automatic weapon, first appeared on the
battlefield in 1918.[109] It was "a heavy machine rifle weighing nearly twenty pounds with
bipod and loaded magazine. . . ."[110] It, too, made its way into civilian life and found favor
among criminals and gangsters in the 1920s and early 1930s.[111]

86. The Complaint turns the story of the Browning BAR on its head when it asserts that "The
Browning BAR is also one of the most used hunting rifles of all time," then adding that
"[v]ariants of this same firearm were purchased by the U.S. military and issued to soldiers. . .
."[112] As the foregoing account says, the BAR was a fully automatic weapon developed for
military use and then became a gangster weapon. Using that weapon for hunting would be an
absurdity.

87. As the Browning Company says, "The Browning BAR sporting version is certainly a distinct
and separate rifle from the military BAR M1918. . . ."[113] The Complaint also fails to note
that the hunting/sporting version of the BAR was not developed until the 1960s, and
officially marketed starting in 1968.

---

[109] Paul Richard Huard, "Browning Automatic Rifle: The Most Dangerous Machine Gun Ever?" *The National Interest*, November 19, 2019, https://nationalinterest.org/blog/buzz/browning-automatic-rifle-most-dangerous-machine-gun-ever-97662; "Browning automatic rifle," *Britannica,* September 8, 2022, https://www.britannica.com/technology/Browning-automatic-rifle.
[110] Helmer, *The Gun That Made the Twenties Roar*, 37.
[111] Derek Avery, *Firearms* (Hertfordshire, England: Wordsworth Editions, 1995), 12. The BAR was a favorite of the notorious outlaws Bonnie and Clyde, for example. Christian Oord, "The Weapons of Bonnie & Clyde & the Guns That Stopped Them," *War History Online,* April 26, 2019, https://www.warhistoryonline.com/history/weapons-of-bonnie-and-clyde.html?A1c=1.
[112] Complaint, 17, ¶ 60.
[113] "A brief history of the Browning BAR." July 26, 2009, https://www.browning.com/news/articles/historical/bar-rifle-history.html

88. Before the early 1920s, these fully automatic weapons were unregulated for the obvious reason that they did not exist or were not circulating widely in society. When they did begin to circulate, however, their uniquely destructive capabilities rapidly became apparent, especially to the emergent Prohibition-fueled gangster organizations of the 1920s. Guns like the Tommy gun and the BAR were actually used relatively infrequently by criminals generally, but when they were used, they exacted a devastating toll and garnered extensive national attention, such as their use in the infamous St. Valentine's Day massacre in Chicago in 1929.[114]

89. I conducted a search of Newspapers.com from 1920-1930 using the search terms "Tommy Gun," "Thompson submachine" and "machine gun."

90. The term "Tommy Gun" turned up essentially no hits until 1928, a clear indication that this particular term did not come into wide use until fairly late in the decade.

91. The search for "machine gun" turned up more, but many of them referenced the weapons owned or used by the military (including many stories about World War I).

92. The search for "Thompson submachine," by contrast, yielded many articles from across the country. Starting in the fall of 1920, a few newspaper articles described regular reports of demonstrations of the gun for police and other government officials and agencies, and reports of local police forces sometimes purchasing a few of the guns. Similar reports began appearing regularly starting in 1921, and continued throughout the 1920s, as did numerous articles describing the gun's development and capabilities by inventor John Thompson.

---

[114]    Chris McNab, *Deadly Force: Firearms and American Law Enforcement* (NY: Osprey Publishing, 2009), 97–98.

34

These articles also reprinted standard accounts of the Tommy gun's weight, size, firing capabilities and possible uses by law enforcement.

93. Starting in roughly late 1921 and early 1922, a handful of small news items reported thefts of Tommy guns from armories or police stations. The one notable crime-related case to receive enormous press attention was a major seizure of about 600 Tommy guns with ammunition and magazines, first reported about June 16, 1921, from a ship docked at the port of Hoboken, New Jersey, bound for Ireland for use by the IRA in the ongoing Irish rebellion (Ireland won its independence from Britain in 1922).[115]

94. Newspaper reports of criminal use of Tommy guns were few, small, and spare until 1926, when a few very sensational news reports of their criminal use received widespread and extensive attention in newspapers across the country. Most of these initial stories were reports of use by Chicago gangsters (notably one "Al Caponi" in an early account) along with stories from the New York City-New Jersey area. For example, an AP story from October 16, 1926, with the dateline Somerville, N.J. reported on "the advance of 500 city, state and volunteer police on the mountain stronghold of New Jersey's machine gun mail bandits."[116] According to the account, eight men robbed a truck of over $100,000 and were holed up at the stronghold. The authorities were also armed with weapons that included machine guns, and were contemplating the expansion of the search party with 2000 militiamen.

---

[115] Helmer, *The Gun That Made the Twenties Roar*, 53-64.
[116] "Use Expert Riflemen to Hunt Robbers," Ithaca Journal, N.Y., https://www.newspapers.com/image/254505945/?terms=%22Thompson%20submachine%22&match=1

95. Coinciding with these extensive stories were articles, editorials, and exposés calling for changes in the law to address this growing gun crime problem. For example, an article from the Boston Herald began by quoting a magazine story from Collier's Weekly that observed: "The police authorities are powerless to interfere with the sale and distribution of the highest powered instrument of destruction that has yet been placed at the convenience of the criminal element in this country." The Herald sent out a man to see if an average person could buy a machine gun "without trouble." The buyer's conclusion: "He had no trouble" purchasing the gun, which the article labeled "a diabolical engine of death." The article detailed that for the prospective gun purchaser, "Pistols would not be shown unless the customer exhibited a permit, but machine guns could be had over the counter with no such formalities." The article concluded this way: "Here is a case where it seems that 'there ought to be a law.' This weapon . . . was designed for war. . . . a machine gun is the greatest aid to crime that yet has been placed within the reach of criminals."[117]

96. Reports and exposés, juxtaposed with lurid and sensational accounts of Tommy gun criminality, built pressure on the states to enact anti-machine gun laws and also put pressure on Congress to act.

97. A long-stalled bill in Congress to restrict the interstate shipment of guns received renewed interest and support in 1926, eventually leading to congressional enactment of the Mailing of Firearms Act of 1927, a limited measure that failed to restrict interstate handgun shipment because it did not affect non-Postal Service shipments.

---

[117] "Machine Guns for All," Kennebec Journal, Augusta, Maine, December 4, 1926, https://www.newspapers.com/image/857617757/?terms=%22Thompson%20submachine%22&match=1

98. From 1926 on, news stories were filled with the kind of sensational gangster-related stories that led to the Tommy gun being labeled the weapon that "made the Twenties roar," and that also led to many anti-machine gun laws. For example, an article dated November 27, 1928, reported that "Chicago's war on gangsters and racketeers was reopened tonight with the drafting of a law to prohibit the sale of machine guns. 'Tommy guns,' the bullet spitting little Thompson submachine guns which are inseparable from gang fights, bank robberies, assassinations and other major crimes . . . could be purchased as easily and legally in Chicago as a pound of meat. . . . practically every sporting goods establishment in Chicago carried the firearms and sold them readily."[118] (Illinois adopted an anti-machine gun law in 1931.[119])

### G.   State-Level and Nationwide Attempts to Regulate Ammunition Feeding Devices and Automatic and Semi-Automatic Firearms

99. In response to the wider availability of firearms like the Tommy gun and the BAR, between 1925 and 1934, at least 32 states enacted laws regulating machine guns (see Exhibits B and E).

100.   These state (and eventually federal) enactments were anticipated, justified, and promoted by the National Conference of Commissioners on Uniform State Laws, a national organization formed in 1892 to provide "non-partisan, well-conceived and well-drafted

---

[118] "Machine Gun Ban Plan of Chicago," The Salt Lake Tribune, https://www.newspapers.com/image/542285510/?terms=%22Thompson%20submachine%22&match=1
[119] Former Ill. Rev. Stat. ch. 38, ¶¶ 414a to 414g, "An Act to regulate the sale, possession and transportation of machine guns," approved July 2, 1931.

legislation that brings clarity and stability to critical areas of state statutory law."[120] (Today, the organization is known as the Uniform Law Commission.)

101.    In 1923, the Commission organized a special committee to draft a "Uniform Act to Regulate the Sale and Possession of Firearms." In 1928, it issued a model law calling for the prohibition of the possession of "any firearm which shoots more than twelve shots semi-automatically without reloading."[121] In 1930, it issued a model firearms act focusing on "guns of the pistol type." In 1932, it issued a model act "intended not only to curb the use of the machine gun, but to make it unwise for any civilian to possess one of the objectionable type."

102.    The Commission explained that, between 1923 and 1930, "the infant industry of racketeering grew to monstrous size, and with it the automatic pistol replaced the revolver, to be in turn displaced by a partly concealable type of machine gun—the Thompson .45 inch caliber submachine gun becoming most popular. . . ."[122]

103.    Congress enacted a machine gun ban for the District of Columbia in 1932 which defined a machine gun as "any firearm which shoots automatically or semiautomatically more than twelve shots without reloading."[123]

104.    The National Rifle Association endorsed D.C.'s ban, stating "it is our desire [that] this legislation be enacted for the District of Columbia, in which case it can then be used as a

---

[120] Uniform Law Commission, About Us, https://www.uniformlaws.org/aboutulc/overview.
[121] Report of Firearms Committee, 38th Conference Handbook of the National Conference on Uniform State Laws and Proceedings of the Annual Meeting 422–23 (1928).
[122] "Uniform Machine Gun Act," National Conference of Commissioners on Uniform State Laws, Forty-Second Annual Conference, Washington, D.C., October 4-10, 1932, http://www.titleii.com/bardwell/1932_uniform_machine_gun_act.txt.
[123] "Hearings Before the Committee on Ways and Means, National Firearms Act, H.R. 9066," U.S. House of Representatives, April 16, 18, May 14, 15, and 16, 1934 (Washington, D.C.: GPO, 1934), 45; 47 Stat. 650, ch. 465, §§ 1, 14 (1932).

guide throughout the states of the Union."[124] In his testimony before Congress in 1934 on the bill that became the National Firearms Act, NRA vice president Milton A. Reckord extolled his organization's role in passing the 1932 D.C. law, saying, ". . . the association I represent is absolutely favorable to reasonable legislation. We are responsible for the uniform firearms act. . . . in the District of Columbia. It is on the books now."[125]

105.    In 1934, Congress enacted the National Firearms Act, which imposed a series of strict requirements on the civilian acquisition and general circulation of fully automatic weapons, like the Tommy gun. The National Firearms Act imposed a tax on the manufacture, sale, and transfer of listed weapons, including machine guns, sawed-off shotguns and rifles, silencers, and "any other weapons" with certain firing capabilities. Such weapons had to be registered with the Treasury Department, and the owners fingerprinted and subject to a background check, with the payment of a $200 tax.[126]

106.    In his opening statement to the Ways and Means Committee of the U.S. House of Representatives, Attorney General Homer Cummings made clear that the bill under consideration was designed to fight the epidemic of gun crime where criminals could evade capture by crossing state lines:

> The development of late years of the predatory criminal who passes rapidly from State to State, has created a situation which is giving concern to all who are interested in law and order. . . . there are more people in the underworld today armed with deadly weapons, in fact, twice as many, as there are in the Army and the Navy of the United States combined. . . . In other words, roughly speaking, there are at least 500,000 of these people who are warring against society and who

---

[124] S. Rep. No. 72-575, at 5–6 (1932).
[125] "Hearings Before the Committee on Ways and Means," 36.
[126] 48 Stat. 1236.

are carrying about with them or have available at hand, weapons of the most deadly character.[127]

107.    In addition to the National Firearms Act's restrictions on fully automatic weapons, during this same time period at least seven states plus the District of Columbia, and as many as ten states plus D.C., enacted laws restricting semi-automatic weapons (see Exhibit B).[128] The reason for restricting semi-automatic firearms is not hard to discern. These restrictions all appeared in the same statutes as those restricting fully automatic weapons, which utilize the same fundamental firearms technology: an action that automatically loads a new round into the chamber after each shot is fired, potentially with the use of detachable ammunition magazines or similar feeding devices, and is capable of firing numerous rounds without reloading.[129]

108.    During the time that Thompson and his company were developing and marketing the Tommy gun (which could fire in semi- or full-auto modes[130]), they were also developing the Thompson Autorifle, a "strictly semiautomatic rifle" for which the military showed greater

---

[127] "Hearings Before the Committee on Ways and Means," 4. The version of the bill that appears on page 1 of the Hearings had this definition of machine gun: "The term 'machine gun' means any weapon designed to shoot automatically or semiautomatically twelve or more shots without reloading." Congress eventually settled on strict regulation of fully automatic weapons, sawed-off shotguns, and silencers. This political compromise was the result of the Congressional focus on weapons used by organized criminals of the era.

[128] *See also* Spitzer, "Gun Law History in the United States and Second Amendment Rights," 68–71. The language of the restrictions in Illinois, Maine, and South Carolina was ambiguous regarding whether they applied to semi-automatic weapons.

[129] Spitzer, *The Gun Dilemma*, 32–33. In 1913, Florida enacted this measure: "It shall, at any time, be unlawful to hunt game in Marion County with guns—known as Automatic guns." While an automatic weapon fires a continuous stream of bullets when the trigger is depressed, a semi-automatic weapon fires a single shot with each pull of the trigger.

[130] Helmer, *The Gun That Made the Twenties Roar*, 48-49, 255-56.

interest than it did for the Tommy gun.[131] The Autorifle was also promoted to police and military organizations, though it was overshadowed in the public mind by the Tommy gun.[132]

109.    As the prior discussion reveals, the regulation of automatic and semi-automatic weapons in the 1920s and 1930s was closely tied to the enhanced firing capacity of these weapons and the attractiveness (and use) of these weapons by criminals at that time, and the related understanding that these weapons had no justifiable civilian use. By that time, gun technology was available that made it possible for ammunition to be reliably fired in rapid succession and guns to be reloaded through interchangeable ammunition magazines or similar devices. Again, the lesson is the same: once these technologies began to spread in civil society and be used for criminal or other dangerous purposes, and because of the belief that it was "unwise for any civilian to possess" such weapons,[133] regulatory efforts ensued.

110.    Restrictions on fully automatic and semi-automatic firearms were closely tied to restrictions on ammunition magazines or their equivalent, as both automatic and semi-automatic weapons are predicated on some kind of mechanical loading function or device that automatically feeds new rounds into the firing chamber after the previous round is fired.

111.    As is the case with contemporary state limitations on ammunition magazine capacity, state laws enacted early in the twentieth century imposed restrictions based on the number of rounds that could be fired without reloading, ranging from more than one (Massachusetts and Minnesota) up to a high of eighteen (Ohio).

---

[131] Helmer, *The Gun That Made the Twenties Roar*, 37, 50.
[132] Ultimately, the military opted for the semiautomatic M1 Garand over the Autorifle. Helmer, *The Gun That Made the Twenties Roar*, 161.
[133] "Uniform Machine Gun Act,"*supra* n.124, Prefatory Note.

112.    In fact, magazine capacity/firing limits were imposed in at least 23 states, representing

approximately 58% of the American population at that time.[134] These state laws fell into

three categories (see Table 1 below): ten states plus the District of Columbia regulated semi-

automatic and fully automatic weapons (California, District of Columbia, Massachusetts,

Michigan, Minnesota, New Jersey, North Carolina, Ohio, Rhode Island, South Dakota, and

Virginia[135]); eleven states regulated fully automatic weapons only, where the regulation was

defined by the number of rounds that could be fired without reloading or by the ability to

receive ammunition feeding devices (Illinois, Louisiana, Minnesota, New Jersey, North

Dakota, Oregon, Pennsylvania, South Carolina, Texas, Vermont, and Wisconsin[136]); and four

states restricted all guns that could receive any type of ammo feeding mechanism or round

---

[134] U.S. Census, Historical Population Change Data (1910-1920) (using 1920 census data),
https://www.census.gov/data/tables/time-series/dec/popchange-data-text.html.

[135] 1933 Cal. Stat. 1169; Act of July 8, 1932, ch. 465, §§ 1, 8, 47 Stat. 650, 650, 652 (District of
Columbia); Act of July 2, 1931, 1931 Ill. Laws 452, 452; 1927 Mass. Acts 413, 413-14; Act of
June 2, 1927, no. 372, 1927 Mich. Pub. Acts 887, 888; Mich. Pub. Acts 1929, Act No. 206, Sec.
3, Comp. Laws 1929; Act of Apr. 10, 1933, ch. 190, 1933 Minn. Laws 231, 232; Act of Apr. 8,
1933, no. 64, 1933 Ohio Laws 189, 189; 1927 R.I. Pub. Laws 256, 256; Uniform Machine Gun
Act, ch. 206, 1933 S.D. Sess. Laws 245, 245; Act of Mar. 7, 1934, ch. 96, 1934 Va. Acts 137,
137. Two of these states enacted early laws focused on such weapons' use in hunting. New Jersey
had a 1920 law making it "unlawful to use in hunting fowl or animals of any kind any shotgun or
rifle holding more than two cartridges at one time, or that may be fired more than twice without
reloading." 1920 N.J. Laws 67, ch. 31, Section 9. North Carolina made it "unlawful to kill quail
with any gun or guns that shoot over two times before reloading" in 1917. 1917 N.C. Sess. Laws
309, ch. 209, Sec. 1.

[136] 1931 Ill. Laws 452-53, An Act to Regulate the Sale, Possession and Transportation of
Machine Guns, §§ 1-2; Act of July 7, 1932, no. 80, 1932 La. Acts 336; 1927 N.J. Laws 180-81, A
Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 95, §§ 1-2; 1931 N.D.
Laws 305-06, An Act to Prohibit the Possession, Sale and Use of Machine Guns, Sub-Machine
Guns, or Automatic Rifles and Defining the Same . . . , ch. 178, §§ 1-2; 1933 Or. Laws 488, An
Act to Amend Sections 72-201, 72-202, 72-207; 1929 Pa. Laws 777, §1; Act of Mar. 2, 1934, no.
731, 1934 S.C. Acts 1288; 1933 Tex. Gen. Laws 219-20, 1st Called Sess., An Act Defining
"Machine Gun" and "Person"; Making It an Offense to Possess or Use Machine Guns. . . , ch.
82, §§ 1-4, § 6; 1923 Vt. Acts and Resolves 127, An Act to Prohibit the Use of Machine Guns
and Automatic Rifles in Hunting, § 1; 1933 Wis. Sess. Laws 245, 164.01.

feeding device and fire them continuously in a fully automatic manner (California, Hawaii, Missouri, and Washington State).[137]

**TABLE 1**

AMMUNITION MAGAZINE RESTRICTIONS IN 23 STATES, 1917-1934[138]

| Semi-automatic and Fully Automatic Firearms (restricted firearms holding more than the listed number of rounds or more without reloading) | Fully Automatic Firearms (restricted firearms capable of firing the listed number of rounds or more without reloading or that could receive ammunition feeding devices) | All Firearms (any weapon capable of receiving rounds through certain named round-feeding devices) |
|---|---|---|
| -California (10 rounds; 1933)<br>-District of Columbia (12 rounds; 1932)<br>-Massachusetts (1 round; 1927)<br>-Michigan (16 rounds; 1927)<br>-Minnesota (1 round; 1933)<br>-New Jersey (2 rounds; hunting only; 1920)<br>-North Carolina (2 rounds; hunting only; 1917)<br>-Ohio (18 rounds; 1933)<br>-Rhode Island (12 rounds; 1927)<br>-South Dakota (5 rounds; 1933)<br>-Virginia (7 rounds; 1934) | -Illinois (8 rounds; 1931)<br>-Louisiana (8 rounds; 1932)<br>-Minnesota (12 rounds; 1933)<br>-New Jersey (any removable device holding rounds; 1927)<br>-North Dakota (loadable bullet reservoir; 1931)<br>-Oregon (2 rounds; 1933)<br>-Pennsylvania (2 rounds; 1929)<br>-South Carolina (8 rounds; 1934)<br>-Texas (5 rounds; 1933)<br>-Vermont (6 rounds; 1923)<br>-Wisconsin (2 rounds; 1933) | -California (1927)<br>-Hawaii (1933)<br>-Missouri (1929)<br>-Washington State (1933) |

See Exhibit B; also Spitzer, "Understanding Gun Law History After *Bruen*," 67-70.

---

[137] 1927 Cal. Stat. 938; 1933 Haw. Sess. Laws 117; 1929 Mo. Laws 170; Wash. 1933 Sess. Laws 335.

[138] Including the District of Columbia. Note that California, Minnesota, and New Jersey appear twice in this table. The dataset from which this information is drawn ended in 1934, so it does not include any states that might have enacted similar restrictions after 1934. See Duke Law Center for Firearms Law, "Repository of Historical Gun Laws," https://law.duke.edu/gunlaws/.

113.    A 1927 California law, for example, prohibited the possession of any "machine gun," where that term was defined to include:

> all firearms known as machine rifles, machine guns or submachine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, disks, drums, belts or other separable mechanical device.[139]

114.    The other three states in this category (Hawaii, Missouri, Washington[140]) utilized this same description.

115.    In all, at least twenty-three states enacted twenty-six gun restrictions based on the regulation of ammunition magazines or similar feeding devices, and/or round capacity (see Table 1).

116.    Of the states appearing in Table 1, fifteen of them restricted weapons or ammunition feeding devices of more than ten rounds. Another five states barred any weapons that could receive removable ammunition feeding devices (i.e., no rounds), totaling twenty states.

117.    The original version of the legislation that became the National Firearms Act of 1934, as noted earlier, included this definition of machine gun that encompassed both semi-automatic and fully automatic firearms: "The term 'machine gun' means any weapon designed to shoot automatically or semiautomatically 12 or more shots without reloading."[141] (This text was derived from the law enacted by Congress for the District of Columbia in 1932, which also stipulated a 12 round limit, as noted previously.[142] The final version of the 1934 bill was

---

[139] 1927 Cal. Stat. 938.
[140] 1933 Haw. Sess. Laws 117; 1929 Mo. Laws 170; Wash. 1933 Sess. Laws 335.
[141] "National Firearms Act," Hearings Before the Committee on Ways and Means, House of Representatives, on H.R. 9066, April 16, 18, and May 14, 15, and 16, 1934 (Washington, D.C.: GPO, 1934), 52.
[142] Ibid., 45.

limited to fully automatic firearms only and did not include any limitation by number of rounds fired.)

118.    Regulations concerning removable magazines and magazine capacity were thus common as early as the 1920s—the period of time when these weapons and devices began to make their way into civilian life and also contributed to violence and criminality, as illustrated by the Tommy gun narrative and other weapons discussed here—as these regulations were adopted by nearly half of all states.

### H.    Lessons From the Regulation of Ammunition Feeding Devices

119.    The lesson from this sequence of events early in the twentieth century demonstrates that changes in gun policy followed the series of steps described in this Report that respond to developments in firearms technologies, their circulation in society, and their use in crime, each dependent on the previous step. This lesson is significant because the Complaint in this case argues (incorrectly) that the absence of government gun regulations in history—at the time of the invention of various weapons or weapons developments—means that regulations now are unjustifiable, or have no historical basis.[143]

120.    Since the Complaint in this case relies heavily on the writings of David Kopel, it is important to discuss the problems with that writing. For example, Kopel argues that "[m]agazines of more than ten rounds are older than the United States."[144] Drawing on examples like a firearm "created around 1580" capable of firing sixteen "'superposed' loads" (with each round stacked on top of the other); the Puckle gun said to fire eleven shots and patented in 1718; the Girandoni air rifle, invented in the late 1700s; and the Pepperbox pistol

---

[143] Complaint, 13, ¶ 44, 15 ¶ 51.
[144] Kopel, "The History of Firearm Magazines and Magazine Prohibitions," 851.

of the early 1800s,[145] Kopel suggests that "magazines of more than ten rounds are older than

the Second Amendment."[146] Therefore, by Kopel's reckoning, and also that of the Complaint

in this case, since these weapons existed early in (or even before) the country's existence,

and were not specifically regulated, ipso facto, today's governments are unable to regulate

assault weapons, like AR-platform rifles, or magazines exceeding certain capacities

(typically, a ten-round limit).[147]

121.    Kopel's and the Complaint's arguments fail for three reasons. First, as explained in the

preceding sections, this sort of narrative misrepresents the availability, viability, and

capabilities of these early weapons. Kopel's claim that ammunition magazines holding "more

than ten rounds" were "very commonly possessed in the United States since 1862" and were

"owned by many millions of law-abiding Americans" dating back to the "mid-nineteenth

century"[148] is simply false, as discussed above. Second, the account fails to understand the

relationship between firearms' technological development, their spread into civil society, and

government gun policy. As one gun history expert noted, "the guns of 1830 were essentially

what they had been in 1430: single metal tubes or barrels stuffed with combustible powder

and projectiles" where "after every shot, the shooter had to carry out a minimum of three

steps: pour powder into the barrel; add a projectile. . .; then ignite the gunpowder and send

---

[145] Kopel, "The History of Firearm Magazines and Magazine Prohibitions," 852-54.

[146] Kopel, "The History of Firearm Magazines and Magazine Prohibitions," 849.

[147] Kopel, "The History of Firearm Magazines and Magazine Prohibitions," 871-72 ("a court which today ruled that [10-round] magazines are 'dangerous and unusual' would seem to have some burden of explaining how such magazines, after a century and a half of being 'in common use' and 'typically possessed by law-abiding citizens for lawful purposes,' became 'dangerous and unusual' in the twenty-first century.").

[148] Kopel, "The History of Firearm Magazines and Magazine Prohibitions," 871. Kopel insists "that [10-round] magazines' have been "'in common use' and 'typically possessed by law-abiding citizens for lawful purposes'" for "a century and a half" (871-72). This claim is both false and unverified by his article.

the projectile on its way."[149] The firearms and firearm feeding devices regulated in the early twentieth century represented a dramatically different type of firearm, capable of reliable, rapid fire utilizing interchangeable ammunition feeding devices. Third, as Jacob Charles importantly argues, "the absence of evidence—historical silence on a question—does not imply any sort of historical understanding that the government lacked power to act."[150] Related to this is the fact that, if the behavior of legislatures and other governing bodies reveals anything, it is that institutions like the U.S. Congress are almost always reactive— that is, they act to address problems only when they arise.[151]

## I.    Clarifying Terms and Concepts About LCMs

Critics of statutory limits on large capacity magazines (LCMs), usually defined as those holding more than ten rounds, complain that such terms are "often purposely and wrongly applied by anti-gun groups during conversations on gun politics to mislabel standard capacity magazines."[152] Yet the LCM term is neither "wrongly applied" nor a political "mislabel," and for three reasons.

---

[149] Rasenberger, *Revolver*, 3-4. Indeed, as the United States evolved from an agrarian to an urban/industrial society, the resultant industrial revolution that took hold by the latter part of the nineteenth century resulted in the "acceleration in the processes of technical innovation. . . ." "Industrial Revolution and Technology," *National Geographic,* https://education.nationalgeographic.org/resource/industrial-revolution-and-technology/. This was no less true for the development of firearms, which witnessed a similar acceleration in developments by the start of the twentieth century.

[150] Jacob D. Charles, The Dead Hand of a Silent Past: Bruen, Gun Rights, and the Shackles of History (January 23, 2023). 73 Duke Law Journal 67 (2023), Pepperdine University Legal Studies Research Paper No. 2023/7, Available at SSRN: https://ssrn.com/abstract=4335545 or http://dx.doi.org/10.2139/ssrn.4335545

[151] Robert J. Spitzer, *President and Congress: Executive Hegemony at the Crossroads of American Government* (NY: McGraw-Hill, 1993), chs. 1-3.

[152] Chris Eger, "Magazines: Standard Capacity v Large Capacity," guns.com, November 18, 2020, https://www.guns.com/news/2020/11/18/magazines-standard-capacity-v-large-capacity

First, the LCM definition of one holding ten or more rounds dates back to at least 1991,[153] in an early version of the law Congress eventually passed in 1994 that said the term "large capacity ammunition feeding device" was defined in the law as "a magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition. . . ."[154] Since that time, ten states plus the District of Columbia have adopted the LCM ten round limit (see earlier discussion).

Second, the definition of LCMs based on a ten-round limit has been and is widely accepted and used in the scholarly literature in criminology and other fields examining such devices.[155]

Third, as Table 1 and the accompanying discussion in this document shows, from 1917 to 1934 roughly half of the states in the U.S. enacted laws that restricted various ammunition feeding devices, or guns that could accommodate them, based on a set number of rounds, though the numerical cap for gun firing without reloading varied at that time from more than a single

---

[153] Violent Crime Control and Law Enforcement Act of 1994, H.R. REP. 103-489, H.R. Rep. No. 489, 103RD Cong., 2ND Sess. 1994, 36.

[154] Violent Crime Control and Law Enforcement Act of 1994, 6.

[155] For example: Gregg Lee Carter, ed., *Guns in American Society,* 3 vols. (Santa Barbara, CA: ABC-CLIO, 2012), III, 777-78; Jaclyn Schildkraut and Tiffany Cox Hernandez, "Laws That Bit The Bullet: A Review of Legislative Responses to School Shootings," *American Journal of Criminal Justice* 39, 2 (2014): 358-74; Luke Dillon, "Mass Shootings in the United States: An Exploratory Study of the Trends from 1982-2012," Mason Archival Repository Service, George Mason University, May 22, 2014, http://mars.gmu.edu/xmlui/handle/1920/8694; Jaclyn Schildkraut, "Assault Weapons, Mass Shootings, and Options for Lawmakers," Rockefeller Institute of Government, March 22, 2019, https://rockinst.org/issue-area/assault-weapons-mass-shootings-and-options-for-lawmakers/; Christopher Koper, et al., "Assessing the Potential to Reduce Deaths and Injuries from Mass Shootings Through Restrictions on Assault Weapons and Other High-Capacity Semiautomatic Firearms," *Criminology & Public Policy*, 19 (February 2020): 157; Philip J. Cook and Kristin A. Goss, *The Gun Debate,* 2nd ed. (NY: Oxford University Press, 2020), 201.

round up to eighteen. Thus, the idea of restricting removable magazines by capping the number

of rounds dates back at least a century.

**J.    Historical Restrictions on Knives, Blunt Weapons, Pistols, and Trap Guns**

122.    Similar to government regulation of certain types of firearms and ammunition feeding

devices in the early twentieth century, which occurred only after the weapons technologies

matured, entered the civilian market, and threatened the public through criminal use,

government regulation of other weapons typically followed a version of this trajectory during

the 1700s and 1800s.

**1.    Historical Restrictions on the Bowie Knife and Similar Long-Bladed Knives**

123.    The Bowie knife is generally credited with having been invented by the brother of

adventurer Jim Bowie, Rezin Bowie.  The knife was named after Jim Bowie, who reputedly

killed one man and wounded another using a "big knife" given to him by his brother in the

alternately notorious or celebrated "Sandbar Duel" in 1827.[156]

124.    While Bowie knives initially "came in a variety of forms—with or without guards, with

differently shaped blades," they eventually became more standardized as "a large knife with

---

[156] "Bowie Knife," *Encyclopedia of Arkansas*, n.d., https://encyclopediaofarkansas.net/ entries/bowie-knife-2738/; William C. Davis, *Three Roads to the Alamo* (NY: HarperCollins, 1998), 207-8.  Davis persuasively dismisses the claim of a blacksmith, James Black, that he invented or styled the distinctive knife for Rezin Bowie (676–77). David Kopel says, erroneously, that "Jim Bowie used a traditional knife at a famous 'sandbar fight' on the lower Mississippi River in 1827." Rezin Bowie had just developed the distinctive knife his brother used in the fight, so it could not have been "traditional." David Kopel, "Bowie knife statutes 1837-1899," *The Volokh Conspiracy*, November 20, 2022, https://reason.com/volokh/2022/11/20/bowie-knife-statutes-1837-1899/

a cross guard and a blade with a clipped point."[157]  The distinctive traits of the Bowie knife

are described in Robert Abels' book, Bowie Knives, which includes pictures of nearly one

hundred such knives made between 1835 and 1890.[158]

125.  The Bowie legend, the explosive growth and spread of Bowie-related mythology (only

magnified by his death at the Alamo in 1836), and the knife's distinctive features,

encouraged its proliferation,[159] referred to by one historian as "the craze for the knives."[160]

126.  As was true of other knives with long, thin blades,[161] they were widely used in fights and

duels, especially at a time when single-shot pistols were often unreliable and inaccurate.[162]

Indeed, such knives were known as "fighting knives"[163] that were "intended for combat."[164]

127.  In the early nineteenth century "guns and knives accounted for a growing share of the

known weapons that whites used to kill whites."[165]  In 1834, for example, a grand jury in

Jasper County, Georgia deplored

> the practice which is common amongst us with the young the middle aged and the aged to
> arm themselves with Pistols, dirks knives sticks & spears under the specious pretence of
> protecting themselves against insult, when in fact being so armed they frequently insult
> others with impunity, or if resistance is made the pistol dirk or club is immediately

---

[157] "Bowie Knife," *Encyclopedia of Arkansas*, n.d., https://encyclopediaofarkansas.net/
entries/bowie-knife-2738/.
[158] Robert Abels, *Bowie Knives* (NY: Abels, 1979).
[159] Virgil E. Baugh, *Rendezvous at the Alamo* (Lincoln, NE: University of Nebraska Press, 1985),
39–63.
[160] Davis, *Three Roads to the Alamo*, 583.
[161] Other such long-bladed, thin knives of varying configurations typically named in laws barring
their carrying included the Arkansas toothpick, the Spanish stiletto, dirks, daggers, and the like.
[162] Davis, *Three Roads to the Alamo*, 164, 208; Baugh, *Rendezvous at the Alamo*, 42; Karen
Harris, "Bowie Knives: The Old West's Most Famous Blade," *Oldwest*, n.d.,
https://www.oldwest.org/bowie-knife-history/; Norm Flayderman, *The Bowie Knife* (Lincoln, RI:
Andrew Mowbray, 2004), 485.
[163] Roth, *American Homicide*, 218.
[164] Flayderman, *The Bowie Knife*, 59.
[165] Roth, *American Homicide*, 218.

resorted to, hence we so often hear of the stabbing shooting & murdering so many of our citizens.[166]

128.   Homicide rates increased in the South in the early nineteenth century, as did laws restricting carrying concealed weapons.

129.   Dueling also persisted during this time, even as the practice was widely deplored by religious and other groups, in newspapers, by anti-dueling societies and political leaders.[167]

130.   Bowie knife writer Norm Flayderman provides abundant and prolific evidence of the early criminal use of Bowie knives in the 1830s, quoting from dozens of contemporaneous newspaper and other accounts, and providing references to literally hundreds of additional articles and accounts attesting to the widespread use of Bowie knives in fights, duels, brawls and other criminal activities.[168]   Flayderman concludes that, as early as 1836, "most of the American public was well aware of the Bowie knife."[169]   (Very much like the allure of contemporary assault weapons to some,[170] the Bowie knife's notorious reputation also, if perversely, fanned its sale and acquisition.[171])

---

[166] Quoted in Roth, *American Homicide*, 218–19.
[167] Baugh, *Rendezvous at the Alamo*, 51.
[168] Flayderman, *The Bowie Knife*, 25–64; 495–502.
[169] Ibid., 43.
[170] Ryan Busse, *Gunfight* (NY: Public Affairs, 2021), 12–15, 65; David Altheide, "The cycle of fear that drives assault weapon sales," *The Guardian,* March 2, 2013, https://www.theguardian.com/commentisfree/2013/mar/02/cycle-fear-assault-weapon-sales; Rukmani Bhatia, "Guns, Lies, and Fear," *American Progress*, April 24, 2019, https://www.americanprogress.org/article/guns-lies-fear/.
[171] Flayderman, *The Bowie Knife*, 46.

131. All this contributed to widespread enactment of laws prohibiting dueling in the states.[172]
In 1839, Congress passed a measure barring dueling in the District of Columbia.[173] Both
pistols and knives were prominently used in such affairs.[174]

132. At least three state court cases dealt in some manner with fighting knives like the Bowie
knife. In the 1840 case of *Aymette v. State*[175] the Supreme Court of Tennessee upheld the
conviction of William Aymette for wearing a Bowie knife concealed under his clothes under
a state law of 1837–1838, ch. 137, sec. 2, providing "that, if any person shall wear any
bowie-knife, or Arkansas toothpick, or other knife or weapon that shall in form, shape, or
size resemble a bowie-knife or Arkansas toothpick, under his clothes, or keep the same
concealed about his person such person shall be guilty of a misdemeanor, and, upon
conviction thereof, shall be fined in a sum not less than two hundred dollars, and shall be
imprisoned in the county jail not less than three months and not more than six months."[176]
The court concluded that the prohibition against wearing the named weapons was well
justified in that they "are usually employed in private broils, and which are efficient only in
the hands of the robber and the assassin."[177] The court continued, "The Legislature,
therefore, have a right to prohibit the wearing or keeping weapons dangerous to the peace
and safety of the citizens."[178] Further, the court added that the state law existed "to preserve
the public peace, and protect our citizens from the terror which a wanton and unusual

---

[172] A search for the word "duel" in the Duke Center for Firearms Law database of old gun laws
yields 35 results.  See https://firearmslaw.duke.edu/repository/search-the-repository/.
[173] H.R. 8, Joint Resolution Prohibiting Dueling, introduced March 5, 1838,
https://history.house.gov/Records-and-Research/Listing/lfp_032/.
[174] Roth, *American Homicide*, 180–83, 210–17.
[175] Cited in *District of Columbia v. Heller*, 554 U.S. 570 (2008).
[176] *Aymette v. State*, 21 Tenn. 152, 153 (Tenn. 1840).
[177] *Id.* at 156.
[178] *Id.* at 157.

exhibition of arms might produce, or their lives from being endangered by desperadoes with concealed arms."[179]

133.   Four years later, the Tennessee Supreme Court again dealt with a Bowie knife law violation and challenge. In the case of *Haynes v. Tennessee* (1844),[180] Stephen Haynes was indicted for carrying a concealed Bowie knife. He was convicted of wearing a knife that resembled a Bowie knife but appealed his conviction on the grounds that he was actually carrying a "Mexican pirate knife," which reputedly had a shorter, narrower blade. (At the trial, witnesses disagreed as to the proper name for the knife in question.) He also argued that the state law, in listing various types of knives including those "similar" to Bowie knives, was "too indefinite" and could therefore lead to "absurd consequences" that "must follow its enforcement. . . ."[181] On appeal, the court upheld his conviction and commended the Tennessee state legislature's enactment: "The design of the statute was to prohibit the wearing of bowie knives and others of a similar description, which the experience of the country had proven to be extremely dangerous and destructive to human life; the carrying of which by truculent and evil disposed persons but too often ended in assassination."[182] The court continued: "The design, meaning, and intent was to guard against the destruction of human life, by prohibiting the wearing [of] heavy, dangerous, destructive knives, the only use of which is to kill. . . ."[183] The court noted that the state law "wisely provides against bowie knives, Arkansas tooth picks, or any other weapon in form, shape or size, resembling

---

[179] *Id.*
[180] *Haynes v. Tennessee*, 24 Tenn. 120 (1844).
[181] *Id.* at 122.
[182] *Id.* at 122.
[183] *Id.* at 123.

them."[184] Noting the similarity among knives and the possibility of an unjust outcome where,

say, a person might be convicted of carrying a mere pocket knife, the court posed this

question: "what is to protect against conviction, when the words of the statute cover the

charge, and its true spirit and meaning does not?" Their answer: "the judge and jury who try

the case."[185] As the author of a book on Bowie knives noted, "the fact that the term 'bowie

knife' had never been precisely defined did not help his [Haynes's] case."[186]

134.  The Texas Supreme Court addressed the legal status of Bowie knives in *Cockrum v. State*

(1859).[187] The *Cockrum* case involved John Cockrum, who was charged with the murder of

his brother-in-law, William Self, with a Bowie knife.[188] Under Texas law, "a homicide,

which would otherwise be a case of manslaughter, if committed with a bowie-knife or

dagger, shall be deemed murder and punished as such. . . ."[189] The court upheld the added

penalty provision of the law relating to use of a Bowie knife, despite the court's very

---

[184] *Id.* at 122.

[185] *Id.* at 123.

[186] Paul Kirchner, *Bowie Knife Fights, Fighters, and Fighting Techniques* (Boulder, CO: Paladin Press, 2010), 43.

[187] *Cockrum v. State,* 24 Tex. 394 (1859), https://constitution.org/1-Constitution/2ll/2ndcourt/state/177st.htm. David Kopel says that a fourth case, *Nunn v. State*, 1 Ga. 243 (1846), is a "major state supreme court case[s] involving Bowie knives." "The legal history of bans on firearms and Bowie knives before 1900," *The Volokh Conspiracy,* November 20, 2022, https://reason.com/volokh/2022/11/20/the-legal-history-of-bans-on-firearms-and-bowie-knives-before-1900/. But *Nunn* involved a man who was prosecuted for carrying a pistol (openly, not concealed), not a knife. A state law criminalized concealed carry of various named weapons, including pistols and Bowie knives, whereas a different provision allowed for open carrying of named weapons, including Bowie knives, but failed to include pistols on that list. Noting the "great vagueness" in the statute's wording, the court reversed the man's conviction and wrote that there was a constitutional right to open carry "for the important end to be attained: the rearing up and qualifying a well-regulated militia, so vitally necessary to the security of a free State." By contrast, the court upheld the constitutionality of the concealed carry restrictions, and noted that those restrictions were enacted "to guard and protect the citizens of the State against the unwarrantable and too prevalent use of *deadly weapons*." 246; italics in original.

[188] https://www.genealogy.com/ftm/p/i/l/Karen-Pilgrim-TX/WEBSITE-0001/UHP-0254.html

[189] *Cockrum*, 24 Tex. at 394.

expansive interpretation of the right to bear arms, but reversed and remanded the man's conviction because of an error related to statutory changes and jury instructions. It described Bowie knives as "an exceeding destructive weapon," an "instrument of almost certain death," and "the most deadly of all weapons in common use."[190] Further, the court said: "He who carries such a weapon. . .makes himself more dangerous to the rights of others, considering the frailties of human nature, than if he carried a less dangerous weapon."[191]

135.   All of these cases underscore the courts' recognition of the dangerous nature and nefarious use of Bowie knives not only by their characterizations of them, but by the fact that they are treated in the same restrictive and prohibitory manner in law as other dangerous, deadly weapons including pistols and various named clubs.[192]

---

[190] *Id.* at 403–04. Kopel says, incorrectly, that "Bowie knives. . . were regulated the same as a butcher's knife." According to the Duke Center for Firearms Law Repository of Historical Gun Laws (https://firearmslaw.duke.edu/repository/search-the-repository/) six states had laws that restricted butcher knives by name, whereas 42 states restricted Bowie knives by name. See Exhibits E and I. Kopel, "Bowie knife statutes 1837-1899."

[191] *Cockrum*, 24 Tex. at 403.

[192] Among the notorious incidents attached to the Bowie knife was its use by two of the conspirators in the Lincoln assassination in 1865. The plan was to assassinate President Lincoln, Vice President Andrew Johnson, and Secretary of State William Seward. The man assigned to attack Seward, Lewis Powell, entered the Seward home armed with a pistol and a Bowie knife. When one of Seward's sons tried to stop him, Powell tried to shoot him, but his gun misfired, so he used it as a club against the son. When he encountered another son, Powell slashed him with his Bowie knife, the weapon he then used to attack Seward who, thanks to a neck collar, survived. David Morgan, "Lincoln assassination: The other murder attempt," *CBS News,* May 10, 2015, https://www.cbsnews.com/news/lincoln-assassination-the-other-murder-attempt/; https://www.history.com/topics/american-civil-war/william-seward. John Wilkes Booth also carried what was later identified as a Bowie knife which he used to slash the man who accompanied Lincoln to the theater and who tried to stop Booth after he shot the president. Booth slashed the man in the arm with his knife to make his escape. https://lincolnconspirators.com/2018/12/31/cloak-and-daggers-cutting-through-the-confusion-of-the-assassination-knives/

136.   The ubiquity of the concern about the criminological consequences of carrying Bowie knives and other, similar long-bladed knives is seen in the widespread adoption of laws barring or restricting these weapons.[193]

137.   In the 1830s, at least six states enacted laws barring the carrying of Bowie knives by name.[194] From then to the start of the twentieth century, every state plus the District of Columbia (with the sole exception of New Hampshire) restricted Bowie knives:  a total of at least 42 states (including the District of Columbia) barred or restricted Bowie knives by name; and another 8 states enacted laws barring the category or type of knife embodied by the Bowie knife but without mentioning them by name (see Exhibits E and I) totaling 49 states plus the District of Columbia.[195]

138.   Several states all but banned the possession of Bowie knives outright, and others imposed taxes on the ability for individuals to acquire or possess them (see Exhibit I).

139.   The desirability and utility of concealed-carry restrictions were precisely that they pushed dangerous weapons out of public spaces and places, improving public safety through the deterrent and punishment effects of such laws, and also discouraging the settlement of private grievances and disputes in public through weapons-fueled violence.

140.   States were imaginative and persistent in their effort to suppress fighting knives and other weapons. For example, an 1881 Arkansas law combined no-carry provisions (whether concealed or openly) applying to any dirk, bowie knife, sword, spear in a cane, brass or metal

---

[193] The near-immediate effort in the states to restrict Bowie knives was noted, for example, in Davis, *Three Roads to the Alamo*, 582, and in Flayderman, *The Bowie Knife*, 53–54.

[194]  A seventh state, Massachusetts, criminalized the carrying of fighting knives using labels that would have included the Bowie knife in an 1836 law.

[195] Bowie law enactment by decade: 1830s: 6 states; 1840s: 4 states; 1850s: 11 states; 1860s: 13 states; 1870s: 19 states; 1880s: 20 states; 1890s: 21 states; 1900s: 13 states.  See Exhibits E and I. See also Spitzer, "Understanding Gun Law History After *Bruen*," 88-95.

knuck[le]s, razors, "or any pistol of any kind whatever" with another provision in the same law that made it a misdemeanor to "sell, barter or exchange, or otherwise dispose of, or in any manner furnish to any person" the aforementioned weapons, including "any kind of cartridge."[196] Even though the law allowed persons to have the weapons on their own premises, it begs the question of how, exactly, a person could legally obtain such weapons in the first place if they weren't already owned within a family before the 1881 law was enacted.

141.  States relied on a variety of regulatory techniques to suppress Bowie knife carrying: 29 states enacted laws to bar their concealed carry; 15 states barred their carry whether concealed or openly; 7 states enacted enhanced criminal penalties for those who used the knives to commit a crime; 4 states enacted regulatory taxes attached to their commercial sale; 3 states imposed a tax for those who owned the knives; 10 states barred their sale to specified groups of people; and 4 states enacted penalties for brandishing the knives (see Exhibit I).

142.  The extensive and ubiquitous nature of these Bowie knife prohibitions raises a further question: given the universal agreement that these knives were dangerous, why not simply ban their possession outright? The answer is two-fold. First, America was a developing nation-state in the nineteenth century. The federal and state governments did not yet possess the maturity, powers, tools, or resources to enact, much less implement, any measure as sweeping as a knife ban, especially since knives are technologically very simple to produce. After all, the front-line administrative entity on which we today rely for law enforcement, the police, barely existed (in the way we think of policing today) in the early nineteenth century

---

[196] 1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI (96), § §1-3. The law also made exceptions for military weapons, for officers, and legal transport for people on a journey, a common exception in such laws.

(up to this time policing fell to a haphazard mix of the watch system, constables, militias, and vigilantes). Modern police forces only came in to being in a handful of large cities before the Civil War.[197] Second, the chief remedy enacted by the states to address the problem of knife fighting was far more focused and feasible: to bar the carrying of knives, along with the other two categories of weapons that also threatened public safety, clubs and pistols. The fact that all three types of weapons were consistently treated together is conclusive evidence that all were considered so dangerous and inimical to public safety that subject to anti-carry laws and bundled together in legislative enactments.

## 2.  Historical Restrictions on Clubs and Other Blunt Weapons

143.  Among the most widely and ubiquitously regulated harmful implements in U.S. history were various types of clubs and other blunt weapons. (See Exhibits E and J.)  Most were anti-carry laws, which also generally encompassed pistols and specific types of knives, although some of the laws extended prohibitions to these weapons' manufacture, possession, sale, or use in crime.[198]

144.  As the table in Exhibit J shows, at least five distinct types of clubs and blunt objects were regulated in the United States (plus a sixth miscellaneous category.  Notably, every state in the nation had laws restricting one or more types of clubs.

---

[197] William R. Kelly and Daniel P. Mears, *The Reinvention of Policing* (Lanham, MD: Rowman & Littlefield, 2023), 54-59; Chris McNab, *Deadly Force* (Oxford, Great Britain: Osprey Publishing, 2009), 13-24. Boston created a police force in 1838, New York City created a standing police force in 1845, followed by Chicago in 1851, Philadelphia in 1854, and Baltimore in 1857 (23). Jill Lepore, "The Invention of the Police," *The New Yorker,* July 13, 2020, https://www.newyorker.com/magazine/2020/07/20/the-invention-of-the-police. Both McNab and Lepore emphasize the role of slavery and slave suppression as key to the development of policing.
[198] E.g. see 1917 Cal. Sess. Laws 221-225; 1923 Cal. Stat. 695.

145.  According to a detailed reference book on the subject of these blunt instruments by Robert

Escobar, they were considered "objectionable objects, once feared but now forgotten."[199]

Escobar provides what he calls "a family history" of these blunt weapons, but adding that

"[i]t's a disreputable family to say the least, black sheep even within the study of

weaponry."[200]  They have been described as "wicked, cowardly, 'Soaked in blood and cured

in whiskey.'"[201]  Those who carried them (excluding police) "were called vicious, devils and

lurking highwaymen."[202]  These club-type blunt objects compose a family of objects used for

striking others, and while they vary in name and construction, the categories are "somewhat

fluid."[203]

146.  Among the five types of clubs regulated in U.S. laws, 15 states barred bludgeon carrying.

A bludgeon is a short stick with a thickened or weighted end used as a weapon.[204]  The

earliest state anti-bludgeon law was in 1799; 12 such state laws were enacted in the 1700s

and 1800s, and 4 in the early 1900s (as with each of these chronological categories, the state

law total exceeds the total number of states because some states enacted the same or similar

laws in multiple centuries).

---

[199] Robert Escobar, *Saps, Blackjacks and Slungshots: A History of Forgotten Weapons* (Columbus, OH: Gatekeeper Press, 2018), 1.
[200] Escobar, *Saps, Blackjacks and Slungshots*, 2.
[201] Escobar, *Saps, Blackjacks and Slungshots*, 2.
[202] Escobar, *Saps, Blackjacks and Slungshots*, 2.
[203] Escobar, *Saps, Blackjacks and Slungshots*, 1.
[204] https://www.merriam-webster.com/dictionary/bludgeon.

147.  A billy (sometimes spelled billie) club is a heavy, hand-held rigid club,[205] usually made of wood, plastic, or metal,[206] that is traditionally carried by police, often called a nightstick or baton.[207]  Escobar cites an early reference to the billy club in an 1854 New Orleans newspaper article in the *Daily True Delta* that referred to "police armed with batons,"[208] a synonym for a billy club.  As this reference suggests, police have long adopted the billy club, or similar striking implements, as part of their on-duty weaponry.  At least 16 states had anti-billy club laws, totaling 46 laws; the earliest law appears to have been enacted in Kansas in 1862,[209] followed by a New York law in 1866.[210]  Fourteen states enacted such laws in the 1800s; 11 states did so in the early 1900s.

148.  At least 14 states barred the carrying of "clubs" more generically, without specifying the type.  The oldest anti-club law was 1664; 7 states enacted these laws in the 1600s-1700s, 7 states in the 1800s, and 2 in the early 1900s.

---

[205] Some versions were made to have some flexibility to increase their striking power. See Escobar, *Saps, Blackjacks and Slungshots*, 118-19.

[206] https://www.merriam-webster.com/dictionary/billy%20club. Escobar discusses a Civil War veteran and later police officer, Edward D. Bean, who experimented with various types of billy clubs to improve their striking power and durability by utilizing leather, often adhered to wood, to reduce the likelihood that the club would break on use. *Saps, Blackjacks and Slungshots*, 118. One of the earliest references to a "billy" was an 1857 newspaper article describing "an indiscriminate attack with slung-shot, billies, clubs, &c."  "Local Intelligence," *Delaware Republican*, June 15, 1857, https://bit.ly/3V9nVO7.

[207] Escobar, *Saps, Blackjacks and Slungshots*, 2, 69-70, 105, 113-30.

[208] Escobar, *Saps, Blackjacks and Slungshots*, 105.

[209] C. B. Pierce, Charter and Ordinances of the City of Leavenworth, with an Appendix Page 45, Image 45 (1863) available at The Making of Modern Law: Primary Sources, 1862.

[210] Montgomery Hunt Throop, The Revised Statutes of the State of New York; As Altered by Subsequent Legislation; Together with the Other Statutory Provisions of a General and Permanent Nature Now in Force, Passed from the Year 1778 to the Close of the Session of the Legislature of 1881, Arranged in Connection with the Same or kindred Subjects in the Revised Statutes; To Which are Added References to Judicial Decisions upon the Provisions Contained in the Text, Explanatory Notes, and a Full and Complete Index Page 2512, Image 677 (Vol. 3, 1882) available at The Making of Modern Law: Primary Sources, 1866.

149.  Anti-slungshot laws were enacted by 44 states, with 71 laws enacted in the 1800s and 13 in the 1900s.  A slungshot (or slung shot), also referred to as "a type of blackjack,"[211] is a hand-held weapon for striking that has a piece of metal or stone at one end attached to a flexible strap or handle that was developed roughly in the 1840s (the first "known use" of slungshot was 1842[212]).  By one account, "[s]lungshots were widely used by criminals and street gang members in the 19th Century.  They had the advantage of being easy to make, silent, and very effective, particularly against an unsuspecting opponent.  This gave them a dubious reputation, similar to that carried by switchblade knives in the 1950s, and they were outlawed in many jurisdictions.  The use as a criminal weapon continued at least up until the early 1920s."[213]  Escobar concurs that slungshots and blackjacks "were a regular part of criminal weaponry. . .and gangsters could be merciless in their use."[214]

150.  In a criminal case considered the most famous of those involving lawyer Abraham Lincoln, the future president defended a man charged with murdering another using a slung shot.  In the 1858 trial of William "Duff" Armstrong, Lincoln succeeded in winning Armstrong's acquittal.[215]

151.  These weapons were viewed as especially dangerous or harmful when they emerged in society, given the ubiquity of state laws against carrying them enacted after their invention

---

[211] Escobar, *Saps, Blackjacks and Slungshots*, 228.

[212] See https://www.merriam-webster.com/dictionary/slungshot Escobar agrees with this rough date. See *Saps, Blackjacks and Slungshots*, 67.

[213] "Slungshot," https://military-history.fandom.com/wiki/Slungshot.

[214] Escobar, *Saps, Blackjacks and Slungshots*, 86.

[215] Lincoln was able to discredit the testimony of a witness who claimed to see Armstrong strike the victim with a slung shot at night because of the full moon.  Lincoln used as evidence an Almanac to prove that on the night in question, there was no full moon.  Judson Hale, "When Lincoln Famously Used the Almanac," *Almanac,* May 4, 2022, https://www.almanac.com/abraham-lincoln-almanac-and-murder-trial.

and their spreading use by criminals and as fighting implements. These devices were invented and appeared in society during an identifiable period of time in the mid-nineteenth century, sparking subsequent wide-ranging prohibitions. The earliest anti-slungshot law was enacted in 1850; 43 states legislated against them in the 1800s (including the District of Columbia), and 12 states in the early 1900s (note this incorporates multiple laws enacted in more than one century by a few states).

152.  Sandbags, also known as sand clubs, were also a specific focus in anti-carry laws as well. Consisting of nothing more than sand poured into a bag, sack, sock, or similar tube-shaped fabric (although the weight could also be something dense and heavy, like a lock in the end of a sock),[216] their particular appeal was that they could be dispensed with by simply pouring the sand out, leaving nothing more than an empty cloth bag. (Alternately, they could be made heavier by adding water to the sand.) The first anti-sandbag law was 1866, with 10 states enacting such laws—7 in the 1800s and 7 in the early 1900s. Only 3 states did not have any prohibitions in any of these six categories, but these 3 (Montana, Ohio, and Washington State) had blanket legislative provisions against the carrying of any concealed/dangerous/deadly weapons.

### 3.    Historical Restrictions on Pistol and Gun Carrying

153.  Carry restriction laws were widely enacted from the 1600s through the start of the twentieth century, spanning over three centuries. As early as 1686, New Jersey enacted a law against wearing weapons because they induced "great Fear and Quarrels." Massachusetts followed in 1750. In the late 1700s, North Carolina and Virginia passed similar laws. In the

---

[216] https://www.ferrislawnv.com/criminal-defense/weapons-offenses/dangerous-weapons/; Escobar, *Saps, Blackjacks and Slungshots*, 20-22. Escobar dates the earliest reference to sandbags as weapons to the 1600s (22).

1800s, as interpersonal violence and gun carrying spread, forty-three states joined the list; three more did so in the early 1900s (see Exhibit B).[217]

154.  The enactment of laws restricting concealed weapons carrying followed the rise of homicides and interpersonal violence described by historian Randolph Roth who noted that restrictions on firearms from the colonial period to the start of the Revolution were few because homicide rates were low. When homicides did occur, guns were seldom used, in large part because of the time involved loading them, their unreliability, and (especially for pistols) their inaccuracy.

155.  After the Revolutionary period the spread of violence tied to concealable percussion cap pistols and fighting knives led to the enactment of anti-concealed carry weapons laws.[218]

156.  Concealed carry laws normally targeted pistols as well as the types of fighting knives and various types of clubs discussed here (see Exhibit E for text of such laws).

157.  In addition, at least three-fourths of the states enacted laws that penalized public weapons brandishing or display. At least four states did so in the 1600s, two in the 1700s, twenty-eight states in the 1800s, and two more in the early 1900s.[219]

158.  As of 1938, "the carrying of concealed pistols is either prohibited absolutely or permitted only with a license in every state but two."[220] Thus, the widespread enactment of concealed carry laws was the public policy remedy to the emergent crime problem described here.  In

---

[217] Spitzer, "Gun Law History in the United States and Second Amendment Rights," 63-67.
[218] Roth, *American Homicide*, 61-144, 216-21; Randolph Roth, "Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *A Right to Bear Arms?* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019), 116-17; Roger Lane, *Murder in America* (Columbus, OH: Ohio State University Press, 1997), 344-45.
[219] Spitzer, *The Gun Dilemma*, 77-80.
[220] Sam B. Warner, "The Uniform Pistol Act," *Journal of Criminal Law and Criminology* 29 (Winter 1938): 530.

addition, and consonant with a maturing society, at least 30 states broadened their laws to restrict open weapons carrying as well. Most of these laws were enacted in the post-Civil War period (see Exhibit B).

### 4.    Historical Restrictions on Trap Guns

159.  Not to be confused with firearms used in trapshooting, trap guns were devices or contraptions rigged in such a way as to fire when the owner need not be present. Typically, trap guns could be set to fire remotely (without the user being present to operate the firearm) by rigging the firearm to be fired with a string or wire which then discharged when tripped.[221]  This early law from New Jersey in 1771 both defines and summarizes the problem addressed by this law:

> Whereas a most dangerous Method of setting Guns has too much prevailed in this Province, Be it Enacted by the Authority aforesaid, That if any Person or Persons within this Colony shall presume to set any loaded Gun in such Manner as that the same shall be intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance, such Person or Persons shall forfeit and pay the Sum of Six Pounds; and on Non-payment thereof shall be committed to the common Gaol of the County for Six Months.[222]

160.  Also sometimes referred to as "infernal machines,"[223] the term trap gun came to encompass other kinds of traps designed to harm or kill those who might encounter them, including for purposes of defending property from intruders.

161.  Unlike the other weapons restrictions examined here, opinion was more divided on the

---

[221] See Spitzer, "Gun Law History in the United States and Second Amendment Rights," 67.
[222] 1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10.
[223] E.g. 1901 Utah Laws 97-98, An Act Defining an Infernal Machine, and Prescribing Penalties for the Construction or Contrivance of the Same, or Having Such Machine in Possession, or Delivering Such Machine to Any Person . . . , ch. 96, §§ 1-3.

relative merits or wisdom of setting such devices, with some arguing that thieves or criminals hurt or killed by the devices had it coming,[224] though the weight of opinion seemed mostly against such devices because of the likelihood that innocent persons could be injured or killed, and also because such devices represented an arbitrary and excessive meting out of private, vigilante-type "justice."[225]  Those who set gun traps typically did so to defend their places of business, properties, or possessions.  This 1870 newspaper account from an incident in New York City provides an example where a burglar was killed by a gun-trap set by a shopkeeper, who was then prosecuted: "As there is a statute against the use of such infernal machines, which might cause loss of life to some innocent person, the jury censured Agostino."  After the verdict the man continued to be held under $2,000 bail.[226]

162.  Inevitably, however, the traps wound up hurting or killing innocents, even including the person who set the trap.  For example, this 1891 newspaper account from Chillicothe, Missouri illustrated the problem: "George Dowell, a young farmer, was fined $50 under an old law for setting a trap-gun.  Dowell set the gun in his corn-crib to catch a thief, but his wife was the first person to visit the crib and on opening the door was shot dead."[227]

163.  In all, at least 18 states had anti-trap gun laws (see Exhibit F).  The earliest such law

---

[224] For example, this small item appeared in the Bangor (Maine) Daily Whig on October 27, 1870: "A burglar while attempting to break into a shop in New York, Monday night, had the top of his head blown off by a trap-gun so placed that it would be discharged by any one tampering with the window.  A few such 'accidents' are needed to teach the thieves who have lately been operating in this city, a lesson."
[225] This is my observation based on my reading of historic newspaper accounts from the late 1800s, and from the number of anti-trap gun laws enacted.  As policing became more consistent, professional, and reliable, support for vigilante-type actions like setting trap guns seems to have declined.
[226] "The Man Trap," *The Buffalo Commercial*, November 1, 1870; from the *N.Y. Standard*, October 29, 1870, https://bit.ly/3yUSGNF.
[227] "Shot by a Trap-Gun," *South Bend Tribune*, February 11, 1891, https://bit.ly/3CtZsfk.

encountered was the 1771 New Jersey law (above). Eleven laws were enacted in the 1700s-1800s, and 9 in the early 1900s (counting states that enacted multiple laws across the centuries).

## III.  GUN PURCHASE WAITING PERIODS

164.    Gun purchase waiting periods as they are understood and implemented today did not exist early in the country's history. Yet no special wisdom is required to discern why. Three important differences between early America and the modern era explain why.

165.    First, in the modern era, gun and ammunition purchases can be made easily and rapidly from tens of thousands of licensed gun dealers,[228] private sales, gun shows, and through internet sales. This modern sales system was key to the enactment of waiting periods. No "Guns-R-Us" outlets existed in the 1600s, 1700s, or most of the 1800s. Rapid, convenient gun sales processes did not exist in the U.S. until the end of the nineteenth century, when mass production techniques, improved technology and materials, and escalating marketing campaigns all made guns relatively cheap, prolific, reliable, and easy to get. As Kennett and Anderson note, "By the 1880s gunmaking had completed the transition from craft to industry."[229] The rise of handgun mail order purchasing through such companies as Montgomery Ward and Sears in the 1870s and 1880s brought cheap handguns to buyers' doors.[230]

---

[228] As of 2021, there were over 52,900 dealer licensees and over 7,000 licensed pawnbrokers. http://www.atf.gov/about/foia/ffl-list.html; "Gun Dealers," Giffords Law Center, https://giffords.org/lawcenter/gun-laws/policy-areas/gun-sales/gun-dealers/#footnote_1_5597.
[229] Kennett and Anderson, *The Gun in America*, 97.
[230] Kennett and Anderson, *The Gun in America,* 99-100. Sears ended handgun catalog sales in 1924, and other companies followed as pressure for government intervention rose. (194)

166.    When the adverse consequences of the spread of cheap handguns began to be felt, states enacted numerous anti-gun carry restrictions in the late 1800s and early 1900s.[231]

167.    Second, no organized system of gun background checking could feasibly exist until the modern era. In fact, the contemporary uniform federal background check system with a five business day waiting period was established by the Brady Handgun Violence Prevention Act in 1993 (although the waiting period was phased out in 1998 and replaced with an instant background check system).[232]

168.    As of this writing ten states plus D.C. have waiting period laws ranging in length from three to 14 days.[233] By its nature, a gun waiting period simply delays an otherwise lawful purchase for two sound reasons: to complete a proper background check to insure that the individual is not among those not qualified to have a gun; and to provide a cooling off period for those who seek to obtain a gun impulsively for homicidal or suicidal reasons.[234]

169.    Third, as Randall Roth reports, homicide rates in the colonies and early Federal era were generally low, and when homicides occurred, guns were seldom used because of the time involved in loading them, their unreliability, and (especially for pistols) their inaccuracy. More specifically, muzzle loading firearms were problematic as implements for murder: they did not lend themselves to impulsive use unless already loaded (and it was generally unwise to leave them loaded for extended periods because their firing reliability degraded over time).

---

[231] Robert J. Spitzer, "Gun History in the United States and Second Amendment Rights," *Law and Contemporary Problems* 80(2017): 59-60, 63-67.
[232] 107 Stat. 1536. Robert J. Spitzer, *The Politics of Gun Control,* 9th ed. (NY: Routledge, 2024), 221-28.
[233] "Waiting Periods," Giffords Law Center, https://giffords.org/lawcenter/gun-laws/policy-areas/gun-sales/waiting-periods/
[234] E.g. Michael Luca, Deepak Malhotra, and Christopher Poliquin, "Handgun waiting periods reduce gun deaths," *PNAS* 114(October 16, 2017): 12162-12165, https://www.pnas.org/doi/full/10.1073/pnas.1619896114

Nearly all firearms at the time were single shot weapons, meaning that reloading time rendered them all but useless if a second shot was needed in an interpersonal conflict.[235]

170.    Beyond these considerations, waiting periods can only exist through the interdiction of the government, or dealers, or both. Given the absence of modern waiting periods earlier in American history, are there similar, analogous historical gun laws? The answer is found below in an examination of two types of analogous historical weapons laws: laws regulating weapons and intoxication, and weapons licensing laws.

### A.    Guns and Intoxication

171.    An interesting, instructive, and analogous historical parallel to waiting periods is gun laws pertaining to alcohol use and intoxication. These measures mimicked waiting periods because, for the most part, they prevented gun acquisition or use only for the period of time of actual intoxication (leaving aside those individuals for which chronic intoxication was a more-or-less permanent condition). When a person became sober, the intoxication barrier disappeared.

172.    Because intoxication is by its nature temporary, it interrupts gun access only temporarily, as is the case with waiting periods.

173.    It is no crime to be intoxicated from alcohol consumption—a fact no less true today than hundreds of years ago. Similarly, the purchase of alcohol for those eligible to drink is and has been perfectly legal, with the exception of the Prohibition period in the 1920s.

---

[235] Randolph Roth, *American Homicide* (Cambridge, MA: Belknap Press, 2012), 61-144, 216-21; Randolph Roth, "Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *A Right to Bear Arms?* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019), 116-17. See also Roger Lane, *Murder in America* (Columbus, OH: Ohio State University Press, 1997), 344-45.

174.    When alcohol consumption is combined with other activities or circumstances, however, it has been and is subject to a variety of regulatory measures, including state sanctions, such as those arising from operating a motor vehicle while under the influence of alcohol. When inebriation ends, drivers may resume driving, subject to any restrictions imposed by the government for prior instances of driving while drunk, such as license suspension for a fixed period.

175.    That aside, the government has long imposed a wide range of regulatory measures pertaining to the adverse consequences of alcohol consumption (including but not limited to those pertaining to weapons), including "pricing and taxation measures, regulating the physical availability of alcohol, restricting alcohol marketing, education and persuasion strategies, drink-driving countermeasures, modifying the drinking context, and treatment and early intervention."[236] Interestingly, nearly all of these types of measures date back hundreds of years,[237] despite changing social attitudes about alcohol and drinking.

176.    In the century and a half before the American Revolution, "the colonists of North America tended to regard heavy drinking as normal"[238] as such beverages "were considered important and invigorating foods, whose restorative powers were a natural blessing."[239] Reliance on alcoholic beverages was also common because of the baneful health effects of drinking contaminated water.

---

[236] Thomas F. Babor, et al., *Alcohol: No Ordinary Commodity: Research and Public Policy,* 3rd ed. (NY: Oxford University Press, 2023), Ch. 1, p. 9.
[237] "History and Culture of Alcohol and Drinking: 17th Century," in Scott C. Martin, *The SAGE Encyclopedia of Alcohol* (Thousand Oaks, CA: SAGE Publications, Inc. 2015), 669-72.
[238] "Alcohol in America: Taking Action to Prevent Abuse," National Library of Medicine, https://www.ncbi.nlm.nih.gov/books/NBK217463/
[239] Paul Aaron and David Musto, "Temperance and Prohibition in America: A Historical Overview," in *Alcohol and Public Policy: Beyond the Shadow of Prohibition,* Mark H. Moore and Dean R. Gerstein, eds. (Washington, D.C.: National Academies Press, 1981), 131

177.    Despite the normality of heavy drinking, drunkenness was also recognized even in this early period as a problem to be "condemned and punished."[240]

178.    During this period, the adverse consequences of excessive drinking were mitigated to a significant degree because it largely occurred through community taverns where social pressures and a system of tavern licensing, dating to the 1600s, that encouraged "responsible oversight"[241] by tavern owners.

179.    The post-Revolution period, however, witnessed a dramatic change in alcohol products as cheaper and more abundant distilled spirits, like domestic whiskey, exploded in production and demand. As production and consumption skyrocketed, earlier safeguards declined, and public drunkenness became much more common.[242]

180.    Coinciding with these changes, attitudes began to change as well, as alcohol came to be thought of increasingly as "an addicting and even poisonous drug," the excessive consumption of which led to a host of familial, behavioral, social, and other problems.[243] This growing societal awareness of the adverse consequences of alcohol consumption gave rise to the temperance movement and the Anti-Saloon Leagues of the nineteenth and early twentieth centuries, culminating in the adoption of the Eighteenth (Prohibition) Amendment to the Constitution in 1919, only to be repealed by the Twenty-first Amendment in 1933.

181.    Remarkably, despite the greater indulgence of drinking alcohol to excess in the colonial and early Federal periods, laws restricting or punishing the handling, carrying, or use of firearms while intoxicated appeared among the very earliest weapons regulations.

---

[240] Aaron and Musto, "Temperance and Prohibition in America," 132.
[241] Aaron and Musto, "Temperance and Prohibition in America," 133.
[242] Aaron and Musto, "Temperance and Prohibition in America," 134-36.
[243] "Alcohol in America"; W.J. Rorabaugh, *The Alcohol Republic* (NY: Oxford University Press, 1979), 125-46.

182.    From the 1600s through the early 1900s, at least 30 states regulated, restricted, and

punished inebriation in connection with the ownership or use of weapons. These regulations

included at least 20 states that criminalized the carrying or use of firearms when intoxicated.

At least 15 states regulated the commercial sale or distribution of alcohol when firearms were

also present; at least 2 states barred gun sales to those who were intoxicated; at least 6 states

enacted laws prohibiting drunkenness in connection with militia activity; and one state

(Arizona) barred guns to Native Americans if intoxicated (see Exhibit G and H).

183.    To parse the data chronologically, in the 1600s, at least 3 states (which at the time were

colonies) enacted 7 such laws; in the 1700s at least 7 states enacted 9 laws; in the 1800s at

least 19 states enacted 28 laws; and in the 1900s at least 15 states enacted 32 laws (note that

some states enacted laws across more than one century). As noted, a number of these

measures appeared very early in the Nation's history, punctuating the country's enduring

struggle with "demon rum."

184.    In 1623, 1631, and again in 1632, for example, Virginia enacted measures all directing

that "[n]o commander of any plantation, shall either himself or suffer others to spend powder

unnecessarily, that is to say, in drinking or entertainments."[244] One presumes that the

expenditure of powder pertained both to firearms discharges and perhaps to the separate

ignition of gun powder. Most important, however, is that the actions under regulation were

barred when "drinking" was involved. In a 1655 Virginia law, more general alcohol-fueled

revelry was subject to fines for any who would "shoot any guns at drinking," though the law

---

[244] 1623 Va. Acts 127 Acts of March 5th, 1623, 29; 1631 Va. Acts 173, Acts of February 24th, 1631, Act L; 1632 Va. Acts 198, Acts of September 4th, 1632, Act XLIV.

carved out two special occasions for regulatory exemption: "marriages and funerals only excepted."[245]

185.    In 1636 Rhode Island enacted a measure to punish any who would engage in "shooting out any gun . . . drinking in any tavern alehouse . . . on the first day of the week more than neccesity requireth." Any who did so would find themselves in the stocks or fined five shillings.[246]

186.    In 1663 Massachusetts criminalized any on board of ships docked at any colonial harbor where those on board would "be drunk within their vessels by day or night" and "shoot off any gun after the daylight is past, or on the sabbath day." The fine was a substantial twenty shillings for every gun so fired.[247]

187.    In 1750 Pennsylvania enacted a law "For Suppressing Idleness, Drunkenness, And Other Debaucheries" that punished with "penalties and forfeitures" any who fired guns or set off fireworks without a special license to do so.[248]

188.    Such measures proliferated in the nineteenth and early twentieth centuries, most commonly as a bar to weapons carrying or discharging. For example, the Tennessee legislature granted a locality the authority to penalize "shooting and carrying guns" along with drinking in 1825.[249] In 1865, Kansas enacted a law to punish any found to carry a

---

[245] 1655 Va. Acts 401, Acts of March 10, 1655, Act XII. Early in the country's history, alcoholic beverages played an especially important role in marrying and burying. Eric Burns, *The Spirits of America* (Philadelphia, PA: Temple University Press, 2004), 16-17.

[246] 1636-1748 R.I. Pub. Laws 31, At A General Assembly Held For Rhode Island Colony At Newport 6th of May, 1679. 1636.

[247] The Charters and General Laws Of The Colony And Province Of Massachusetts Bay Page 190, Image 197 (1814) available at The Making of Modern Law: Primary Sources. 1663.

[248] 1750 Pa. Laws 208, An Act For The More Effectual Preventing Accidents Which May Happen By Fire, And For Suppressing Idleness, Drunkenness, And Other Debaucheries.

[249] 1825 Tenn. Priv. Acts 306, An Act to Amend an Act Passed at Murfreesboro, October 20, 1821, Incorporating Winchester and Reynoldsburgh, ch. 292.

deadly weapon while "under the influence of intoxicating drink."[250] Nevada enacted

measures in 1881 and 1885 that punished any who discharged firearms in various public

spaces while "under the influence of liquor."[251] An 1883 Wisconsin law made it "unlawful

for any person in a state of intoxication, to go armed with any pistol or revolver."[252] In 1878,

1880, and 1908, Mississippi enacted laws that made it illegal "to sell to any minor or person

intoxicated" any pistol or other named weapon[253] (minors and those intoxicated were more

than occasionally treated together within these laws[254]). In 1907 Arizona found it necessary

to enact a law making it "unlawful for any constable or other peace officer in the Territory of

Arizona, while under the influence of intoxicating liquor of any kind, to carry or have on his

person a pistol, gun, or other firearm."[255]

---

[250] The General Statutes of the State of Kansas, to Which the Constitutions of the United State of Kansas, Together with the Organic Act of the Territory of Kansas, the Treaty Ceding the Territory of Louisiana to the United States, and the Act Admitting Kansas into the Union are Prefixed Page 378, Image 387 (1868) available at The Making of Modern Law: Primary Sources.

[251] 1881 Nev. Stat. 19-20, An Act to Prohibit the Use of Firearms in Public Places, ch. 7, § 1; David E. Aily, The General Statutes of the State of Nevada. In Force. From 1861 to 1885, Inclusive. With Citations of the Decisions of the Supreme Court Relating Thereto Page 1076, Image 1084 (1885) available at The Making of Modern Law: Primary Sources. An Act to Prohibit the Use of Firearms in Public Places, § 1.

[252] 1883 Wis. Sess. Laws 290.

[253] 1878 Miss. Laws 175-76, An Act To Prevent The Carrying Of Concealed Weapons And For Other Purposes, ch. 46, §§ 2-3; Josiah A.Patterson Campbell, The Revised Code of the Statute Laws of the State of Mississippi: With References to Decisions of the High Court of Errors and Appeals, and of the Supreme Court, Applicable to the Statutes Page 776-777, Image 776-777 (1880) available at The Making of Modern Law: Primary Sources; Laws regulating carrying and brandishing firearms, who can own them, where they can be brought, etc., Ch. 20, §§ 293-300, in The Charter and Code of the Ordinances of Yazoo City (1908).

[254] E.g. William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 50, Image 50 (1867) available at The Making of Modern Law: Primary Sources. Police Regulations of the State. Selling Liquors or Weapons to Minors. § 4864.

[255] 1907 Ariz. Sess. Laws 15, An Act to Prohibit Officers from Carrying Firearms While Under the Influence of Liquor and for Other Purposes, ch. 16, § 1.

189.    The state of Missouri must have felt its population to have been greatly abused by the intersection of guns and alcohol: in 1879 and again in 1883, the state enacted a law to fine or imprison any who carried concealed or brandished "any kind of fire arms" or other listed weapons "when intoxicated or under the influence of intoxicating drinks."[256] Not content with these two state laws, at least 20 similar laws were also enacted in Missouri between 1873 and 1917 that applied to counties, cities, and towns (see Exhibits G and H).

190.    A Maryland state law from 1884 pertaining to Baltimore said that anyone found to be "drunk or disorderly" who was also carrying a concealed pistol or other weapon was subject to confiscation of the weapon and a fine.[257] Rhode Island enacted a similar law—fine plus weapon confiscation—in 1893.[258] An 1899 South Carolina law said that "any person who shall engage in any boisterous conduct, under the influence of intoxicating liquors" who discharged a firearm of any kind near a road would be subject to a fine and jail.[259] A 1909 Idaho law criminalized anyone who "shall have or carry any such weapon upon or about his person when intoxicated, or under the influence of intoxicating drinks."[260]

---

[256] MO. REV. STAT. § 1274 (1879), reprinted in 1 The Revised Statutes of the State of Missouri 1879 224 (John A. Hockaday et al. eds. 1879); 1883 Mo. Laws 76, An Act to Amend Section 1274, Article 2, Chapter 24 Of The Revised Statutes Of Missouri, Entitled "Of Crimes And Criminal Procedure," § 1.

[257] John Prentiss Poe, The Maryland Code. Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local Acts of the Session of 1888 Incorporated Therein Page 522-523, Image 531-532 (Vol. 1, 1888) available at The Making of Modern Law: Primary Sources. 1884.

[258] General Laws of the State of Rhode Island and Providence Plantations to Which are Prefixed the Constitutions of the United States and of the State Page 1010, Image 1026 (1896) available at The Making of Modern Law: Primary Sources. 1893.

[259] 1899 S.C. Acts 97, An Act to Prevent Drunkeness And Shooting Upon The Highway, No. 67, § 1.

[260] 1909 Id. Sess. Laws 6, § 1.

191.    While the focus of these laws was those who had weapons while drinking or drunk,

another type of law appeared early: that restricting the sale or distribution of alcohol in the

proximity of those with firearms. A 1679 Massachusetts law prohibited bringing or selling

"any wine, strong liquor, cider, or any other inebriating drinckes, excepting beere of a penny

a-quart" on and in the proximity of militia training days unless they were licensed to do so

"from the hands of two magistrates" or the commanding military officer then present.[261] In

1746 New Jersey enacted a law penalizing anyone who would "presume to sell any strong

Liquor. . . in such Days or Times. . . at the Place of Mustering or Training [of militias], or

within a Mile thereof. . . ."[262] Similarly, a 1756 Delaware law forbade militia companies

from meeting within a half mile of any inn or tavern. It also punished any attempting to sell

"any strong liquor" in a booth or tent in proximity of a militia training area.[263] Also in 1756,

Maryland enacted a similar measure to penalize attempts to sell "strong liquor" at the time

and location of militia musters.[264] Pennsylvania enacted the same type of measure in 1780.[265]

Such measures extended into the nineteenth century.[266]

---

[261] Order p[ro]hibbiting retayling strong drinckes at traynings, Boston, May 28th, 1679. Beer had a lower alcohol content than other alcoholic beverages.
[262] An Act for better settling and regulating the Militia of this Colony of New-Jersey, for the repelling Invasions, and Suppressing Insurrections and Rebellions. Passed May 8, 1746. Section 3. Officers and Soldiers to behave well while under Arms; and, Section 23. Penalty on selling strong Liquor near the mustering Place.
[263] An Act for Establishing a Militia in this Government (Delaware, 1756).
[264] An Act for Regulating the Militia of the Province of Maryland (MD General Assembly, Lower House, L.H.J. Liber No. 48, Assembly Proceedings, May 22, 1756).
[265] An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania (20 March, 1780), § 57, Penalty on Officers Misbehaving while on Parade; § 60, Rules and regulations, 12th rule.
[266] Acts & Resolves of Vermont, 25, no. 24, An Act to Prevent Traffic in Intoxicating Liquors for the Purpose of Drinking, §15 (1852); An Act for the More Effectual Suppression of Drinking Houses and Tippling Shops, §10, Acts & Resolves of the General Assembly of the State of Rhode Island (1853); Temporary Buildings within One Mile of Muster Field, Used for Sale of

192.    These laws restricting the civilian commercial sale of alcohol all pertained to their proximity to militia/military activity.

193.    Aside from these laws, colonies and then states also enacted laws that directly restricted or punished drunkenness among militia ranks[267] for the obvious reason that excessive alcohol consumption undermined military order, morale, and effectiveness.[268] To be sure, alcohol was also very much a part of soldiering during this time. For example, General George Washington "insisted on alcohol for his men"[269] during the Revolutionary War, but like any good commander he wanted to tightly control its dissemination and consumption. The normal daily alcohol ration for Washington's men was four ounces.[270] Despite the efforts to

Intoxicating Liquors, May Be Removed, Acts and Resolves of Maine, Ch. 265 "An Act to Organize and Discipline the Militia," §73 (1856); 1859 Conn. Acts 62, Temporary Erections for Sale of Liquors or Gaming, Near Parade Ground, May Be Abated as Nuisances. In Public Acts Passed by the General Assembly of the State of Connecticut, Ch. 82, §5; Amendments to Militia Regulations, Ohio Senate Bill No. 7, § 1, in The State of Ohio: General and Local Acts Passed, and Joint Resolutions Adopted by the Sixty-Seventh General Assembly at Its Regular Session (1886); Selling Liquors on Camp Grounds Prohibited, § 22 of Chapter 102—An Act to Revise, Amend, and Codify the Statutes Relative to the Militia in Acts and Resolutions Passed at the Regular Session of the Twenty-Sixth General Assembly of the State of Iowa (1896).

[267] E.g. An Act for regulating and ordering the Troops that are, or may be raised, for the Defence of this Colony, Article 19 (11 May, 1775); An Act For the better ordering of the Militia of this Province §19 Savannah, GA (25 March, 1765); An Act for Regulating the Militia of the Province of Maryland (MD General Assembly, Lower House, L.H.J. Liber No. 48, Assembly Proceedings, May 22, 1756); An Act to regulate the Militia of the Common-Wealth of Pennsylvania, §§ IX-X (1777); An Act for the Regulation of the Militia of this State (South Carolina) § 5 Regulations for the government of the militia, Rule 7 (1782).

[268] This concern is reflected in Frederick William Baron von Steuben, *Baron von Steuben's Revolutionary War Drill Manual* (NY: Dover Publications, 1985; first pub. 1779, rev'd. 1794), 82, 105.

[269] Burns, *The Spirits of America*, 16.

[270] Burns, *The Spirits of America,* 16. During the terrible winter at Valley Forge, Pa., of 1777-78, Washington doubled the daily alcohol ration for the men to eight ounces.

control quantity, drunkenness was a serious and chronic problem among the militias throughout the existence of the old militia system.[271]

194.    A Chicago, Illinois ordinance from 1851 imposed a series of strict and wide-ranging regulations concerning licensing for the storage, transport, and handling of gun powder and gun cotton that included this prohibition: "no permit shall be granted to any retailer of intoxicating liquors or to any intemperate person."[272] St. Paul, Minnesota enacted a similar measure in 1858.[273] Delaware enacted laws in 1911 and 1919 that made it "unlawful for any person or persons, or a member of any firm, or the agents or officers of any corporation to sell to a minor, or any intoxicated person, any revolver, pistol, or revolver or pistol cartridges."[274]

### B.    Historical Weapons Licensing Laws

195.    The Complaint in this case states that: "Only a few states have historically had a permit-to-purchase law which effected a *de facto* waiting period to purchase a firearm - and all of those came in the twentieth century."[275] This claim is entirely false. As the account below explains, weapons licensing dates in America to the 1700s, and from the 1700s to the end of

---

[271] Spitzer, *The Politics of Gun Control*, 40-41, 46-49; "The Militia System," *The Advocate of Peace (1837-1845)* 6(November/December 1845): 133-35, https://www.jstor.org/stable/pdf/27888661.pdf?refreqid=excelsior%3Aca7db5c5969e023981868 e0b56120741&ab_segments=&origin=&initiator=&acceptTC=1

[272] George Manierre, The Revised Charter and Ordinances of the City of Chicago: To Which are Added the Constitutions of the United States and State of Illinois Page 123-125, Image 131-133 (1851) available at The Making of Modern Law: Primary Sources.

[273] The Charter and Ordinances of the City of St. Paul, (To August 1st, 1863, Inclusive,) Together with Legislative Acts Relating to the City. Page 166-167, Image 167-168 (1863) available at The Making of Modern Law: Primary Sources. 1858.

[274] Vol. 26 Del. Laws 28, 28- 29 (1911); Vol. 30 Del. Laws 55, 55-56 (1919).

[275] Complaint, 47, ¶ 189.

the 1800s, at least half of the states adopted some kind of weapons/firearms licensing scheme.

196.    Weapons licensing or permitting was a widespread and varied regulatory tool utilized in America. By one definition, licensing is the "permission by competent authority to do an act which, without such permission, would be illegal. . . ."[276] Despite the difference of hundreds of years, licensing in early America functioned largely in the way it functions today.

197.    While different in their particulars, historical weapons licensing and permitting laws operated in a manner similar to modern waiting periods, in that they are predicated on a process whereby a license applicant provides or submits some kind of information which is then judged to be acceptable or not. If the judgment is affirmative, the license is granted. By its nature, then, licensing contemplates the passage of some period of time between the time the request for permission to do something is submitted (such as a hunting license application) and the license or permission is granted.

198.    In addition, licensing generally represented a more mature and nuanced form of regulation that in many instances succeeded or supplemented more rigid but less complicated laws (see discussion below). The same can be said of modern waiting periods.

199.    State and local laws encompassing the licensing, permitting, or registration of dangerous weapons and substances date to the 1700s and became more wide-ranging and widespread in the 1800s and early 1900s. These laws mostly pertained to those weapons that posed a threat to public safety: concealable weapons, including handguns, fighting knives, various types of clubs, and explosives (ranging from firecrackers to gun powder to nitroglycerine after its invention).

---

[276] Henry C. Black, *Black's Law Dictionary,* 6th ed. (St. Paul, MN: West Publishing, 1991), 634.

200.    At least 29 states enacted 61 licensing requirement laws for individuals as a pre-requisite for their weapons ownership during this time (see Exhibits C and D); 17 of those states did so in the 1800s.

201.    At least 26 states enacted laws to regulate firearms discharging through licensing, with 13 of those states doing so from the 1700s up to the start of the Civil War, and another 20 states doing so between the end of the Civil War and 1900 (some states enacted laws in both periods).

202.    At least 12 states licensed hunting with firearms from the post-Civil War period through the early 1900s.

203.    At least 21 states licensed the commercial sale, transport, or firing of weapons at locations like shooting galleries.

204.    At least 21 states licensed the possession, handling, or transport of gunpowder and other explosives.

205.    At least 15 states required those selling or otherwise providing weapons to individuals to record and keep information pertaining to the buyers of weapons.

206.    At least 14 states imposed licensing requirements on marginalized groups (variously including Native Americans, felons, non-citizens, non-state residents, or minors). In the pre-Civil War period, at least 12 states imposed licensing on enslaved persons or free Blacks.

207.    Most weapons licensing laws pertaining to weapons carrying, discharge, commercial sales, and gunpowder licensing generally were applied to populated areas, since misuse of weapons posed a far greater risk to public safety in areas where larger numbers of people lived in close proximity to each other.

208.   These licensing categories were instances where the prevailing legal standard had been to ban the activity or practice outright—banning concealed carrying, banning weapons discharge in cities and towns, banning weapons from marginalized groups, etc. The governing units enacting licensing for these activities were now allowing firearms or other dangerous weapons or substances to be used or possessed with the granting of a license to do so, when their possession or use would otherwise be subject to criminal penalties. The proliferation of licensing represented in most instances a new, more mature, and more nuanced form of government regulation of the activities in question.

209.   With regard to concealed carry of pistols and other dangerous weapons, for example, from the 1700s through the early 1900s virtually every state in the country restricted or criminalized such carrying.[277] With the spread of licensing requirements in the post-Civil War nineteenth century, however, governing units were now allowing legal weapons carrying, subject to the review criteria as conducted by local officials who were empowered to grant carry licenses.

210.   The criteria for the granting of these licenses were generally highly discretionary for the individuals or bodies granting them. In some laws, no criteria were specified; in others, the criteria were vague or broad, but often included wording that the applicants must be persons of good character or sound judgment, again emphasizing the determinative judgment of those granting the licenses. They usually set a time limit for permits, ranging from a month to a year (see below).

211.   Regarding hunting licenses, many earlier laws criminalized various hunting practices, dating back to the 1600s, for reasons related to protection of private property and lands,

---

[277] Spitzer, "Gun Law History in the United States and Second Amendment Rights," 63-67.

conservation, and safety.[278] The hunting related laws listed here are all instances where hunting was allowed through permitting by a government entity, meaning that the permits or licenses could be withdrawn if the licensees violated whatever rules the laws imposed (such as hunting out of season).

212.    Licensing related to Indigenous people, enslaved persons, and free persons of color is discussed in more detail below.  All of these types of laws are detailed in Exhibits C and D.

### 1.    Licensing of Weapons Carrying or Possession

213.    In 1871, Missouri enacted a measure to license the otherwise illegal practice of concealed carrying of handguns and other named weapons, including "any other dangerous or deadly weapon" in St. Louis by means of "written permission from the Mayor."[279] St. Louis enacted its own municipal version of this law in 1892.[280] A similar measure was enacted for Kansas City, Missouri, in 1880.[281]

214.    Jersey City, New Jersey enacted a licensing scheme in 1871 for concealed weapons carrying of pistols and other dangerous weapons, defined in the law as "any gun, pistol, cannon, or fowling piece or other fire-arms. . . ."[282]  As this wording makes clear, this

---

[278] Spitzer, "Gun Law History in the United States and Second Amendment Rights," 73-74.

[279] Everett Wilson Pattison, The Revised Ordinance of the City of St. Louis, Together with the Constitution of the United States, and of the State of Missouri; the Charter of the City; and a Digest of the Acts of the General Assembly, Relating to the City Page 491-492, Image 499-500 (1871).

[280] The Municipal Code of St. Louis (St. Louis: Woodward 1901), p.738, Sec. 1471. 1892; Chapter 18. Of Misdemeanors, Sec. 1471.

[281] An Ordinance in the Revision of the Ordinances Governing the City of Kansas (Kansas City, MO; Isaac P. Moore's Book and Job, 1880), p. 264, Sec. 3. 1880; Chapter XXXIV. Public Safety, Sec. 3.

[282] Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 46, Image 46 (1874) available at The Making of Modern Law: Primary Sources. 1871.

extended to long guns as well (a fowling piece is a long-barreled shotgun for shooting small animals[283]). Jersey City's 1873 law laid out a broadly discretionary set of criteria for granting licenses, described below (as determined by the city's municipal court), that bears great similarity to contemporary gun licensing schemes:

> The Municipal Court of Jersey City may grant permits to carry any of the weapons named in the first section to such persons as should, from the nature of their profession, business or occupation, or from peculiar circumstances, be allowed so to do; and may, in granting such permits, impose such conditions and restrictions in each case as to the court shall seem proper.[284]

215.    The Jersey City ordinance added that carry permits would not be granted "to any person until the court is satisfied that such person is temperate, of adult age, and capable of exercising self-control."[285]

216.    Hyde Park, Illinois enacted a similar licensing law for concealed weapons carrying, including handguns, in 1876. In this instance, the licenses were granted "by written permission of the Captain of Police."[286] Evanston, Illinois's concealed carry licensing law of 1893 granted licensing issuance authority to the city mayor.[287]

---

[283] https://www.thefreedictionary.com/fowling+piece.

[284] Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 86- 87, Image 86-87 (1874) available at The Making of Modern Law: Primary Sources. 1873.

[285] Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871.

[286] Consider H. Willett, Laws and Ordinances Governing the Village of Hyde Park Together with Its Charter and General Laws Affecting Municipal Corporations; Special Ordinances and Charters under Which Corporations Have Vested Rights in the Village. Also, Summary of Decisions of the Supreme Court Relating to Municipal Corporations, Taxation and Assessments Page 64, Image 64 (1876) available at The Making of Modern Law: Primary Sources. 1876. Misdemeanors, § 39.

[287] George W. Hess, Revised Ordinances of the City of Evanston : Also Special Laws and Ordinances of General Interest Page 131-132, Image 143-144 (1893) available at The Making of Modern Law: Primary Sources.

217.    New York City criminalized the carrying of "a pistol of any description concealed on his

person" in 1881 but provided for a legal carry license exception:

> Any person, except as provided in this article, who has occasion to carry a pistol for his
> protection, may apply to the officer in command at the station-house of the precinct
> where he resided, and such officer, if satisfied that the applicant is a proper and law
> abiding person, shall give said person a recommendation to the superintendent of police,
> or the inspector in command at the central office in the absence of the superintendent,
> who shall issue a permit to the said person allowing him to carry a pistol of any
> description.[288]

218.    This provision also allowed for non-residents who had occasional business in the city to

apply for permits as well. An 1884 New York state law barred the carrying or possession of

named weapons, including fighting knives and types of clubs, from those under eighteen,

unless they possessed a license to do so. Licenses could only be granted for up to one year

and were subject to revocation "at the pleasure of the mayor."[289] A year later, the law was

extended to all cities in the state and included "any pistol or other firearms of any kind."[290]

(This would have included long guns as it did not specify only concealed carry.) In 1891, the

state extended permitting to Buffalo covering handguns and other dangerous weapons.[291]

219.    Wheeling, West Virginia enacted a law in 1881 making it "unlawful for any person to

carry" various named weapons, including a "colt" revolver, or to "carry about his person, hid

---

[288] Elliott Fitch Shepard, Ordinances of the Mayor, Aldermen and Commonalty of the City of
New York, in Force January 1, 1881; Adopted by the Common Council and Published by Their
Authority Page 214-215, Image 214-215 (1881) available at The Making of Modern Law:
Primary Sources.
[289] George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of
New York as Amended 1882-5 Page 172, Image 699 (1885) available at The Making of Modern
Law: Primary Sources. 1884.
[290] George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of
New York as Amended 1882-5. Fourth Edition Page 298, Image 824 (1885) available at The
Making of Modern Law: Primary Sources.
[291] 1891 N.Y. Laws 129, 177, An Act to Revise the Charter of the City of Buffalo, ch. 105, tit. 7,
ch. 2, § 209.

from common observation" any pistol or other named weapon without a permit from the mayor.[292] Under the heading "License," an 1882 law applying to St. Paul, Minnesota criminalized any concealed weapons carrying, absent such licensing.[293]

220.    An 1888 Salt Lake City, Utah ordinance barred the carrying of "any concealed weapon" unless the person obtained a permit from the city mayor.[294] New Haven, Connecticut enacted a similar anti-carry law in 1890, extending to pistols, unless the person first obtained a permit either from the mayor or police superintendent.[295] Oakland, California enacted a similar law in 1890 making it unlawful "to wear or carry concealed about his person" a pistol or other listed weapon unless the person obtained a permit from the mayor. The permit was good for up to a year, and could be granted to "any peaceable person whose profession or occupation may require him to be out at late hours of the night to carry a concealed deadly weapon upon his person."[296] The California cities of Stockton (1891)[297] and Fresno (1896)[298] did the same.

---

[292] Laws and Ordinances for the Government of the City of Wheeling, West Virginia (Wheeling, WV: W. Va. Printing 1891), p.206, SEC. 14. 1881.

[293] W. P. Murray, The Municipal Code of Saint Paul: Comprising the Laws of the State of Minnesota Relating to the City of Saint Paul, and the Ordinances of the Common Council; Revised to December 1, 1884 Page 289, Image 295 (1884) available at The Making of Modern Law: Primary Sources. 1882.

[294] The Revised Ordinances of Salt Lake City, Utah, Chapter XXVI, Misdemeanors, p. 283 Sec. 14 (1888), Dangerous and Concealed Weapons. SEC. 14.

[295] Charles Stoers Hamilton, Charter and Ordinances of the City of New Haven, Together with Legislative Acts Affecting Said City Page 164, Image 167 (1890) available at The Making of Modern Law: Primary Sources.

[296] Fred L. Button, ed., General Municipal Ordinances of the City of Oakland, California (Oakland, CA; Enquirer, 1895), p. 218, Sec. 1, An Ordinance to Prohibit the Carrying of Concealed Weapons, No. 1141. 1890.

[297] Charter and Ordinances of the City of Stockton (Stockton, CA: Stockton Mail Printers and Bookbinders, 1908), p. 240, Ordinance No. 53. 1891.

[298] L. W. Moultrie, Charter and Ordinances of the City of Fresno Page 30, Image 28 (1896) available at The Making of Modern Law: Primary Sources.

221.    A law passed by the U.S. Congress in 1892 for the District of Columbia criminalized the concealed carry of "any deadly or dangerous weapons," including pistols, unless granted a permit by a judge of the police court "for a period of not more than one month at any one time, upon satisfactory proof to him of the necessity for the granting thereof. . . ."[299]

222.    Florida's 1893 law made it "unlawful to carry or own a Winchester or other repeating rifle or without first taking out a license from the County Commissioner. . . ." In addition, the law specified that the applicant "shall give a bond running to the Governor of the State in the sum of one hundred dollars, conditioned on the proper and legitimate use of the gun with sureties to be approved by the County Commissioners," along with "a record of the name of the person taking out such license, the name of the maker of the firearm so licensed to be carried and the caliber and number of the same."[300]

223.    Montana enacted a wide-ranging state licensing law in 1895 that threatened imprisonment and fines for anyone "who brings into this state an armed person or armed body of men for the preservation of the peace or the suppression of domestic violence, except at the solicitation and by the permission of the legislative assembly or of the governor. . . ."[301]

224.    A state law in Nebraska granted the mayor of Lincoln the authority to issue concealed carry weapons licenses good for a year "at his pleasure" in 1895.[302]

---

[299] Washington D.C. 27 Stat. 116 (1892), CHAP. 159.
[300] 1893 Fla. Laws 71-72, An Act to Regulate the Carrying of Firearms, chap. 4147, §§ 1-4.
[301] Decius Spear Wade, The Codes and Statutes of Montana. In Force July 1st, 1895. Including the Political Code, Civil Code, Code of Civil Procedure and Penal Code. As Amended and Adopted by the Fourth Legislative Assembly, Together with Other Laws Continued in Force Page 873, Image 914 (Vol. 2, 1895) available at The Making of Modern Law: Primary Sources. 1895. Crimes Against the Public Peace, § 759.
[302] 1869 Neb. Laws 53, An Act to Incorporate Cities of the First Class in the State of Nebraska, § 47.

225.    The city of Spokane, Washington criminalized the concealed carrying of "either a revolver, pistol or other fire-arms" unless persons obtained a "special written permit from the Superior Court" to do so.[303]

226.    Milwaukee, Wisconsin enacted a permitting system in 1896 for persons to carry otherwise barred various dangerous weapons including "any pistol or colt" if the city police chief granted a license if "it is necessary for the personal safety of such person or for the safety of his property or of the property with which he may be entrusted, to carry such weapon." The chief could also "revoke such permit at any time."[304]

227.    In the twentieth century, permitting accelerated, spread, and broadened. In 1905 New Jersey enacted a state law licensing concealed weapons carrying for a year "unless sooner revoked by the officer or body granting the same."[305] Licensing was extended to long guns—machine guns and automatic rifles—in New Jersey in 1927[306] and 1934.[307] (A number of the 32 states that enacted anti-machine gun laws in the 1920s and 1930s made exceptions for possession via licensing.)

---

[303] Rose M. Denny, ed., The Municipal Code of the City of Spokane, Washington (Spokane, WA; W.D. Knight, 1896), p. 309-10, Ordinance No. A544, Sec. 1. 1895.

[304] Charles H. Hamilton, ed., The General Ordinances of the City of Milwaukee to January 1, 1896: With Amendments Thereto and an Appendix (Milwaukee, WI: E. Keough, 1896), pp.692-93, Sec. 25. Chapter XX. Misdemeanors. Section 25.

[305] 1905 N.J. Laws 324-25, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 172, § 1.

[306] 1927 N.J. Laws 180-81, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 95, §§ 1-2.

[307] 1934 N.J. Laws 394-95, A Further Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 155, §§ 1-5.

228.    In 1906 a Massachusetts state law noted that prosecution for carrying "a loaded pistol or revolver" did not apply to those with a license.[308] It extended licensing to a variety of guns in 1927.[309]

229.    In 1908 Virginia enacted a dangerous weapons concealed carry permit law, with permits granted for one year "upon a written application and satisfactory proof of the good character and necessity of the applicant to carry concealed weapon."[310] It extended the permitting process in 1926.[311]

230.    Georgia enacted a detailed handgun permitting system in 1910.[312]

231.    Thereafter, permitting was enacted in states (not including those that enacted permitting in the 1800s, most of which also enacted permitting laws in the 1900s as well) including

---

[308] 1906 Mass. Acts 150, ch. 172, An Act to Regulate by License the Carrying of Concealed Weapons.

[309] 1927 Mass. Acts 413, An Act Relative to Machine Guns and Other Firearms, ch. 326, §§ 1-2 (amending §§ 121, 123).

[310] 1908 Va. Laws 381, An Act To Amend And Re-Enact Section 3780 Of The Code In Relation To Carrying Concealed Weapons, § 3780.

[311] 1926 Va. Acts. 285-87, CHAP. 158.

[312] Orville Park, Park's Annotated Code of the State of Georgia 1914, Penal Code, Article 3, Carrying pistols without license, § 348(a)-(d). 1910.

Hawaii,[313] Indiana,[314] Michigan,[315] New Hampshire,[316] North Carolina,[317] North Dakota,[318] Ohio,[319] Oregon,[320] Pennsylvania,[321] Rhode Island,[322] and South Carolina.[323]

### 2.    Permits for Firearms Discharge or Use of Explosives

232.    As noted above, at least 26 states enacted licensing mechanisms to allow firearms and like discharges under certain circumstances. Generally speaking, firearms discharge licensing pertained to any firearm, not just handguns.

233.    From the 1700s to 1860, at least 13 states enacted discharge licensing authority to local officials. The earliest were in Pennsylvania. In 1713, Philadelphia penalized various activities

---

[313] 1927 Haw. Sess. Laws 209-217, AN ACT Regulating the Sale, Transfer and Possession of Certain Firearms and Ammunitions, and Amending Sections 2136, 2137, 2138, 2139, 2140, 2141, 2142, 2143, 2146 and 2147 of the Revised Laws of Hawaii 1925 (the "Small Arms Act"), §§ 10-11, § 17; 1933 Haw. Sess. Laws 39, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 8, 10-16.

[314] 1925 Ind. Acts 495, 495-98.

[315] 1925 Mich. Pub. Acts 47, An Act to Regulate the Possession and Sale of Pistols, Revolvers and Guns; to Provide a Method of Licensing Those Carrying Such Weapons Concealed; and to Provide Penalties for Violations of Such Regulations, § 7; 1927 Mich. Pub. Acts 888-89, 91, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, §§ 3, 9.

[316] 1923 N.H. Laws 138.

[317] 1919 N.C. Sess. Laws 397-99, Pub. Laws, An Act to Regulate the Sale of Concealed Weapons in North Carolina, ch. 197, §§1, 5.

[318] 1915 N.D. Laws 96, An Act to Provide for the Punishment of Any Person Carrying Concealed Any Dangerous Weapons or Explosives, or Who Has the Same in His Possession, Custody or Control, unless Such Weapon or Explosive Is Carried in the Prosecution of a Legitimate and Lawful Purpose, ch. 83, §§ 1-3, 5; 1923 N.D. Laws 379, 380-82 ch. 266; 1925 N.D. Laws 216–17, Pistols and Revolvers, ch. 174, § 2; 1931 N. D. Laws 305-06, An Act to Prohibit the Possession, Sale and Use of Machine Guns, Sub-Machine Guns, or Automatic Rifles and Defining the Same . . . , ch. 178, §§ 1-2.

[319] 1933 Ohio Laws 189-90, Reg. Sess., An Act. . . Relative to the Sale and Possession of Machine Guns, § 1.

[320] 1913 Or. Laws 497; 1917 Or. Sess. Laws 804-808; 1925 Or. Laws 468, 469-471.

[321] 1929 Pa. Laws 777; 1931 PA. Laws 498, No. 158.

[322] 1927 (January Session) R.I. Pub. Laws 256.

[323] 1934 S.C. Acts 1288.

in the city including "firing a Gun without license."[324] An act pertaining to the entire colony

from 1721 imposed "penalties and forfeitures" to anyone who engaged in various activities

including firing "any gun or other fire arm" or selling or setting off various types of

fireworks "without the governor's special license."[325] Another Philadelphia ordinance to

prevent "mischief [that] may happen by shooting of guns" or setting off fireworks,

criminalized such activities unless individuals first obtained a "governor's special license."[326]

A 1750 law did the same for the District of Southwark,[327] as did a colony-wide law also in

1750.[328] In 1824, permission from the president of the board of commissioners was required

for anyone seeking to test through firing any gun, cannon, or similar weapons in certain

sections of Philadelphia.[329]

---

[324] Pennsylvania Archives. Selected And Arranged From Original Documents In The Office Of The Secretary Of The Commonwealth, Conformably To Acts Of The General Assembly, February 15, 1851, & March 1, 1852 Page 160, Image 162 (1852) available at The Making of Modern Law: Primary Sources. 1713.

[325] Act of 26th August 1721. [An Act of 9th of February, 1750-51], § 1.

[326] John C. Lowber, Ordinances of the Corporation of the City of Philadelphia; to Which are Prefixed, the Original Charter, the Act of Incorporation, and Other Acts of Assembly Relating to the City; with an Appendix, Containing the Regulation of the Bank of the River Delaware, the Portraiture of the City, as Originally Laid Out by the Proprietor, &c. &c. Page 15-16, Image 18-19 (1812) available at The Making of Modern Law: Primary Sources. 1721.

[327] Ordinances of the Corporation of the District of Southwark and the Acts of Assembly Relating Thereto Page 49, Image 47 (1829) available at The Making of Modern Law: Primary Sources. 1750.

[328] 1750 Pa. Laws 208.

[329] An Act of Incorporation for that Part of the Northern Liberties, Lying between the Middle of Sixth Street and the River Delaware, and between Vine Street and Cohocksink Creek, with Ordinances for the Improvement of the Same Page 51, Image 52 (1824) available at The Making of Modern Law: Primary Sources. 1824.

234.    Charleston, South Carolina enacted an ordinance in 1802 similar to those of Philadelphia where Commissioners of the Streets would grant a license for gun firing and fireworks "at times of public rejoicing" and at specified locations.[330]

235.    New Hampshire enacted a discharge permit system for Portsmouth in 1823.[331]

236.    New York State enacted a law in 1824 that allowed the Schenectady mayor or other city officials to grant permission for discharge of any gun or various fireworks.[332]

237.     Marietta, Ohio enacted a discharge licensing law in 1823 because of concern that "the quiet of any of the inhabitants may be disturbed, or their lives and safety endangered."[333]

238.    New London, Connecticut singled out "some public day of review" in an 1835 law as a permissible reason for issuing a discharge permit,[334] and New Haven enacted a similar law in 1845.[335]

---

[330] Alexander Edwards, Ordinances of the City Council of Charleston, in the State of South-Carolina, Passed since the Incorporation of the City, Collected and Revised Pursuant to a Resolution of the Council Page 289, Image 299 (1802) available at The Making of Modern Law: Primary Sources. 1802.

[331] 1823 N.H. Laws 73-74, An Act to Establish a System of Police in the Town of Portsmouth, and for Other Purposes, ch. 34, § 4.

[332] Laws of the State of New-York, Relating to the City of Schenectady: And the Laws and Ordinances of the Common Council of the City of Schenectady Page 58, Image 58 (1824) available at The Making of Modern Law: Primary Sources.

[333] The Act of Incorporation, and the Ordinances and Regulations of the Town of Marietta, Washington County, Ohio Page 17-18, Image 17-18 (1837) available at The Making of Modern Law: Primary Sources. 1823.

[334] The By-Laws of the City of New London, with the Statute Laws of the State of Connecticut Relative to Said City Page 47-48, Image 47-48 (1855) available at The Making of Modern Law: Primary Sources. 1835.

[335] 1845 Conn. Acts 10, An Act Prohibiting the Firing of Guns and Other Fire Arms in the City of New Haven, chap. 10.

239.    The same was enacted for Quincy, Illinois in 1841,[336] Jeffersonville, Indiana in 1855,[337] and Richmond, Virginia in 1859.[338]

240.    Another 20 states enacted such laws from the end of the Civil War up to the end of the 1800s (not including states that enacted laws both before and after the Civil War: Alabama, Arkansas, California, Colorado, Louisiana, New Jersey, Oregon, Texas, Vermont, Washington State, West Virginia, Wisconsin, and Wyoming). Most of them applied to specified cities and towns within their states (see Exhibits C and D).

### 3.    Commercial Licensing

241.    As noted, a total of at least 21 states enacted commercial licensing laws with 16 states doing so throughout the 1800s, and 9 states doing so in the early 1900s (some states enacted laws in both centuries). The earliest commercial licensing law was an 1814 Illinois measure that made it unlawful for whites to engage in commercial activities with Native Americans unless they obtained a license from the governor.[339]

---

[336] Samuel P. Church, The Revised Ordinances of the City of Quincy, Ill. to Which are Prefixed the Charter of the City of Quincy, and the Amendment Thereto Page 47, Image 47 (1841) available at The Making of Modern Law: Primary Sources. 1841.
[337] W. G. Armstrong, The Ordinances and Charter of the City of Jeffersonville Page 15-17, Image 15-17 (1855) available at The Making of Modern Law: Primary Sources. 1855.
[338] The Charters and Ordinances of the City of Richmond, with the Declaration of Rights, and Constitution of Virginia Page 227, Image 274 (1859) available at The Making of Modern Law: Primary Sources. 1859.
[339] An Act concerning the Kaskaskia Indians, in Nathaniel Pope, Laws of the Territory of Illinois (1815). 1814. This law is placed under this category because it pertained to white settler commerce; it was not a law that licensed Natives to engage in commerce.

242.    A century later, a Chicago ordinance imposed a licensing requirement both on persons or entities to sell concealable weapons, and also a licensing requirement to those seeking to buy them.[340]

243.    An 1854 law for San Francisco, California licensed commercial shooting galleries.[341] Indeed, at least 10 of the states in this category enacted shooting gallery licensing requirements.

### 4.    Licensing Restrictions on Gunpowder

244.    Gunpowder was widely and extensively regulated in the colonies and states. In fact, with one exception, every state in the country enacted one or more gunpowder laws from the seventeenth century through the start of the twentieth century.[342]

245.    One element of this regulation was gunpowder licensing; at least 21 states enacted such licensing from the 1700s through the early 1900s.

### 5.    Weapons Sellers Recording Purchases

246.    Aside from direct licensing of weapons purchasers by a government official or entity, at least 15 states required those who sold or otherwise transferred guns (mostly handguns) or

---

[340] Samuel A. Ettelson, Opinions of the Corporation Counsel and Assistants from May 1, 1915, to June 30, 1916 Page 458-459, Image 458-459 (Vol. 7, 1916) available at The Making of Modern Law: Primary Sources. 1914.

[341] Ordinances and Joint Resolutions of the City of San Francisco; Together with a List of the Officers of the City and County, and Rules and Orders of the Common Council Page 220, Image 256 (1854) available at The Making of Modern Law: Primary Sources. 1854.

[342] Mark Anthony Frassetto, "The Duty to Bear Arms: Historical Militia Law, Fire Prevention Law, and the Modern Second Amendment" (January 12, 2022), 8, in *New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society* (eds. Jacob Charles, Joseph Blocher & Darrell Miller) (Oxford University Press, Forthcoming), Available at SSRN: https://ssrn.com/abstract=4007491 or http://dx.doi.org/10.2139/ssrn.4007491; Saul Cornell and Nathan DeDino, "A Well Regulated Right: The Early American Origins of Gun Control," *Fordham Law Review* 73(2004): 510.

other weapons to others to record information about the buyer, with that information to be

maintained and subject to possible later examination. This regulatory mechanism put the

burden of information collection and maintenance on the seller or dealer, rather than directly

on the government, though it served the same purpose: to acquire and maintain information

about those who obtained the weapons in question and when, for future reference or

inspection by government officials or others. In some instances these requirements existed

along with direct governmental licensing.

247.    In 1885, Illinois enacted this registration requirement for weapons dealers:

> All persons dealing in deadly weapons, hereinbefore mentioned, at retail within this State shall keep a register of all such weapons sold or given away by them. Such register shall contain the date of the sale or gift, the name and age of the person to whom the weapon is sold or given, the price of the said weapon, and the purpose for which it is purchased or obtained. The said register shall be in the following form. [Form of Register] Said register is to be kept open for inspection of the public. . . .[343]

With minor variations, this law was typical of such requirements.

248.    For example, a 1911 Colorado law offered this detailed set of instructions:

> Every individual, firm or corporation engaged . . . in the- retail sale, rental or exchange of firearms, pistols or revolvers, shall keep a record of each pistol or revolver sold, rented or exchanged at retail. Said record shall be made at the time of the transaction in a book kept for that purpose and shall include the name of the person to whom the pistol or revolver is sold or rented, or with whom exchanged; his age, occupation, residence, and, if residing in a city, the street and number therein where he resides; the make, calibre and finish of said pistol, or revolver, together with its number and serial letter, if any; the date of the sale, rental or exchange of said revolver; and the name of the employee or other person making such sale, rental or exchange. Said record-book shall be open at all times to the inspection of any duly authorized police officer.[344]

---

[343] Merritt Starr & Russell H. Curtis, Annotated Statutes of the State of Illinois in Force (1885), Criminal Code Ch. 38, para. 90.
[344] 1911 Colo. Sess. Laws 408, Section 3.

249.   A 1911 New York law required every person selling any handgun to maintain a register
"at the time of sale, the date of sale, name, age, occupation and residence of every purchaser
of such a pistol, revolver or other firearm, together with the calibre, make, model,
manufacturer's number or other mark of identification on such pistol, revolver or other
firearm."[345] The purchaser also had to produce a permit at the time of the transaction, with
the seller to note the permit information.

### 6.   Licensing Pertaining to Named Groups

250.   The licensing of "Named Groups" referenced in Exhibit D includes the granting of
weapons licenses to non-state residents, non-citizens, minors, felons, the intoxicated (who
stood to lose their licenses), and Native Americans/Indigenous people.

251.   Licensing the sale of weapons to Native Americans might seem paradoxical, since white
leaders fought protracted conflicts with Natives from the 1600s through the end of the
nineteenth century. But whites also traded arms with Natives throughout this entire period, as
they sought profitability, access to highly desired goods made available by Indians, and
security alliances with some Indians through the supplying of weapons. This steady and
enduring trade revealed "the high degree of interdependence between Indians and Euro-
Americans."[346]

252.   As for licensing related to enslaved persons and free persons of color (listed separately in
Exhibit D), it is well understood that white racist regimes before the Civil War were frantic
to keep weapons out of the hands of enslaved persons. The laws listed here, however, are all

---

[345] 1911 N.Y. Laws 444-45, An Act to Amend the Penal Law, in Relation to the Sale and
Carrying of Dangerous Weapons. ch. 195, § 2.
[346] David J. Silverman, *Thundersticks* (Cambridge, MA: Harvard University Press, 2016), 15-16
and passim.

instances when enslaved persons or free persons of color were allowed to have possession of weapons under listed, restricted circumstances through licensing in the pre-Civil War era. Some whites who owned enslaved persons sought the convenience of allowing the enslaved to carry weapons for hunting or other purposes designated by, and often under the supervision of, the white owners.

253.    Beyond that, the Complaint in this case offers this incorrect conclusion about firearms regulations and enslaved persons and other marginalized groups: "Firearms regulation in the United States is . . . a shameful history of racism, bigotry, and oppression. To the extent they were adopted at all, firearm laws were largely motivated by race and directed towards restricting access to enslaved, Native, and free Black peoples, as well as other people of color."[347]

254.    Indeed, some historic weapons laws did single out African Americans, mostly before the Civil War, for invidious and racist treatment. Other laws attempted to halt or regulate the trade of firearms and weaponry with Indigenous people.

255.    But these laws represented a very small percent of all weapons laws. For example, out of the 265 licensing laws tabulated in Exhibit D, 17 of them—6.4%--pertained to African Americans. Any general perusal of old gun laws yields similar results. For example, the Duke Center for Firearms Law lists a total of 2074 old weapons laws. Of those, 50, or 2.4%, pertained to African Americans.[348] The chief problem facing African Americans in a racist American society was not a singular deprivation of gun rights, but the deprivation of all rights.[349]

---

[347] Complaint, 27, ¶ 97.
[348] https://firearmslaw.duke.edu/repository-of-historical-gun-laws/advanced-search
[349] Robert J. Spitzer, *The Gun Dilemma* (NY: Oxford University Press, 2023), 11-13.

256.    Finally, the fact that groups treated as marginalized in prior centuries—especially African Americans and Native Americans—were authorized to gain even limited access to dangerous weapons through licensing may seem incompatible with an otherwise racist tradition aimed at subjugating these groups, but such measures reflect the fact that it was in the interest of whites to allow weapons acquisition to these groups under limited circumstances.

## IV.    CONCLUSION

257.    Contemporary restrictions pertaining to large capacity ammunition magazines and waiting periods are merely the latest iteration of a centuries-long tradition of weapons regulations and restrictions.

258.    When new weapons were developed, circulated, and associated with threats to public order and safety, governmental regulations ensued.

259.     The mere existence of early, experimental multi-shot weapons did not prod early regulations because they were not replicated in any or meaningful numbers and never entered society. Thus, there was no basis or reason for regulation of that which, in societal terms, did not exist.

260.    Yet when weapons, even as simple as new fighting knives like the Bowie knife, or clubs like the slungshot did enter society and pose a safety risk, wide-ranging and multifarious regulations ensued. The same was true when feasible and reliable multi-shot firearms and removable, large capacity ammunition feeding devices attached to some of those weapons also began to circulate and cause mayhem.

261.    In most of American history, the idea of waiting periods for firearms purchases would have been unnecessary and infeasible as a public policy tool given the way firearms

96

technology and distribution developed over time, as shown above. As Jacob Charles has argued, the fact that our ancestors were silent on some question or issue should not bestow "historical silence" with "explanatory power" over current policymaking.[350]

262.    There is no reason to believe that the absence of firearm purchase waiting periods early in American history somehow means that our ancestors would have disapproved of such a policy option. Far from it, especially considering the inherently modest nature of waiting periods. As this Report has demonstrated, weapons and intoxication laws, along with licensing laws, provide pertinent historical analogs.

263.    The historical record of weapons regulations and restrictions from the 1600s through the early twentieth century, as seen in the numerous examples examined here, is even more remarkable given that the United States was an evolving and developing nation-state that could not claim to have reached maturity until the twentieth century.

264.    Contemporary restrictions among the states pertaining to large capacity ammunition magazines, and the imposition of firearm waiting periods, are merely the latest iterations of a centuries-long American tradition of weapons regulations and restrictions.

---

[350] Jacob D. Charles, "The Dead Hand of a Silent Past: Bruen, Gun Rights, and the Shackles of History" (January 23, 2023). *Duke Law Journal*, Vol. 73 (forthcoming), Pepperdine University Legal Studies Research Paper No. 2023/7, Available at SSRN: https://ssrn.com/abstract=4335545 or http://dx.doi.org/10.2139/ssrn.4335545).

**DECLARATION UNDER PENALTY OF PERJURY
PURSUANT TO 28 U.S.C. § 1746**

I declare that the foregoing is true and correct under penalty of perjury under the laws of

the United States.

Executed on February 20, 2024

*/s/ Robert Spitzer*
Robert Spitzer