# Attachment A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| VERMONT FEDERATION OF SPORTSMEN'S CLUBS,<br><br>POWDERHORN OUTDOOR SPORTS CENTER, INC.,<br><br>JPC, INC. (D/B/A BLACKDOG SHOOTING SUPPLIES,<br><br>PAUL DAME, and<br><br>MARSHA J. THOMPSON,<br><br>       *Plaintiffs,*<br><br>  vs.<br><br>MATTHEW BIRMINGHAM, Director of the Vermont State Police, in his Official and Personal Capacities,<br><br>CHARITY CLARK, Attorney General of the State of Vermont, in her Official and Personal Capacities, and<br><br>SARAH GEORGE, State's Attorney for Chittenden County, in her Official and Personal Capacities,<br><br>       *Defendants*<br> . | Case No. 2:23-cv-00710 |

**AMICUS BRIEF OF GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE, BRADY CENTER TO PREVENT GUN VIOLENCE, AND MARCH FOR OUR LIVES IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... iii

INTEREST OF AMICI CURIAE ........................................................................ 1

INTRODUCTION .............................................................................................. 2

    I.   Under *Bruen*, Courts Must First Consider Whether The Burdened Conduct Is Protected By The Second Amendment, Looking To The Plain Text And Historical Understandings. ................................................................................... 3

    II.  If The Conduct Is Protected By The Plain Text, *Bruen* Instructs Courts To Evaluate Historical "Analogues" To A Challenged Firearms Regulation To Assess Whether It Imposes A "Comparable Burden" On Lawful Self-Defense. ............................................. 4

ARGUMENT ...................................................................................................... 5

    I.   VERMONT'S 72-HOUR WAITING PERIOD IS CONSTITUTIONAL BECAUSE IT DOES NOT IMPLICATE THE SECOND AMENDMENT'S PLAIN TEXT AND, EVEN IF IT DID, THE LAW IS CONSISTENT WITH HISTORICAL TRADITION.... 5

       a. Regulation Of The Commercial Transfer Of Firearms Does Not Implicate The Plain Text Of The Second Amendment. ........................................................................ 5

       b. Historical Realities Do Not Support A Right To Instantaneous Receipt Of A Firearm Upon Purchase. ............................................................................................. 6

       c. As A Regulation On The Commercial Sale Of Firearms, Vermont's Waiting Period Is Presumptively Lawful And Relevantly Similar To Historical Analogues.................... 7

          1. Vermont's Waiting Period Regulation Is Analogous To Historical Regulations Of The Commercial Sale Of Firearms. ......................................................... 8

          2. Vermont's Waiting Period Regulation Is "Relevantly Similar" To Historical Laws Imposing Delays In Firearm Transfers To Protect Public Health. ..................... 9

       d. Vermont's 72-Hour Waiting Period Is "Reasonable" And "Well-Defined" Because It Does Not Burden An Individual Right To Self-Defense. .................................. 10

       e. Vermont's Waiting Period Regulation Appropriately Addresses The Threat To Public Health And Safety From Impulsive Acts Of Gun Violence. ................................ 11

    II.  VERMONT'S LCM REGULATION IS A "REASONABLE, WELL-DEFINED" RESTRICTION ON THE MANNER OF CARRYING ARMS CONSISTENT WITH THE SECOND AMENDMENT. .......................................................................... 13

       a. Vermont's LCM Regulation Is Analogous To Historical Firearms Restrictions That Did Not Burden The Right Of Armed Self-Defense. ...................................... 13

i

b. Vermont's Regulation Is "Relevantly Similar" To Historical Laws Restricting Weapons Capable Of Firing Repeatedly Without Reloading. .......................................... 15

   1. Firearms Capable Of Firing Repeatedly Without Reloading Were Not Broadly Available Until After Enactment Of The Fourteenth Amendment. ........................... 16

   2. Because They Represent A Technological Change, Modern Firearms Capable Of Firing Repeatedly Without Reloading Require A "More Nuanced Approach" Under Bruen That Cannot Rely Solely On Historical Antecedents Pre-Dating The Fourteenth Amendment. ....................................................................... 20

c. Vermont's LCM Regulation Is "Reasonable" And "Well-Defined" Because It Does Not Burden An Individual Right To Self-Defense. ........................................................ 21

d. LCMs' Unjustifiable Threat To Public Health And Safety Demonstrates That The Vermont Regulation Is Indeed Constitutional. ................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Andrews v. State*,
    50 Tenn. 165, 171, 186 (1871).................................................................................14

*Antonyuk v. Chiumento*,
    89 F.4th 271 (2d Cir. 2023) ..............................................................................4

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*,
    910 F.3d 106 (3d Cir. 2018)...........................................................................22

*District of Columbia v. Heller*,
    554 U.S. 570 (2008).......................................................................... *passim*

*Duncan v. Bonta*,
    19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895,
    and *vacated and remanded on other grounds*, 49 F.4th 1228 (9th Cir. 2022)..........................22

*Friedman v. City of Highland Park*,
    68 F. Supp. 3d 895 (N.D. Ill. 2014), *aff'd*, 784 F.3d 406 (7th Cir. 2015) ...............................24

*Gazzola v. Hochul*,
    88 F.4th 186 (2d Cir. 2023) ..............................................................................7

*Hanson v. District of Columbia*,
    No. 22-cv-2256 (RC), 2023 WL 3019777 (D.D.C. Apr. 20, 2023)...................................2, 23

*Hill v. State*,
    53 Ga. 472 (1874) ...........................................................................................13

*Kolbe v. O'Malley*,
    42 F. Supp. 3d 768 (D. Md. 2014) *aff'd in part, vacated in part, remanded sub*
    *nom. Kolbe v. Hogan*, 813 F.3d 160 (4th Cir. 2016), *on reh'g en banc*, 849
    F.3d 114 (4th Cir. 2017), and *aff'd*, 849 F.3d 114 (4th Cir. 2017) ...................................22, 24

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010)..........................................................................................5

*McRorey v. Garland*,
    No. 7:23-CV-00047-O, 2023 WL 5200670 (N.D. Tex. Aug. 14, 2023) ...............................10

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012)..........................................................................................12

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  597 U.S. 1 (2022) ............................................................................................... *passim*

*O'Neill v. State*,
  16 Ala. 65 (1849) ...........................................................................................................14

*Ocean State Tactical, LLC v. Rhode Island*,
  646 F. Supp. 3d 368 (D.R.I. 2022) ............................................................................2, 23

*Ocean State Tactical, LLC v. Rhode Island*,
  No. 1:22-cv-00246 (D.R.I. Oct. 14, 2022) ......................................................................15

*Oregon Firearms Fed'n v. Brown*,
  644 F. Supp 3d 782 (D. Or. 2022) .................................................................12, 15, 25

*Oregon Firearms Fed'n v. Kotek Oregon All. for Gun Safety*,
  No. 2:22-CV-01815-IM, 2023 WL 4541027 (D. Or. July 14, 2023) .................................2, 23

*Rocky Mountain Gun Owners v. Polis*,
  467 P.3d 314 (Colo. 2020) ..............................................................................................22

*Rocky Mountain Gun Owners v. Polis*,
  No. 23-CV-02563-JLK, 2023 WL 8446495 (D. Colo. Nov. 13, 2023)...........................7, 9

*Silvester v. Harris*,
  843 F.3d 816 (9th Cir. 2016) ...........................................................................................10

*State v. Curley-Egan*,
  2006 VT 95, 180 Vt. 305, 910 A.2d 200 .........................................................................31

*State v. Langford*,
  10 N.C. 381 (1824) .........................................................................................................14

*State v. Misch*,
  2021 VT 10, 214 Vt. 309, 256 A.3d 519 ....................................................................21, 31

*State v. Mitchell*,
  3 Blackf. 229 (Ind. 1833)................................................................................................14

*Teixeira v. Cnty. of Alameda*,
  873 F.3d 670 (9th Cir. 2017) .............................................................................................8

*Ex parte Thomas*,
  97 P. 260 (Okla. 1908).....................................................................................................14

*Worman v. Healey*,
  922 F.3d 26 (1st Cir. 2019), *abrogated on other grounds by Bruen* .......................................22

iv

**Rules and Statutes**

10 V.S.A. § 4704 ...................................................................................................15

13 V.S.A. §§ 4007-4008 .........................................................................................16

13 V.S.A. § 4010 ...................................................................................................15

13 V.S.A. § 4019(d) ...............................................................................................11

13 V.S.A. § 4019a .......................................................................................2, 6, 7, 10

13 V.S.A. § 4019a(a) ..............................................................................................11

13 V.S.A. § 4021 .............................................................................................2, 30

13 V.S.A. § 4021(a) ...............................................................................................25

18 U.S.C. § 1715 ....................................................................................................8

1896 Vt. Acts & Resolves No. 111 ....................................................................15, 16

1904 Vt. Acts & Resolves No. 152, § 1 ...................................................................16

1912 Vt. Acts and Resolves No. 237 .......................................................................15

1923 Vt. Acts and Resolves 130 .............................................................................15

2023 Vt. Acts & Resolves No. 45 ...........................................................................12

Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189, 189, § 12819-3 ...........................16

Act of Apr. 22, 1927, ch. 1052, 1927 R.I. Pub. Laws 256, §§ 1, 4............................16

Act of Feb. 4, 1812, ch. 195, 1812 Del. Sess. Laws 522, 522–24 .............................13

Act of Feb. 28, 1933, ch. 206, 1933 S.D. Sess. Laws 245, 245, § 1 ..........................16

Act of Jan. 30, 1847, ch. 79, 1846–47 Va. Acts 67 .................................................13

Boulder Revised Code §§ 5-8-2, 5-8-28 ..................................................................25

Cal. Penal Code §§ 16740, 32310 (West 2015)........................................................25

Colo. Rev. Stat. Ann. §§ 18-12-301(2), 18-12-302 (West 2013) ..............................25

Cook Cnty., Ill., Code of Ordinances §§ 54-211 – 54-213 ........................................25

Conn. Gen. Stat. Ann. §§ 53- 202w(a)(1), 53-202w(b) (West 2013) .........................25

D.C. Code Ann. § 7-2506.01(b) (West 2012) .................................................................25

Gun Control Act of 1968 ..............................................................................................8

Haw. Rev. Stat. Ann. §§ 134-1, 134-4, 134-8(c) (West 2013) .....................................25

Mass. Gen. Laws Ann. ch. 140, §§ 121, 131M (West 2014) ........................................25

Md. Code Ann., Crim. Law §§ 4-306(b)(1) (West 2013) ..............................................25

N.J. Stat. Ann. §§ 2C:39-1(y), 2C:39-3(j), 2C:39-9(h) (West 2014) ...........................25

N.Y. Penal Law §§ 265.00(23), 265.02(8), 265.10 (McKinney 2018) ........................25

National Firearms Act of 1934 .....................................................................................8

R.I. Gen. Laws. §§ 11-47.1-2, 11-47.1-3 .....................................................................25

S.F. Police Code § 619.................................................................................................25

Sunnyvale, Cal., Municipal Code § 9.44.050 ..............................................................25

U.S. Const. amend. II...........................................................................................*passim*

U.S. Const. amend. XIV ...............................................................................15, 16, 20

**Other**

*1st DC Cavalry Martial Henry Rifle*, College Hill Arsenal, https://perma.cc/LFP3-
    AVDY (last visited Nov. 29, 2022) ...........................................................................19

*1860 Henry Repeating Rifle*, Fandom: Deadliest Warrior Wiki,
    https://perma.cc/H9YW-SZHG (last visited Nov. 29, 2022)...................................19

A. Sauaia et al., *Fatality and Severity of Firearm Injuries in a Denver Trauma
    Center* , 2000-2013, 315 JAMA 2465 (Jun. 14, 2016),
    https://jamanetwork.com/journals/jama/fullarticle/2528198 ...................................26

*Bennett & Havilland Revolving Rifle*, Fandom: Military Wiki,
    https://perma.cc/D68U-MSGU (last visited Nov. 29, 2022) ...................................18

Carla Occaso, *Police Arrest Former Rumney, U-32 Student in Minnesota Potential
    Alleged 'Full Scale Attack' Thwarted by Custodian Police,* the bridge,
    https://montpelierbridge.org/2023/04/police-arrest-former-rumneyu-32-
    student-in-minnesota/ (last visited June 23, 2023) ................................................29

Catherine W. Barber and Matthew J. Miller, "Reducing a Suicidal Person's
    Access to Lethal Means of Suicide: A Research Agenda," American Journal
    of Preventive Medicine 47, no. 3 (2014): S264–S272...........................................11

*Chain Guns—I*, Firearms History, Technology & Development Blog (July 23, 2014), https://perma.cc/MT7P-JP5L............................................................................19

Charging Document, *State v. Sawyer*, Docket No. 142-2-18 Rdcr (Sup. Ct. Rutland Unit, Feb. 16, 2008), https://www.documentcloud.org/documents/4380795-Jack-SawyerCharging-Document.html#document/p3............................................................................29

Charles DiMaggio et al., *Changes in US Mass Shooting Deaths Associated with the 1994-2004 Federal Assault Weapons Ban: Analysis of Open-Source Data,* 86 Trauma Acute Car Surg. No. 1 11, 14 (2018)....................................................28

Charles Worman, *The Iconic Pepperbox Revolving Pistol*, J. Antiques & Collectibles, https://perma.cc/E3K8-W3LH (last visited Nov. 29, 2022) ..............................17

Chris Baker, *How Much Ammo Capacity Is Enough*, Lucky Gunner: Lounge (Sept. 2, 2016), https://perma.cc/9UYC-7ZZC....................................................................24

Christopher Ingraham, *What 'Arms' Looked Like When the 2nd Amendment Was Written*, Wash. Post (June 13, 2016), https://perma.cc/H6X5-C2NL..............................20, 21

Christopher S. Koper et al., *Criminal Use of Assault Weapons and High-Capacity Semi-Automatic Firearms: An Updated Examination of Local and National Sources*, 95 J. of Urban Health (Issue 3) 313, 319 (2018)........................................27

D.C. Council Comm. on Public Safety & the Judiciary, Report on Bill 17–843*, "Firearms Registration Amendment Act of 2008*," at 9 (Nov. 25, 2008), https://perma.cc/YN6H-2U9M ........................................................................23

Dan Alex, *Henry Model 1860. Lever-Action Repeating Rifle*, Military Factory, https://perma.cc/N47S-7PKR (last edited Feb. 4, 2022)..........................................19

Dan Alex, *Winchester Model 1866 Lever-Action Repeating Rifle*, Military Factory (March 12, 2019), https://perma.cc/4ZJA-5V4M ........................................................21

Danielle Hollembaek, *The Pepperbox Pistol*, Rock Island Auction Co. (Jan. 16, 2019), https://perma.cc/2ERY-26CX..............................................................................17

David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 88 Alb. L. Rev. 849 (2015) ..........................................................................................20

David Card and Gordon B. Dahl, "Family Violence and Football: The Effect of Unexpected Emotional Cues on Violent Behavior," The Quarterly Journal of Economics 126, no. 1 (2011): 103–143 ....................................................................12

Decl. of Brennan Rivas at 23, *Wiese et al. v. Bonta et al.*, Docket No. 2:17-cv-00903 (E.D. Cal. filed April 28, 2017), ECF No. 135-14 (Decl. dated July 10, 2023) ....................................................................................................................18

Derek Brouwer, *Gun Group Sues Over Vermont's New Waiting-Period Law*,
Seven Days (December 18, 2023), https://www.sevendaysvt.com/news/gun-
group-sues-over-vermonts-new-waiting-period-law-39739968 (last visited
February 27, 2024) ................................................................................................. 12

Everytown for Gun Safety Support Fund, "*Mass Shootings in the United States*,"
(March 2023), https://everytownresearch.org/mass-shooting-report ..................... 26

Final Report, Sandy Hook Advisory Commission (Mar. 6, 2015), available at
http://www.shac.ct.gov/SHAC_Final_Report_3-6-2015.pdf ................................. 29

Forgotten Weapons, *Porter Turret Rifle (2nd Variation) – Unsafe in Any Direction*,
YouTube (March 7, 2018), https://www.youtube.com/watch?v=Wm_1Ny6r6zg ................. 18

*Girandoni Air Rifle*, Fandom: Military Wiki, https://perma.cc/4RFA-Q9BK (last
visited Nov. 29, 2022) ............................................................................................. 17

Greg Ellifritz, *An Alternate Look at Handgun Stopping Power*, Buckeye Firearms
Association (July 8, 2011), https://perma.cc/7AW4-EXJV ..................................... 24

Ian McCollum, *RIA: Porter Turret Rifle, Forgotten Weapons* (Feb. 7, 2016),
https://perma.cc/N5J5-R93H ................................................................................... 18

Ian McCollum, *Winchester Lever Action Development: Model 1866*, Forgotten
Weapons (June 7, 2017), https://perma.cc/2LMH-CQK5 ...................................... 20

J. Davidson, K. R. Scherer, and H. H. Goldsmith, "The Role of Affect in Decision
Making," Handbook of Affective Sciences (2003): 619–642 ................................. 12

J. Walters, *Thousands Attend March for Our Lives Rally in Montpelier*, Seven
Days, (Mar. 24, 2018), https://www.sevendaysvt.com/OffMessage/archives/
2018/03/24/walters-thousands-attendmarch-for-our-lives-rally-in-montpelier. ..................... 30

Jen Christensen, *Gunshot Wounds Are Deadlier Than Ever As Guns Become
Increasingly Powerful*, CNN (Jun. 14, 2016),
http://www.cnn.com/2016/06/14/health/guninjuries-more-deadly/........................ 26

John Donohue and Theodora Boulouta, *That Assault Weapon Ban? It Really Did
Work*, N.Y. Times (Sept. 4, 2019),
https://www.nytimes.com/2019/09/04/opinion/assaultweapon-ban.html................. 28

John Holl, *New Jersey Man is Accused of Plotting Attack in Vermont,* N.Y.
Times, (July 15, 2005), https://www.nytimes.com/2005/07/15/nyregion/new-
jersey-man-is-accusedof-plotting-attack-in-vermont.html ..................................... 30

John Paul Jarvis, *The Girandoni Air Rifle: Deadly Under Pressure* (March 15,
2011), https://perma.cc/57AB-X2BE....................................................................... 17

John Sammon, *The Case for Caselessness. The Volcanic Rifle*, Guns.com (April 19, 2011), https://perma.cc/462K-M6TA ...............................................................19

*Josselyn Revolver—Patent Protype*, FLicense Blog (Sept. 23, 2014), https://perma.cc/8CRB-7XH7.............................................................................19

J. George, *Shoot to Kill*, Baltimore Sun (Sep. 30, 2016), http://data.baltimoresun.com/news/shoot-to-kill/ ................................................26

*Large Capacity Magazines*, Giffords Law Ctr., https://perma.cc/X84S-97DT (last visited Feb. 28, 2024).................................................................................21

*Lot 1099. Very Rare Hall 15 Round Percussion Revolving Rifle*, Rock Island Auction Co., https://perma.cc/43X5-EKSG (last visited Nov. 29, 2022)................................18

Louis Klarevas, *Rampage Nation: Securing America from Mass Shootings* (2016)....................27

Marjory Stoneman Douglas High School Public Safety Commission Report, Fl. Dep't of Law Enforcement, at 32 (Jan. 2, 2019), available at http://www.fdle.state.fl.us/MSDHS/CommissionReport.pdf; ..................................29

Mark Anthony Frassetto, *Firearms and Weapons Legislation Up To The Early Twentieth Century* (Jan. 15, 2013), (unpublished manuscript), https://ssrn.com/abstract=2200991 [https://perma.cc/YEY9-KEN8] ........................8

Memorandum and Exs. in Support of Government's Mot. for Detention, *U.S. v. Greene*, Docket No. 2:06-CR-22 (D. Vt. filed April 10, 2006), http://lawcenter.giffords.org/wpcontent/uploads/2018/07/US-v.-Greene-ECF-14.pdf; http://lawcenter.giffords.org/us-vgreene-ecf-14-1/; http://lawcenter.giffords.org/us-v-greene-ecf-14-2/ .............................................30

Michael A. Foster, Cong. Research Serv., R45629, Federal Firearms Laws: Overview and Selected Legal Issues 1 (2019) ..........................................................8

Michael Luca, Deepak Malhotra, and Christopher Poliquin, "Handgun Waiting Periods Reduce Gun Deaths," Proceedings of the National Academy of Sciences 114, no. 46 (2017): 12162–12165.............................................................12

Mike Markowitz, *The Girandoni Air Rifle: A Weapon Ahead of Its Time?* Defense Media Network (May 14, 2013), https://perma.cc/5F8G-UZAR ...........................................17

*Original U.S. Civil War French M1854 Lefaucheux Cavalry Model 12mm Pinfire Revolver with Round*, Int'l Military Antiques, https://perma.cc/58KW-PHS7 (last visited Nov. 29, 2022)......................................................................................18

Patrick Crowley, *Student from Vermont arrested in Minnesota for allegedly planning to attack school*, Valley News, https://www.vnews.com/Student-from-Vermont-arrested-in-Minnesota-for-allegedly-planning-to-attack-school-50610712 (last visited June 23, 2023) ...................................................................29

Paul Heintz, Taylor Dobbs, and John Walters, *In Historic Shift, Vermont's GOP Governor and Democratic Leaders Embrace Gun-Control Measures*, Seven Days (Feb. 22, 2018), https://www.sevendaysvt.com/OffMessage/archives/2018/02/22/in-dramatic-shiftvermonts-democratic-leaders-unite-behind-background-checks................................30, 31

Peter Hirschfeld, *In Less Than a Week, Scott and Lawmakers Put Gun Control Bills on Fast Track*, VPR (Feb. 22, 2018), http://digital.vpr.net/post/less-week-scott-andlawmakers-put-gun-control-bills-fast-track#stream/0....................................30

Police Executive Research Forum, Guns and Crime: Breaking New Ground By Focusing on the Local Impact 24 (2010), https://www.issuelab.org/resources/14333/14333.pdf.............................................27

Rare 20-Shot Lefaucheux *"High Capacity" Pin Fire Revolver, College Hill Arsenal*", https://perma.cc/TNY6-8PTL (last visited Nov. 29, 2022) ....................................18

*Rare Alexander Hall Percussion Revolving Rifle*, Cowan's, https://perma.cc/T4F3-49KM (last visited Nov. 29, 2022)....................................18

*Revolver - Invented by Samuel Colt*, Edubilla, https://perma.cc/4AS9-PQ5U (last visited Nov. 29, 2022)....................................................................................19

Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 162–63 (2007)....................................................................13

Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights,* 80 Law & Contemp. Probs. 55, 75 (2017)............................................8, 15

Rock Island Auction Co*., Repeating Flintlock Rifles?!?*, YouTube (Sept. 7, 2021), https://www.youtube.com/watch?v=0FkW-CSTCwo .............................................17

Ryan Hodges, *The 1866 Rifle*, Taylor's & Company (Aug. 26, 2020), https://perma.cc/7STW-8WMS ...................................................................................20

Sam Petulla, *Here is 1 Correlation Between State Gun Laws and Mass Shootings*, CNN, (Oct. 5, 2017), https://www.cnn.com/2017/10/05/politics/gun-laws-magazines-lasvegas/index.html .........................................................................*28*

Sentencing Mem. of the U.S. and Mot. for Upward Departure 1-2, *U.S. v. Greene*,
  Docket No. 2:06-CR-22 (D. Vt. filed Mar. 12, 2008),
  http://lawcenter.giffords.org/wpcontent/uploads/2018/07/US-v.-Greene-ECF-
  54.pdf ................................................................................................................................30

T. R. Simon, et al., "Characteristics of Impulsive Suicide Attempts and
  Attempters," Suicide and Life-Threatening Behavior 32 no. 1 (Suppl.) (2001):
  49–59..................................................................................................................................11

Tim Lambert, *Statements by John R. Lott, Jr. on Defensive Gun Brandishing*,
  ScienceBlogs (Oct. 17, 2002), https://perma.cc/65PN-YMA4....................................24

*United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 68–
  71 (2017) ...........................................................................................................................15

*United States and Second Amendment Rights,* 80 Law & Contemp. Probs. 55, 75
  (2017) ...................................................................................................................................8

Veronica Miracle, *Thousand Oaks Mass Shooting Survivor: "I Heard Somebody
  Yell, 'He's Reloading,'"* ABC News (Nov. 8, 2018),
  https://abc7.com/thousand-oaks-survivori-heard-somebody-yell-hes-
  reloading/4649166/ ...........................................................................................................29

*Very Rare Hall 15 Round Percussion Revolving Rifle*, All Outdoor (June 18,
  2021), https://perma.cc/39V8-75RR (last visited June 29, 2023)..........................18

*Very Rare Hall 15 Round Percussion Revolving Rifle*, Rock Island Auction Co.,
  https://perma.cc/43X5-EKSG (last visited Nov. 29, 2022) ...................................18

Violence Policy Center, "Mass Shootings in the United States Involving Large
  Capacity Ammunition Magazines" April 2023,
  https://vpc.org/fact_sht/VPCshootinglist.pdf....26*Volcanic Rifles & Pistols*, Winchester Arms
  Collectors Ass'n, https://perma.cc/52FB-2PCF (last visited Nov. 29, 2022).........................19

*Waiting Periods*, Everytown for Gun Safety,
  https://www.everytown.org/solutions/waiting-periods/ (last visited February
  27, 2024) ..............................................................................................................................9

*Wheelgun Wednesday: A Closer Look at Pepperbox Pistols*, The Firearm Blog
  (Dec. 8, 2021), https://perma.cc/2Z2U-RJ62 .......................................................17

*Why Britain Didn't Adopt the Winchester 1866*, The Armourer's Bench,
  https://perma.cc/PRY3-YHSN (last visited Nov. 29, 2022)...................................20

Winchester *1866 Prototype Musket*, The Armourer's Bench,
  https://perma.cc/PB83-TSM4 (last visited Nov. 29, 2022)...................................20

## INTEREST OF AMICI CURIAE

*Amicus curiae* Giffords Law Center to Prevent Gun Violence (Giffords Law Center) is a non-profit policy organization serving lawmakers, advocates, legal professionals, gun violence survivors, and others who seek to reduce gun violence. Founded in 1993 after a gun massacre at a San Francisco law firm, the organization was renamed Giffords Law Center in October 2017 after joining forces with the gun-safety organization led by former Congresswoman Gabrielle Giffords. Today, through partnerships with gun violence researchers, public health experts, and community organizations, Giffords Law Center researches, drafts, and defends the laws, policies, and programs proven to effectively reduce gun violence.

Brady Center to Prevent Gun Violence (Brady) is the nation's most longstanding non-partisan, non-profit organization dedicated to reducing gun violence through education, research, legal advocacy, and political action. Brady works across Congress, courts, and communities, uniting gun owners and non-gun owners alike to take action to prevent gun violence. Brady has a substantial interest in ensuring that the Constitution is construed to protect Americans' fundamental right to live and in protecting the authority of democratically elected officials to address the Nation's gun violence epidemic.

March for Our Lives (MFOL) is a youth-led non-profit organization dedicated to promoting civic engagement, education, and direct action by youth to achieve sensible gun violence prevention policies. MFOL arose in the wake of the mass shooting at Marjory Stoneman Douglas High School in Parkland, Florida in 2018. It immediately organized the largest single day of protest against gun violence in the nation's history, and, six years later, MFOL has established itself as one of the foremost authorities at the intersection of youth-led activism and advocacy to prevent gun violence.

1

## INTRODUCTION

Vermont Act 45, enacted at 13 V.S.A. § 4019a, implements a brief, 72-hour waiting period between when a licensed dealer receives background check clearance and when the firearm is transferred to the individual's possession. Act 45 does not implicate the Second Amendment's plain text because it merely regulates the manner of commercial transfer of firearms and does not burden the right to possess and carry arms. Further, Vermont's waiting period is consistent with historical understandings of both how long it took to receive goods and the government's right to regulate commercial firearm sales to protect public safety.

Vermont Act 94, enacted at 13 V.S.A. § 4021, prohibits the acquisition of large-capacity magazines ("LCMs") that are capable of providing more than ten rounds of ammunition for a long gun or 15 rounds for a handgun. Act 94 is likewise consistent with the history and tradition of firearms regulation in this country because it regulates the manner in which firearms may be carried without burdening the right of lawful armed self-defense.[1]

Part I of this brief, *infra*, explains that Vermont's waiting period law does not implicate the plain text of the Second Amendment because the ability to receive a firearm immediately upon purchase is not within the literal or historical meanings of the rights to "keep" and "bear" arms. Colonial and early American life routinely involved far longer shipping times and routine delays for the receipt of goods. Put simply, there is no right in the plain text of the Second

---

[1] As persuasively explained in Defendants' Opposition, Act 94 is also constitutional because: (i) LCMs are accessories not subject to constitutional protection as "arms" under the Second Amendment because they are not required to use a firearm, and the regulation of them does not prevent the use of any firearm, *Or. Firearms Fed'n v. Kotek Or. All. for Gun Safety*, No. 2:22-CV-01815-IM, 2023 WL 4541027, at *26 (D. Or. July 14, 2023) (hereinafter *Kotek*); *Ocean State Tactical, LLC v. Rhode Island*, 646 F. Supp. 3d 368, 388 (D.R.I. 2022); and (ii) "'weapons that are most useful in military service' fall outside of Second Amendment protection," *Hanson v. District of Columbia*, No. 22-cv-2256 (RC), 2023 WL 3019777, at *8 (D.D.C. Apr. 20, 2023) (quoting *Heller*, 554 U.S. at 627) (*appeal docketed*, No. 23-7061 (D.C. Cir. May 16, 2023)). Because these arguments are explored in depth in Defendants' briefing, we do not focus on them here.

Amendment to purchase a gun on demand.  And even if this conduct falls within the ambit of the

Second Amendment, waiting periods laws are consistent with a long historical tradition of

regulating commercial firearm transfers to protect public safety, including licensing regimes and

background check requirements.  Vermont's 72-hour waiting period is a presumptively

constitutional regulation of commercial sales and is not so lengthy as to create a *de facto* burden

on the right to lawful self-defense.  Further, the threat to public safety from impulsive acts of gun

violence supports Act 45's constitutionality.

Part II of this brief, *infra*, explains that Vermont's LCM law is "relevantly similar" to

historical regulations that limited where firearms could be carried, what weapons could lawfully

be possessed, and the manner in which weapons could be carried.  Given the dramatic changes in

firearms technology, the most relevant historical comparisons are early twentieth century laws

restricting guns capable of firing repeatedly without reloading.  Similar to these historical

analogues, Vermont's waiting period regulation does not burden the right to armed self-defense

because LCMs are not necessary for lawful self-defense (in fact, these magazines are not even

useful for civilian self-defense).  Finally, like historical considerations, policy considerations

demonstrate Act 94's constitutionality.

## I.   Under *Bruen*, Courts Must First Consider Whether The Burdened Conduct Is Protected By The Second Amendment, Looking To The Plain Text And Historical Understandings.

*In New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, the Supreme Court announced a

new test for evaluating Second Amendment claims.  597 U.S. 1 (2022).  At the same time, *Bruen*

did not disrupt, and indeed reaffirmed, the central holding of the Court's seminal decision in

*District of Columbia v. Heller*, which held that the Second Amendment protects a law-abiding

person's right to possess a weapon for lawful self-defense.  *Id.*  But "[l]ike most rights, the right

secured by the Second Amendment is not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008).

Thus, "*Bruen* requires courts to engage in two analytical steps when assessing Second Amendment challenges: first, by interpreting the plain text of the Amendment as historically understood; and second, by determining whether the challenged law is consistent with this Nation's historical tradition of firearms regulation." *Antonyuk v. Chiumento*, 89 F.4th 271, 300 (2d Cir. 2023) *cert. filed*, No. 23-910 (Feb. 22, 2024). When, as here, a challenger cannot carry its initial burden of showing that the regulated conduct is covered by the Second Amendment's plain text, then the law must be upheld, without any further consideration of historical tradition.

## II. If The Conduct Is Protected By The Plain Text, *Bruen* Instructs Courts To Evaluate Historical "Analogues" To A Challenged Firearms Regulation To Assess Whether It Imposes A "Comparable Burden" On Lawful Self-Defense.

If, and only if, a challenger carries its initial burden of establishing that the plain text of the Second Amendment is implicated, then the court must determine whether the regulation is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. "[D]etermining whether a historical regulation is a proper analogue for a distinctly modern firearms regulation requires a determination of whether the two regulations are relevantly similar." *Id.* at 28-29 (quotation and citation omitted). This "analogical reasoning requires only that the government identify a well-established and representative historical **analogue**, not a historical **twin**. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id*. at 30.[2] Indeed, it is reversible error for a district court to require a state to produce or discover a "historical twin" to justify each aspect of a challenged regulation. *Antonyuk*, 89 F.4th at 302.

---

[2] Original emphasis modified from italics to bold for readability. All emphases in the original unless otherwise noted.

Following *Bruen*, courts conducting this historical inquiry must consider "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29. "As we stated in *Heller* and repeated in *McDonald*, 'individual self-defense is "the **central component**" of the Second Amendment right.'" *Id.* (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (quoting *Heller*, 554 U.S. at 599)).

Although the *Bruen* Court invalidated New York's "proper-cause" standard, the Court identified several presumptively lawful firearms regulations that are "relevantly similar" to historical laws. For example, "the right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms." *Id.* at 38. Therefore, because "historical evidence from antebellum America does demonstrate that **the manner** of public carry was subject to reasonable regulation," laws that impose "reasonable, well-defined restrictions" on the manner of carrying firearms do not violate the Second Amendment. *Id.* at 59, 70.

## ARGUMENT

I. **VERMONT'S 72-HOUR WAITING PERIOD IS CONSTITUTIONAL BECAUSE IT DOES NOT IMPLICATE THE SECOND AMENDMENT'S PLAIN TEXT AND, EVEN IF IT DID, THE LAW IS CONSISTENT WITH HISTORICAL TRADITION.**

a. **Regulation Of The Commercial Transfer Of Firearms Does Not Implicate The Plain Text Of The Second Amendment.**

Plaintiffs fail to carry their threshold burden of establishing that the Second Amendment's plain text covers the right to receive a firearm immediately after commercial purchase. *See Bruen*, 597 U.S. at 24. In *Bruen,* the Supreme Court did not recognize a right to purchase a firearm on-demand. Instead, the *Bruen* Court recognized that, consistent with *Heller*, the Second Amendment protects a right for ordinary, law-abiding citizens to "keep" and "bear" arms for self-defense. *Id.*

5

at 17.  In *Heller*, the Court analyzed the textual meaning of these phrases within the Second Amendment.  To "keep arms" means to "have weapons" and to "bear arms" means to "wear, bear, or carry [weapons] upon the person or in the clothing or in a pocket, for the purpose of being armed and ready for offensive or defensive action[.]"  *Heller*, 554 U.S. at 582.

Here, § 4019a does not regulate firearm possession or use, nor does it prohibit law-abiding citizens from purchasing firearms from licensed dealers.  Given these definitions, waiting periods required at the point of commercial *transfer* of arms do not implicate the plain text of the Second Amendment and are presumptively constitutional.  Accordingly, waiting periods associated with the transfer of firearms are thus presumptively constitutional according to the plain text of the Second Amendment.

### b.  Historical Realities Do Not Support A Right To Instantaneous Receipt Of A Firearm Upon Purchase.

The Constitutional drafters would not have understood that a right to "keep" a gun encompassed a right to obtain a firearm without any delay.  Waiting periods are well-supported by the historical realities of early American life.

Waiting for delivery of goods, including firearms, was an accepted part of American life in the 18th and 19th century.  For example, when the Erie Canal opened in 1825, it was an enormous accomplishment for consistent and "speedy" transportation of commercial goods.  But, by today's standards, products still moved at a glacial pace.  In fact, at the time, people marveled that barges could reach speeds of up to two miles per hour and that the canal cut travel time between Albany and Buffalo in half, down to only five to seven days:

- ❖ Jack Larkin the Reshaping of Everyday Life: 1790-1840, HarperPerennial 1988:
    - ○ "Americans still lived in a world of small scale and scarcity.  People, goods and information moved slowly.  The tools they used and the routines of their work, their materials and sources of power, would have been immediately recognizable to a man or woman of the seventeenth century."

6

❖ Carol Sheriff, The Artificial River, The Erie Canal and the Paradox of Progress 1817-1862 (Chapter 3, Reducing Distance and Time):

   o "The Canal made distances seem short not so much with speed as with efficiency. Pulled by teams of horses, canal boats still moved relatively slowly, though methodically. Those catering exclusively to passengers reached speeds of up to five miles an hour, while freight boats moved at about two miles an hour. Yet canal boats cut nearly in half the travel time between Albany and Buffalo–a journey that now took between five and seven days. . . ."

❖ Charles O. Paullin, Atlas of Historical Geography of the United States:

   o In 1800, it took 9 days for a person to travel from New York City to Buffalo, NY. It similarly would have taken over a week for a person to travel from New York City to Burlington, Vermont.

As one District Court succinctly stated: "[e]ven if purchasing a firearm could be read into the terms 'keep' or 'bear,' receipt of a firearm without any delay could not be, because the Founders would not have expected instant, widespread availability of the firearm of their choice." *Rocky Mountain Gun Owners v. Polis*, No. 23-CV-02563-JLK, 2023 WL 8446495, at *8 (D. Colo. Nov. 13, 2023); *see also Gazzola v. Hochul*, 88 F.4th 186, 197-98 (2d Cir. 2023) ("It bears repeating that gun buyers have no right to have a gun store in a particular location, nor a right to travel no more than short distances to the most convenient gun store that provides what they deem a satisfactory retail experience.").

   c. **As A Regulation On The Commercial Sale Of Firearms, Vermont's Waiting Period Is Presumptively Lawful And Relevantly Similar To Historical Analogues.**

Regulating the commercial transfer of firearms is "consistent with the Nation's historical tradition of firearm regulation." *See Bruen*, 597 U.S. at 24. As recognized by the Supreme Court in *Heller*, "laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful." *Heller*, 554 U.S. at 626–27 & n.26; *see also Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring, joined by Roberts, C.J.) (quoting *Heller*). Accordingly, the regulatory scheme laid out in § 4019a is one of these "presumptively lawful" measures that is

7

consistent with the long history of regulating the commercial sale of firearms to protect public safety.

### 1.   Vermont's Waiting Period Regulation Is Analogous To Historical Regulations Of The Commercial Sale Of Firearms.

"[C]olonial governments substantially controlled the firearms trade." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017).  Even without accounting for restrictions on *who* could purchase firearms, a survey of state gun laws from the founding until the first major federal gun legislation in 1934 identified "[a]t least eight states [that] regulated, barred, or licensed firearms sales.  For example, Florida (1927), Georgia (1902), and North Carolina (1905) gave localities the power to license, regulate, or even bar the commercial sale of firearms." [3] Likewise, an 1893 South Carolina law authorized local governments to "issue licenses in their respective Counties for the sale of pistols and pistol cartridges upon the payment to County Treasurer [.]" [4]

On the federal level, regulation of commercial firearm sales is similarly entrenched in our national history.  Since 1927, federal law has prohibited use of the U.S. Postal Service to ship concealable firearms (subject to some exceptions).[5]  Shortly thereafter, Congress passed the National Firearms Act of 1934 (NFA), which required, among other things, the registration and identification of certain weapons upon production, importation, and transfer.[6]  The Gun Control Act of 1968 (GCA) subsequently established a comprehensive regulatory scheme for licensing

---

[3] Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights,* 80 Law & Contemp. Probs. 55, 75 (2017).

[4] Mark Anthony Frassetto, *Firearms and Weapons Legislation Up To The Early Twentieth Century*, at 80 (Jan. 15, 2013) (unpublished manuscript), https://ssrn.com/abstract=2200991 [https://perma.cc/YEY9-KEN8]

[5] Michael A. Foster, Cong. Research Serv., R45629, Federal Firearms Laws: Overview and Selected Legal Issues 1 (2019) (citing 18 U.S.C. § 1715)

[6] *Id.* at 4.

firearm manufacturers and dealers, and forbidding sale to prohibited persons.[7]  Since 1993, the

Brady Act has required licensed dealers to conduct background checks on prospective purchasers

to ensure they are not selling to prohibited persons.[8]  In order to complete this check, dealers

must query the National Instant Criminal Background Check System (NICS), which will tell the

dealer the sale may proceed, that it cannot proceed (such as when the putative purchaser has been

convicted of a felony), or that the sale must be delayed for investigation.  If they do not receive

confirmation that the sale can proceed, dealers must wait up to 3 business days—72 hours—after

receiving a 'delay' notification  before they can transfer the firearm to the purchaser.[9]

### 2. Vermont's Waiting Period Regulation Is "Relevantly Similar" To Historical Laws Imposing Delays In Firearm Transfers To Protect Public Health.

Each of these various laws spanning many decades of American practice imposed some

non-prohibitive cost, inconvenience, or delay to the process of purchasing a firearm.  Vermont's

72-hour waiting period is "relevantly similar" to these historical laws because it imposes a

"comparable burden" on the right of armed, lawful self-defense.  *See Bruen*, 597 U.S. at 29.

Like its many historical analogues, Vermont's waiting period regulation does not prohibit the

possession, carry, or use of firearms; it merely places reasonable requirements on the manner of

a commercial sale.

As of the date of this filing, Vermont is one of eleven states with mandatory waiting-

period regulations.[10]  Yet despite facing challenges, multiple courts post-*Bruen* have declined to

strike down a waiting period law.  *See, e.g., Rocky Mountain Gun Owners*, 2023 WL 8446495, at

---

[7] *Id.* at 6.

[8] *Id.* at 18.

[9] *Id.* at 19.

[10] *Waiting Periods*, Everytown for Gun Safety, https://www.everytown.org/solutions/waiting-periods/ (last visited Feb. 27, 2024).

*8 (rejecting a preliminary injunction because "the relevant conduct impacted by the waiting period—the receipt of a paid-for firearm without delay—is not covered" by the plain language of the Second Amendment); *McRorey v. Garland*, No. 7:23-CV-00047-O, 2023 WL 5200670, at *5 (N.D. Tex. Aug. 14, 2023) (denying a motion for preliminary injunction, concluding that plaintiffs were unlikely to succeed on the merits because they "have not shown that the potential waiting periods here are 'indefinite' or that a potential ten-business-day waiting period is unconstitutional in all cases.").

Courts before *Bruen* upheld waiting period regulations as consistent with history. As the Ninth Circuit stated as recently as 2016:

> **There is, moreover, nothing new in having to wait for the delivery of a weapon.** Before the age of superstores and superhighways, most folks could not expect to take possession of a firearm immediately upon deciding to purchase one. As a purely practical matter, delivery took time. Our 18th and 19th century forebears knew nothing about electronic transmissions. . . . [D]elays had to be routinely accepted as part of doing business.

*Silvester v. Harris*, 843 F.3d 816, 827 (9th Cir. 2016) (emphasis added).

### d. Vermont's 72-Hour Waiting Period Is "Reasonable" And "Well-Defined" Because It Does Not Burden An Individual Right To Self-Defense.

In *Bruen*, the Supreme Court did not "rule out" the possibility that an otherwise lawful regulation may run afoul of the Second Amendment if it were "put toward abusive ends," suggesting that "lengthy wait times" may act as *de facto* bars to possession if delays are so extreme as to effectively "deny ordinary citizens their right" to bear arms. *See* 597 U.S. at 38 n.9. But there is no such risk with the Vermont waiting period law. The express language of § 4019a limits the waiting period to the shorter of: (i) 72-hours after the dealer facilitating the transfer is provided with a unique identification number for the transfer by NICS or (ii) seven

10

business days after the dealer has contacted NICS to initiate a background check.[11]  The

requirement to wait seven business days after contacting NICS to allow additional time for

background checks to take place is not a new feature of Act 45, rather the Act recognizes the 7-

day background check period previously enacted at 13 V.S.A. § 4019(d).  The newly enacted 3-

day period is the same finite length as that required for other public health-motivated gun sale

regulations, such as the Brady Act, and is far shorter than most colonial- and early American

shipping times.  Vermont's 72-hour waiting period is a "reasonable" and "well-defined"

regulation of commercial sales that cannot be said to effectively deny the right to self-defense.

*See Bruen*, 597 U.S. at 70.

>   **e.   Vermont's Waiting Period Regulation Appropriately Addresses The Threat
>         To Public Health And Safety From Impulsive Acts Of Gun Violence.**

Waiting periods for the possession of firearms are a commonsense way to prevent

impulsive, volatile acts of gun violence.  By delaying immediate access to firearms, waiting

periods create an important "cooling off" period that can help prevent impulsive acts of gun

violence, including gun homicides and suicides.  Suicide attempts are often impulsive, singular

episodes that involve little planning.  Many studies suggest that most suicide survivors

contemplated their actions for only a brief time before making a suicide attempt.[12]  Research on

the impact of waiting period laws demonstrates that they are associated with reduced rates of

firearm suicide.  By one estimation, waiting period laws may reduce firearm suicide rates by 7–

---

[11] 13 V.S.A. § 4019a(a).

[12] Eberhard A. Deisenhammer, et al., "The Duration of the Suicidal Process: How Much Time is Left for
Intervention Between Consideration and Accomplishment of a Suicide Attempt?," The Journal of Clinical
Psychiatry 70, no. 1 (2008); T. R. Simon, et al., "Characteristics of Impulsive Suicide Attempts and Attempters,"
Suicide and Life-Threatening Behavior 32 no. 1 (Suppl.) (2001): 49–59; Catherine W. Barber and Matthew J.
Miller, "Reducing a Suicidal Person's Access to Lethal Means of Suicide: A Research Agenda," American Journal
of Preventive Medicine 47, no. 3 (2014): S264–S272. See also, Harvard T.H. Chan School of Public Health, Means
Matter, "Impulsivity and Crises," http://www.hsph.harvard.edu/means-matter/means-matter/impulsivity.

11% (a percentage that translates to a significant number of saved lives of actual people whose untimely deaths would otherwise deeply affect their family, friends, and loved ones).[13]

Similarly, studies suggest that some of the factors that incite violence against others, such as anger and rage, can be short-lived.[14]  A study relied upon by the Vermont General Assembly in enacting Act 45 found "that waiting period laws that delay the purchase of firearms by a few days can reduce gun homicides by roughly 17 percent."[15]  Courts should override this type of life-saving legislative judgment only if there is a clear, constitutionally based need to do so.  *Cf. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538, 132 (2012) ("Proper respect for a coordinate branch of the government requires that we strike down an Act of Congress only if the lack of constitutional authority to pass the act in question is clearly demonstrated." (quotations omitted)).

As noted, the dangers of spontaneous gun purchases are far from hypothetical.  A sponsor of the bill, Rep. Alyssa Black (D-Essex), advocated for Vermont's waiting period law after losing her 23-year-old son, who "bought a gun and fatally shot himself just hours later."[16]  By enacting a 72-hour waiting period, Vermont's legislature appropriately exercised its traditional police powers to protect public health and safety.  *See Bruen*, 597 U.S. at 80-81 (Kavanaugh, J., concurring); s*ee also Or. Firearms Fed'n, Inc. v. Brown*, 644 F.Supp.3d 782, 806 (D. Or. 2022) (hereinafter *Brown*).

---

[13] Michael Luca, Deepak Malhotra, and Christopher Poliquin, "Handgun Waiting Periods Reduce Gun Deaths," Proceedings of the National Academy of Sciences 114, no. 46 (2017): 12162–12165.

[14] J. Davidson, K. R. Scherer, and H. H. Goldsmith, "The Role of Affect in Decision Making," Handbook of Affective Sciences (2003): 619–642.  *See also, e.g.,* David Card and Gordon B. Dahl, "Family Violence and Football: The Effect of Unexpected Emotional Cues on Violent Behavior," The Quarterly Journal of Economics 126, no. 1 (2011): 103–143.

[15] 2023 Vt. Acts & Resolves No. 45, General Assembly findings.

[16] Derek Brouwer, *Gun Group Sues Over Vermont's New Waiting-Period Law*, Seven Days (December 18, 2023), https://www.sevendaysvt.com/news/gun-group-sues-over-vermonts-new-waiting-period-law-39739968 (last visited Feb. 27, 2024).

## II.  VERMONT'S LCM REGULATION IS A "REASONABLE, WELL-DEFINED" RESTRICTION ON THE MANNER OF CARRYING ARMS CONSISTENT WITH THE SECOND AMENDMENT.

### a.  Vermont's LCM Regulation Is Analogous To Historical Firearms Restrictions That Did Not Burden The Right Of Armed Self-Defense.

From the Founding Era to the Reconstruction era, and onwards into the twentieth and twenty-first centuries, states have enacted restrictions on where arms may be brought, what arms may be possessed, and the manner in which arms may be carried.  These laws included restrictions on carrying firearms into sensitive places, limitations on the type of arms individuals could lawfully possess, and prohibitions on the concealed carry of arms.

Vermont's LCM regulation does not prevent armed self-defense (*see* Part II, *infra*) but rather imposes restrictions "relevantly similar" to those imposed by historical laws regulating firearms.  For example:

**1. Sensitive places.**  Colonial Philadelphia, New York, and Boston prohibited the discharge of firearms within their cities.[17]  By the time of the Fourteenth Amendment's ratification in 1868, states such as Virginia and Delaware had passed regulations on the discharge of firearms in sensitive or crowded public places.[18]  Courts consistently upheld these regulations on the carrying or discharge of firearms in sensitive places, reasoning that such laws did not impinge on the right of armed self-defense.  *See, e.g., Hill v. State*, 53 Ga. 472, 477-79 (1874) (finding that carrying arms to sensitive places was simply not necessary for the right to "use [arms] as to become familiar with that use," but did risk impinging on the "constitutional

---

[17] *See* Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 162–63 (2007).
[18] *See* Act of Jan. 30, 1847, ch. 79, 1846–47 Va. Acts 67; Act of Feb. 4, 1812, ch. 195, 1812 Del. Sess. Laws 522, 522–24.

duties of the legislature" to ensure "[t]he preservation of the public peace, and the protection of the people against violence.").

    **2. Excessively dangerous weapons.**  States have also historically regulated weapons deemed excessively dangerous, and courts have consistently upheld these laws, reasoning that such arms are not necessary for self-defense.  For example, the North Carolina Supreme Court wrote in 1824 that arming oneself with "dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people," is "an offence at common law, and is strictly prohibited by statute."  *State v. Langford*, 10 N.C. 381, 383–84 (1824); *see also O'Neill v. State*, 16 Ala. 65, 67 (1849) (noting that persons arming themselves with "deadly or unusual weapons for the purpose of an affray . . . may be guilty of this offence, without coming to actual blows").

    During Reconstruction in 1871, the Tennessee Supreme Court in *Andrews v. State* upheld the constitutionality of a statute making it unlawful "for any person to publicly or privately carry a dirk, swordcane, Spanish stiletto, belt or pocket pistol or revolver." 50 Tenn. 165, 171, 186 (1871).  The court reasoned that the banned weapons were not needed for self-defense: "[a]dmitting the right of self-defense in its broadest sense, still on sound principle every good citizen is bound to yield his preference as to the means to be used, to the demands of the public good." *Id.* at 188–89.

    **3. Concealed carry.**  States across the country have regulated the concealed carry of firearms for more than two centuries, and courts have repeatedly upheld these laws.  *See, e.g.*, *State v. Mitchell*, 3 Blackf. 229, 229 (Ind. 1833) (upholding Indiana's concealed carry law against a Second Amendment challenge); *Ex parte Thomas*, 97 P. 260, 265 (Okla. 1908) (upholding a state concealed carry law against a state constitutional challenge).

**b. Vermont's Regulation Is "Relevantly Similar" To Historical Laws Restricting Weapons Capable Of Firing Repeatedly Without Reloading.**

Vermont's regulation is also consistent with nearly a century of state firearms laws, including laws from Vermont, restricting weapons capable of firing repeatedly without reloading.[19, 20]  In 1923, Vermont banned hunters from using a "machine gun of any kind or description, *or an automatic rifle of military type with a magazine capacity of over six cartridges."*  1923 Vt. Acts and Resolves 130 (emphasis added).  The bill's initial language did not contain this final clause, which was added on the Senate's recommendation.  *See* Journal of the Senate of the State of Vermont, 202-03 (1923).  By adding this clause, the Legislature ensured that the law would specifically regulate the magazine capacity of military-style automatic rifles.  This law remains in effect in a slightly amended form at 10 V.S.A. § 4704.

Other Vermont laws illustrate the Legislature's history of responding to new dangers posed by advancements in firearms and firearms accessory technology.  In 1912, the Vermont Legislature enacted a ban on gun silencers.  1912 Vt. Acts and Resolves No. 237 (this law remains in effect in amended form at 13 V.S.A. § 4010).  Similarly, the Vermont Legislature has regulated the sale and possession of firearms by minors since 1896.  *See* 1896 Vt. Acts &

---

[19] *See* Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 68–71 (2017).

[20] As *Bruen* acknowledged, "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868."  597 U.S. at 27.  Unlike the handgun regulations addressed in *Bruen* and *Heller*, for which the Supreme Court looked to historical antecedents limiting the right of armed self-defense, a "more nuanced approach" is required when evaluating firearms restrictions on technology that did not exist before 1791 or 1868.  *Id.*  These laws do not date back to the Founding Era or the Civil War, but for good reason: weapons capable of firing repeatedly without reloading were not in widespread circulation until *after* the ratification of the Fourteenth Amendment in 1868 and *long after* the ratification of the Second Amendment in 1791.  *See, e.g.*, *Brown*, 644 F.Supp.3d at 803 ("Defendants have proffered evidence that large-capacity magazines represent the kind of dramatic technological change envisioned by the *Bruen* Court.");  *Ocean State Tactical, LLC v. Rhode Island*, No. 1:22-cv-00246 (D.R.I. Oct. 14, 2022) ("Rifles holding more than 10 rounds made up a tiny fraction of all firearms in the United States during Reconstruction. Furthermore . . . legal possession . . . was limited almost exclusively to U.S. soldiers and civilian law enforcement officers.").

Resolves No. 111; *see also* 1904 Vt. Acts & Resolves No. 152, § 1. These restrictions remain in effect in a slightly amended form at 13 V.S.A. §§ 4007-4008.

A 1927 Rhode Island law prohibited "any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading."[21] That same year, Michigan passed a law prohibiting any firearm that fired more than sixteen times without reloading.[22] In 1933, Ohio outlawed any firearm that "shoots automatically, or any firearm which shoots more than eighteen shots semi-automatically without reloading," and South Dakota banned firearms "from which more than five shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine."[23] In total, between 1927 and 1934, at least seven states and as many as ten restricted access to certain weapons capable of firing repeatedly without reloading.[24]

These laws demonstrate a clear history and tradition dating back to the Founding Era and Reconstruction of regulations on particular types of firearms and firearm accessories.

### 1. Firearms Capable Of Firing Repeatedly Without Reloading Were Not Broadly Available Until After Enactment Of The Fourteenth Amendment.

During the Founding Era, civilians did not have widespread access to firearms capable of firing more than ten rounds without reloading. Although "experimental prototypes" existed, it took decades for the technology to develop enough for these weapons to be practicable for civilian use. For example, the Girandoni air rifle used a wagon-mounted pump filled with water

---

[21] Act of Apr. 22, 1927, ch. 1052, 1927 R.I. Pub. Laws 256, §§ 1, 4.
[22] *Id.*
[23] Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189, 189, § 12819-3; Act of Feb. 28, 1933, ch. 206, 1933 S.D. Sess. Laws 245, 245, § 1.
[24] *See* Spitzer, *supra* note 19, at 68, 70–71 (collecting laws).

to sustain the pressure needed to operate the rifle.[25]  Without the pump, the weapon took nearly

1,500 manual hand pumps to restore power.[26]  Moreover, the weapon was delicate, would

frequently malfunction, and faced significant manufacturing difficulties.[27]  Only 1,500 or so

were ever built.[28]  Other prototypes were similarly limited in availability and application:

1. ***Jennings Multi-Shot Flintlock Rifle* (1821)**: Just 521 of these multi-shot firearms were produced for use by the New York militia, and the weapon was considered to be "anything but a common firearm."[29] The Jennings flintlock rifle most frequently allowed for just four shots to be fired without reloading, and manual manipulation was required between each shot.[30]

2. ***"Pepperbox" Pistols*  (1830s)**: The most common "pepperbox" pistols could fire just five or six rounds without reloading.[31]  Although a Belgian pepperbox pistol with 24 different barrels was manufactured, it was "monstrously unwield[y]."[32] The weapon was also notorious because of its shortcomings: its accuracy did not extend "much beyond the width of a poker table"[33]; its firing power was extremely modest[34]; and it was so unreliable that at times all of its barrels would fire simultaneously (known as "chain-firing").[35]

3. ***Bennett and Havilland Rifle* (1838)**[36]: The Bennett & Havilland rifle was known to be as "safe as juggling chainsaws," and the weapon's design was "inherently unsafe" because it could cause chain-firing that could result in severe injury or death for the gunman.[37]  As a result, "very few of these rifles were actually produced, with experts

---

[25] John Paul Jarvis, *The Girandoni Air Rifle: Deadly Under Pressure*, Guns.com (March 15, 2011), https://perma.cc/57AB-X2BE.

[26] *Id.*

[27] *Girandoni Air Rifle*, Fandom: Military Wiki, https://perma.cc/4RFA-Q9BK (last visited Feb. 28, 2024).

[28] Mike Markowitz, *The Girandoni Air Rifle: A Weapon Ahead of Its Time?* Defense Media Network (May 14, 2013), https://perma.cc/5F8G-UZAR.

[29] Rock Island Auction Co*., Repeating Flintlock Rifles?!?*, YouTube (Sept. 7, 2021), https://www.youtube.com/watch?v=0FkW-CSTCwo.

[30] *Id.*

[31] Charles Worman, *The Iconic Pepperbox Revolving Pistol*, J. Antiques & Collectibles, https://perma.cc/E3K8-W3LH (last visited Feb. 28, 2024).

[32] *Wheelgun Wednesday: A Closer Look at Pepperbox Pistols*, The Firearm Blog (Dec. 8, 2021), https://perma.cc/2Z2U-RJ62; Worman, *supra* note 31.

[33] Worman, *supra* note 31.

[34] Danielle Hollembaek, *The Pepperbox Pistol*, Rock Island Auction Co. (Jan. 16, 2019), https://perma.cc/2ERY-26CX.

[35] *Id.*

[36] This rifle was patented in 1838.  *See* Jarvis *supra* note 25.

[37] *Id.*

2035d5e383a6c0ac

saying that less than ten were ever made."[38]

4. **_Pin-Fire Revolvers_ (1850s)**: Pin-fire revolvers most commonly had a capacity of five or six rounds.[39] Although pin-fire revolvers capable of holding as many as 20 rounds did exist, they were "extraordinarily large and unwieldy."[40] The pin-fire revolver "was not a success" in the United States, in part because "accidental discharge of the cartridges before being loaded into the weapon became a serious problem."[41]

5. **_Rifle Invented by Alexander Hall_ (mid-1850s)**[42]: There is very little publicly available information about this rifle, but collectors have stated that they are "extremely scarce."[43] Like the Bennett and Havilland Rifle, the rifle had a "giant flaw" in that the weapon could chain-fire, creating a risk of severe injury to the shooter.[44]

6. **_Rifle Invented by Colonel Perry W. Porter_ (1851)**[45]: This rifle was known to be "unsafe in any direction" because it had a risk of chain-firing that could cause rounds to fire in different directions.[46] The rifle had "radial chambers" with at least one chamber pointing back at the shooter, creating a risk of self-harm.[47] In an era when firearms could chain-fire without warning, "the notion of having a loaded chamber pointing at your face was less than appealing to most people."[48] Only approximately 1,250 Porter rifles were ever produced.[49]

7. **_Ferris Wheel Pistol by Joseph Enouy_ (1855)**: There are very few records on this pistol but it appears to have been a rare weapon with which few Americans would have been familiar. Most photographs of this gun depict only one manufactured

---

[38] _Bennett & Havilland Revolving Rifle_, Fandom: Military Wiki, https://perma.cc/D68U-MSGU (last visited Feb. 28, 2024).

[39] Rare 20-Shot Lefaucheux "_High Capacity" Pin Fire Revolver, College Hill Arsenal_", https://perma.cc/TNY6-8PTL (last visited Feb. 28, 2024).

[40] _Id._

[41] _Original U.S. Civil War French M1854 Lefaucheux Cavalry Model 12mm Pinfire Revolver with Round_, Int'l Military Antiques, https://perma.cc/58KW-PHS7 (last visited Feb. 28, 2024).

[42] This rifle was manufactured in the mid-1850s. _See Lot 1099. Very Rare Hall 15 Round Percussion Revolving Rifle_, Rock Island Auction Co., https://perma.cc/43X5-EKSG (last visited Feb. 28, 2024).

[43] _Rare Alexander Hall Percussion Revolving Rifle_, Cowan's, https://perma.cc/T4F3-49KM (last visited Feb. 28, 2024); see also _Lot 1099. Very Rare Hall 15 Round Percussion Revolving Rifle, supra_ note 42.

[44] _POTD: Very Rare Hall 15 Round Percussion Revolving Rifle_, All Outdoor (June 18, 2021), https://perma.cc/39V8-75RR (last visited Feb. 28, 2024).

[45] This rifle was patented in 1851. Forgotten Weapons, _Porter Turret Rifle (2nd Variation) – Unsafe in Any Direction,_ YouTube (March 7, 2018), https://www.youtube.com/watch?v=Wm_1Ny6r6zg.

[46] _Id._

[47] Ian McCollum, _RIA: Porter Turret Rifle, Forgotten Weapons_ (Feb. 7, 2016), https://perma.cc/N5J5-R93H.

[48] _Id._

[49] _Porter Turret Rifle, Forgotten Weapons supra_ note 45.

product, which was held in an English collection before it was sent to Egypt.[50]

8. **_Volcanic Rifle_ (1855)**: The Volcanic Rifle was "[u]npopular because of its unreliability" as "it suffered from design defects including gas discharge around the breech and misfires."[51]  According to one expert, "[t]here weren't a lot of these weapons made."[52]  The rifle was ineffective for self-defense because it was "grossly underpowered" and did not fire with enough force to be a "man stopper."[53]

9. **_Henry Lever Action Rifle_ (1862)**: Although the Henry rifle featured technological advances, "it also had some issues that hindered its rapid acceptance in the marketplace."[54]  The rifle was "underpowered for a military firearm"; the "open magazine bottom under the barrel could easily become fouled"; the rifle's design could make it difficult to operate and aim; the rifle was prone to becoming jammed; the barrel became hot with repeated firing; the firing pins were fragile and could break, rendering the firearm inoperable; and the frame was prone to damage, causing the cartridges not to feed into the rifle.[55]  Just 14,000 Henry rifles were manufactured by 1866, and the weapon saw only limited use during the Civil War.[56]  After the Civil War, the Henry company ceased production of the Henry rifle.[57]

10. **_Josselyn Belt-Fed Chain Pistol_ (1866)**: The Josselyn belt-fed pistol featured an "odd" design consisting of a loop of chambers linked together in a chain.[58]  The design caused it to "fail[] to make it commercially,"[59] "possibly because of the inconvenience of carrying one around."[60]  In addition, the design likely meant that "bringing the chain's next chamber into position isn't a rapid endeavour."[61]  As one commentator quipped: "It is relatively easy to imagine what embarrassment might be experienced by a man who, in defense of his person, is required to extract from his

---

[50] Decl. of Brennan Rivas at 23, *Wiese et al. v. Bonta et al.*, Docket No. 2:17-cv-00903 (E.D. Cal. filed April 28, 2017), ECF No. 135-14 (Decl. dated July 10, 2023).

[51] John Sammon, *The Case for Caselessness. The Volcanic Rifle*, Guns.com (April 19, 2011), https://perma.cc/462K-M6TA.

[52] *Id.*

[53] *Volcanic Rifles & Pistols*, Winchester Arms Collectors Ass'n, https://perma.cc/52FB-2PCF (last visited Feb. 28, 2024).

[54] *1st DC Cavalry Martial Henry Rifle*, College Hill Arsenal, https://perma.cc/LFP3-AVDY (last visited Feb. 28, 2024).

[55] *Id.*

[56] Dan Alex, *Henry Model 1860. Lever-Action Repeating Rifle*, Military Factory, https://perma.cc/N47S-7PKR (last edited Feb. 4, 2022).

[57] *1860 Henry Repeating Rifle*, Fandom: Deadliest Warrior Wiki, https://perma.cc/H9YW-SZHG (last visited Feb. 28, 2024).

[58] *Josselyn Revolver—Patent Protype*, FLicense Blog (Sept. 23, 2014), https://perma.cc/8CRB-7XH7.

[59] *Id.*

[60] *Chain Guns—I*, Firearms History, Technology & Development Blog (July 23, 2014), https://perma.cc/MT7P-JP5L.

[61] *Old West firearms—Weapons Locker (Part #3)*, writeups.org, https://perma.cc/RHY4-7GX4 (last visited Feb. 28, 2024).

pocket a gun with a foot or so of loose chain attached."[62]  The weapon's shortcomings led it to become a "mechanical curiosity," and it does not "appear to have been produced in significant quantities."[63]

11. **_Winchester Repeating Rifle_ (1866)**: The Winchester rifle represented a "serious leap forward in firearms capability," but it still suffered from significant limitations.[64]  The rifle's exposed magazine was open to dirt and debris, which could lead to jamming, and the barrel could become dangerously hot after firing.[65]  The Winchester rifle also suffered from "poor accuracy at longer ranges" and was very heavy when fully loaded.[66]  Professor David B. Kopel, described the Winchester as the first rifle with more than ten rounds of ammunition to achieve "mass-market success in the United States."[67]  However, sales of the Winchester almost entirely postdated the ratification of the Fourteenth Amendment in 1868.  The first deliveries of the Winchester rifle were not made until 1867, and the model sold just 4,500 firearms worldwide in its first five months on the civilian market.[68]

> ## 2. *Because They Represent A Technological Change, Modern Firearms Capable Of Firing Repeatedly Without Reloading Require A "More Nuanced Approach" Under Bruen That Cannot Rely Solely On Historical Antecedents Pre-Dating The Fourteenth Amendment.*

Modern firearms capable of firing repeatedly without reloading bear little resemblance to their historical predecessors.  At the time of the Founding, the typical Revolutionary-era musket (i) could hold just one round at a time, (ii) could fire no more than three rounds per minute (and even then only when worked by a well-trained and experienced shooter), (iii) had a maximum accurate range of 55 yards, and (iv) had a muzzle velocity of approximately 1,000 feet per second.[69]  By contrast, a typical modern AR-15 (i) can hold 30 or 100 or even more rounds (at

---

[62] *Revolver - Invented by Samuel Colt*, Edubilla, https://perma.cc/4AS9-PQ5U (last visited Feb. 28, 2024).

[63] *Old West Firearms*—Weapons Locker, *supra* note 61.

[64] Ian McCollum, *Winchester Lever Action Development: Model 1866,* Forgotten Weapons (June 7, 2017), https://perma.cc/2LMH-CQK5.

[65] Ryan Hodges, *The 1866 Rifle*, Taylor's & Company (Aug. 26, 2020), https://perma.cc/7STW-8WMS.

[66] *Why Britain Didn't Adopt the Winchester 1866*, The Armourer's Bench, https://perma.cc/PRY3-YHSN (last visited Feb. 28, 2024).

[67] David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 88 Alb. L. Rev. 849 (2015).

[68] Winchester *1866 Prototype Musket*, The Armourer's Bench, https://perma.cc/PB83-TSM4 (last visited Feb. 28, 2024).

[69] Christopher Ingraham, *What 'Arms' Looked Like When the 2nd Amendment Was Written*, Wash. Post (June 13, 2016), https://perma.cc/H6X5-C2NL.

least 30 times more than a typical Revolutionary-era musket), (ii) can fire approximately 45 rounds per minute (15 times more), (iii) can shoot accurately from approximately 600 yards (11 times further), and (iv) attains a muzzle velocity of over 3,000 feet per second (3 times faster).[70]

Although firearms technology had improved by the Civil War, even the most advanced firearms of the era were a far cry from the modern AR-15. For example, the Winchester Model 1866, discussed *supra*, had a maximum effective range of approximately 100 yards (about one-sixth of an AR-15) and had a muzzle velocity of just 1,100 feet per second (roughly one-third of an AR-15).[71] Modern LCMs, coupled with advances in firearm technology, pose a risk of far greater carnage than could even be contemplated during the Founding Era or the nineteenth century. Indeed, as of July 2020, LCMs were used in the ten deadliest mass shootings of the prior decade, and mass shootings from 1990 to 2017 involving LCMs resulted in a 62 percent higher death toll compared to those that did not involve an LCM.[72]

### c. Vermont's LCM Regulation Is "Reasonable" And "Well-Defined" Because It Does Not Burden An Individual Right To Self-Defense.

Empirical evidence supported Vermont's LCM ban. First, a weapon equipped with a large-capacity magazine "is almost never used for self-defense." *State v. Misch*, 2021 VT 10, ¶ 84, 214 Vt. 309, 356, 256 A.3d 519, 552. Data collected by the NRA itself demonstrates that "[t]he average number of shots fired in self-defense between 1997 and 2001, and 2011 to 2013, has been estimated to be 2.2 or fewer." *Id.* As established by Defendant's expert Dr. Allen, this figure has remained remarkably stable. Decl. of Lucy P. Allen ¶ 18 (ECF No. 24-2) (estimating 2.34 shots per incident based on a review of news stories through 2011 to 2017).

---

[70] *Id.*

[71] Dan Alex, *Winchester Model 1866 Lever-Action Repeating Rifle*, Military Factory (March 12, 2019), https://perma.cc/4ZJA-5V4M.

[72] *Large Capacity Magazines*, Giffords Law Ctr., https://perma.cc/X84S-97DT (last visited Feb. 28, 2024).

Numerous federal and state courts have similarly found no evidence that firing more than ten bullets without the need to reload is necessary for self-defense.  For example, in 2021, the Ninth Circuit concluded that "[t]he use of more than ten bullets in defense of the home is '**rare**,' or **non-existent**," and that the record in that case, "as in other cases," offered no indication that "the added benefit of a large-capacity magazine—being able to fire more than ten bullets in rapid succession— has **ever** been realized in self-defense in the home."  *Duncan v. Bonta*, 19 F.4th 1087, 1104–05 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895, and *vacated and remanded on other grounds*, *49 F.4th 1228 (9th Cir. 2022)* (citations omitted) (first two emphases added).

In 2019, the First Circuit found that "not one of the plaintiffs or their six experts could identify *even a single example of* . . . a self-defense episode in which ten or more shots were fired."  *Worman v. Healey*, 922 F.3d 26, 37 (1st Cir. 2019), *abrogated on other grounds by Bruen*.  And the Colorado Supreme Court similarly concluded, based on trial testimony, "that [i]n no case had a person fired even five shots in self-defense, let alone ten, fifteen, or more." *Rocky Mountain Gun Owners v. Polis*, 467 P.3d 314, 331 (Colo. 2020) (quotation omitted); *see also ANJRPC*, 910 F.3d at 121 n.25 ("The record reflects that most homeowners only use two to three rounds of ammunition in self-defense."); *Kolbe v. O'Malley*, 42 F. Supp. 3d 768, 787 (D. Md. 2014) *aff'd in part, vacated in part, remanded sub nom. Kolbe v. Hogan*, 813 F.3d 160 (4th Cir. 2016), *on reh'g en banc*, 849 F.3d 114 (4th Cir. 2017), *and aff'd*, 849 F.3d 114 (4th Cir. 2017) ("Maryland law enforcement officials are unaware of any Marylander . . . needing to fire more than ten rounds, to protect himself.").

Post-*Bruen*, courts have continued to find that LCMs are not covered by the Second Amendment because they are not, in fact, used for self-defense—including by crediting the

testimony of one of Defendants' experts, Dr. Lucy Allen.  *See Kotek*, 2023 WL 4541027, at *32 (crediting Dr. Allen's testimony and finding that "it is extremely rare for an individual to fire more than ten rounds in self-defense."); *Hanson*, 2023 WL 3019777 at *10-12  (same); *see also Ocean State Tactical*, 646 F. Supp. 3d at 388 (finding "simply no credible evidence…that LCMs are weapons of self-defense").

These findings are consistent with prior testimony and analyses by law enforcement officers that civilians do not need to fire more than ten rounds of ammunition for self-defense. The D.C. Council's Committee on Public Safety and the Judiciary "agree[d]" with the then-D.C. Chief of Police that "magazines holding[] over 10 rounds are more about firepower than self-defense."[73]

Edward Troiano, chief of Rhode Island's Bureau of Criminal Identification and Investigation and former Special Agent for the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), testified in a challenge to Rhode Island's LCM restriction that the "[c]ircumstances where it is necessary to have more than 10 rounds of ammunition without the need to change magazines involve ***limited circumstances applicable to law enforcement***."  Decl. of Edward Troiano ¶¶ 9, 10, *Ocean State Tactical*, 646 F. Supp. 3d 368, No. 1:22-cv-00246 (ECF No. 19-3) (emphasis added) ("I am unaware of ***any incident*** in which a civilian has **ever** fired as many as 10 rounds in self-defense." (emphasis added)).

In a case challenging Maryland's LCM restriction, the then-Baltimore County Police Chief—head of the twentieth-largest police department in the U.S.—testified that he was "***unaware of any self-defense incident***" in Baltimore County or "anywhere else in Maryland" for which "it was necessary to fire as many as 10 rounds in self-defense."  Decl. of James W.

---

[73] D.C. Council Comm. on Public Safety & the Judiciary, *Report on Bill 17–843, "Firearms Registration Amendment Act of 2008*," at 9 (Nov. 25, 2008), https://perma.cc/YN6H-2U9M.

Johnson ¶¶ 2, 30, 31, *Kolbe*, 42 F. Supp. 3d 768, No. 1:13-cv-02841 (ECF No. 44-3) (filed Feb. 14, 2014) (emphasis added).  And in a case challenging an Illinois municipal ordinance regulating firearms capable of accepting more than ten rounds of ammunition, former longtime ATF official Mark D. Jones testified that "the ammunition capacity of a standard revolver (6 cartridges) would satisfy one's self defense needs most of the time and a semi-automatic pistol with a 10 round capacity magazine even more so."[74]

Even advocates of the permissive use of firearms have acknowledged that the ability to fire more than ten rounds of ammunition without reloading is not necessary for any defensive purpose.  A blog post for ammunitions retailer Lucky Gunner stated that in the "very rare instances . . . [that involved] round counts in the low double digits," the suspect was generally "disabled after the first couple of shots."[75]  Firearms training officer Greg Ellifritz similarly found that "[a]ll the common defensive calibers required around 2 rounds on average to incapacitate," and that "in the majority of shootings, the person shot merely gives up without being truly incapacitated by the bullet."[76]  Another advocate concluded that, in 98 percent of defensive gun use cases, "people simply brandish weapons to stop attacks."[77]

The available evidence demonstrates that more than ten rounds are unnecessary for lawful armed self-defense.

---

[74] Decl. of Mark D. Jones ¶ 40, *Friedman v. City of Highland Park*, 68 F. Supp. 3d 895 (N.D. Ill. 2014), *aff'd*, 784 F.3d 406 (7th Cir. 2015), No. 13-cv-9073 (ECF No. 22-1, Ex. C) (filed Feb. 7, 2014).

[75] Chris Baker, *How Much Ammo Capacity Is Enough*, Lucky Gunner: Lounge (Sept. 2, 2016), https://perma.cc/9UYC-7ZZC.

[76] Greg Ellifritz, *An Alternate Look at Handgun Stopping Power*, Buckeye Firearms Association (July 8, 2011), https://perma.cc/7AW4-EXJV.

[77] Tim Lambert, *Statements by John R. Lott, Jr. on Defensive Gun Brandishing*, ScienceBlogs (Oct. 17, 2002), https://perma.cc/65PN-YMA4.

### d.  LCMs' Unjustifiable Threat To Public Health And Safety Demonstrates That The Vermont Regulation Is Indeed Constitutional.

LCMs allow shooters to kill more people and thus pose an unjustifiable threat to public health and safety.  When Governor Phil Scott signed the LCM ban, Vermont joined several state and local governments across the country that have saved lives by banning LCMs.[78]  LCMs are repeatedly and predictably used in mass shootings and attacks on law enforcement officers because they allow shooters to repeatedly fire bullets without pausing.  Shooters use LCMs to kill and wound more people—more parents, teachers, police officers, students, and children—far faster than they otherwise could with a single weapon.

*Bruen* does not prevent legislatures from exercising their traditional police powers to pass commonsense gun laws, like Vermont's waiting period and LCM ban, to protect public health and safety.  *See Bruen*, 597 U.S. at 79-81 (Kavanaugh, J., concurring) (properly interpreting the Second Amendment as allowing a "variety" of gun regulation including prohibitions on the possession of firearms by felons and the mentally ill).  *See also Brown*, 644 F.Supp.3d at 806 ("[T]his Court finds that [under *Bruen*] it may consider the public safety concerns of today.").

LCMs are intended for military-style assaults.  With LCMs, a shooter can fire more bullets without pausing to reload, inflicting mass casualties in an extremely short timeframe using a single weapon.  A review of mass shootings involving a firearm equipped with an LCM resulted in nearly 10 times as many total casualties.[79]  The horrific nature of mass shootings

---

[78] *See* Cal. Penal Code §§ 16740, 32310 (West 2015); Colo. Rev. Stat. Ann. §§ 18-12-301(2), 18-12-302 (West 2013); Conn. Gen. Stat. Ann. §§ 53- 202w(a)(1), 53-202w(b) (West 2013); D.C. Code Ann. § 7-2506.01(b) (West 2012); Haw. Rev. Stat. Ann. §§ 134-1, 134-4, 134-8(c) (West 2013); Md. Code Ann., Crim. Law §§ 4-306(b)(1) (West 2013); Mass. Gen. Laws Ann. ch. 140, §§ 121, 131M (West 2014); N.J. Stat. Ann. §§ 2C:39-1(y), 2C:39-3(j), 2C:39-9(h) (West 2014); N.Y. Penal Law §§ 265.00(23), 265.02(8), 265.10 (McKinney 2018); R.I. Gen. Laws. §§ 11-47.1-2, 11-47.1-3; 13 V.S.A. § 4021(a); 2021 WA S 5078 (to be codified);Cook Cnty., Ill., Code of Ordinances §§ 54-211 – 54-213; Boulder Revised Code §§ 5-8-2, 5-8-28; S.F. Police Code § 619; Sunnyvale, Cal., Municipal Code § 9.44.050.

[79] Everytown for Gun Safety Support Fund, "*Mass Shootings in the United States*," (March 2023) https://everytownresearch.org/mass-shooting-report.

involving LCMs is now burned into the national consciousness and has irreparably scarred

communities across the country.  In 2023 alone 19 people have died in mass shootings in the

United States where the shooter used large capacity magazines containing more than 10 rounds.[80]

Medical research confirms that mass shootings involving LCMs are deadlier than ever

before.[81]  A research letter in the Journal of the American Medical Association described how,

even as trauma medicine has improved, more patients are dying from gunshots because they

have been shot multiple times, more severely.[82]  Between 2000 and 2013, in one major American

trauma center, the "number of severe [gunshot wounds] per patient increased significantly" and,

as a result, patients were more likely to die from gunshots than they were in the preceding

decade.[83]  Increased gunshot mortality was unique: the trauma center did not observe the same

mortality spike for any other class of traumatic injury, including stabbings, car crashes, and falls

or accidents.[84]  Other hospitals, cities, and states that have analyzed the number of gunshot

wounds per patient have observed the exact same trend: more victims coming in with multiple

bullet wounds, making them more likely to die from their injuries.[85]

Empirical research also documents strong links between LCM use, deadly mass

shootings, and everyday gun crimes.  A 2016 analysis of mass shooting data by Dr. Louis

---

[80] The Violence Policy Center, "*Mass Shootings in the United States Involving Large Capacity Ammunition Magazines*" April 2023,  https://vpc.org/fact_sht/VPCshootinglist.pdf.

[81] *See, e.g.,* Jen Christensen, *Gunshot Wounds Are Deadlier Than Ever As Guns Become Increasingly Powerful*, CNN, (Jun. 14, 2016), http://www.cnn.com/2016/06/14/health/guninjuries-more-deadly/.

[82] *See* A. Sauaia et al., *Fatality and Severity of Firearm Injuries in a Denver Trauma Center*, 2000-2013, 315 JAMA 2465 (Jun. 14, 2016), https://jamanetwork.com/journals/jama/fullarticle/2528198 (noting that in one trauma center, "[f]irearm in-hospital case-fatality rates increased, contrary to every other trauma mechanism, attributable to the rising severity and number of injuries").

[83] *Id.*

[84] *Id.*

[85] *See* J. George, *Shoot to Kill*, Baltimore Sun, (Sep. 30, 2016), http://data.baltimoresun.com/news/shoot-to-kill/ (in Maryland, statewide "the number of victims shot five to nine times doubled" from 2005 to 2015, "as did those shot 10 or more times"); D. Livingston et al., Unrelenting Violence: An Analysis of 6,322 Gunshot Wound Patients at a Level I Trauma Center, 76 J. Trauma Acute Care Surg. 2 (2014) (hospital in Newark, New Jersey saw that the percentage of patients with three or more bullet wounds increased from 10 percent in 2001 to 23 percent in 2011).

Klarevas observed that high-fatality "gun massacres" have become deadlier and more frequent since 1966, reaching unprecedented levels in the past decade.[86]  The analysis concluded that LCM use is the "factor most associated with high death tolls in gun massacres."[87]  A 2017 study by Dr. Christopher Koper similarly found that LCMs are "particularly prominent in public mass shootings and those resulting in the higher casualty counts."[88]

The same study highlighted the role LCMs play in fueling gun crimes generally, finding that after federal magazine restrictions were repealed in 2004, criminals began using large-capacity firearms much more frequently.  Since the repeal, such guns grew as a share of firearms recovered in crime by between 33% and 112% and were disproportionately used in murders of law enforcement officers.[89]  As a result of the increased criminal use of LCMs, some police departments witnessed an uptick in gun fatalities despite fewer shootings, because shooters are firing more rounds during a single shooting.[90]

LCM bans are an evidence-based counter to the epidemic use of large-capacity magazines in mass shootings and crimes.  Between 1994 and 2004, when federal law restricted the sale and possession of LCMs, both the number of large-scale mass shootings and the number of deaths during such shootings fell dramatically.[91]  A 2019 Stanford study found that the federal restrictions were "associated with a 25 percent drop in gun massacres" and "a 40 percent drop in

---

[86] Louis Klarevas, *Rampage Nation: Securing America from Mass Shootings*, 78-79 (2016).

[87] *Id.* at 257; *see also id.* at 215-25.

[88] Christopher S. Koper et al., *Criminal Use of Assault Weapons and High-Capacity Semi-Automatic Firearms: An Updated Examination of Local and National Sources*, 95 J. of Urban Health (Issue 3) 313, 319 (2018).

[89] *Id.* at 313.

[90] Police Executive Research Forum, Guns and Crime: Breaking New Ground By Focusing on the Local Impact 24 (2010), https://www.issuelab.org/resources/14333/14333.pdf (although Newark, New Jersey "made an enormous reduction in shooting incidents," the city saw "an increase of 11 percent in our murder rate, because more rounds are being fired in particular incidents").

[91] *See* Klarevas, *supra* note 86, at 240-243 & n. 40.

fatalities" between 1994 and 2004, compared to the decade before their adoption.[92]  Another study concluded that during the federal ban period, "mass shooting fatalities were 70% less likely to occur."[93]  Unfortunately, when the federal restrictions expired in 2004, deadly largescale shootings spiked once more, and deaths involving LCMs quadrupled.[94]  With all this evidence that LCM access fuels deadly gun rampages, it is not surprising that one Boston University researcher identified LCM bans as the strongest driver of lower mass shooting rates at the state level.  Using data from Stanford University's Mass Shooting Database, which defines a mass shooting as an event with three or more casualties, Dr. Michael Siegel found that state laws prohibiting LCMs correlate with a 63% lower rate of mass shootings.[95]  After considering "many possible socio-demographic factors," Dr. Siegel concluded that whether "a state has a large capacity ammunition magazine ban is the single best predictor of the mass shooting rate in that state.[96]

This research confirms what common sense and real-life experience tell us: When a person intent on killing can keep shooting without pause, more people will be injured and killed. When that shooter has to pause to reload, fewer people will be injured and killed because during that pause the shooter could be disarmed by the victims, or victims could escape to safety.  There are numerous, powerful examples illustrating the importance of this momentary pause to reload:

---

[92] John Donohue and Theodora Boulouta, *That Assault Weapon Ban? It Really Did Work*, N.Y. Times, (Sept. 4, 2019), https://www.nytimes.com/2019/09/04/opinion/assaultweapon-ban.html.
[93] Charles DiMaggio et al., *Changes in US Mass Shooting Deaths Associated with the 1994-2004 Federal Assault Weapons Ban: Analysis of Open-Source Data*, 86 Trauma Acute Car Surg. No. 1 11, 14 (2018).
[94] Klarevas, *supra* note 86, at 350 n.40.
[95] Sam Petulla, *Here is 1 Correlation Between State Gun Laws and Mass Shootings*, CNN, (Oct. 5, 2017), https://www.cnn.com/2017/10/05/politics/gun-laws-magazines-lasvegas/index.html.
[96] *Id.*

- When the Parkland shooter (who used 30- and 40-round LCMs) paused to reload, eight students were able to escape and survive the shooting.[97]
- During the mass shooting in Thousand Oaks, California (where the shooter used an LCM), rescuers were able to pull people through windows to safety as the shooter paused to reload.[98]
- When the Sandy Hook shooter (who used 30-round LCMs) stopped to reload, nine children were able to flee to safety.[99]

In April 2023, a 20-year-old student from Middlesex, Vermont was arrested on charges related to an alleged threat at his college in Minnesota where prosecutors said he was planning to carry out a "mass casualty event."[100]  Among other evidence leading to the arrest was the discovery of high-capacity magazine packages and packages bearing the individual's name in a garbage can located outside a dorm.[101]

In February 2018, a young man in Vermont named Jack Sawyer was arrested and charged in connection with his detailed plan for a mass shooting at Fair Haven Union High School. Sawyer's "Journal of an Active Shooter" described his extensive plan for a catastrophic shooting at his former school.  Sawyer planned to "beat the highest casualty count of all the other school shootings," in part by using ammunition that "would cause greater casualties and injuries."[102]

---

[97] Marjory Stoneman Douglas High School Public Safety Commission Report, Fl. Dep't of Law Enforcement, at 32 (Jan. 2, 2019), available at http://www.fdle.state.fl.us/MSDHS/CommissionReport.pdf; see also id. at 262 ("Eight 30- and 40-round capacity magazines were recovered from the scene.")

[98] See Veronica Miracle, *Thousand Oaks Mass Shooting Survivor: "I Heard Somebody Yell, 'He's Reloading*,'" ABC News, (Nov. 8, 2018), https://abc7.com/thousand-oaks-survivori-heard-somebody-yell-hes-reloading/4649166/.

[99] Final Report, Sandy Hook Advisory Commission, at 12 (Mar. 6, 2015), available at http://www.shac.ct.gov/SHAC_Final_Report_3-6-2015.pdf.

[100] Patrick Crowley, *Student from Vermont arrested in Minnesota for allegedly planning to attack school*, Valley News, https://www.vnews.com/Student-from-Vermont-arrested-in-Minnesota-for-allegedly-planning-to-attack-school-50610712 (last visited Feb. 28, 2024)

[101] Carla Occaso, *Police Arrest Former Rumney,U-32 Student in Minnesota Potential Alleged 'Full Scale Attack' Thwarted by Custodial Police*, the bridge, https://montpelierbridge.org/2023/04/police-arrest-former-rumneyu-32-student-in-minnesota/ (last visited Feb. 28, 2024)

[102] Charging Document, *State v. Sawyer*, Docket No. 142-2-18 Rdcr (Sup. Ct. Rutland Unit, Feb. 16, 2008), https://www.documentcloud.org/documents/4380795-Jack-SawyerCharging-Document.html#document/p3.  The court subsequently held that Sawyer's preparations were not sufficient to constitute "attempt" to cause bodily injury with a deadly weapon or attempted murder.

Sawyer's planned shooting was not an isolated incident in Vermont's recent past.  In August 2005, state police arrested Christopher Greene in Brattleboro, Vermont, thwarting a potentially devastating attack. Police found handwritten notes in Greene's car outlining a planned attack on Greene's former school in Connecticut, including diagrams depicting the school from both the side and back doors alongside the note "Heads: 3. Shoulders: 3. 2 Teachers. 2 to the legs."[103]  His detailed notes outlined an apparent plot to escape to Brattleboro, cause a traffic back up, and shoot drivers in the head on Interstate 91.[104]  Along with the notes, police found a receipt for the purchase of the Ruger Mini-14 .223 assault rifle and a loaded magazine for the rifle.[105]

Following the averted mass shooting in Fair Haven, Vermont citizens mobilized in support of gun safety regulations.[106]  Acknowledging how close Vermont had come to suffering the latest school massacre, Governor Scott unveiled an action plan urging the Legislature to pass multiple gun safety measures, including magazine capacity restrictions.[107]  Ultimately, Act 94, Vermont's comprehensive gun safety bill was signed into law, reflecting the broad desire to reduce the risk of high-fatality shootings in Vermont.[108]  Indeed, the Vermont Supreme Court has

---

[103] Memorandum and Exs. in Support of Government's Mot. for Detention, *U.S. v. Greene*, Docket No. 2:06-CR-22 (D. Vt. filed April 10, 2006), http://lawcenter.giffords.org/wpcontent/uploads/2018/07/US-v.-Greene-ECF-14.pdf; http://lawcenter.giffords.org/us-vgreene-ecf-14-1/; http://lawcenter.giffords.org/us-v-greene-ecf-14-2/.

[104] John Holl, *New Jersey Man is Accused of Plotting Attack in Vermont*, N.Y. Times, (July 15, 2005), https://www.nytimes.com/2005/07/15/nyregion/new-jersey-man-is-accusedof-plotting-attack-in-vermont.html.

[105] Sentencing Mem. of the U.S. and Mot. for Upward Departure 1-2, *U.S. v. Greene*, Docket No. 2:06-CR-22 (D. Vt. filed Mar. 12, 2008), http://lawcenter.giffords.org/wpcontent/uploads/2018/07/US-v.-Greene-ECF-54.pdf.

[106] *See, e.g.*, J. Walters, *Thousands Attend March for Our Lives Rally in Montpelier*, Seven Days, (Mar. 24, 2018), https://www.sevendaysvt.com/OffMessage/archives/2018/03/24/walters-thousands-attendmarch-for-our-lives-rally-in-montpelier.

[107] Peter Hirschfeld, *In Less Than a Week, Scott and Lawmakers Put Gun Control Bills on Fast Track*, VPR, (Feb. 22, 2018), http://digital.vpr.net/post/less-week-scott-andlawmakers-put-gun-control-bills-fast-track#stream/0.

[108] *See* Paul Heintz, Taylor Dobbs, and John Walters, *In Historic Shift, Vermont's GOP Governor and Democratic Leaders Embrace Gun-Control Measures*, Seven Days (Feb. 22,

already found the Act to be within the reasonable limits of the Vermont Constitution. *See State v. Misch*, 2021 VT 10, ¶ 45, 214 Vt. 309, 256 A.3d 519 (recognizing that "Vermont has had, and continues to have, numerous firearms-related restrictions" and that "the use of firearms has long been understood to be subject to regulation by the State"; *id.* ¶ 49 (recognizing that "[g]iven the stark reality of gun violence, subject to the limitations of the Constitution, the Legislature acts within its authority in exercising its inherent power to impose such reasonable regulations and restraints as are essential to the preservation of the health, safety and welfare of the community" (citing *State v. Curley-Egan*, 2006 VT 95 ¶ 9, 180 Vt. 305, 910 A.2d 200).

Dated February 28, 2024

Respectfully submitted,

By:     */s/ Jennifer McDonald*
Tristram J. Coffin, Esq.
Jennifer E. McDonald, Esq.
Monica H. Allard, Esq.
Downs Rachlin Martin, PLLC
P.O. Box 190
Burlington, VT  05402-190
Telephone: (802) 863-2375
Email: tcoffin@drm.com
E-Mail: jmcdonald@drm.com
E-Mail: mallard@drm.com

William Clark, Esq.
Giffords Law Center to Prevent
Gun Violence
233 West 38th St. #90
New York, NY 10019
(917) 680-3473

Counsel for Giffords Law Center to
Prevent Gun Violence, March For
Our Lives, and Brady Center to
Prevent Gun Violence

---

2018), https://www.sevendaysvt.com/OffMessage/archives/2018/02/22/in-dramatic-shiftvermonts-democratic-leaders-unite-behind-background-checks.