UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

| | |
|---|---|
| VERMONT FEDERATION OF SPORTSMEN'S CLUBS, *et al.* <br><br> *Plaintiffs*, <br><br> v. <br><br> MATTHEW BIRMINGHAM, *et al.*, <br><br> *Defendants*. | Case No. 2:23-cv-710 |

# MOTION TO EXCLUDE EXPERT TESTIMONY
# OR ALTERNATIVELY FOR A *DAUBERT* HEARING

NOW COME Plaintiffs, and move that this Court either exclude Defendants' proffered expert testimony, or alternatively to schedule a *Daubert* hearing. Plaintiffs submit that such a hearing could efficiently be held on the same day as the hearing on the merits of Plaintiffs' Motion for a Preliminary Injunction, but prior to any taking any testimony on the merits, because any ruling the Court makes will impact the scope of direct and cross examination of any expert witnesses.[1]

---

[1] To the extent that Defendants elect not to present any live expert testimony at the preliminary injunction hearing, Plaintiffs do not request that experts be required to appear for a separate *Daubert* hearing. However, if the State anticipates presenting live testimony, Plaintiffs submit that they must be permitted to *voir dire* any expert witness prior to the presentation of such testimony. Plaintiffs' position is that the expert declarations are inadmissible, but are inadmissible on their face and that no separate inquiry or *voir dire* is necessary as to opinions presented only in written form.

1

I.  **Introduction**

Defendants call upon five professors to provide "expert" testimony in opposition to Plaintiffs' Motion for a Preliminary Injunction.[2] The State's proffered expert testimony is inadmissible, because it runs afoul of both *Bruen* and *Daubert*.

II. **Facts**

Notwithstanding that the Supreme Court has called Second Amendment analogies "a commonplace task for any lawyer or judge," *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 8, (2022), the State marshals five expert witnesses in its brief opposing a preliminary injunction. The State is paying these experts handsomely,[3] but each of the State's experts offers testimony of questionable relevance or of no relevance under *Bruen* and *Daubert*:

1. Professor Lucy Allen was "asked by the Vermont Office of the Attorney General to address the following issues: (a) the number of rounds of ammunition fired by individuals using a gun in real-life self-defense and (b) the outcomes when large-capacity magazines are used in public mass shootings, including the associated number of casualties." ECF 24-2, ¶ 1. She is an economist by training. *Id.* at ¶ 4.

---

[2] Defendants also submitted a Declaration from one Connecticut law enforcement officer. This does not appear to be expert testimony, as the declarant does not assert she was retained by Vermont and the case caption refers to a Connecticut case. ECF 24-21. Plaintiffs assume that Defendants do not intend to designate the Connecticut declarant as an expert or to call upon the Connecticut officer for live testimony, based on the context of that filing and the Defendants' Rule 26 disclosures.

[3] Professor Allen garners the highest pay: $1,200 per hour. ECF24-2, ¶ 1. Professor Spitzer collects either $500 or $750 per hour, depending on whether he is under oath or not. ECF24-10, ¶ 3. Professor Baron makes $450 per hour, regardless. ECF24-5, ¶ 2. Professor Roth is paid $250 per hour. ECF24-8, ¶ 2. Professor Donohue does not disclose his pay rate. ECF24-6.

2. Professor Denis Baron "examined the historical use of the terms arms and accoutrements in order to determine whether magazines, including large-capacity magazines (henceforth, LCMs), were considered arms during the Founding Era (1750–1820)" and "examined the lexical evidence for repeater firearms, including 'repeater air guns,' which are sometimes referred to as 'wind guns,' and the rare terms 'magazine wind-gun' and 'magazine gun' in the Founding Era." ECF24-5 at ¶¶ 3-4. He is a Professor of English at the University of Illinois. *Id.* at ¶ 6.

3. Professor Randolph Roth asserts that he possesses "expertise on the causes of homicide and mass violence, and on the role technology has played in changing the nature and incidence of homicide and mass violence." ECF24-8 at ¶ 8. He is trained as a historian. *Id.* at ¶ 3.

4. Professor John Donohue is an attorney who represented an amicus in support of the losing party in the seminal *Bruen* case. ECF24-6 at ¶ 14. He appears in this case as an "expert" without ever asserting the nature of his expertise or the field of such expertise, but asserts that "[i]t is a sound, evidenced-based, and longstanding harm-reducing strategy virtually uniformly embraced throughout the developed world for governments to place constraints on the harm that weapons can inflict." *Id.* at ¶ 23.

5. Professor Robert Spitzer states that his "expertise includes the history of gun laws, gun policy in American politics, and related historical, legal, political, and criminological issues." ECF24-10 at ¶ 5. He is a Professor of Political Science. Id. at ¶ 4.

### III. Standard of Review

Under Fed. R. Evid. 702, "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify … if the proponent demonstrates… that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> *(c)* the testimony is the product of reliable principles and methods; *and*
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."

In *Daubert*, the Supreme Court emphasized that the requirement of Fed. R. Evid. 702 (a) only permits testimony that will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993). Further, "[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id*. The Court noted that expert testimony is not an end-run around the ordinary rules prohibiting hearsay, and that "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." *Id*. For these reasons, even otherwise admissible expert testimony may be excluded on the grounds that it is more prejudicial than probative under Fed. R. Evid. 403.

### IV. Argument

The State's proffered testimony is *per se* irrelevant and inadmissible because it has no bearing on the relevant inquiry under *Bruen*. It should be excluded.

4

### a. The Testimony is inadmissible under *Daubert* because it is irrelevant under *Bruen*.

Because *Bruen* and other binding cases foreclose the type of testimony the State seeks to admit through experts, the testimony is also *per se* prohibited under *Daubert* and the ordinary principles of expert testimony. Specifically, the State cannot posit any admissible fact that its experts will explain to the trier of fact, and is instead attempting to use experts to testify as to avenues of proof foreclosed by *Bruen*, to make arguments as to policy, or to assert the ultimate legal issues in this case. None of the State's aims is consistent with *Daubert* and Rule 702.

### i) The State's experts do not have any scientific, technical, or specialized knowledge.

The State's experts have no have "scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702 (a). Under *Bruen,* "history and tradition" must guide the Second Amendment analysis of any challenged statute. 597 U.S. at 25 ("[R]eliance on history… is, in our view, more legitimate, and more administrable, than asking judges to 'make difficult empirical judgments' about 'the costs and benefits of firearms restrictions.'") (cleaned up). In assessing "present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge." *Id*. But this inquiry is not supposed to be a freewheeling journey into history and tradition writ large. Instead, it is required to be an inquiry into the history *of firearms regulation. Id.* at 24. While doubtful that a handful of laws could shed any light on a broader "history and tradition," the Supreme Court acknowledged its ability to examine "laws on their own terms" to examine whether a history and tradition *of firearms regulation* exists. *Id*. at 46.

Vermont's experts have no relevant expertise with reference to the only relevant inquiry. Professor Allen is an economist who asserts expertise in the ordinary usage of firearms in modern self-defense situations. Without remarking upon the academic basis for her purported expertise, and accepting *arguendo* that Ms. Allen is indeed an expert on modern self-defense situations, she offers nothing in the way of demonstrating a "history and tradition" of "firearms regulations." Professor Allen does not examine any "laws on their own terms," and likely could not do so in any event, as questions of law are purely within the province of the Court. Similarly, Professor Baron is an expert in English and linguistics, and purports to use "corpus linguistics" to determine whether historical documents and their authors used the word "magazine" in a sense that it is an "arm" protected by the Second Amendment. But history *in se* and historical uses of various terms are irrelevant to the test this Court must apply; which will involve examining historical "laws on their own terms." In this same vein, Professor Roth is a historian, but history in the general sense is not at issue in this case. Instead, the history *of firearms regulation*, through examining the texts of historical laws, is the relevant test. Professor Spitzer is a criminologist and political scientist, but policies and political choices relating to crime are outside the scope of this case in which the Supreme Court has held that the Constitution itself balanced the relevant interests. Professor Donohue is an attorney, and brags that he is the "principal author" of a brief that the Supreme Court rejected in *Bruen*. Assuming (even without any express indication from the declarant himself) that Professor Donohue asserts expertise in harm reduction and the approaches taken by governments across the world, Professor Donohue asserts no expertise with respect to history or traditions of regulations, and especially not with respect to the text of historical laws "on their own terms." Nor could he: laws are

judicially noticeable, and interpretations of law are solely within the province of the Court.

In short, none of the State's experts pass the first step of the *Daubert* test because none of them have expertise on any relevant topic. Spitzer comes the closest because he has conducted historical research and attempts to examine the history of approaches to regulation "taken by governments around the world," but even as to his testimony the State cannot establish any admissible facts or opinions as to the relevant history *of firearms regulation* in this Nation during the relevant Founding-Era time period. To the extent that any expert offers an opinion as to a law, such opinions are inadmissible and the underlying laws themselves are admissible through other means. This Court should therefore disregard the State's "expert" declarations, and examine only judicially noticeable and relevant laws and regulatory enactments for purposes of determining whether history and tradition support the State's position.

**ii)    The State's experts offer irrelevant testimony.**

Through its supposed "expert" affidavits and declarations, the State ignores *Bruen* and instead proposes to use expert testimony to usurp the role the Supreme Court reserved for lawyers and judges: reasoning by analogy. The State also proposes to use an attorney and purported expert in "harm reduction" to "make difficult empirical judgments" that no longer have any place in Second Amendment jurisprudence, calls upon a linguist to assert that magazines are not arms within the meaning of the Second Amendment, calls upon an economist to testify as to how ordinary citizens use arms to defend themselves in the modern era, and calls upon a historian to testify as to the evolution of technology. Each of these issues is foreclosed by precedent, and is not a proper basis for supposedly expert testimony.

First, the State offers Professor Allen's declaration relating to self-defense scenarios. As a fellow District Court recently noted with reference to a nearly identical declaration prepared by this same declarant, Allen's evidence relating to modern day self-defense is largely based on hearsay, nested hearsay, or even anecdote. *Duncan v. Bonta*, No. 17-cv-1017-BEN (JLB), 2023 U.S. Dist. LEXIS 169577, at *35 (S.D. Cal. Sep. 22, 2023) ("Allen's study relies on unverified, uncorroborated second or third hand anecdotal information."). Allen's evidence in this case suffers from the same infirmities; she has no personal knowledge of any self-defense situation and relies upon studies that are themselves based upon reports of third parties.[4] But even leaving aside the data quality problems inherent in Allen's report, the Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court has held that the relevant question is what weapons are "*chosen* by Americans for self-defense," *Heller*, 554 U.S. 570, 629, 128 S. Ct. 2783, 2818 (2008) (*emphasis added*), and not what weapons are deployed or fired in self-defense. An individual can keep and bear an arm without firing a single shot; indeed, that is the idea. "Probably the vast majority of Americans that own magazines of 11 rounds or more keep them and use them for self-defense in the same way that a driver puts on and uses a seat belt in case of a collision. … A person may happily live a lifetime without needing to fire their gun in self-defense."

---

[4] Allen does not "reliably apply the principles and methods to the facts of this case." Fed. R. Evid. 702 (d). The U.S. District Court for the Southern District of California held as to Allen's supposed statistical data on defensive gun uses that the "whole statistical exercise is based on hearsay (anecdotes) upon hearsay news reporting, rather than police investigatory reports." *Bonta*, 2023 U.S. Dist. LEXIS 169577, at *35 (S.D. Cal. Sep. 22, 2023). These sorts of "harm reduction" studies are based on underlying data which lacks the "usual indicia of accuracy and reliability of admissible evidence." *Id.*

8

*Duncan*, 2023 U.S. Dist. LEXIS 169577, at *28. Allen says nothing about the "keeping" of firearms, or even about the "bearing" of firearms; instead she only opines (based on flawed data) about those rare circumstances where they are *fired*. Nowhere does she address the deterrent effect of LCMs. Nor does she explain why she has cabined her analysis to only one lawful use of firearms (self-defense) to the exclusion of all other lawful uses (such as target practice, training, and sport). For these reasons, she has nothing admissible to offer this Court.

Second, there is the declaration of Professor Baron on linguistics. Baron asserts, inter alia, that "magazines… as well as ammunition cases, cartridge cases, boxes and other ammunition storage containers, were considered 'accoutrements' or 'accessories' and not 'arms' during the Founding and Reconstruction Eras…" ECF24 at ¶ 5. Unfortunately, Baron's opinion runs afoul of both common sense and how the Second Circuit has treated ammunition feeding devices. *N.Y. State Rifle & Pistol Ass'n v. Cuomo* found it unnecessary to specifically decide whether magazines, which are integral parts of a firearm, are "arms" within the meaning of the Second Amendment. 804 F.3d 242, 263 n.127 (2d Cir. 2015). It nonetheless treated and referred to the magazines as "weapons" and treated the magazines as protected arms in its analysis and its ultimate ruling that a 7-round load limit was unconstitutional. *Id.* at 257 (Referring to semiautomatics and large-capacity magazines, "[w]e proceed on the assumption these laws ban *weapons* protected by the Second Amendment") (emphasis added); *Id.* at 264 (finding that load limit fails to pass the now-abrogated intermediate scrutiny test). Those courts that have weighed in struggle to find any reasonable principle by which an integral part of a firearm is not itself an "arm" for Second Amendment purposes. See, e.g., *Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015) ("[O]ur case law supports the

9

conclusion that there must also be some corollary… right to possess the magazines necessary to render those firearms operable."); *Ocean State Tactical, LLC v. Rhode Island,* No. 23-1072, 2024 U.S. App. LEXIS 5723, at *7 (1st Cir. Mar. 7, 2024) ("we find it unnecessary on this appeal to decide whether the district court erred in deeming LCMs outside the realm of 'arms' protected by the plain text of the Second Amendment. Instead, we assume that LCMs are 'arms' within the scope of the Second Amendment."); *Bevis v. City of Naperville,* 85 F.4th 1175, 1214 (7th Cir. 2023) (Brennan, J., dissenting) ("magazines banned by the Act and ordinances are 'Arms' under the plain text of the Second Amendment."). The Second Circuit also stated that the magazines were in common use for purposes of *Heller. Id.* at 255 ("Even accepting the most conservative estimates cited by the parties and by amici, the assault weapons and large-capacity magazines at issue are 'in common use' as that term was used in *Heller.*"). Baron is certainly entitled to believe that the Second Circuit's *Cuomo* decision was wrong to treat magazines as weapons and to employ the "common use" analytic framework that applies only to "arms" under Second Amendment jurisprudence. But testimony contrary to binding precedent cannot be admissible.[5]

    Third, there is the declaration of Professor Roth on the causes of mass violence. Roth testifies that "the emergence of modern breech-loading firearms in the mid-nineteenth century, and of rapid-fire semiautomatic weapons and extended magazines

---

[5] Even if this Court were not to exclude Baron's opinions on the basis of irrelevancy, the U.S. District Court for the Southern District of California has also expressed grave concerns about the research methodologies employed by "corpus linguistics" experts, including Baron, noting that this scholarship employs "methodology [that is] incomprehensible." *Duncan v. Bonta*, No. 17-cv-1017-BEN (JLB), 2023 U.S. Dist. LEXIS 169577, at *34 (S.D. Cal. Sep. 22, 2023). Baron thus does not "reliably apply the principles and methods [of his expertise] to the facts of this case." Fed. R. Evid. 702 (d).

in the late twentieth century, have pushed the homicide rate in United States well beyond what it would otherwise have been." ECF24-8, ¶ 12. Accepting Roth's analysis at face value, he has little to say about any relevant issue. As the Supreme Court held in *McDonald*, 561 U.S. at 790 (quoting *Heller*, 554 U.S. at 636), "the Second Amendment '*restricts* experimentation and local variations,' since '[t]he enshrinement of constitutional rights necessarily takes certain policy choices off the table.'" (*emphasis added*).[6] Roth does not establish that there is a "*dramatic* technological change" or "*unprecedented* societal concern" that gave rise to the modern homicide rates that are the focus of his declaration: instead, he traces the beginning of the rise in homicide rates to the development of *breechloading* firearms, which long predate repeating firearms. He uses the word "dramatic" and its variations only twice; once to say that there was a dramatic rise in homicides in the Antebellum South (¶ 23) and once to say that the use of semiautomatic rifles *and handguns* caused a rise in homicides since 1966 (¶54). Roth demonstrates neither an unprecedented societal concern[7] or a dramatic change in technology.[8] To the extent he ties the rise in homicides to the prevalence of *handguns*, Roth also shows his testimony is contrary to *Heller* and *McDonald*, which unequivocally

---

[6] Roth similarly fails to explain from a criminological perspective or otherwise why homicide rates do not militate in favor of *broader* access to the firearms typically chosen for self-defense. To the extent that the State argues that homicide rates are high or rising, the State and its experts are remarkably disinterested in allowing citizens to defend themselves from such ostensible risks.

[7] Roth identifies a rise in homicides as an "unprecedented" societal concern, but traces this back as far as the invention of the breechloader. A concern that traces back more than two centuries cannot be "unprecedented."

[8] The only possible "dramatic" change in technology to which Roth refers appears to be the rise in semiautomatic handguns since approximately 1966. Leaving aside whether semiautomatic handguns were a "dramatic technological change" in 1966, the issue is irrelevant because *Heller* already established that there is a per se bar on banning semiautomatic handguns based on commonality.

held that semiautomatic handguns are protected by the Second Amendment, making it irrelevant.

Fourth, there is the declaration of Professor Donohue on harm reduction. Donohue confesses that he is an attorney who authored a brief that the Supreme Court rejected in *Bruen*. ECF24-6, ¶ 14. He nevertheless states that "Restrictions on the size of … magazines… can be expected to reduce deaths and injury from gun violence. Similarly …  waiting periods prior to the purchase of weapons… will reduce … and would be expected to reduce the risk … of enraged individuals buying firearms on the way to commit mass violence and other criminal acts." *Id.* at ¶ 23. Again, Donohue's "expertise" is a thinly-veiled attempt to overrule *Bruen* and its antecedent precedents. As stated above, and as the Supreme Court held in *McDonald*, 561 U.S. at 790 (quoting *Heller*, 554 U.S. at 636), "the Second Amendment … necessarily takes certain policy choices off the table." In *Bruen*, the Supreme Court emphasized that "*Heller* and *McDonald* expressly rejected the application of any… 'interest-balancing inquiry' that 'asks whether the statute… is out of proportion to the statute's salutary effects upon other important governmental interests.'" *Bruen*, 597 U.S. at 22.  Quite simply, Donohue's declaration is akin to his amicus brief in *Bruen*, except it is now an argument for ignoring or overruling controlling precedent and applying policy choices favored by a defeated litigant.[9] It is not an expert opinion on any issue genuinely in dispute in this case, and

---

[9] Even when expressing support for Vermont's policy choices, Donohue struggles to support the law as it is written. For example, he fails entirely to explain why there is a ten-round capacity restriction for magazines affixed to rifles, but a fifteen-round capacity restriction for magazines affixed to handguns, and makes no reference to a historical statute that treats the capacity of either type of firearm differently.

12

allowing defeated amici to appear as "experts" making the same arguments would undermine the orderly process of litigation.

Fifth, there is the declaration of Professor Spitzer on what he calls "[t]he current controversy surrounding legislative efforts to restrict large capacity magazines" and "Gun purchase waiting periods." ECF24-10 at ¶ 9, 164. Spitzer explains that his testimony "examines historical weapons regulations relevant to two current laws: those pertaining to restrictions on large capacity ammunition magazines, and those pertaining to the modern regulatory technique of firearm purchase waiting periods." ECF24-10, ¶ 8. As the Second Circuit has made plain, "an expert's testimony on issues of law is inadmissible." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991). And as the Supreme Court has explained, it is not history in a general sense that informs the Court's analysis of a Second Amendment claim; instead, it is the history "of firearms regulations." *Bruen*, 597 U.S. at 33 n.8. This analysis necessarily includes "looking at [historical] laws on their own terms." *Id*. at 8.[10] It also includes "reasoning by analogy—a commonplace task for any lawyer or judge." *Id*. at 28. Professor Spitzer cannot opine on the law, because it is solely within the province of the Court. He cannot opine on history generally without reference to law, because it is irrelevant. And he cannot reason by analogy, because such a task calls for no particular expertise and the Supreme Court has held that the relevant factfinder (the Court itself, acting without a jury) is fully capable

---

[10] On at least one issue (the waiting period), Spitzer confesses there are no relevant laws for him to examine. *Id*. at ¶ 164. He therefore argues not the history *of firearms regulation*, as the Supreme Court has said is the only relevant inquiry, but instead "important differences between early America and the modern era." *Id*. This is an impermissible venture away from the Supreme Court test and to a test of the Professor's own invention.

13

of such reasoning without assistance. Professor Spitzer's testimony therefore must be excluded.

## V. Conclusion

Because Vermont seeks to use expert testimony either to inject irrelevant issues into this litigation or to sneak a stealth interest balancing inquiry into the adequacy of the State's policy goals in violation of *Bruen*, all expert testimony it offers (whether in written or oral form) must be excluded. To the extent the State intends to call its experts to provide live testimony, Plaintiffs request a *Daubert* hearing at which they can voir dire the State's experts and argue for exclusion of their opinions or limitation of their opinions as appropriate.[11] Additionally and alternatively, even if this Court determines that some or all of the testimony the State has offered would otherwise be admissible under *Daubert*, this Court should nonetheless exclude the State's expert testimony because it is "more prejudicial than probative" under Fed. R. Evid. 403.

---

[11] *Koppell v. N.Y. State Bd. of Elections*, 97 F. Supp.2d 477, 479 (S.D.N.Y. 2000) (purpose of *Daubert* hearing is to determine whether the proffered expert testimony rests on a reliable foundation and is relevant) (citing *Zuchowicz v. United States*, 140 F.3d 381, 386 (2d Cir. 1998), see also *Steffenhagen v. Morrill*, 2013 U.S. Dist. LEXIS 167317, 2013 WL 6181856, at *1 n.2 (W.D.N.Y. Nov. 25, 2013) (citing *Daubert*, 509 U.S. 579 ("A *Daubert* hearing is [] held by the Court for the purpose of determining whether or not expert [] testimony proffered by any party may be admitted at trial.).

Respectfully submitted,

| | |
|---|---|
| HARDIN LAW OFFICE | DIGENOVA & TOENSING, LLP |
| By: /s/ *Matthew D. Hardin* | By: */s/ Brady C. Toensing* |
| Matthew D. Hardin | Brady C. Toensing |
| 1725 Eye Street NW, Suite 300 | 1775 Eye Street NW, Suite 1150 |
| Washington, DC 20006 | Washington, DC 20006 |
| Phone: (202) 802-1948 | Phone: (202) 289-7701 |
| Email: Matt@MatthewHardin.com | Email: brady@digtoe.com |
| *Attorney for Plaintiff* | *Attorneys for Plaintiff* |

## Certificate of Service

I hereby certify that on this the 13th day of March 2024, I served a true and correct copy of the foregoing, upon Defendants via filing the same through CM/ECF.

/s/ Matthew D. Hardin
Matthew D. Hardin