# UNITED STATES DISTRICT COURT
# DISTRICT OF VERMONT

VERMONT FEDERATION OF SPORTSMEN'S
CLUBS, *et al.*

       *Plaintiffs*,

    v.

MATTHEW BIRMINGHAM, *et al.*,

      *Defendants*.

Case No. 2:23-cv-710

## Reply in Further Support of Plaintiffs'
## Motion for a Preliminary Injunction

# Table of Contents

Introduction and Summary of Argument...........................................................................1

1. Plaintiffs filed as-applied and facial challenges to the
   magazine ban and the waiting period..........................................................................4

2. The State's evidentiary objections are meritless.........................................................6

3. Ammunition feeding devices are "arms" in common use
   for lawful purposes......................................................................................................8
   A. Ammunition feeding devices are "arms" for purposes of
      Second Amendment analysis...................................................................................8
   B. Ammunition feeding devices banned by the law are in
      common use for lawful purposes..........................................................................12
   C. There is no military-style weapons test................................................................17

4. There is no historical tradition of banning arms in common use
   for lawful purposes....................................................................................................19
   A. It is unconstitutional for the Government to ban arms in common
      use for lawful purposes. ......................................................................................19
   B. Nuance is inapplicable here, but even if it were, the State fails to
      identify an appropriate relevant historical
      analog....................................................................................................................21
      (1) Vermont's analogical reasoning defies Bruen.....................................21
      (2) Vermont cannot save its ban by claiming it is a response to an
          unprecedented societal concern or that large capacity ammunition
          feeding devices are a dramatic technological change......................23
          (a) The magazine ban does not implicate unprecedented
              societal concern....................................................................23
          (b) Ammunition feeding devices are not a dramatic
              technological change.............................................................24
   C. Vermont fails to produce evidence sufficient to show its magazine
      ban is consistent with this Nation's historical tradition of firearms
      regulations........................................................... ....................................29
      (1) Bruen requires the State to present historically relevant analogues
          and analysis showing a comparable justification and burden.............29
      (2) The laws cited by the State fail Bruen's historical relevancy test.........32
          (a) Laws regulating machine guns and semi-automatics
              Enacted more than a century after the Founding are inapt..........33
          (b) Bowie knife restrictions are inapt.................................................35
          (c) Concealed carry laws are inapt....................................................38
          (d) Club and blunt weapons laws are inapt........................................40

i

(e)  Trap gun laws are inapt...................................................40
(f)  Fire-safety laws governing the storage of gunpowder
      are inapt. ......................................................................41

5. The State cannot impose a purposeless delay on citizens seeking to exercise
   fundamental constitutional rights...............................................42
   A.  The Second Amendment's text protects the right to acquire a firearm...............42
   B.  A purposeless waiting period is directly at odds with the Second
       Circuit's controlling opinion in *Antonyuk*. ..............................44
   C.  A restriction on retail sales of firearms and transfers between
       individuals is not a "commercial" regulation and is not presumptively
       lawful. ......................................................................46
   D.  There is no historical tradition for delay in the transfer of firearms...................47

6. Plaintiffs will be irreparably harmed and public interest always
   Weighs in favor of preventing constitutional violations..............................49
   A.  Irreparable harm is presumed.............................................49
   B.  The public interest favors an injunction. ..............................50

Conclusion.................................................................................51

NOW COME Plaintiffs, by and through undersigned counsel, and respectfully submit this reply brief in further support of their Motion for a Preliminary Injunction and in response to Defendants' Response in Opposition to Plaintiffs' Motion for a Preliminary Injunction.

## Introduction and Summary of Argument

Vermont has failed to rebut Plaintiffs' showing they are likely to prevail on the merits. No relevant historical tradition exists in America of banning commonly owned arms like the magazines at issue. That should end the analysis. There is likewise no historical tradition of imposing a purposeless waiting period to prevent a citizen from acquiring a firearm.

In a series of landmark cases the Supreme Court has said that Second Amendment rights are to be favored. But the State (as did others in the wake of *Heller*) is asking this Court to misread, misapply, and contort the reasoning of these precedents to limit and undermine a fundamental constitutional right. *Caetano v. Massachusetts*, 577 U.S. 411, 412 (2016). ("the explanation the Massachusetts court offered for upholding the law contradicts this Court's precedent"). "The Second Amendment ... elevates above all other interests the right of law-abiding, responsible citizens to use arms [and] demands our unqualified deference." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 26, 142 S. Ct. 2111, 2131 (2022). "[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table." *District of Columbia v. Heller*, 554 U.S. 570, 636, 128 S. Ct. 2783, 2822 (2008). Banning magazines and imposing a purposeless waiting period are two policy "solutions" that have been taken off the table. which only means that the State must return to the drawing board to find other, constitutionally-compliant ways of addressing the policy goals of these laws.

*Heller* asks only whether the banned magazines are in common use for lawful purposes. If so, they cannot be banned because they do not fall within "the historical tradition" of restricting "dangerous *and* unusual weapons." *Heller*, 554 U.S. at 627 (emphasis added). *Heller*'s question and its answer begin and end the analysis for arms in America. The State criticizes this controlling precedent as too "simplistic." ECF24 at 20. The banned magazines, however, are owned by millions of Americans for lawful purposes. *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) (banned magazines are "in common use as that term was used in *Heller*"). So the law banning them is unconstitutional.

Even if we ignore *Heller* and look for historical analogues, Vermont presents no "well-established and representative analogues" for banning magazines commonly owned by millions of Americans for lawful purposes, including self-defense, training, hunting, target shooting, and competition. The State focuses on immaterial history and presents nothing remotely analogous to a ban on commonly possessed arms, especially from the decisive time of the Founding. As to the Reconstruction era, the best Vermont offers are laws restricting carry (but not possession) of concealed pistols and certain other weapons like Bowie knives. A ban on concealed carry does not approach the burden on Second Amendment rights that Vermont's ban on possession, even in the home, entails. All the while, its experts admit no laws regulated the repeating rifles that paved the way for today's semiautomatic firearms equipped with detachable magazines holding more than ten rounds.

The analysis is as simple for the State's purposeless waiting period. The conduct, acquiring arms, is governed by the Second Amendment's plain text and the State

2

proffers no relevant historical analogues to justify its law. In the absence of any legitimate or historically-recognized purpose, the law is unconstitutional.

The State argues it is entitled to "nuance" (a lower standard of proof) because this case implicates "unprecedented societal concerns" and "dramatic technological changes." But it fails to make that showing. There is, unfortunately, nothing unprecedented about firearm violence or suicide. Large capacity ammunition feeding devices have existed for well over a century so they cannot represent a "dramatic technological change." Even if Vermont could establish those things, it fails to meet even this lower standard because "nuance" only gets you so far. The State is still required to prove "whether the challenged regulation and the proposed historical analogue are relevantly similar." *Antonyuk v. Chiumento*, 89 F.4th 271, 302 (2d Cir. 2023).

Vermont makes conclusory statements claiming past laws are analogues to the magazine ban and waiting period, but ignores the analysis demanded by *Bruen* – the comparable justification and burden tests. Instead, it misstates the *Bruen* test and then fails to meet its own diluted test because the State's proposed analogues are historically irrelevant. Plaintiffs' analysis showing a complete lack of historical relevancy makes it likely that the State's failure to apply the test properly to its laws is due to what it shows – the inescapable conclusion that the State cannot meet its *Bruen* burden.

To prevail, Vermont needs historic laws that do not exist. Vermont's defense of its ban on commonly possessed firearm magazines and its purposeless waiting period presents specious arguments in hundreds of pages of exhibits and "expert" declarations. But its attempt to elevate opinions of modern academics into equivalence with historical laws fails. None of the voluminous pages contain any "relevantly similar" analogues, much less the "distinctly similar" analogues *Bruen* requires to support a magazine ban

and a waiting period. Faced with no support, Vermont seeks to revive the interest-balancing test *Bruen* expressly rejects, citing mass shootings and presenting declarations with little bearing on the merits. These forbidden arguments are implicit concessions to Vermont's inability to meet the tests spelled out in *Heller* and *Bruen*.

Because Plaintiffs are likely to prevail on the merits on their constitutional claims, the remaining preliminary injunction factors necessarily fall in their favor because loss of constitutional rights for even minimal periods is an irreparable injury and the balance of equities and public interest favor vindication of constitutional rights.

## 1. Plaintiffs filed as-applied and facial challenges to the magazine ban and the waiting period.

The Complaint makes plain that Plaintiffs challenge the restrictions at issue, both facially and as applied. Complaint, ECF1, ¶ 175, 195. So too does Plaintiffs' Motion for a Preliminary Injunction. ECF2-1 at 4-5 (explaining each Plaintiff seeks to do what the law prohibits) and at 23-24 (citing to declarations filed by each Plaintiff, detailing how the laws at issue harm each). Inexplicably, the defense falsely asserts that Plaintiffs have made only a facial challenge. ECF24 at 4.

"In a facial constitutional challenge, individual application facts do not matter [and] the plaintiff's personal situation becomes irrelevant." *Ezell v. City of Chicago,* 651 F.3d 684, 697 (7th Cir. 2011). Instead, Plaintiffs need introduce "only the [statute] itself" and the "statement of basis and purpose that accompanied its promulgation." *Reno v. Flores*, 507 U.S. 292, 300-01 (1993). As the Seventh Circuit summarized: "In a facial constitutional challenge, *lex ipsa loquitur*: the law speaks for itself." *Ezell,* 651 F.3d at 697-98 (cleaned up). By contrast, "A party asserting a prospective as-applied challenge must tailor the proof to the specific conduct that she would pursue but for fear of future enforcement." *Copeland v. Vance*, 893 F.3d 101, 112-13 (2d Cir. 2018) "[I]n the context of an as-applied ... challenge, a court's analysis should be confined to the litigant's actual

conduct…" *Id.*, quoting *VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 189 (2d Cir. 2010).

It is hard to imagine that Vermont's restrictions could be construed as constitutional in any respect. By way of analogy, consider the conduct at issue in *Heller* and *McDonald*: in those cases, the District of Columbia and Chicago prohibited possession of handguns in the home. Doubtless such a statute might be constitutional if expressly applicable only to felons, or the mentally ill, or drug addicts. See, e.g., 18 U.S.C. § 922(g)(3) (prohibiting unlawful drug users from possessing firearms). But neither Chicago's nor D.C.'s statute was so limited, and each statute applied *facially* to all citizens and all handgun possession. The Supreme Court did not rewrite the statutes or hold they might be constitutional as applied to certain individuals or certain handguns while not as applied to others. Instead, the Court held that each statute was unconstitutional. Neither decision even engaged in the facial versus as-applied debate that Vermont attempts to apply here.[1]

Similarly, Plaintiffs allege that the State has categorically banned firearms and magazines with a capacity of greater than 10 or 15 rounds, which arms are indisputably "in common use" under binding Supreme Court and Second Circuit precedent. See, e.g., ECF2-1 at 9 *et seq.* (citing controlling precedent for the proposition that firearms with capacities of greater than 10 or 15 rounds are in common use) and ECF1 at ¶ 77 (alleging Vermont prohibited an entire class of firearms, which class is inarguably "in common use" under binding precedents). Vermont could have banned unusual magazines with capacities of 40 or 50 rounds, or some other unique and dangerous technology, or it

---

[1] A similar hypothetical illustrates the problem with Vermont's line of reasoning: If the State were to pass a statute that banned "all handguns," such a statute would be facially unconstitutional under *Heller* and *McDonald*. But imagine if the State passed a statute that banned civilian possession of "all handguns and nuclear weapons." By the State's reasoning in this case, such a statute by virtue of intentional over-inclusiveness would be immune from facial review. A ban on nuclear weapons would be constitutional and would have at least one conceivable permissible application. This cannot be the law.

could have banned deploying firearms while intoxicated. But it did not. Vermont must answer for the law it *actually* enacted, and not hypothetical statutes it might have passed or hypothetical weapons Plaintiffs might choose to purchase if the law is struck down. Vermont cannot save its enactment by imagining different statutes that might have passed constitutional muster or hypothetical conduct by Plaintiffs that might be either permissible or banned under a future regulatory regime.

Even assuming, *arguendo*, that this Court chooses to rewrite Vermont's statutes so they do not apply to every Vermonter who attempts to possess every model of every banned firearm, Plaintiffs should nevertheless prevail because, in an abundance of caution, they have also made as-applied challenges. In the declarations, Paul Dame swore that the waiting period negatively impacts him because he seeks to avoid the burden of possessing a firearm in his home until such time as a firearm becomes necessary. ECF2-2. Marsha Thompson cannot buy replacements for her current magazines if they become damaged or otherwise inoperable. ECF2-3. Powderhorn and Black Dog have increased storage costs and fewer sales because of the laws. ECF2-4 and 2-5. The Vermont Federation of Sportsmen's Clubs (VTFSC) cannot hold its regular raffles. ECF2-6. In short, Plaintiffs have set forth specific circumstances in which the laws, *as applied to each of them*, cause unconstitutional harms. As the Second Circuit acknowledged in *Antonyuk*, *Bruen* was a facial challenge and "[h]ow [the State's law] was applied in particular cases was irrelevant." 89 F.4th at *82. Nevertheless, if a Court determines that a law is facially valid, the Court must still adjudicate "as-applied challenges to particular [applications]." *Id.* at *61.

## 2.  The State's evidentiary objections are meritless.

The State asks that Plaintiffs not be permitted to rely upon the evidence they have submitted, which it argues consists of hearsay or speculation, and even casts doubt on Plaintiffs' standing. ECF24 at 6 fn. 2, 37 *et seq*. Vermont is wrong for two reasons: First,

rules of evidence do not apply on a preliminary injunction (and Vermont itself relies upon the same supposedly "hearsay" evidence that it seeks to prohibit from Plaintiffs). Second, assuming arguendo that the rules did apply, evidence as to applications (real or imagined) of the State's law is irrelevant for purposes of Plaintiffs' facial challenges. As to the as-applied challenges, the only facts that matter and are subject to proof are facts relating to each Plaintiff and their circumstances; the law and its legislative history remain subject to judicial notice. *Aqua Harvesters, Inc. v. N.Y. State Dep't of Envtl. Conservation*, 399 F. Supp. 3d 15, 65 (E.D.N.Y. 2019) (taking judicial notice of legislative facts and examining legislative history to ascertain whether a statute had an impermissible purpose).

As Plaintiffs pointed out at ECF15 at 4, it is binding Second Circuit precedent that "hearsay evidence may be considered by a district court in determining whether to grant a preliminary injunction…" *Mullins v. City of N.Y.*, 626 F.3d 47, 52 (2d Cir. 2010). While the State objects that Plaintiffs' statistical evidence is based upon surveys and "hearsay," ECF24 at 21, it then submits evidence in the form of expert testimony that another court has already considered to be nested hearsay and even anecdotal. *Duncan v. Bonta*, No. 17-cv-1017-BEN (JLB), 2023 U.S. Dist. LEXIS 169577, at *35 (S.D. Cal. Sep. 22, 2023).

Moreover, as indicated above, the nature of a facial challenge is such that evidence is irrelevant.[2] "[F]acial challenges are to constitutional law what *res ipsa loquitur* is to facts—in a facial challenge, *lex ipsa loquitur*: the law speaks for itself."

---

[2] To the extent that the State's law and its purposes must be analyzed for the purposes of the as-applied challenge, the relevant "legislative facts" are also admissible by judicial notice under *United States v. Davis*, 726 F.3d 357, 366 (2d Cir. 2013) (legislative facts are judicially noticeable) and any impermissible purpose for such laws is subject to scrutiny under *Aqua Harvesters, Inc.*, 399 F. Supp. 3d at 65 (E.D.N.Y. 2019).

Nicholas Rosencrantz, *The Subjects of the Constitution*, 62 Stan. Law. Rev. 1209, 1238 (2010). This Court need only consider the law and its history. *Reno*, 507 U.S. at 300-01. "Legislative facts" are admissible.  Fed. R. Evid. 201, 1972 Advisory Committee Note. *Cf Frank v. Walker*, 773 F.3d 783, 795 (7th Cir. 2014) (Posner, J., dissenting from denial of reh'g en banc and explaining the nature of a legislative fact as judicially noticeable). Plaintiffs need only establish standing, *Ezell*, 651 F.3d at 691, and the State has not (yet) contested that.

### 3. Ammunition Feeding Devices are "arms" in common use for lawful purposes.

#### A. Ammunition feeding devices are "arms" for purposes of Second Amendment analysis.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. *Heller* held that a handgun was an "arm" within the meaning of the Second Amendment. 554 U.S. at 581, 628–29. In reaching that conclusion, the Court began by noting that, as a general matter, the "18th-century meaning" of the term "arms" is "no different from the meaning today." *Id*., at 581. Then as now, the Court explained, the term generally referred to "[w]eapons of offence, or armour of defence." *Id*. (cleaned up). The Court further noted that all relevant sources of the original public meaning of "arms" agreed that "all firearms constituted 'arms'" within the then-understood meaning of that term. *Id*.

Plaintiffs quote this language and the broader definition of arms as a "thing that a man … takes into his hands, or useth in wrath to cast at or strike another" to argue that magazines qualified as arms under *Heller*. ECF 2-1 at 2. The State claims this *direct*

*quote* from *Heller* mischaracterizes its definition of arms, otherwise "numerous types of highly dangerous, military weaponry" would be protected by the Second Amendment. State at 11. Resistance like this is not new, but that is not how *Heller* works. *Caetano,* 577 U.S. at 415 (noting that although lower court professed to apply Heller, it "defied *Heller*'s reasoning."). *Heller* first asks if an object qualifies as an arm and then asks if it is dangerous and unusual, which would justify its banning. *Heller,* 554 U.S. at 573*;* Dangerous *and* unusual military weaponry would not enjoy Second Amendment protection under *Heller.*

The banned magazines are arms covered by the Second Amendment's plain text, which covers all "modern instruments that facilitate armed self-defense." *Bruen*, 142 S. Ct. at 2132. Vermont concedes that ammunition feeding devices are arms by placing the prohibition into "Chapter 85: Weapons" in Title 13 of the Vermont code. It also concedes that magazines are an essential component of semiautomatic firearms by also banning non-removable magazines – an integrated magazine illustrates the necessity of a magazine to the functioning of a firearm. 13 V.S.A. § 4021(e); See also Exhibit A at ¶ 21. (magazines are essential components for all semiautomatics). Therefore, they fall within the category of modern instruments that facilitate armed self-defense. To rebut this argument, Vermont employed a linguistics professor to focus narrowly on the definition of the term "magazine" at different times in history, claiming that magazines are not arms. ECF24 at 15. To do so, however, the State's non-firearm "expert" had to ignore the functionality of "ammunition feeding devices," as the law refers to them. This is akin to saying that a screw-top can of fuel is the same as a fuel injector on an internal combustion engine. Or limiting modern speech by saying that electronic speech is not protected because at the founding written speech only consisted of ink and paper. The

Supreme Court rejected this limited view of modern firearms, first in *Heller* and even more emphatically in *Caetano*.[3]

Even if the outcome-oriented interpretations of linguistics professors could be used for authority on this issue, common sense and numerous courts say otherwise, including binding Second Circuit precedent in *Cuomo*.[4] 804 F.3d at 254-57 (referring to and analyzing magazines as "weapons" for purposes of Second Amendment) and *Id.* at 264 (treating magazines as protected arms and finding load limit fails to pass the now-abrogated intermediate scrutiny test);[5] *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey (ANJRPC)*, 910 F.3d 106, 116 (3d Cir. 2018), *abrogated on other grounds by Bruen*; *Kolbe v. Hogan*, 813 F.3d 160, 175 (4th Cir. 2016), *on reh'g en banc*,

---

[3] The Massachusetts Supreme Court (the court from *Caetano*) "got the message" that arms cannot be banned purely because they are of recent vintage. *Ramirez v. Commonwealth*, 479 Mass. 331 (2018) (overruling prior decision inconsistent with *Caetano*).

[4] The State approvingly lists the reasoning of several lower courts and one 7th Circuit case finding that magazine bans are permissible. EFC24 at 13. All these cases, however, suffer from failure to follow *Bruen*, are inapposite, and/or utilize reasoning that this Court cannot follow due to binding precedent. For example, *Bevis* concluded that the magazines banned by the City of Naperville were not bearable arms, or alternatively were not in common use, but *Cuomo* did not make those findings. *Bevis*, 85 F.4th at 1193, contra *Cuomo* 804 F.3d at 255, 264 (in common use and analyzed as bearable arms). *Grant v. Lamont* was resolved on the question of whether defendants were properly sued under *Ex Parte Young*; each had argued they had no special duty to enforce the Connecticut statutes at issue. *Grant v. Lamont*, No. 3:22-cv-01223 (JBA), 2023 U.S. Dist. LEXIS 147954 (D. Conn. Aug. 23, 2023). *Nat'l Association of Gun rights v. Lamont* "read[] *Bruen* to abrogate *Cuomo*," No. 3:22-1118 (JBA), 2023 U.S. Dist. LEXIS 134880, at *45 (D. Conn. Aug. 3, 2023), a remarkable position for a lower court to take in the absence of guidance from the Second Circuit and even as the Second Circuit continues to cite to *Cuomo* post-*Bruen*. See, e.g., *Antonyuk*, 89 F.4th 271 at *77. *Oregon Firearms Federation* similarly reached conclusions directly at odds with *Bruen* and *Cuomo* (e.g., magazines are not arms or in common use). *Or. Firearms Fed'n v. Kotek*, No. 2:22-cv-01815-IM, 2023 U.S. Dist. LEXIS 121299 (D. Or. July 14, 2023).

[5] In a footnote, *Cuomo* had said it was unnecessary to specifically decide whether magazines are "arms" under the Second Amendment, but then proceeded to treat them as arms when it found the load limit was unconstitutional. *Id.* at 263 n.127, 264.

849 F.3d 114 (4th Cir. 2017), *abrogated on other grounds by Bruen*; *Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015); *Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.*, 2023 WL 2655150, at *7 (D. Del. Mar. 27, 2023); and *Hanson v. D.C.*, 2023 WL 3019777, at *6 (D.D.C. Apr. 20, 2023); *See also Bevis v. City of Naperville*, 85 F.4th 1175, 1206 (7th Cir. 2023)(Brennan, J., dissenting); Mand *Duncan v. Bonta ("Duncan II")*, 83 F.4th 803, 808 (9th Cir. 2023) (Bumatay, J., dissenting).

Vermont cites one of its experts and two, non-controlling district court cases that disallowed protection to magazines on the basis that a firearm could function with a smaller, government-approved magazine. ECF24 at 17. But this opinion and flawed, non-controlling caselaw ignores Supreme Court precedent holding it is not the government's place to dictate how Americans choose to defend themselves. *Heller, 554 U.S. at 629* (Arms "chosen by Americans for self-defense" are protected.) The State's argument invites this Court to perform a forbidden, interest-balancing test. Its logic would permit the government to allow only one-round magazines because firearms can still "function" with just one round and in most cases firearms are merely brandished. ECF24 at 17-19.

Vermont contends it is "illogical and unsupported" to find that the device used for feeding protected ammo into a firearm is also protected. ECF24 at 16-17. To make its point, it uses the example that just because handguns are protected does not mean M-16s are. But the Supreme Court has explained why the State's example does not work. *Staples*, 511 U.S. at 612 (machine guns are not "widely accepted as lawful possessions"). Vermont's argument that finding magazines are arms "would mean that 100-round drums of armor-piercing bullets fall within the Second Amendment's scope," ECF24 at

17, would only be true if these drums and this ammunition passed *Heller*'s "in common use" test.

### B. Ammunition feeding devices banned by the law are in common use for lawful purposes.

"In common use" means "the quality of being public or generally used." *Bevis,* 85 F.4th at 1214 (Brennan, J. dissenting) (*quoting* Bryan Garner, *Garner's Dictionary of Legal Usage* 179 (Oxford, 3d ed. 2011)), which can be demonstrated by evidence showing widespread ownership, the basis for *Cuomo* holding that the "common use" issue is an "objective and largely statistical inquiry." *Id.*, 804 F.3d at 256.

The State argues LCM's are not in common use with citation to two non-binding lower court decisions and claims that Plaintiffs must prove LCMs are in common use. Supreme Court precedent says otherwise. *Heller* and *Bruen* set limits on the government's authority, "consistent with the Nation's historical tradition of firearm regulation," to enact "a 'complete prohibition'" on a type of firearm. *Bruen*, 142 S. Ct. at 2128, 2130. Vermont can enact and enforce such a ban, those decisions hold, *only* if the banned arms are not "the sorts of weapons . . . in common use at the time," so that its regulation falls within "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" *Heller*, 554 U.S. at 627 (cleaned up). The ammunition feeding devices banned by Vermont *are* "in common use . . . for lawful purposes." *Id.* at 624 (cleaned up). *Bruen* squarely places the burden on the government to "justify its regulation by demonstrating it is consistent with the Nation's historical tradition of firearm regulation," 142 S. Ct. at 2130—including "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627. Therefore, it is Vermont's burden to show that the arms it has banned are "unusual," and thus *not* "in

common use at the time." The State, however, did not provide evidence to establish that LCMs are not in common use. The general population data used by the State to try to minimize commonality is too broad, ECF24 at 18, and would have meant that the handguns in *Heller* (and most certainly the stun guns in *Caetano*) were not in common use; *Caetano, 577 U.S. at 420* (200,000 is enough) (Alito J. and Thomas J. concurring). Therefore, the preliminary injunction should be granted.

Even if Plaintiffs are forced to carry the burden of proving commonality, they have provided ample data sufficient to carry this burden. ECF2-1 at 9 to 14, and ECF2-7, 2-8. There is also ample caselaw, including binding Second Circuit precedent, establishing that LCMs are in common use. Commonality in this case "is determined largely by statistics." *Duncan v. Becerra*, 970 F.3d 1133, 1147 (9th Cir. 2020), *rev'd sub nom.; Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021) (en banc), *granted, vacated, and remanded in light of Bruen*, 142 S. Ct. 2895 (2022); *see also Friedman v. City of Highland Park, Ill.*, 136 S. Ct. 447, 449 (2015) (Thomas, J., dissenting from denial of certiorari) ("citizens . . . have a right under the Second Amendment to keep" "AR-style semiautomatic rifles" because "roughly five million Americans own" them and "the overwhelming majority . . . do so for lawful purposes"); *ANJRPC*, 910 F.3d at 116 (finding an "arm" commonly owned because "[t]he record shows that millions . . . are owned"); *Heller II*, 670 F.3d at 1261 ("We think it clear enough in the record that semi-automatic rifles and magazines holding more than ten rounds are indeed in 'common use.'"); *Bevis*, 85 F.4th at 1215 (Brennan, J., dissenting) (Many handguns, which are the "quintessential self-defense weapon" for Americans, come standard with magazines that carry more than 15 rounds). Data regarding their use for self-defense and sport along with logic and reason show "these magazines are *lawfully owned* by millions of people

nationwide." *Duncan v. Bonta*, 19 F.4th 1087, 1140 (9th Cir. 2021) (Bumatay, J., dissenting). This data and caselaw confirms *Cuomo*'s holding that "[e]ven accepting the most conservative estimates cited by the parties and by *amici*, the assault weapons and large capacity magazines at issue are 'in common use' as that term was used in *Heller*." 804 F.3d at 255.

The State takes issue with Plaintiffs' reading of *Cuomo* as satisfying *Heller*'s commonality test. But *Cuomo* has not been overruled in that respect and remains binding on this Court. Even where a portion of a decision has been "abrogated on other grounds," the remaining portions of a decision nonetheless "remain good law." *Vill. Green at Sayville, LLC v. Town of Islip*, 43 F.4th 287, 294 (2d Cir. 2022) (explaining that the Supreme Court had overruled part of *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 90 (2d Cir. 2002), but the remainder of that decision remained binding). While *Cuomo*'s two-step balancing test was abrogated by *Bruen*, the intact, non-abrogated portions of that decision (including its finding that plus-10 mags are "in common use for purposes of *Heller*") remain binding upon this Court.

Although *Cuomo* noted that evidence presented to it in 2015 was equivocal regarding whether the banned arms were typically possessed for lawful purposes, *id.* at 256, its reasoning on this issue and current data forecloses any other finding. *Id.* (Even if defendants correct that banned weapons used disproportionately in crimes, "the same could be said for the handguns in *Heller*," noting that "disproportionate criminal use did not prevent the Supreme Court from holding that handguns merited constitutional protection."). To the extent that lower courts have distorted the "lawful purposes" test and found there is no common use of a firearm unless that firearm is actually fired in self-defense, *see e.g., Ocean State Tactical*, No. 23-1072, 2024 U.S. App. LEXIS 5723, at

14

\*14, such courts have disregarded Supreme Court precedent, which dictates that common use is a question of what weapons are "chosen by Americans for self-defense," *Heller*, 554 U.S. 570, 629, 128 S. Ct. 2783, 2818 (2008), not what weapons are deployed or fired in self-defense.

While Vermont makes no claim that the banned magazines are disproportionately used in crimes, recent industry data indicates the overwhelming majority of uses are lawful. Nearly 70% of "assault rifle" magazines in the country have a capacity of more than 10 rounds. ECF2-1 at 11. These magazines are typically possessed for lawful purposes. According to the National Firearms Survey, the most common reasons cited for owning these magazines are target shooting (64.3% of owners), home defense (62.4%), hunting (47%), and defense outside the home (41.7%). ECF2-1 at 11, citing to ECF2-7 and 2-8. The law also concedes the lawful use of these magazines by its exceptions for already-owned magazines and for competitive shooters, who are allowed to bring banned magazines into Vermont for competitions. 13 V.S.A. §§ 4021(a), (c)(1), (d)(1)(F).

The People's overwhelming use of the banned firearms and magazines for lawful purposes establishes that they are protected by the Second Amendment. Absent data showing otherwise, the State creatively tries to rejigger the standard by claiming that Plaintiffs must also show that the banned magazines are commonly used specifically for self-defense.[6] ECF24 at 17-19. This process involves flawed expert testimony assessing

---

[6] In rejiggering the test, the State abandoned the argument made in other cases by other defendants that the LCMs must be in "common use *for lawful purposes*." But, in light of strong data showing lawful use, that abandonment was not a great sacrifice. Otherwise, the State would have to ask this Court to conclude that hundreds of millions of LCMs are mainly being used criminally.

whether LCMs are actually used in self-defense by giving an opinion as to how many rounds are typically fired in self-defense, which then delimits the right. ECF24 at 18.[7] But that proposal is flatly contrary to *Heller* and *Bruen*.[8] Even accepting the State's erroneous claim that only self-defense matters when assessing whether a firearm is "in common use," that does not mean a firearm must be commonly *fired*. A firearm kept for self-defense, but not actively fired in self-defense, is still possessed for that purpose. Requiring firearms to be commonly fired (a rare event) would mean that *Heller* was wrong to find handguns are in common use.[9]

Of course, the State should not be allowed to limit "common use" to self-defense. While *Heller* establishes that armed self-defense is "the *central component*" of the Second Amendment, it also repeatedly recognizes that the right to keep and bear arms extends to other lawful purposes—including "hunting" and "practi[cing] in safe places the use of them." 554 U.S. at 599, 619; *see also Ezell*, 651 F.3d at 708. The Supreme

---

[7] The State's expert for purposes of establishing how firearms are used in self-defense has been criticized by a sister court. That court cited numerous methodological flaws in her studies, and went on to say that "Allen's 2.2 shot average is suspect for larger reasons. The whole statistical exercise is based on hearsay (anecdotes) upon hearsay [and] lacks the usual indicia of accuracy and reliability of admissible evidence." *Duncan*, No. 17-cv-1017-BEN (JLB), 2023 U.S. Dist. LEXIS 169577, at *35 (S.D. Cal. Sep. 22, 2023).

[8] Another U.S. District court called this approach "a stealth return to the interest balancing test rejected by *Heller* and *Bruen*, … based on concocted statistics about what a hypothetical average person needs to defend against an attacker or attackers in an average self-defense situation." *Duncan v. Bonta*, No. 17-cv-1017-BEN (JLB), 2023 U.S. Dist. LEXIS 169577, at *4-5 (S.D. Cal. Sep. 22, 2023) (rejecting idea that number of shots fired matters for Second Amendment purposes).

[9] The First Circuit similarly erred in *Ocean State Tactical*, No. 23-1072, 2024 U.S. App. LEXIS 5723, at *14 (1st Cir. Mar. 7, 2024) (Looking at how many shots actually fired to conclude that banning LCMs imposes no meaningful burden on right to self-defense.) The relevant constitutional right is the right to "keep" and "bear" arms, not the right to fire or deploy them in a particular circumstance. And neither *Heller*, *McDonald*, nor *Bruen* permit a court to uphold a regulation because it characterizes a burden as "minimal."

Court has repeatedly described the Second Amendment as protecting arms that are generally "in common use at the time," *Heller*, 554 U.S. at 624; *see also id.* at 627; *Caetano*, 577 U.S. at 411, 412; *Bruen*, 152 S. Ct. at 2128, 2143—in common use "for lawful purposes *like* self–defense," but not *limited* to that purpose, *Heller*, 554 U.S. at 624 (emphasis added). Indeed, Vermont's argument would mean that a firearm that was commonly owned by ordinary, law-abiding citizens at the Founding but was most commonly used for militia service not for self-defense—the very "purpose for which the right was codified," *id.* at 599—would be unprotected.

In all events, the magazines at issue are commonly owned for the lawful purpose of self-defense, a fact evident from the statistical evidence cited in Plaintiffs' motion, ECF2-1 at 11, 13-14; and in our Complaint at ¶¶ 7, 10, 38 *et seq.*, showing that self-defense is a common reason cited by the owners of these arms for acquiring them. It remains true even if they are rarely fired in self-defense. And, if it is true that they are rarely fired in self-defense, that may be due to the deterrence power of these arms.

## C.  There is no military-style weapons test.

The State argues that LCMs are not arms, but then concedes they are arms by claiming they should not be protected "because they are akin to military-style offensive weapons." ECF24 at 19-20 (citing to non-binding cases: two lower court and one 7th Circuit). There is no "akin to military-style" test. Indeed, the Supreme Court has explicitly rejected arguments that *only* military style arms are protected. *See Caetano*, 577 U.S. at 419 (Alito J. concurring) (weapons typically possessed by citizens protected "regardless of any weapon's suitability for military use"); *See also Kolbe v. Hogan*, 849 F.3d 114, 156 (4th Cir. 2017) (Traxler, J., dissenting) (calling an arm a "weapon of war"

irrelevant, because under *Heller* "weapons that are most useful for military service" do not include "weapons typically possessed by law-abiding citizens.").

The State argues that small capacity magazines "are unquestionably suitable for self-defense." ECF24 at 19. However, by excepting police, who like citizens can only use weapons in self-defense or defense of others, the State concedes that LCMs are useful in self-defense. 13 V.S.A. § 4021(d)(1)(B). Just like citizens, law enforcement may use deadly force only when there is "an imminent danger of death or serious physical injury to the officer or another person." U.S. Department of Justice Policy on Use of Force, 1-16.200, https://www.justice.gov/jm/1-16000-department-justice-policy-use-force.

The claim that LCMs are, in the State's judgment, unnecessary for self-defense also reveals the fault in this argument. The Second Amendment does not permit the government to choose what we use to protect ourselves. It protects those arms "chosen by Americans for self-defense" "*[w]hatever the reason*" for the choice. *Heller*, 554 U.S. at 629 (emphasis added). After all, it is the "balance . . . struck by the traditions of the American people . . . that demands our unqualified deference" under the Second Amendment. *Bruen*, 142 S. Ct. at 2131. And the Second Amendment *does not* contemplate "defer[ence] to the determinations of legislatures," *id.*, concerning which types of firearms are deemed "suitable" for use by ordinary citizens.

In the State's view, even the total ban of the most popular firearm magazines in the country is only a slight burden on the Second Amendment right because the banned magazines are unnecessary for self-defense as individuals in self-defense situations rarely fire 10 rounds. ECF24 at 21 (mag bans "merely restrict a *single* manner of use, not all manners.") (emphasis original). *Heller* petitioners made the same argument by trying to show that *rifles* are good for self-defense while *handguns* are ill-suited. The

Court rejected this argument: "It is no answer to say . . . that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed." 554 U.S. at 629. It cannot be the case, that if a firearm is not "dangerous and unusual," and therefore its ownership is protected by the Second Amendment, a ban on its possession is a slight burden. That experts and Vermont consider the firearms not to be suitable, or even unnecessary for self-defense, ECF24 at 18-19, is irrelevant.

The Supreme Court, faced with virtually identical arguments about handguns,[10] listed "many reasons that a citizen may prefer a handgun" but found the actual reason immaterial, *Heller*, 554 U.S. at 629. What mattered was that "handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." *Id.* Because the American people have chosen magazines with greater than 10- and 15-round capacity in large numbers, Vermont's ban of those protected arms cannot be considered a slight burden on the right.

## 4.  There is no historical tradition of banning arms in common use for lawful purposes.

### A.  It is unconstitutional for the government to ban arms in common use for lawful purposes.

*Heller* instructs that the Second Amendment presumptively protects all bearable arms. 554 U.S. at 582; *see also Caetano,* 577 U.S. at 411. That presumption can be rebutted by showing that a bearable arm is not commonly possessed for lawful purposes. 554 U.S. at 624-25. As *Heller* explained, arms commonly possessed and used

---

[10] *See, e.g.*, Violence Policy Center and the Police Chiefs of Los Angeles, Minneapolis, and Seattle as *Amici Curiae* in Support of Pet'rs, 2008 WL 136348 at \*29–30, *District of Columbia v. Heller*, No. 07-290 (Jan. 11, 2008) ("[T]he handgun is the *least* effective firearm for self-defense for all but a small group of exceptionally well-trained individuals. . . . [S]hotguns and rifles are much more effective.").

for lawful purposes receive Second Amendment protection. 554 U.S. at 624-25, 627-28. *Bruen*, citing *Heller*, confirmed this unambiguous directive: "The Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions." 142 S.Ct. at 2156 ("Apart from a few late-19th-century outlier jurisdictions, American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense.") *Bruen* stressed that commonly possessed arms are protected. *Id.* at 2123, 2143, 2144, 2153; *see also Caetano*, 577 U.S. at 411, 417, 420 (2016) ("A weapon may not be banned unless it is *both* dangerous *and* unusual.") (Alito, J. and Thomas, J. concurring).[11]

The State dismisses this argument as "simplistic." ECF24 at 20-21. But, under *Heller* and *Bruen*, the analysis is straightforward. Only two questions are relevant to this Court's analysis of the magazine ban: 1) Are 10 or 15 round ammunition feeding devices arms that the Second Amendment presumptively protects? If so, (2) are they in common use for lawful purposes? No historical analysis, such as that proposed by the State, is necessary because the Supreme Court has already performed that service and concluded that commonly possessed arms are protected while those that are "highly unusual in society at large" are not. *Heller*, 554 U.S. at 627-28; *see also id.*, at 625-26 ("We therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns. That accords with the historical understanding of the right . .

---

[11] The First Circuit recently held that statistical evidence of ownership rates was "ancillary" to the question of whether the Second Amendment protects the right to possess LCMs, *Ocean State Tactical*, No. 23-1072, 2024 U.S. App. LEXIS 5723, at *30. Such a holding would be improper in this Circuit, where *Cuomo* remains binding law. *Cuomo*, 804 F.3d at 256 (2d Cir. 2015) ("common use is an objective and largely statistical inquiry").

..."). Grafting another inquiry atop *Heller*'s and *Bruen*'s straightforward test dilutes the Second Amendment protection these landmark cases sought to reinforce.

**B. Nuance is inapplicable here, but even if it were, the State fails to identify an appropriate relevant historical analog.**

*(1) Vermont's analogical reasoning defies* Bruen.

Instead of following binding Supreme Court precedent that commonly possessed arms may not be banned, the State proposes for this Court to embark on an historical inquiry based on language from *Bruen* that when conducting historical analysis, "cases implicating unprecedented societal concerns or dramatic technological changes require nuanced consideration." ECF24 at 22-26, Bruen, 142 S.Ct. at 2131-32.

Vermont argues its magazine ban is "relevantly similar" to its proffered historical analogues while imposing a limited comparable burden. ECF24 at 26-28, citing *Bruen*, 142 S. Ct. at 2132-33. *Bruen* says otherwise. Vermont has banned arms commonly possessed for lawful purposes, but has not shown an established tradition of banning any commonly possessed arms, or even banning the carrying of such arms. At best, Vermont's historical analogues support a tradition of regulating how such arms are carried, e.g., prohibiting concealed carry of such arms so long as open carry is allowed. Vermont's ban on possession of an arm, even in the home, imposes a far greater burden than a regulation on how such arm is carried. *See Heller,* 554 U.S. at 628-30.

*Bruen* said "*unprecedented* societal concerns or *dramatic* technological changes may require a more nuanced approach" to determining whether a law is consistent with historical tradition. 142 S. Ct. at 2132 (emphasis added). Nothing in this language or its surrounding text suggest that the Court was overturning, diluting, or qualifying in any way its finding that commonly owned arms may not be banned. Indeed, the Court went

on from this quote to detail how the Second Amendment has evolved to protect modern firearms. *Bruen* at 2132 (Arms "in existence in the 18th Century" are not the only arms protected, because "'[j]ust like the First Amendment protects modern forms of communication and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.'") (quoting *Heller*).

The State invokes this "nuance" language to seek a lower burden of justification. ECF24 at 22-26. But even if Supreme Court precedent is ignored and "nuance" is applied, the State still fails to carry its burden. Even in the realm of "nuance," *Bruen* still rules and it cautioned that reasoning by analogy in such cases must be carefully constrained by an inquiry into both "whether modern and historical regulations impose a comparable burden on the right of armed self-defense – here it does not – and whether that burden is comparably justified." *Id.* at 2133. It did not suggest, as Vermont does, that such changes give it a "blank check" to rely on any historical practice no matter how far removed from *Bruen*'s clear dictate that Second Amendment burdens must be rooted in "an enduring American tradition of state regulation," *Id.* at 2155-56 (emphasis added). Regardless, Vermont's magazine ban addresses neither an "*unprecedented* societal concern" nor a "*dramatic* technological change" in firearms.[12]

---

[12] *Ocean State Tactical* correctly recognized the applicability of this test, but dramatically erred in applying it. 2024 U.S. App. LEXIS 5723, at *9. Specifically, holding that because "law advances more slowly than the technology it regulates," Rhode Island could regulate LCMs even without showing they were a "dramatic" technological change.  *Id.* at * 24-25. It also mischaracterized laws restricting the *carry* of Bowie knives as laws "restricting access," *Id.* at 19, disregarding the differences between historical bans on *carrying* certain weapons and modern bans on possession.

**(2) *Vermont cannot save its ban by claiming it is a response to an unprecedented societal concern or that large capacity ammunition feeding devices are a dramatic technological change.***

*(a) The magazine ban does not implicate unprecedented societal concern.*

The "societal concern" addressed by the LCM ban involves the same concern as *Heller* and *Bruen*—firearm violence—and it is far from "unprecedented." *Id.* Firearm violence is "a general societal problem that has persisted since the 18th century." *Id.* at 2131. Indeed, for most of the seventeenth century, the "peacetime murder rate for adult colonists . . . ranged from 100 to 500 or more per year per 100,000 adults, ten to fifty times the rate in the United States" in 2009. Randolph Roth, *American Homicide* (Cambridge, MA: Belknap Press, 2009), 209. Yet the Founders did not ban common firearms, but constitutionally enshrined the right to keep and bear them. The fact that Vermont has "addressed a perceived social problem" that has widely existed since the Founding in a way "that the Founders themselves could have," but did not, conclusively shows that Vermont's ban cannot be justified as "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2131, 2135.

Mass public killings were also a familiar social problem at the Founding. For example, "[i]t is difficult for modern Americans to appreciate the acute, consuming fear of 'Indian raids' held by early Americans." Stephen P. Halbrook, *The Right to Bear Arms* 131 (2021); *see also* Tr. of Oral Arg. at 8:14–16, *Heller*, No. 07-290 (U.S. Mar. 18, 2008), https://tinyurl.com/yzakhdce (Kennedy, J.) (observing that the American colonist carried arms "to defend himself and his family against hostile Indian tribes" in addition to "outlaws, wolves and bears . . . and things like that"). "After clashes in western Virginia in 1774, James Madison wrote that the attacking Indians were 'determined in the extirpation of the inhabitants.'" Halbrook, *The Right to Bear Arms* (Bombardier

Books: Brentwood, TN) at 131 (cleaned up). And John Adams described in 1775 how "New-Englandmen" were "habituated . . . to carry their fuzees or rifles upon one shoulder to defend themselves against the Indians, while they carry'd their axes, scythes and hoes upon the other to till the ground." John Adams, Letter To the Inhabitants of the Colony of Massachusetts-Bay, FOUNDERS ONLINE (Feb. 6, 1775), https://tinyurl.com/yc3df5yp. It was recognized, moreover, that the threat was greatest in public spaces, such as places of worship, where large groups of people gathered. Yet again, the approach that the Founders "adopted to confront that problem," *Bruen*, 142 S. Ct. at 2131, could not have been more different than the bans challenged here: in colony after colony, the Founders responded to the threat of mass public violence by *requiring* law-abiding citizens to bring firearms to those gatherings where the threat was most acute. *See* Halbrook, *supra*, at 132–35.

*(b) Ammunition feeding devices are not a dramatic technological change.*

The State contends "dramatic technological changes" explain the lack of any historical (or even modern-day) tradition supporting the magazine ban. ECF24 at 23-25. But that lack of support is certainly not owing to any "dramatic technological changes." *See Bruen*, 142 S.Ct. at 2132. Vermont takes issue with the examples Plaintiffs provide in their Complaint, EFC24 at 23; Complaint at ¶¶42 *et seq.*, but history shows (and courts have found) there is nothing new about firearms capable of firing more than one round without reloading. "[T]he first firearm that could fire more than ten rounds without reloading was invented around 1580." *Duncan*, 970 F.3d at 1147; *see also* William Wellington Greener, *The Gun and Its Development* 80-81 (Cassell & Co., 8th ed. 1907) (1881). Several such arms pre-dated the Revolution, some by nearly a hundred years. For example, the popular Pepperbox-style pistol could "shoot 18 or 24 shots before

24

reloading individual cylinders," and the Girandoni air rifle, which "had a 22-round capacity," "was famously carried on the Lewis and Clark expedition." *Duncan*, 970 F.3d at 1147. These and other models of firearms capable of firing more than ten rounds of ammunition without reloading became widespread in the United States well before the framing of the Fourteenth Amendment.

"Cartridge-fed" "repeating" firearms came onto the scene "at the earliest in 1855 with the Volcanic Arms lever-action rifle that contained a 30-round tubular magazine, and at the latest in 1867, when Winchester created its Model 66, which was a full-size lever-action rifle capable of carrying 17 rounds" that "could fire 18 rounds in half as many seconds." *Duncan*, 970 F.3d at 1148; *see* Louis A. Garavaglia & Charles G. Woman, *Firearms of the American West 1866- 1894*, at 128 (1985); *see also* Kopel, *supra*, 78 Alb. L. Rev. at 854-55 (discussing the advent of the "first metallic cartridge ... similar to modern ammunition" in the 1850s).

The State contends that multi-shot arms "had very little civilian market in the Reconstruction Era." ECF24 at 23. But these multi-shot arms were not novelties; they were ubiquitous among civilians by the end of the Civil War. "[O]ver 170,000" Winchester 66's "were sold domestically," and the successors that replaced the Model 66, the 73 and 92, sold more than ten times that amount in the ensuing decades. *Duncan*, 970 F.3d at 1148. Winchesters were far from unique in this regard. *See* Harold F. Williamson, *Winchester: The Gun That Won The West* 28-31 (1952) (discussing the Henry lever action rifle, which could fire 16 rounds without reloading); Norm Flayderman, *Flayderman's Guide to Antique American Firearms and Their Values* 305 (9th ed. 2007) (noting that 14,000 Henry rifles were sold between 1860 and 1866).

Amici claim Henry and Winchester rifles with magazine capacities in excess of 10 rounds were not really popular with civilians when the 14th Amendment was ratified. ECF26-1 at 32, 33, see also ECF24 at 20. Even if true, and it is not, this claim provides no relevant historical basis for Vermont's magazine ban.[13] Professor Michael Vorenberg in a declaration filed in *Duncan v. Bonta*, (as an expert for defendants) ("Vorenberg"), acknowledged that Americans came to regard self-defense as important in the western states, and the Winchester Company capitalized on this in its marketing. Ex. C at ¶ 54. Yet he contended these rifles were not popular and did not sell well. *Id.* at ¶¶ 55-59. However, given that the military did not adopt Henry-Winchester rifles, and that over 100,000 in the Reconstruction era stayed in the country, it follows they were commonly owned by regular citizens. *Id. See also* Kopel at 869 ("The best of these was the sixteen-shot Henry Rifle, introduced in 1861 with a fifteen-round magazine. The Henry Rifle was commercially successful, but Winchester Model 1866, with its seventeen-round magazine, was massively successful.")

In any event, Vermont fails to identify a single law banning acquisition and possession of these rifles (or any other firearm) based on their firing capacity in this relevant time period. Vorenberg, in his *Duncan* declaration, candidly admits this fact. *See* Ex, C at ¶ 8 ("[E]xplicit legal text prohibiting civilian possession of the most dangerous weapons of war was not commonly the means by which such weapons were

---

[13] Judge Benitez conducted his own statistical analysis of civilian repeating rifle ownership in the 1800s, consulting the Winchester company website and anecdotal evidence, and concluded "there was an awful lot of those weapons that wound up in civilian hands." *Duncan v. Bonta,* Case No. 17-cv-1017, Tr. 21-22 (Dec. 12, 2022). "[i]f you look at Professor Vorenberg's materials, which I have looked at you see that the statement that they were not commonly owned is just not true." *Id.* at 22.

regulated in the United States.") Speculative explanations for why legislative action did not occur cannot justify Vermont's restriction on standard capacity magazine. To the contrary, *Bruen* demands Vermont identify relevant and well-established historical laws evidencing an American tradition of similar regulation.

To be sure, feeding devices capable of holding more than 10 or 15 rounds were not as numerous in the nineteenth century as today. But the same could be said of pretty much any type of arm (our population today is more than 10 times higher than in 1860). The more relevant point is that history refutes any notion that there is something novel about what Vermont has banned. What fed ammunition into the chamber of these firearms were magazines and other ammunition feeding devices capable of holding more than 10 or 15 rounds. "The Winchester M1873 and then the M1892 were lever actions holding ten to eleven rounds in tubular magazines." Kopel, *supra*, 78 Alb. L. Rev. at 855. Similarly, the Evans Repeating Rifle, which first hit "the market in 1873," came standard with a fixed magazine located in the buttstock that "held thirty-four rounds." Kopel, *supra*, 78 Alb. L. Rev. at 856; *see also* Dwight B. Demeritt, Jr., *Maine Made Guns And Their Makers* 293-95 (rev. ed. 1997). And contrary to the State's expert, semi-automatic firearms with detachable magazines "came into wide use toward the end of the nineteenth century." Stephen P. Halbrook, *America's Rifle: The Case for the AR-15*, at 9 (2022).

In short, semiautomatic firearms and feeding devices capable of holding more than 10 or 15 rounds have been part of American life for well over 100 years. The State attempts to dismiss examples of repeating firearms from the Founding as "'fraught' with problems and 'proven unfeasible.'" ECF24 at 23. But today's less problematic and more reliable firearms make them better for self-defense, as millions of Americans can attest.

27

The fact that modern firearms and magazines are more accurate and capable of quickly firing more rounds than their Founding-era predecessors does not make them any less linear descendants of the "small-arms weapons used by militiamen … in defense of person and home" when the Second Amendment was ratified. *Heller*, 554 U.S. at 624-25; *see also Caetano*, 577 U.S. at 416-17 (Alito, J., concurring) ("revolvers and semiautomatic pistols" are protected as descendants of arms in common use at the founding). After all, it would be perverse to confine the people to arms that are less accurate, efficient, and reliable for self-defense— which likely explains why no such historical tradition exists. Moreover, much of what the State said about why the magazines it now deems too "large" are supposedly different from arms long in common use could be said of the handguns protected by *Heller*. That is why the Supreme Court eschewed a test focused on which arms are capable of doing the most damage by a small number of people bent on misusing them, in favor of a test focused on which arms law-abiding citizens commonly conclude best serve their needs.

Even accepting *arguendo* that centuries old technology could be deemed to be a "dramatic technological change," the fact that a weapon is the product of new technology does not mean that it can be banned. "Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, *prima facie*, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Bruen*, 142 S. Ct. at 2132 (*quoting Heller*, 554 U.S. at 582).

Moreover, while mass shootings are indisputably tragic, they are rare. In a nation with a population of 330 million, 928 deaths in 33 years (on average, 28 deaths per year) cannot serve as the basis for depriving millions of law-abiding citizens of the right

28

to possess a weapon they have chosen for lawful purposes. This conclusion is reinforced by *Heller*. In that case, D.C. informed the Court that in the then-recent Virginia Tech shooting, "a single student with two handguns discharged over 170 rounds in nine minutes, killing 32 people and wounding 25 more." Brief of Petitioners, *D.C. v. Heller*, 2008 WL 102223, 53. The Court responded: "We are aware of the problem of handgun violence in this country, and we take seriously the concerns raised ..." *Id.*, 554 U.S. at 636. "But the enshrinement of constitutional rights necessarily takes certain policy choices off the table. These include the absolute prohibition of [commonly possessed arms] held and used for self-defense in the home." *Id.*

## C.  Vermont fails to produce evidence sufficient to show its magazine ban is consistent with this Nation's historical tradition of firearms regulations.

### (1)  Bruen *requires the State to present historically relevant analogues and analysis showing a comparable justification and burden.*

Under the history and tradition test, the government has the burden of identifying well-established and representative historical analogues to show that the modern regulation is consistent with a historical tradition of firearms regulation. *Bruen*, 142 S. Ct. at 2133. This analogical inquiry requires a court to review proposed analogues at the appropriate level of generality. *Id.* ("[A]nalogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check."). On one hand, under *Bruen*, courts must not "uphold every modern law that remotely resembles a historical analogue." 142 S. Ct. at 2133 (internal citation omitted). On the other hand, a proposed analogue need not be a "dead ringer" for the modern law. *Id.*

The first issue in a historical inquiry is to identify the relevant time period. *Bruen* noted that "not all history is created equal. 'Constitutional rights are enshrined with the

scope they were understood to have *when the people adopted them*.'" *Id*., 142 S. Ct at 2136, *citing Heller*, 554 U.S. at 634-35 (emphasis original). The Second Amendment was adopted in 1791. The Court cautioned against "giving postenactment history more weight than it can rightly bear." *Id*., 142 S. Ct. at 2136. "[T]o the extent later history contradicts what the text says, the text controls." *Bruen*, 142 S. Ct. at 2137 (citation omitted). In examining the relevant history, the *Bruen* Court noted that "[a]s we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'" *Bruen*, 142 S. Ct at 2137 (citing *Heller*, 554 U.S. at 614). This Court need not resolve the issue of whether 1791 or 1868 is the proper timeframe, because, as in *Bruen*, "the lack of support for [the State's] law in either period makes it unnecessary to choose between them." *Id*., 142 S. Ct. at 2163 (Barrett, J., concurring). Finally, whatever may be the case as to 19th-century laws, *Bruen* held that 20th Century laws are certainly irrelevant to the historical inquiry. Such precedents do "not provide insight into the meaning of the Second Amendment." *Id*., 142 S. Ct. at 2154, n. 28. The "tradition" part of the test means that the comparison must be to laws with wide acceptance in American society. *Id*., 142 S. Ct. at 2136. Only laws that enjoyed "widespread" and "unchallenged" support form part of our tradition. *Id*., at 2137.[14]

---

[14] For ease of reference, Plaintiffs attach hereto as Exhibit B a compilation and analysis of relevant laws pre-dating the 20th Century. David Kopel and Joseph Greenlee, *The History of Bans on Types of Arms Before 1900*, available at https://davekopel.org/2A/LawRev/The%20History%20of%20Bans%20on%20Types%20of%20Arms%20Before%201900.pdf (last visited March 12, 2024).

*Bruen* asked two questions when assessing proposed historical analogues: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.*, at 2133. A court must ask how the regulation limited the right to keep and bear arms and why did it do so? Of critical importance to this case, the Court must consider whether the challenged regulation imposes a "comparable burden on the right of armed self-defense." *Id.*; *See also Antonyuk*, at *50 (setting forth *Bruen* test when nuance applies – comparable burden and justification are central considerations) (cleaned up). The more expansive the limitation, the greater the burden on the Second Amendment right, which necessarily requires a close analogical fit. *Bevis*, 85 F.4th at 1211. When considering the "why" question, a court must consider whether the challenged regulation and the proposed historical analogue have comparable justifications for burdening the right to bear arms. *Bruen*, 142 S. Ct. at 2133. If the reasons motivating the historical and modern regulations differ, there is no analogue. *See id.* at 2140, 2144.

There are no Founding-era laws even remotely analogous to the absolute ban on a weapon commonly possessed for lawful purposes. The ban is therefore categorically unconstitutional and the analysis should end. Despite this simple rule from *Heller*, the State offers a list of laws it argues are analogous to its absolute ban of commonly possessed weapons. ECF24 at 26-28. Application and comparison of these historical laws to the modern restriction is the most important part of the *Bruen* test, but Vermont spends only about two pages addressing it with summary reference to how its experts described the laws rather than the laws themselves. *Id.* The State never cites the text to try to carry its burden of showing an appropriate analogue. That is understandable because text is stubborn and none supports the ban. So the State resorts to malleable expert opinion with the hope that neither Plaintiffs nor the Court will peak behind the

curtain to examine the actual text. Summaries are insufficient to carry the State's

burden, and, as in *Heller*, the laws it presents are not "remotely" analogous.

**(2)  *The laws cited by the State fail Bruen's historical relevancy test.***

Vermont's historical evidence fails on its own terms. None of the historical laws

identified by the State meet *Bruen*'s historically relevant test or its how and why criteria

(comparable justification and burden). *Bruen*, 142 S. Ct at 2133 (historical laws must be

analogous in two senses: they "impose a comparable burden on the right of armed self-

defense" as the challenged restriction, and "that burden is comparably justified").

Vermont cites three lower court decisions to assert that magazine bans are

"analogous to historical regulations that banned new and dangerous weapons." ECF24

at 26-27. But those decisions make the sweeping claim that such laws justified banning

magazines (and presumably many other arms) based on their perceived

"'dangerous[ness] to public safety.'" ECF24 at 27 (quoting *Oregon Firearms Fed'n*, 2023

WL 4541027, at 46). The State asks this Court to do the same – to find its law

constitutional because it was passed to respond to public safety concerns and the

perceived danger of these arms, precisely the sort of analysis *Bruen* warned against

when it explained that its opinion should not be read to permit courts to "engage in

independent means-end scrutiny under the guise of an analogical inquiry." 142 S. Ct. at

2133 n.7.

Indeed, this sort of analysis is *worse* than the old means-end test because there,

at least, the question of whether there really is a connection between the banned arms

and "a recent rise in mass shooting incidents" would be tested. No such connection

would be found. *See Effects of Assault Weapon and High-Capacity Magazine Bans on

Mass Shootings*, RAND CORP. (Jan. 10, 2023), https://tinyurl.com/fczanc5f. Instead, the

State proposes that this Court uncritically accept the claimed link and declare it as "similar" to historical regulations, which it suggests were also based on public safety concerns. Such broad generalizations about the motivations of present and past firearms laws would presumably excuse any firearm ban—indeed, it is hard to see how they would not excuse the handgun ban in *Heller*, which reveals the flaws of this analysis.

The State's claim to have presented a robust tradition of cracking down on relatively new firearms technology after it has proliferated to a point where the firearms are deemed problematic is based on laws that simply do not say what the State claims they say. Therefore, its proposed unbounded justification and burden test – if an arm is deemed dangerous by a legislature, it can be banned regardless of its lawful commonality – is unsupported.

The State argues there is "a well-worn historical 'pattern' of weapons invention, military use, civilian use, use in crime, and regulation." ECF24 at 27. This gloss on our Nation's history significantly overstates and misstates the evidence on which it is based. The actual restrictions on which the State's experts rely to divine this pattern were much less strict and wide-ranging than the Vermont ban. None meet *Bruen*'s analogue test.

*(a)  Laws regulating machine guns and semi-automatics enacted more than a century after the Founding are inapt.*

Vermont's expert, citing 1920s and 1930s laws, claimed that "[t]hirteen states restricted the capacity of ammunition magazines for semi-automatic and automatic firearms" ECF24 at 28.[15] The State presented these as supportive analogues. But they come far too late. *Bruen*, 142 S. Ct. at 2154 (20th Century laws irrelevant to "meaning of

---

[15] In fact, for this claim, the State's expert Roth cites to a paper by another State expert Spitzer who in turn presents a table of state laws with a nonworking data link source. Roth Dec. ¶ 47.

the Second Amendment"). Even if timely, these laws, which neither the State nor its expert analyzed, do not support a magazine ban.

The laws of four of these States only applied to "machine rifles, machine guns, or submachine guns capable of automatically and continuously discharging" and so they are disanalogous. 1927 Cal. Stat. 938; 1933 Cal. Stat. 1169; 1933 Haw. Sess. Laws 117; 1929 Mo. Laws 170; 1933 Wash. Sess. Laws 335. Machine gun possession regulations are irrelevant because they are *not* the same as semiautomatic firearms. Indeed, the Supreme Court has identified the line between semiautomatic and automatic as key in determining whether a firearm is of a type traditionally "accepted as lawful." *See Staples*, 511 U.S. at 612.

That leaves the other nine. Of those, one law did not ban semiautomatics. It just required a permit *See* 1933 Ohio Laws 189-90. Two laws permitted ordinary possession but banned possession for an "offensive or aggressive purpose." 1933 S.D. Sess. Laws 245-47; 1934 Va. Acts 137-39. Three laws only applied to machine guns, 1927 Mass. Acts 416, 1932 La. Acts 337-38 ("An Act to Regulate the Sale, Possession and Transportation of Machine Guns"), 1934 S.C. Acts 1288, and two were limited to ammunition capacity of firearms used in hunting, 1920 N.J. Laws 67, ch. 31, § 9; 1917 N.C. Sess. Laws 390, ch. 209, § 1. Another reached semiautomatics only if they were "changed, altered or modified" from their original design to increase capacity. 1933 Minn. Laws ch. 190.

Very few jurisdictions banned semiautomatic firearms based on capacity. *See* 1932, Public-No. 275-72D (District of Columbia) (12 rounds without reloading); 1927 Mich. Pub. Acts 888-89 (16 rounds); 1927 R.I. Pub Laws 256 (12 rounds). Of these laws that most stringently restricted possession of semiautomatic firearms, only D.C.'s law was not repealed. *See* 1959 Mich. Pub. Acts 249, 250; 1959 R.I. Acts & Resolves 260, 263. In other words, the ban is unconstitutional because Vermont failed to show an enduring tradition of lawful restriction on the right to own a commonly possessed firearm.

34

*(b)  Bowie knife restrictions are inapt.*

The State points to Bowie Knives in the 1800s as fitting its posited well-worn historical pattern. But Bowie knives were not "invented" in the 1800s. Similar weapons, e.g., swords, had been around for many thousands of years, so the State transforms "invention" to popularity, claiming that "as the Bowie Knife became *popular* and started to be [used in crimes] most states responded by barring or restricting them (and similar long-bladed knives)." ECF24 at 27 (emphasis added).

Furthermore, the expert's claims do not meet the facts. By his count, between 1837 and 1925, "29 states enacted laws to bar [Bowie knife] concealed carry. 15 states barred their carry whether concealed or openly." Spitzer Dec. ¶ 141 and Ex. I. That is not true. Of the 15 states that Spitzer claimed (throughout its analysis, the State cites to its expert's analysis of the relevant laws, rather than the laws themselves) banned the carry of Bowie knives altogether, three merely banned concealed carry or open carry with intent to use the knife in a crime. Colo. Rev. Stat. 1774, § 248 (1881); 1859 Ind. Acts. 129; George R. Donnan, *Ann. Code of Crim. P. & Penal Code of the State of N.Y. as Amended 1882-5*, § 410 (1885). Two others applied only to certain "sensitive places" or on election days. 1870 La. Acts 159-60; James H. Shankland, *Public Statutes of the State of Tennessee, since the Year 1858. Being in the Nature of a Supplement to the Code*, at 108 (1869). Six others did not apply statewide but were limited to certain localities (and even in those localities, some of these were still not the broad bans on carry). Joplin Code of 1917, art. 67, § 1201 (Joplin, also only applied to certain "sensitive places"); William King McAlister Jr., *Ordinances of the City of Nashville, to Which are Prefixed the State Laws Chartering and Relating to the City, with an Appendix*, 340−41 (1881)

(Nashville); Claude Waller, *Digest of the Ordinances of the City of Nashville, to Which are Prefixed the State Laws Incorporating, and Relating to, the City*, 364-65 (1893) (Nashville); Gilbert B. Colfield, *Laws, Ordinances, and Rules of Nebraska City, Otoe County* at 36 (1872) (Nebraska City, also notably prohibited all carriage even of rifles, muskets, and pistols, plainly unconstitutional under *Bruen*); Charter and Revised Ordinances of Boise City, Idaho 119-20 (1894) (Boise, permitted carrying while traveling); Revised Ordinances of Provo City, Containing All The Ordinances In Force 105, 106-107 (1877) (Provo).

One cited law applied only to those who were engaged in the illegal transport of alcohol. 1923 Mo. Laws 24-42. Several others were mere "territorial restrictions," which *Bruen* discounted because they were frequently short lived, rarely tested in court, and irrelevant to the vast majority of the country at the time they were in force, *Bruen*, 142 S. Ct. at 2154–55; *see* 1889 Ariz. Sess. Laws 16; 1890 Okla. Laws 495; 1913 Haw. Rev. Laws ch. 209 (also contained exception for those "authorized by law"); and one Hawaiian law predates Hawaii even having territory status, 1852 Haw. Sess. Laws 19. In the end, the State has presented evidence of just *three* states that actually prohibited all forms of carry of Bowie knives—Arkansas, Texas, and West Virginia.[16]

Even accepting that these states significantly restricted carry of Bowie knives, three outliers (including two states whose laws were also rejected as outliers by *Bruen*, *see* 142 S. Ct. at 2153), all post-dating the Civil War, are insufficient to establish a national historical tradition of regulation. In any event, these few laws do not impose a

---

[16] *Bruen* expressed great skepticism that the existence of three carry statutes from the more relevant colonial era were sufficient to justify a much more analogous modern regulation.. 597 U.S. at 8 ("While the Court doubts that just three colonial regulations could suffice to show a tradition of public-carry regulation...").

"comparable burden on the right" to Vermont's magazine ban, since the historical restrictions did not bar *possession*, as Vermont's law does.

Regarding the regulation of Bowie Knives, renowned Second Amendment historian David Kopel, whose work was cited favorably in *Bruen*, recently published a detailed evaluation of Reconstruction-era Bowie knife laws that confirms this analysis.

> At the end of the 19th century, no state prohibited possession of Bowie knives. Two states, Tennessee and Arkansas, prohibited sales. The most extreme tax statutes, such as Alabama's $100 transfer tax from 1837, had been repealed.

> Only a very few statutes had ever attempted to regulate the peaceable possession or carrying of Bowie knives more stringently than handguns or other fighting knives, such as dirks and daggers. Of those, only the 1838 Tennessee sales ban was still on the books by the end of the century…. As with handguns, the states were nearly unanimous in rejecting bans on adult possession or acquisition of Bowie knives…. The much more common approach was to legislate against concealed carry, criminal misuse, or sales to minors.

David Kopel, *Bowie Knife Statutes 1837-1899,* THE VOLOKH CONSPIRACY,

https://tinyurl.com/msh566r9 (last visited March 12, 2024). Once again, Vermont relies primarily on historical laws restricting the manner of carrying arms in public, not their possession or even use. At best, it evidences that concealed carry was disfavored in Reconstruction-era America, which we already know from *Heller*. *See* 554 U.S. 612-14, 626. But such evidence was not enough to justify modern-day bans on all carry in *Bruen*, so it is difficult to see how such laws could support Vermont's flat ban on possession of commonly possessed magazines.

Applying *Bruen*'s "why" question to laws regulating public carry shows the "why" of the ban is not relevantly similar to the "why" of regulating public carry. In *Andrews v. State*, the court held that a man cannot be punished for bearing arms in his own home, but when he "goes among the people in public assemblages where others are to be

affected by his conduct, then he brings himself within the pale of public regulation." 50 Tenn. 165, 185–86 (1871). The scope of the government's regulatory powers over people is far narrower when they are in their homes than when in public. Thus, the "why" of the carry laws was to regulate public conduct, not private conduct in the home. It also fails the "how" question, because restrictions on carry are less of a burden than a ban, as explained in the conceal carry discussion below.

Furthermore, there is significant evidence that the more onerous Bowie knife restrictions were understood to violate the right to bear arms for self-defense unless they could be given a narrow construction. *See Nunn v. Georgia*, 1 Ga. 243 (1846); *see also Heller*, 554 U.S. at 612, 626, 629 (singling out *Nunn* as "particularly instructive" for the Second Amendment's meaning). It would be error to rely on these laws for support.

*(c)  Conceal carry laws are inapt.*

The State cites to one of its experts for the observation that "by the early 20th Century, most states had banned or severely restricted concealed firearms." ECF24 at 28. But this comparison fails *Bruen*'s "how" question. None of the concealed-pistol laws prohibited the mere possession of pistols for lawful purposes or carrying the guns openly. *Duncan I*, 2023 U.S. Dist. LEXIS 169577 at *62 (stayed).

Restrictions on the manner of carrying arms in public do not impose a burden on the Second Amendment that is in any way comparable to the burden imposed by a ban on their acquisition and possession. The distinction between anti-carry and anti-possession laws is critical. *Duncan II*, 83 F.4[th] at 819. The former limits only the way a person may use a firearm in public. *Id*. The latter categorically denies all possession of a firearm for any purpose – even in the home where the right to self-defense is most acute. *Id*. While restrictions on carrying a firearm are a significant burden, the burden of

prohibiting an arm anywhere, including in the home for self-defense, is greater in kind and magnitude. *Id. See also Teter v. Lopez*, 76 F. 4th 938, 951 (laws banning carrying a weapon are different than laws banning possession because they regulate different conduct) (petition for reh'g *en banc* granted at 2024 U.S. App. LEXIS 4079).

As in *Heller*, laws restricting the method of carry do not burden the right to keep and bear arms as much as an absolute ban on an arm commonly possessed for lawful purposes (including especially self-defense in the home). Therefore, they are not "relevantly similar" as *Bruen* requires. 152 S.Ct. at 2122. And historical concealed carry bans do not justify modern day carry bans, let alone flat bans on the possession and acquisition of commonly possessed arms as Vermont imposes.  Moreover, *Bruen* warned that courts should refrain from "giving post enactment history more weight than it can rightly bear." 142 S.Ct. at 2136. "[T]o the extent later history contradicts what the text says," as Vermont's cited concealed carry bans do, "the text controls." *Id.* at 2137 (citing *Gamble v. United States*, 139 S.Ct. 1960, 1987 (2019) (Thomas, J., concurring)).

*(d)  Club and blunt weapons laws are inapt.*

Vermont claims that "clubs and blunt weapons" followed "a similar timeline and pattern" of "invention, military use, civilian use, use in crime, and regulation." ECF24 at 27. But clubs and blunt weapons were "invented" by cavemen. Once again, the State does not cite to the laws themselves, but to its expert's report, which cites to historical laws from the latter half of the nineteenth century targeting the "billy club" and the "slungshot," as examples. Spitzer Dec. ¶¶ 147, 149. But the laws were nowhere near as restrictive as Vermont's ban. Many did not entirely forbid carry but merely regulated its method, *see* 1872 Md. Laws 57 (billy club *concealed* carriage prohibited, but only in

Annapolis); 1873 Ala. Offenses Against Public Justice § 4110 (prohibiting *concealed* carriage of brass knuckles and slung-shots). The State does not discuss these laws, but only mentions the regulated items without analysis. A closer look shows that these varying laws, which in many cases did not entirely forbid carriage of the weapons, cannot support the State's flat ban on possession. Indeed, the historical record would not even support a ban on billy clubs themselves. *Fouts v. Bonta*, No. 19-cv-1662-BEN-JLB, 2024 U.S. Dist. LEXIS 31528, at *25 (S.D. Cal. Feb. 23, 2024) (the "State has not shown a tradition of prohibiting the simple possession of a billy.").

*(e)  Trap gun laws are inapt.*

Vermont's expert points to what he calls anti-trap gun laws as analogues for the mag ban. ECF24 at 27. These laws, however, are unsupportive since the devices known as "trap guns" are not "bearable arms," *Heller*, 554 U.S. at 582. Rather, as the State's expert describes them, these devices are "contraptions rigged in such a way as to fire when the owner need not be present," through some string, or wire. Spitzer Dec. at ¶159. To the extent any of these laws also applied to bearable arms, they were more akin to gun storage rules—merely restricting *using* an arm in the particular way of "set[ting] [it] in such Manner as [the arm] shall be intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance." 1763-1775 N.J. Laws 346 (1771). Historical storage rules cannot justify firearm bans, since "they do not remotely burden the right of self-defense as much as an absolute ban." *Heller*, 554 U.S. at 632.

*(f)  Fire-safety laws governing the storage of gunpowder are inapt.*

Vermont points to 18th and 19th-century gunpowder storage laws as analogues. These laws prohibited storage of large quantities of gunpowder in one place for the purpose of reducing fires and explosions. These laws fail to establish an historical

tradition because they fail to present a comparable justification or burden on the possession of a firearm or the way it is discharged. Vermont's law is aimed at prohibiting firearms capable of firing more than 10 or 15 rounds. Gunpowder laws were fire prevention laws, directed at preventing storage of too much explosive material.

It is odd for the State to use these fire safety laws as analogues in light of *Heller's* rejection of the dissent's claim that these laws were analogues for the handgun ban. *Heller* at 632 (gunpowder storage laws "did not clearly prohibit loaded weapons, but required only that excess gunpowder be kept in a special container or on the top floor of the home" and "do not remotely burden the right of self-defense as much as an absolute ban on handguns.")  "Likewise, those fire-safety laws do not create a comparable burden to the absolute ban on the most common magazines.*" Duncan II*, 83 F.4th at 8 21 (Nelson, J., dissenting) (preventing citizens from using the most common magazine is "a starkly greater burden" than a fire-safety storage limit).

Indeed, early militia law forecloses the possibility of finding an analogous Founding-era regulation. During the Founding era, federal and state governments enacted laws to form and maintain citizen militias. Examples of these statutes are described in *United States v. Miller,* 307 U.S. 174, 180-81 (1939). These laws did not restrict firing capacity or ban weapons. They did just the opposite. They mandated the acquisition of arms and a *minimum* firing capacity, i.e., the laws required citizens to arm themselves with guns and a minimum quantity of bullets and gunpowder. For example, Congress passed the Militia Act in 1792. 1 Stat. 271, 2 Cong. Ch. 33, which required a citizen to acquire a firearm and be equipped to fire at least 20 to 24 shots. This and other state militia laws demonstrate that, contrary to a firing-capacity ceiling, there was a *floor* in the Founding era. Able-bodied men were legally obligated to have at least 20

rounds available for immediate use. *Duncan I*, 2023 U.S. Dist. LEXIS 169577 at *35. Far from being analogous to a Founding-era law, the mag ban could not have existed under the understanding of the Second Amendment at the time of the Founding because it is contrary to the legal commands for militia readiness.

## 5. The State cannot impose a purposeless delay on citizens seeking to exercise fundamental constitutional rights.

The State argues that its waiting period is constitutional even though it delays the transfer of firearms for at least 72 hours even after all other lawful requirements for a transfer have been satisfied and even though no governmental activity occurs. To reach that conclusion, Vermont misstates controlling appellate holdings, makes irrelevant public policy arguments, and ignores relevant historical firearms regulations.

### A. The Second Amendment's text protects the right to acquire a firearm.

The State cites out-of-district cases questioning whether the right to acquire a firearm is covered by the Second Amendment. ECF24 at 30. The Second Amendment, however, plainly applies to Plaintiffs' right to acquire firearms, which by necessary implication also extends to their right to transfer firearms. This is not a close call, especially in the Second Circuit, which has held that there is a "subsidiary right to acquire arms," and it may be enforced by retailers and their customers. *Gazzola v. Hochul*, 88 F.4th 186, 194 (2d Cir. 2023) (collecting cases from the Fourth, Seventh, and Ninth Circuits). The reasoning is common sense, because the right to keep and bear arms would have little practical meaning if divorced from the right to acquire arms. It is congruent with the treatment of other ancillary Second Amendment activity, such as the right to train in a firearm's use. *Ezell*, 651 F.3d at 696 ("the right to maintain proficiency

in firearm use [is]an important corollary to the meaningful exercise of the" Second Amendment).

All Plaintiffs seek to lawfully exercise their Second Amendment rights. The individuals are law-abiding, adult American citizens. The VTFSC represents its members, who are law-abiding, adult American citizens. The two firearms dealers seek to transfer firearms to law-abiding adult citizens in a lawful manner, and the Second Circuit has expressly endorsed their right to sue on behalf of their customers. *Gazzola*, 88 F.4th at 194 ("purveyors of arms" seeking to vindicate the Second Amendment rights of customers have derivative standing.) All Plaintiffs are therefore part of "the People" protected by the Second Amendment. Although the Second Amendment facially applies only to the right to "Keep and Bear" firearms, it necessarily also protects the right to acquire them. *Def. Distributed v. Bonta*, No. CV 22-6200-GW-AGRx, 2022 U.S. Dist. LEXIS 195839, at *11 (C.D. Cal. Oct. 21, 2022) (the Second Amendment's right "to keep and bear arms" "implicitly includes the right to acquire and manufacture firearms" and "necessarily involves the right to purchase" arms.). This is so because the Supreme Court has made clear that "certain unarticulated rights are implicit in enumerated guarantees." *Richmond Newspapers v. Virginia*, 448 U.S. 555, 579-80 (1980).

Vermont's waiting period infringes citizens' ability to obtain firearms, despite having already passed a background check and satisfied all other necessary requirements. In short, the law is triggered by a firearms purchase, and is a ban on the delivery of that firearm to an individual for a set amount of time while no governmental action occurs. So-called "waiting periods" on the exercise of other constitutional rights are impermissible, even with more lenient standards of review. See, e.g., *Planned Parenthood Arizona, Inc. v. Humble*, 753 F.3d 905, 916 (9th Cir. 2014) (law

unconstitutional that delayed abortion by requiring a 75 mile trip to a qualified facility); *Ind. Planned Parenthood Affiliates Asso. v. Pearson*, 716 F.2d 1127 (7th Cir. 1983) (24 hour waiting period for abortion unconstitutional), *Falls Church Med. Ctr., LLC v. Oliver*, 412 F. Supp. 3d 668, 676 (E.D. Va. 2019) ("two trip" abortion requirement unconstitutional) (all abrogated on other grounds by *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022)); *Kev, Inc. v. Kitsap County*, 793 F.2d 1053, 1060 (9th Cir. 1986) (5-day waiting period between filing an exotic dancer's permit and granting a license unconstitutional under First Amendment despite argument that delay served governmental purpose). Indeed, the Second Circuit has analogized pre-*Dobbs* abortion restrictions to post-*Bruen* restrictions on the Second Amendment. *Gazzola*, 88 F.4th at 196 ("State could not circumvent the Fourteenth Amendment's prohibition on abortion bans by imposing unnecessary special regulations on abortion providers as a class.").

## B. A purposeless waiting period is directly at odds with the Second Circuit's controlling opinion in *Antonyuk*.

The State argues that *Antonyuk* "flat out precludes Plaintiffs' claim that waiting periods are impermissible." ECF24 at 6. Vermont, however, badly misreads *Antonyuk* and the Supreme Court precedents it applied to a New York regulation, which was far different than the Vermont regulation at issue here.

*Bruen* acknowledged that while licensing of firearms may be constitutional, "lengthy wait times in processing license applications" would not be. *Bruen*, 597 U.S. 1, 8. *Bruen* explained the basis for its decision: "shall-issue regimes… often require applicants to undergo a background check or pass a firearms safety course, [and] are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Bruen*, 597 U.S. 1, 38 n.9. The government, therefore,

may investigate the applicant for purposes of ascertaining whether the prospective weapon carrier is "a law-abiding, responsible citizen." *Heller*, 554 U.S. 570, 635. *Bruen* expressly tied the ability of the government to delay the exercise of the constitutional right to the need for the government to ensure the right is being exercised by a qualified individual.

*Antonyuk* held that New York's licensing regime did not allow "unnecessary delays" insofar as a licensing officer was lawfully exercising discretion to issue a license. 89 F.4th 271 at 331. *Antonyuk* emphasized it was leaving open the door to future challenges based on "a de facto pattern of denials or de jure interpretation" of New York's permitting regime, which might cause *unnecessary* delay, *Id.* at 271 n.26, and expressly upheld the New York law because it could not be held on a facial challenge that it was "impermissibly discretionary."  *Id.* at *73. The court even explained why the question of delay and discretion came into play at all: Citing *Bruen* and *Heller*, the government is permitted to require licensing and to apply "'narrow, objective, and definite standards' guiding licensing officials."  *Id.* at 299.

In contrast to New York's licensing regime, Vermont's law serves no governmental function. Only individuals otherwise eligible for transfer of a firearm are impacted by the law. The government is not investigating a prospective transferee, but is instead imposing delay for delay's sake. A purchaser is unable to take possession of a firearm regardless of personal circumstances or need, and regardless of any factor unique to the individual. It does not apply to felons and others who are ineligible to purchase a firearm, but only to those otherwise qualified to purchase a firearm – the People. Hence Vermont's law is facially invalid, and cannot be saved by reference to any supposed discretion in enforcement for states with shall issue licensing regimes.

Delay may be permissible, but only to serve a legitimate governmental purpose. *See, e.g., Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 47 (1991) ("Delay for delay's sake" presumptively unconstitutional under Fourth Amendment), *United States v. Smith*, 967 F.3d 198 (2d Cir. 2020) (needless detention of property without a warrant violates Fourth Amendment), *United States v. Sharpe*, 470 U.S. 675, 686 (1985) (reasonableness of detention in *Terry* stop tied to need to accomplish governmental business during delay).

## C. A restriction on retail sales of firearms and transfers between individuals is not a "commercial" regulation and is not presumptively lawful.

*Heller* cautioned, even while striking down a statute banning handgun possession in the home: that "nothing in our opinion should be taken to cast doubt on . . . laws imposing conditions and qualifications on the commercial sale of arms." 554 U.S. at 626-27. These types of regulations, are examples of "presumptively lawful regulatory measures." *id.* at 627 n.26. Two years later, the Supreme Court repeated that *Heller* "did not cast doubt on such longstanding regulatory measures." *McDonald*, 561 U.S. at 786. But it is useful to analyze when a restriction is commercial in nature and when it affects retail users of the goods. For example, Circuit Courts have upheld as "commercial" regulations such as zoning restrictions and display restrictions, in *Nordyke v. King*, 681 F.3d 1041, 1044 (9th Cir. 2012) and *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 682 (9th Cir. 2017), but the Second Circuit has expressly held that no "commercial" regulation can justify the effect of depriving an end user of the right to acquire arms. *Gazzola v. Hochul*, 88 F.4th 186, 196 (2d Cir. 2023).

It follows that commercial regulations on firearms dealers, whose services are necessary to a citizen's effective exercise of Second Amendment rights, cannot serve as a

fig leaf for Vermont to hide behind as it infringes the ability of law-abiding citizens to acquire firearms. It is a fundamental principle of constitutional law that "what cannot be done directly cannot be done indirectly. The Constitution deals with substance, not shadows." *Gazzola*, 88 F.4th at 196.

## D.  There is no historical tradition for delay in the transfer of firearms.

The State spends six pages presenting public policy arguments, ECF24 at 30-36, which are not allowed post-*Bruen. Bruen*, 597 U.S. 1 at 22, ("*Heller* and *McDonald* expressly rejected the application of any 'judge-empowering 'interest-balancing inquiry'"). The State cites no laws as analogues for its waiting period, and its social science data on waiting periods begins with 1987, a period indisputably far too late to shed any light on the original meaning of the Second Amendment.

The only laws the State cites with specificity relate to possession or "shooting" firearms at taverns or while "drinking." ECF24 at 33. But the *how* and the *why* of such laws are indisputably different from the how and why of Vermont's waiting period. Historic laws against drinking and shooting disarmed the populace only while intoxicated or while at a tavern. One could avoid the restrictions by not drinking or going to a tavern. And the *why* of such laws was to ensure that people carrying or shooting firearms were unimpaired. But even a ban on the possession of magazines while intoxicated might still not fly. "[T]he government identifies no Founding-era law or practice of disarming ordinary citizens for drunkenness" at all. *United States v. Daniels*, 77 F.4th 337, 346 (5th Cir. 2023) (two colonial era examples insufficient to establish the historical pedigree of such a regulation).

In any event, Vermont is not before this Court to defend a hypothetical law restricting the possession or use of firearms while drunk. Instead, the State is here to

defend a purposeless, *per se* waiting period. And it can muster no historical support (nor apparently any relevant statute more ancient than 1987) for its position.

The State's most risible justification for its position is that there is either no historical tradition for the immediate transfer of firearms due to technological realities of 18th Century life, or alternatively that there is a historical tradition of restricting the immediate transfer of firearms. ECF24 at 29 *et seq*. But here too, Vermont grasps at straws.

It may well be, as the State posits, that an individual in 1792 might have ordered a firearm from a gunsmith, and may have had to wait weeks for such a firearm to be manufactured or shipped. ECF24 at 33. But this argument also fails *Bruen*'s how and why questions because, first and foremost, there is no law to analyze. It is also not the proper way to analyze a constitutional right. By way of analogy, Thomas Paine's *Common Sense* was published as a pamphlet after being manually typeset, while Plaintiffs today enjoy the ability to express their thoughts on the Internet without delay. The Supreme Court expressly analogized the evolutionary use of the First Amendment to the evolutionary use of the Second Amendment. *Bruen*, 597 U.S. 1, 28. *CBS v. Davis* held that the delay of a television broadcast constituted a constitutional harm, notwithstanding that the Founding Fathers had no idea what a television broadcast was and therefore did not expressly protect against delayed broadcasts. 510 U.S. 315 (1994). Similarly, the State cannot hide behind earlier methods of manufacturing and shipping to handicap modern access to firearms.

Neither can the State point to any historical tradition of delay in firearms acquisition, much less a tradition of purposeless delay. Notably, the State does not cite a single historical law delaying the transfer of a firearm, and cites only to statistics relating

to the prevalence of suicide and impulsive firearms usage. Plaintiffs are similarly unaware of any historical law preventing the immediate transfer of a firearm. Thus, Vermont cannot argue there is an historical tradition of governmental purposeful and purposeless delays on firearms transfers.

## 6. Plaintiffs will be irreparably harmed and public interest always weighs in favor of preventing constitutional violations.

Defendants make various arguments to attempt to rebut the presumption of irreparable harm and to assert that the public interest does not require an injunction. These arguments fail.

### A. Irreparable harm is presumed.

The State is wrong to place the burden to prove irreparable harm on Plaintiffs. ECF24 at 4, 39 *et seq. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006) ("the burdens at the preliminary injunction stage track the burdens at trial."). Under Part 2 of *Bruen*, the State carries the substantial burden of overcoming the presumption of a firearm regulation's unconstitutionality. *Bruen*, 597 at 17. Further, deprivation of a constitutional right is a *per se* irreparable injury even in the absence of any other evidence. ECF2-1 at 23. There is therefore a presumption of irreparable harm when a constitutional violation has been established. *See also* Complaint at ¶ 142 (presumption of irreparable injury applies).

Even assuming this Court is not bound to presume an irreparable injury, the State's arguments nonetheless miss the mark. It is well established that an ongoing constitutional injury merits injunctive relief. See, e.g., *Fraser v. BATFE*, No. 3:22-cv-410, 2023 U.S. Dist. LEXIS 154088, at *7 (E.D. Va. Aug. 30, 2023) ("no remedy other than an injunction will rectify Plaintiffs' ongoing constitutional injury."), *Adams v.*

49

*Lanum*, No. 3:24-CV-5034-KKE-DWC, 2024 U.S. Dist. LEXIS 22625, at *7 (W.D. Wash. Feb. 8, 2024) (citing *Ex Parte Young* as basis for court's authority to issue injunction to remedy ongoing constitutional injury), *D.D.T. v. Rockdale Cnty. Pub. Sch.*, 580 F. Supp. 3d 1314, 1335 (N.D. Ga. 2021) (pattern of ongoing constitutional injury), *Holbrook v. Jellen*, No. 3:14-cv-00028, 2017 U.S. Dist. LEXIS 33890, at *26 (M.D. Pa. Mar. 8, 2017) (involving "continuation of an ongoing constitutional injury").

Vermont cannot reframe Plaintiffs' injuries by referring to the weaponry that the Plaintiffs are free to purchase. Plaintiffs have not alleged that they are harmed by an inability to purchase *any* firearm. Instead, the harm at issue is their inability to purchase protected firearms and engage in protected activity. Complaint at ¶¶ 112-113, 117-119. This harm arises in conjunction with the inability of the retailer Plaintiffs to sell protected and more popular products and diminished sales caused by waiting periods. *See e.g., AK Futures Ltd. Liab. Co. v. Boyd St. Distro, Ltd. Liab. Co.*, 35 F.4th 682, 694 (9th Cir. 2022) (presumptive irreparable competitive harm from restrictions on selling more popular marijuana products).

## B. The Public Interest favors an injunction.

The State argues public interest favors continuing to deny Plaintiffs their Second Amendment rights, but in doing so seeks to impose forbidden interest balancing. ECF24 at 20-22, 30-36; *Bruen*, 597 U.S. 1, 26 (interest balancing because already done at the founding); *Antonyuk*, 89 F.4th 271 at *35 ("the [Supreme] Court ruled out the … 'interest-balancing inquiry' that assesses the proportionality of the law's burden to the state's interest.") Furthermore, "the public interest lies with the enforcement of the Constitution." *Ligon v. City of N.Y.*, 925 F. Supp. 2d 478, 541 (S.D.N.Y. 2013), and "enforcement of an unconstitutional law is always contrary to the public interest."

*Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013). Because the preliminary injunction analysis tracks the burdens at trial, it would be improper for this Court to consider the public policy goals proffered by the State. The only proper consideration is whether fundamental constitutional rights are being violated. If so, the injunction should issue.

## Conclusion

Vermont's opposition is an interest-balancing test in disguise. It cannot meet the burdens it has under *Bruen*, so it resorts to public policy arguments to support the magazine ban's and waiting period's constitutionality. These arguments are improper. *McDonald*, 561 U.S. at 790 (quoting *Heller*, 554 U.S. at 636) (Second Amendment "restricts experimentation and local variations," since "[t]he enshrinement of constitutional rights necessarily takes certain policy choices off the table.'"). Even if there were proof that a magazine ban reduced crime or that waiting periods reduced suicide (there is not), there are other policy options to address this problem, such as increased investment in mental health treatment or studies into whether there should be additional Black Box warnings for certain classes of popular mental health medications. See e.g., Glen Spielmans, Duty to Warn: Antidepressant Black Box Suicidality Warning is Empirically Justified, National Library of Medicine (Feb. 20, 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7031767/ (popular mental health drugs cause increased suicide ideation, attempts, and "completed suicides."). These alternatives may be more difficult and expensive, but they are likely more effective and will not infringe on the constitutional rights of citizens.

Plaintiffs have met the requirements for granting a preliminary injunction: they have shown likelihood of success on the merits, that they suffer irreparable injury, that

the balance of harms favors an injunction, and that an injunction is in the public

interest. Therefore, Plaintiffs request the injunction be granted.

Respectfully submitted,


HARDIN LAW OFFICE                          DIGENOVA & TOENSING, LLP

By: /s/ Matthew D. Hardin                  By: /s/ Brady C. Toensing
     Matthew D. Hardin                          Brady C. Toensing
1725 Eye Street NW, Suite 300              1775 Eye Street NW, Suite 1150
Washington, DC 20006                       Washington, DC 20006
Phone: (202) 802-1948                      Phone: (202) 289-7701
Email: Matt@MatthewHardin.com              Email: brady@digtoe.com

*Attorney for Plaintiff*                   *Attorneys for Plaintiff*

### Certificate of Service

I hereby certify that on this the 13th day of March 2024, I served a true and
correct copy of the foregoing, upon Defendants via filing the same through CM/ECF.


/s/ Matthew D. Hardin
Matthew D. Hardin