UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| VERMONT FEDERATION OF SPORTSMEN'S ) <br> CLUBS; POWDERHORN OUTDOOR SPORTS ) <br> CENTER, INC.; JPC, INC. (d/b/a BLACK DOG ) <br> SHOOTING SUPPLIES; PAULE DAME; and ) <br> MARSHA J. THOMPSON; ) <br>     Plaintiffs, ) <br> ) <br>     v. ) <br> ) <br> MATTHEW BIRMINGHAM, Director of the ) <br> Vermont State Police, in his Official and Personal ) <br> Capacities; CHARITY CLARK, Attorney General ) <br> of the State of Vermont, in her Official and ) <br> Personal Capacities; and SARAH GEORGE, ) <br> State's Attorney for Chittenden County, in her ) <br> Official and Personal Capacities; ) <br>     Defendants. ) | Case No. 2:23-cv-710 |

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE TESTIMONY OR, ALTERNATELY, FOR A *DAUBERT* HEARING

### INTRODUCTION

The Court should deny Plaintiffs' motion to exclude the testimony of Defendants' experts. Multiple courts considering issues analogous to Plaintiffs' claims here have considered and relied upon similar expert testimony—in many cases, from the same experts. The experts are well qualified by education and experience and their opinions readily satisfy Rule 702's standard. Indeed, Plaintiffs barely discuss the experts' qualifications and offer no substantive critique of their methodology. Instead, Plaintiffs argue that the testimony offered by these experts is "*per se* irrelevant and inadmissible because it has no bearing on the relevant inquiry under *Bruen*." Mot., ECF No. 30, at 4. In other words, Plaintiffs' motion is a merits argument recast as a *Daubert*

challenge. *See, e.g.,* Pls. Reply Prelim. Inj., ECF No. 32-1, at 20 (arguing that "[n]o historical analysis, such as that proposed by the State, is necessary" under *Bruen*).

Defendants have elsewhere shown that Plaintiffs are wrong about *Bruen*. Defs. Opp. Prelim. Inj., ECF No. 24; *see also N.Y. State Rifle & Pistol Assoc. Inc. v. Bruen*, 597 U.S. 1 (2022). Because they are wrong about *Bruen*, their relevancy challenge under *Daubert* fails as well. Regardless, those relevancy arguments will necessarily be addressed by the Court in deciding Plaintiffs' preliminary injunction motion. Absent a jury, there is no obligation for the Court to act as a "gatekeeper," and thus no need for a pre-hearing *Daubert* inquiry to assess relevancy. *See, e.g., Kortright Cap. Partners LP v. Investcorp Inv. Advisers Ltd.*, 392 F. Supp. 3d 382, 397 (S.D.N.Y. 2019). The motion should be denied and the Court should consider the relevance and persuasiveness of the expert opinions as part of its decision on the merits of Plaintiffs' preliminary injunction motion.

## LEGAL STANDARD

The admission of expert testimony is governed by Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

*Daubert* and *Kumho Tire* elucidate the Court's "gatekeeping" role under Rule 702. *E.g., Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 597 (1993). The Court's "objective" is to "ensure the reliability and relevancy of expert testimony." *Kumho Tire Co. v. Carmichael*, 526

U.S. 137, 152 (1999). The Court must determine that "an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.*

But "there is no need for the Court to gate-keep expert testimony from itself." *3DT Holdings LLC v. Bard Access Sys. Inc.*, No. 17-CV-5463 (LJL), 2022 WL 2037853, at *1 (S.D.N.Y. May 10, 2022) (citation omitted). "*Daubert* and its progeny do not apply straightforwardly in the context of bench trials," where "there is no possibility of prejudice and no need to protect the factfinder from being overawed by expert analysis." *Kortright*, 392 F. Supp. 3d at 397 (cleaned up). "Thus, unless the disputed evidence is wholly irrelevant or so speculative as to have no probative value, a court may freely receive the evidence and disregard it later if it fails to satisfy the strictures of Rule 702 and *Daubert*." *Id.* (cleaned up).

"Overall, the Supreme Court has emphasized the 'liberal thrust' of the Federal Rules of Evidence with regard to expert opinion testimony." *Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295, 312 (D. Vt. 2007) (citation omitted). And the Court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire*, 526 U.S. at 152. The general standard of reliability and relevancy is the same for any expert, *see id.* at 147-49, but there is no "definitive checklist or test" that guides the inquiry, *id.* at 150. Rather, the inquiry "depends upon the particular circumstances of the particular case at issue." *Id.*; *see also, e.g., Adel v. Greensprings of Vermont, Inc.,* 363 F. Supp. 2d 683, 687 (D. Vt. 2005) (because non-exhaustive *Daubert* factors were "developed for novel scientific evidence," "other factors may be more relevant when courts consider more mainstream methods;" noting as other potential factors, *inter alia*,

whether field itself lacks reliability, "whether the testimony comes from research conducted independent of litigation," and expert's "intellectual rigor").

## ARGUMENT

I.  **Defendants' expert evidence is relevant and admissible, as evidenced by multiple court decisions relying on the same or similar expert opinions.**

As the Supreme Court has recognized, "there are many different kinds of experts, and many different kinds of expertise." *Kumho Tire*, 526 U.S. at 150. Here, Defendants' experts have specialized knowledge on a range of relevant topics: firearms technology; the history of firearms ownership, use, and regulation; the history of violent crime and gun-related violence; historical linguistics analysis; the use of large-capacity magazines (LCMs) in deadly mass shootings; and the impact, if any, of LCM restrictions on self-defense. Plaintiffs ask the Court to ignore this wealth of historical analysis and data and simply hold, as a matter of law, that any LCM restriction and any waiting period is per se unconstitutional. Taking that approach would put this Court out of step with the overwhelming majority of courts that have decided similar constitutional challenges post-*Bruen*. *See infra* §I(A). The Court should decline Plaintiffs' invitation and decide this case on an appropriate evidentiary record. *See Ocean State Tactical, LLC v. Rhode Island*, 646 F. Supp. 3d 368, 378 (D.R.I. 2022) (explaining that, "[u]nlike the *Bruen* Court, this Court *has* an evidentiary record upon which to base its findings" and Court has accordingly "pored over" expert declarations and exhibits, including those of "expert historians"), *aff'd,* No. 23-1072, 2024 WL 980633 (1st Cir. Mar. 7, 2024).

A.     **Multiple courts, including the First Circuit, have relied on expert evidence addressing the history of firearms regulations, historical and current firearms technology, and social science data regarding self-defense, mass shootings, and the use of LCMs.**

This Court is not writing on a blank slate. Multiple courts have considered—and rejected— similar constitutional challenges post-*Bruen*. *See* Defs. Opp. Prelim. Inj., ECF No. 24, at 2-3 (collecting cases); Supp. Auth., ECF No. 31. And many of those courts, even at the preliminary injunction stage, considered and relied upon expert evidence like that proffered by Defendants here.  In *Ocean State Tactical,* the Rhode Island district court (whose decision was recently affirmed by the First Circuit), relied on expert declarations from Drs. Roth and Baron, as well as from another history professor, a medical expert, and a law enforcement officer who opined about incidents of armed self-defense. *Ocean State Tactical,* 646 F. Supp. 3d at 378-81, 389, 395. Affirming, the First Circuit expressly relied on record evidence "that civilian self-defense rarely—if ever—calls for the rapid and uninterrupted discharge of many shots, much less more than ten." *Ocean State Tactical*, 2024 WL 980633, at *4.

The *Lamont* court likewise cites and relies on multiple experts, including Drs. Allen and Roth, and Professor Donohue. *Nat'l Ass'n for Gun Rts. v. Lamont*, No. CV 3:22-1118 (JBA), 2023 WL 4975979, at *2, 18, 20-24, 27-28 (D. Conn. Aug. 3, 2023). Its exhaustive opinion addresses much of the evidence that Plaintiffs object to here. Likewise, the Massachusetts district court that upheld that state's LCM restrictions cited and relied upon Drs. Allen, Baron, Roth and Spitzer, and Professor Donahue. *Capen v. Campbell*, No. CV 22-11431-FDS, 2023 WL 8851005, at *13-15, 17-18, 20 (D. Mass. Dec. 21, 2023). And the district court in Oregon relied upon Drs. Allen and Spitzer, along with other historical and firearms experts. *Oregon Firearms Fed'n v. Kotek Oregon All. for Gun Safety*, No. 2:22-CV-01815-IM, 2023 WL 4541027, at *12, 15, 32 (D. Or. July 14, 2023).

Plaintiffs do not cite, much less distinguish, any of these cases. Their motion also asks this Court to disregard controlling Second Circuit precedent. In *Antonyuk v. Chiumento*, the Second Circuit held that Reconstruction Era history is relevant under the Bruen analysis. 89 F.4th 271, 304 (2d Cir. 2023) (because "the CCIA is a state law, the prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points of our analysis"). But Plaintiffs insist that only the "Founding-Era time period" is relevant. Mot. 7. *Antonyuk* also explains how "unprecedented societal concerns or dramatic technological changes" affect the *Bruen* standard. 89 F.4th at 302-03 (citation omitted). Ignoring this guidance, Plaintiffs ask this Court to disregard both the dramatic changes in firearms technology and the unprecedented and widespread harm caused by public mass shootings. Mot. 11-12. Plaintiffs are wrong on both points. *Antonyuk*, which is binding precedent, confirms the relevance of this evidence.

**B.     The expert opinions are relevant and admissible.**

**Dr. Lucy Allen.** The *Lamont* court expressly relied on Dr. Allen's opinions regarding armed self-defense. *Nat'l Ass'n for Gun Rts. v. Lamont*, No. CV 3:22-1118 (JBA), 2023 WL 4975979, at *21 (D. Conn. Aug. 3, 2023). The First Circuit in *Ocean State Tactical* cited similar evidence. Her opinions are relevant and material to how (if at all) restrictions on LCMs affect the Second Amendment right to bear arms for the purpose of self-defense.

Although Plaintiffs repeatedly describe Dr. Allen as an economist, they do not suggest that she lacks the expertise to review and analyze data, or that her methodology was unsound. Their only specific complaint is that she reviewed reported instances of armed self-defense that are hearsay. Mot. 8-9. Dr. Allen is well qualified to conduct statistical analysis, Allen Decl., ECF No. 24-2, ¶¶ 3-4 & Ex. A, and explained her three data sources for armed self-defense in her declaration: the NRA Armed Citizen database, news reports, and Portland, WA police reports. *Id.*

¶¶ 5, 8-9, 14-17, 20-21.[1] She also specifically explained that the NRA database is useful because it is a collection of reports about armed self-defense, assembled by an organization that opposes firearms restrictions. *Id.* ¶ 9. Thus, any "selection bias" in the database, *id.*, should favor Plaintiffs' position.

Given the lack of any governmental or other official source that systematically tracks rounds fired in self-defense, the data sources chosen by Dr. Allen are reasonable. Further, her analysis of these three separate sources led to consistent overall results. *Compare id.* ¶¶ 11-12 *with* ¶¶ 18-19 and ¶¶ 23-24. Plaintiffs do not identify any available source of data that she ignored.[2] And their hearsay objection makes little sense in this context. Nearly all statistical analysis of this kind is based on what Plaintiffs call hearsay. Dr. Allen doesn't have to have "personal knowledge" of armed self-defense, Mot. 8, to provide a reliable statistical analysis.

**Dr. Dennis Baron.** Dr. Baron is a linguistics expert who analyzed historical word usage to determine whether historical equivalents to large-capacity magazines, such as cartridge cases, were considered "arms" during the Founding and Reconstruction periods. Baron Decl., ECF No. 24-5, ¶ 3. He also looked at historical "lexical evidence" related to so-called repeater firearms. *Id.* ¶ 4. Aside from a brief cite to *Bonta* in a footnote, Plaintiffs do not offer any critique of Dr. Baron's methodology or findings.[3] They assert instead that his historical analysis is irrelevant,

---

[1] Plaintiffs do not object to Dr. Allen's analysis of the use of LCMs in mass shootings. Allen Decl., ECF No. 24-2, ¶¶ 30-42.

[2] Plaintiffs quote the *Bonta* court as criticizing Dr. Allen for relying on "hearsay" instead of police investigatory reports. Mot. 8 n.4. But Dr. Allen's analysis of police reports from Portland, WA was consistent with her analysis of the other data sources. Allen Decl., ECF No. 24-2, ¶ 29. And police reports are hearsay as well.

[3] Plaintiffs cite the *Bonta* court as asserting that the field of corpus linguistics is supposedly "incomprehensible." Mot. 10 n.5. But Plaintiffs do not identify any problematic aspect of Dr. Baron's methodology. Further, *Bonta* is an outlier in downplaying the value of corpus linguistics. *See, e.g., Caesars Ent. Corp. v. Int'l Union of Operating Engineers Loc. 68 Pension Fund*, 932

because the Court must find that LCMs are "arms" within the meaning of the Second Amendment regardless of historical usage. Mot. 10-11. Plaintiffs are wrong on this point, and regardless, their arguments about the interpretation of precedent go to the merits of their claims—not to Dr. Baron's expertise. That conclusion is amplified by the fact that other courts have relied on his testimony in relevantly similar contexts. *E.g., Ocean State Tactical,* 646 F. Supp. 3d at 386-89 *Capen*, 2023 WL 8851005, at *17 (citing Professor Baron and concluding "that LCMs are not 'arms' within the textual meaning of the Second Amendment"); *but see NAGR v. Lamont*, 2023 WL 4975979, at *19 (concluding "that magazines as a general category constitute bearable arms" but ultimately upholding Connecticut's LCM ban).

**Randolph Roth.** Dr. Roth is a history professor, author, and widely recognized expert on the history of violence and use of firearms in the United States. His 2009 book, *American Homicide*, received numerous awards. Roth Decl., ECF No. 24-8, ¶¶ 3-9 & Ex. A.

As the Second Circuit recognizes, *Bruen* holds that when courts must "reason[] by analogy" when faced with "'unprecedented societal concerns or dramatic technological changes,'" it makes sense to consider "whether modern and historical regulations impose a comparable burden on the right of armed self-defense is comparably justified." *Antonyuk*, 89 F.4th at 302 (quoting *Bruen*, 597 U.S. at 27-29). The information Professor Roth provides will

---

F.3d 91, 95 n.1 (3d Cir. 2019) (noting that corpus linguistics enables courts "to perform analyses unavailable in standard sources like dictionaries" including "measuring, in a given speech community over a given time, the statistical frequency of a word and the linguistic contexts in which it appears"); *accord United States v. Rice*, 36 F.4th 578, 583 n. 6 (4th Cir. 2022) ("[C]orpus linguistics is gaining traction as an interpretive tool . . . . Hopefully, this trend will continue." (cleaned up)); *Jones v. Bonta*, 34 F.4th 704, 714 n. 6 (9th Cir.), *opinion vacated on reh'g*, 47 F.4th 1124 (9th Cir. 2022) ("Corpus linguistics "is a powerful tool for discerning how the public would have understood a statute's text at the time it was enacted," and "[c]ourts should consider adding this tool to their belts." (quoting *Wilson v. Safelite Grp., Inc.*, 930 F.3d 429, 439–40 (6th Cir. 2019) (Thapar, J., concurring in part and in the judgment))).

help this Court to consider whether and how historical regulations burdened a law-abiding citizen's right to armed self-defense. Plaintiffs' suggestion that *Bruen* limits the inquiry to "the history *of firearms regulation*, through examining texts of historical laws," Mot. 6, is exactly the kind of "'regulatory straightjacket,'" *id.* (quoting *Bruen*, 597 U.S. at 30), *Bruen* and *Antonyuk* eschew.

Contrary to plaintiffs' strawman argument, Professor Roth does not merely "trace[] the beginning of the rise in homicide rates to the development of *breechloading* firearms." Mot. 11. To the contrary, he describes in detail the historical arc of gun violence in the U.S. from the pre-Founding era up to the present. Along the way, he contrasts the orders-of-magnitude greater lethality of modern-day weapons that accept large magazines with their slow-loading, oft-misfiring single-shot forerunners. *Compare* Roth Dec. ¶¶ 40-50 and ¶16. This is precisely the kind of factual input the Court needs in order to perform the analogic reasoning required by *Bruen* and *Anonyuk*, and amply supports the common-sense conclusion that modern technologies like LCMs represent a "dramatic technological change[]," *Bruen*, 597 U.S. at 27, from the Founding and Reconstruction Eras. *E.g., Capen*, 2023 WL 8851005, at *12 (citing Professor Roth's testimony about automatic weapons) & 18-19 (LCMs "represent a dramatic change in firearm technology"). *See also Rocky Mountain Gun Owners v. Polis*, No. 23-CV-02563-JLK, 2023 WL 8446495, at *16 (D. Colo. Nov. 13, 2023) (relying on testimony by Profs. Roth and Spitzer and concluding that "[o]verall, the evidence shows that firearms were not as readily available for purchase and that impulsive gun homicides were much less prevalent at the time of the founding and in the century that followed. Thus, it is logical that waiting-period laws were not adopted during that period.").

9

**Robert Spitzer.** Professor Spitzer is a Distinguished Service Professor of Political Science Emeritus at the State University of New York at Cortland who has been studying and writing about the history of gun laws, of gun policy in American politics, and related historical, legal, political, and criminological issues for nearly 40 years. Spitzer Dec. ¶¶ 4-5. He has presented expert testimony in dozens of cases in courts across the country in litigation over gun-related laws and regulations. *Id.* ¶ 6.

Plaintiffs' claim that Professor Spitzer's testimony amounts to nothing more than legal opinion, Mot. 13, is off the mark. Professor Spitzer has spent decades studying and writing about laws and regulations dating back to colonial times that relate to the question of how government has responded to developments in weapons technology. The fact that some of the historical raw material that he necessarily must analyze comprises laws and regulations does not transform any opinion he draws from that work into legal opinion. By analyzing, organizing, and presenting a huge mass of historical data (including laws and regulations), Professor Spitzer and defendants' other experts are giving the Court the factual inputs needed to engage in the "reasoning by analogy," 597 U.S. at 28, *Bruen* and *Antonyuk* call for – and leaving it to the Court to perform that reasoning in light of the evidence. Like the other experts, Professor Spitzer's work has also been cited favorably by other courts. *E.g., Rocky Mountain*, 2023 WL 8446495, at *8 (upholding Colorado's waiting period and relying on Professors Spitzer and Roth to conclude that the "Founders would not have expected instant, widespread availability of the firearm of their choice"); *Kotek*, at *39-42, 44-45, 46 (citing Professor Spitzer repeatedly in concluding that Oregon's LCM restrictions "are consistent with the Nation's history and tradition of firearm regulation").

***John Donohue.*** Professor Donohue is the C. Wendell and Edith M. Carlsmith Professor of Law at Stanford Law School who, for decades, has examined and written about the nature of gun regulation in the United States and the impact of gun regulation (or the lack thereof) on crime. Donohue Dec. ¶¶ 3-6. He has submitted expert declarations in approximately 20 cases involving gun-related laws or regulations. *Id.* ¶¶ 7-22.

Considering Professor Donohue's declaration would not, as Plaintiffs contend, "overrule *Bruen.*" Mot. 12. Far from it; his declaration provides the Court with factual input and expert analysis bearing directly on the question of whether Vermont's laws address a "'societal problem'" that "past generations experienced." *Antonyuk*, 89 F.4th at 301 (quoting *Bruen*, 597 U.S. at 26). His declaration catalogs the overwhelming and unique harms inflicted by mass shooting events, including widespread casualties and life-altering non-fatal injuries, as well as their increasing frequency over time, and the increased death and injury counts enabled by LCM technology. Donohue Dec. ¶¶ 36-47, 54-65. He also presents and analyzes self-defense data, input that will help the Court decide whether LCMs are in common use for self-defense, *id.* ¶¶ 30-32, 111-15 – another relevant question *Bruen* and *Antonyuk*.

In sum, defendants' experts have proffered, through their declarations, relevant, admissible evidence that easily satisfies *Daubert*, especially given the procedural posture of the case. Plaintiffs' attempt to sidestep that reality should be denied.

**II.** **There is no need for a separate *Daubert* hearing before, or as part of, the preliminary injunction hearing.**

The Court does not need to schedule a separate *Daubert* hearing. To begin with, the May 23 hearing is a Court hearing (no jury) on Plaintiffs' request for a preliminary injunction. When Plaintiffs opposed consolidating their preliminary injunction motion with the merits, they argued that the preliminary injunction hearing would be a "necessarily limited" proceeding aimed at

11

"rough justice" and marked by the "court's ability to resolve masses of conflicting evidence without strict application of the ordinary evidentiary rules." ECF No. 15, at 4. Instead of adhering to that position, Plaintiffs now want to inject formal *Daubert* proceedings into this preliminary inquiry. As courts routinely recognize, however, there is no need for a separate *Daubert* hearing or ruling when the Court is conducting a bench trial and "there is no concern with protecting a jury." *L.S. by Oliveira v. United States*, No. 16-CV-08763 (PMH), 2020 WL 13566228, at *2 (S.D.N.Y. Oct. 30, 2020). In fact, a "*Daubert* hearing prior to a bench trial can be unnecessary and inefficient." *Id.* In a bench trial, the Court may "receive testimony from the experts subject to a later determination as to whether the evidence should be credited or disregarded under *Daubert* and its progeny." *Id.*; *see also Kortright Capital Partners LP v. Investcorp Inv. Advisers Ltd.*, 392 F. Supp. 3d 382, 397 (S.D.N.Y. 2019) (same); *U.S. v. Brown*, 415 F.3d 1257, 1268-1269 (11th Cir. 2005) (*Daubert* "even more relaxed" in a bench trial because there "is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself"); *Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 852 (6th Cir. 2004) ("gatekeeper" doctrine "largely irrelevant in the context of a bench trial"); *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000) (most *Daubert* safeguards "are not as essential" where a district judge sits as the trier of fact).

     A separate hearing is also unnecessary because Plaintiffs' *Daubert* motion is directed at a legal issue—namely, relevance—rather than factual disputes. *See, e.g., Humphrey v. Diamant Boart, Inc.,* 556 F.Supp.2d 167, 173 n. 3 (E.D.N.Y.2008) (*Daubert* hearing unnecessary where objections to the testimony do not raise a factual issue). Plaintiffs insist that the historical and social science evidence proffered by Defendants' experts is all irrelevant under *Bruen*. As discussed above, the relevant precedents, including *Ocean State Tactical*, *Antonyuk*, and others,

12

hold otherwise. Regardless, Plaintiffs' relevance argument is a legal argument based on Plaintiffs' interpretation of *Bruen* and related precedent. Plaintiffs contend that the Court may not consider the types of evidence proffered by these experts as part of its Second Amendment analysis. Because the Court will necessarily address Plaintiffs' arguments about *Bruen* when it addresses the merits of their constitutional challenge, there's no need to separately analyze those issues as part of a *Daubert* hearing.

Plaintiffs themselves recognize that a separate *Daubert* inquiry is unnecessary, because they only ask for a separate *Daubert* hearing with respect to witnesses who testify live. They state that "no separate inquiry or *voir dire* is necessary as to opinions presented only in written form" because, in their view, the expert declarations "are inadmissible on their face." ECF No. at 30, at 1 n.1. Their position confirms that their objection is purely legal, and can be addressed by the Court as part of its decision on the merits of the preliminary injunction motion.

Based on the nature of both the proceeding (a preliminary hearing conducted as a bench trial) and Plaintiffs' challenge (legal argument rather than factual dispute), Defendants ask that the Court dispense with any separate *Daubert* inquiry or voir dire and instead receive the evidence subject to the Court's later assessment of its reliability and relevance. Plaintiffs can, of course, inquire about issues relevant to the Rule 702 analysis as part of their cross-examination. If the Court elects, however, to allow Plaintiffs to voir dire the experts before their substantive testimony, Defendants ask that the voir dire take place as part of each expert's hearing testimony, not as a separate advance hearing. That will avoid the need to call the same witnesses twice and make the hearing more efficient.

## CONCLUSION

Plaintiffs' motion should be denied.

DATED at Montpelier, Vermont, this 27th day of March 2024.

                STATE OF VERMONT

                CHARITY R. CLARK
                ATTORNEY GENERAL

By:    */s/ David R. Groff*
       David R. Groff
       Assistant Attorney General
       Office of the Attorney General
       109 State Street
       Montpelier, VT 05609-1001
       (802) 828-1101
       David.Groff@vermont.gov

       Bridget Asay
       Michael Donofrio
       STRIS & MAHER LLP
       15 East State Street, Suite 2
       Montpelier, VT  05602
       (802) 858-4285
       (802) 858-4465
       basay@stris.com
       mdonofrio@stris.com

       Counsel for Defendants