UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

| | |
|---|---|
| VERMONT FEDERATION OF SPORTSMEN'S CLUBS, *et al.* <br><br> *Plaintiffs*, <br><br> v. <br><br> MATTHEW BIRMINGHAM, *et al.*, <br><br> *Defendants*. | Case No. 2:23-cv-710 |

# PLAINTIFFS' SUPPLEMENTAL MEMORANDUM OF LAW

NOW COME the Plaintiffs, pursuant to this Court's June 3, 2024 order, and file this supplemental brief in further support of their Preliminary Injunction Motion. ECF2.

# Introduction

Vermont has enacted two laws that burden Plaintiffs' Second Amendment rights. First, the State banned the acquisition or importation of magazines with a capacity of greater than 15 rounds for handguns and 10 rounds for rifles, which, according to witness testimony, renders common handguns and rifles illegal for sale in their most common, popular, and factory-designed configurations. See, *e.g.*, ECF 59 at 17:24 *et seq.*, 22:12 *et seq.*, 23:20-21, 65:19 *et seq.* and 68:4 *et seq.* Second, the State enacted a 72-hour waiting period for transfer of a firearm, which serves no purpose other than to delay the acquisition of arms, even if the arm is being purchased by a law-abiding citizen who already owns firearms or is facing an imminent threat. *Id.* a 38:3 et seq., 71:9 *et seq.* and ECF 62 at 82:25 et *seq*. This waiting period plays no role in ensuring an individual is eligible to purchase a firearm. Plaintiffs, despite passing the federal National Instant

1

Criminal Background Check System (NICS),[1] must still wait to "keep and bear" their purchased arms. ECF59 at 56:2 *et seq.*, 73:16 *et seq.*, ECF62 at 86:17 *et seq.*

## Facts

Plaintiffs have established Second Amendment harms. Both Chris Bradley, the President of the Vermont Federation of Sportsmen's Clubs, and Bill Cleary, the owner of Powderhorn Outdoor Sports Center, testified that the AR-15 and Glock 17 are common firearms chosen by Americans for self-defense, and that Vermont has banned their sale in the most common and factory-designed configurations. ECF59 at 17:24 *et seq.*, 22:12 *et seq.*, 23:20-21, 65:19 *et seq.* and 68:4 *et seq.*  Both testified that magazines wear out over time or are damaged in various ways, such that the need for replacement of damaged or otherwise inoperable magazines is a certainty.  *Id.* at 14:10 *et seq.* and 63:14-15. And both testified that they and their customers are forced to wait 72 hours to take possession of a firearm from a dealer. *Id.* at 39:21 *et seq.*, 81:9 *et seq.*

Vermont called two witnesses over Plaintiffs' *Daubert* objections: Lucy Allen and Robert Spitzer.[2] Both offered testimony irrelevant to the applicable legal tests, thus failing to carry the State's burden. Allen, an economist and statistician, testified that she had no training in self-defense.[3] ECF59 at 116:19. She repeatedly failed to explain what a "defensive gun use" (DGU) is, notwithstanding that the State relied on her testimony and the number of DGUs in its briefing. ECF24 at 18 (State relies on testimony of Allen

---

[1] FBI, *About NICS*, available at https://www.fbi.gov/how-we-can-help-you/more-fbi-services-and-information/nics/about-nics (last visited June 10, 2024).

[2] The Court denied the Plaintiffs' *Daubert* objection as to Lucy Allen at ECF44 and ECF59 at 94:19. The Court took the Daubert objection as to Robert Spitzer under advisement at ECF62 at 3:19-25.

[3] Plaintiffs had assumed for purposes of their *Daubert* Motion at ECF40 at 5 that Allen would testify as to self-defense, but Allen admitted no expertise in self-defense in her testimony at the hearing, Plaintiffs therefore again object as to the relevance of Allen's testimony.

as to DGUs), ECF24-2 at 4, fn. 5, 10 ¶ 17, 11 ¶ 18, and 12 (Allen testifying as to DGUs), ECF59 at 118:5 *et seq.* (Allen unable to define DGU). Allen admitted her work suffered from numerous methodological flaws, including that it was based on data gathered from non-random sources, ECF59 at 122:23 *et seq.*, that it relied upon uncertain definitions of the word "incident" that excluded the possibility of analysis of firearms to deter criminal activity rather than in response to criminal activity, *id.* at 121:7 *et seq.*, and that it was unchanged since it was heavily criticized and labeled "misleading" by the Southern District of California. *Id.* at 129:5 *et seq.* Allen said nothing about commonality of firearms chosen for self-defense. Moreover, her testimony has not been revised to account for a sister court's scathing evaluation of its methodological flaws. ECF59 at 129 *et seq.* Raising additional epistemological concerns, Allen even contradicted the State's other witness regarding whether the NRA data upon which she relied is up-to-date. ECF59 at 136:4 (Allen claims the NRA stopped updating the Armed Citizen column in 2017), *contra.* ECF62 at 38 (Spitzer testifies that he read the column in last month's NRA magazine).

      The State's other expert, Spitzer, expressed blatant and open hostility to *Bruen* and *Heller*, which he said made sense "only if you're standing on your head" and should be overruled. ECF62 at 99:20 *et seq.* Unsurprisingly, Spitzer's hostility to the relevant historical laws and the governing legal test led to fundamental mistakes in his search for analogs to Vermont's statutes. Spitzer repeatedly expressed that statutory malice requirements could be inferred merely from carrying a weapon, notwithstanding clear precedent to the contrary in *Bruen* (holding that bearing arms was constitutionally protected) and textual proof that carrying a weapon was only prohibited when done with intent to commit a crime. See, e.g., ECF62 at 55:18 *et seq.*, 68:6 *et seq.* Spitzer had no

idea how the federal background check interacts with Vermont's waiting period law, *id.* at 83:5 *et seq.* and 85:17 *et seq.*, and confessed that the first waiting period law he could find was from the 20th Century. *Id.* at 90:5. Spitzer admitted he only "thinks" he may have read Vermont's law "[a]t some point," *id.* at 86:16, and questioned counsel as to its terms and applications at least twice, expressing his own uncertainty. *Id.* at 87:6-7 ("Vermont goes through the Brady checklist, is that right?"), 96:10 ("I yield to you on that."). Spitzer also confirmed Plaintiffs were right to question his expertise: his declaration was repeatedly demonstrated to be in error with respect to key historical facts, with Spitzer frequently characterizing statutes as "no carry" when the relevant statutes said nothing of the sort. ECF62 at 46 *et seq.*

## Argument

1. **Standard of Review.**

Although preliminary injunction movants "normally have the burden of demonstrating a sufficient likelihood of prevailing on the merits," *Reilly v. City of Harrisburg*, 858 F.3d 173, 180 (3d Cir. 2017), the burden reverses when the government has the underlying burden of proof on a constitutional issue. *Ashcroft v. ACLU*, 542 U.S. 656, 666, 124 S. Ct. 2783, 2791-92 (2004). This standard is used because "the burdens at the preliminary injunction stage track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006). All factors other than the likelihood of success on the merits take a backseat. As the Supreme Court held in another preliminary injunction case involving constitutional issues, the Court must adjudicate the likelihood of success on a limited record because the other factors will necessarily be subsumed into that analysis and are difficult to apply in a vacuum. *Labrador v. Poe*, 144 S. Ct. 921 (2024).

4

## 2. The Second Amendment protects Plaintiffs proposed conduct, and Vermont has failed to rebut the presumption of unconstitutionality.

### A. The State cannot ban arms in common use.

The Supreme Court has made the analysis of weapon bans in America easy. If an arm is in common use for lawful purposes, it cannot be banned. Vermont ignores the Supreme Court's repeated holding that weapons in common use are protected, and asks this Court to instead focus on the government's interest in regulating firearms, which is an argument for nullification of binding precedent.

Four Supreme Court cases, *Miller*, *Heller*, *Caetano*, and *Bruen*, clearly express this fundamental holding, including the admonition of two of those cases saying, in essence, listen to our decisions. *Heller* made particularly plain that "the Second Amendment extends *prima facie* to all instruments that constitute bearable arms, even those not in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. at 582 (2008) Later, *Heller* discusses at length what sorts of weapons are protected and says "weapons in common use" are protected and only those "not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns" are not protected. *Id.* at 625 (citing *United States v. Miller*, 307 U.S. 174 (1939)). Just a couple of pages later, *Heller* again says "the sorts of weapons protected are those in common use" and only "dangerous and unusual weapons" are not protected. *Id.* at 627. The relevant question is what firearms are "*chosen* by American for self-defense." *Id.* at 629 (emphasis added).

*Caetano v. Massachusetts'* per curiam opinion starts off quoting *Heller* – "The Court has held that 'the Second Amendment extends, *prima facie*, to all instruments that constitute bearable arms, even those not in existence at the time of the founding.'"

577 U.S. 411 (2016) (citing *Heller*, 554 U.S. at 582). The Court then rebukes the Massachusetts Supreme Court's reasoning that stun guns are not protected because they were not in common use at the Founding, saying such reasoning is inconsistent with "*Heller*'s clear statement" that the Second Amendment protects all modern arms in common use today. *Id.* at 412. *Caetano*'s concurrence, after walking through *Heller*'s and *Miller*'s findings and reasoning, says, "[a]s the foregoing makes clear, the pertinent Second Amendment inquiry is whether stun guns are commonly possessed by law-abiding citizens for lawful purposes today." *Id.* at 419-20.[4]

Then came *Bruen*. It recounts *Heller*'s holding, "the Second Amendment protects the possession and use of weapons that are 'in common use at the time.'" *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 128 S.Ct. 2111, 2128 (2022) (cleaned up). *Bruen* explains that *Heller*'s historical analysis showed that the Second Amendment "did not countenance a 'complete prohibition' on the use of 'the most popular weapon chosen by Americans for self-defense in the home." *Id.* at 2128. Later, *Bruen* provides further clarity, saying its historical analysis shows that the Second Amendment protects the carrying of weapons in common use today, even if those weapons were dangerous and unusual in the past. *Id.* at 2143.

The State has not shown that LCM's are dangerous *and* unusual. By contrast, Plaintiffs demonstrated the commonality of the banned weapons: the Glock 17 is among the most popular handguns in America; the AR-15 is the most common rifle. ECF59 at

---

[4] *Caetano* was mooted by a resolution of the case, but the Massachusetts Supreme Court got the message, holding in a subsequent case that stun guns are "arms" protected under the Second Amendment. *Ramirez v. Commonwealth*, 94 NE.3d 809, 815 (2018) (protected arms "may be regulated, but not absolutely banned.")

17:24 *et seq.*, 22:12 *et seq.*, 23:20-21, 65:19 *et seq.* and 68:4 *et seq.* Both are designed to be equipped with magazines of greater than 15 and 10 rounds (respectively), and neither can now be acquired or equipped in their most common configurations. *Id.* Spitzer neither rebutted the commonality of these modern firearms nor offered any explanation for how they might differ in any dramatic way from previous technologies. Indeed, he confessed there were "no such laws" in the historical era that regulated repeating firearms. ECF62 at 12:23. Allen similarly offered no testimony as to commonality, but only (flawed) testimony as to deployment in an "incident."

Viewed through *Bruen*, the Supreme Court has done the historical looking and analog analysis and found no analogs for banning weapons in common use. If a weapon is in common use, it can be regulated (so long as consistent with our Nation's history and tradition), but it cannot be banned. This Court can reach the State's history and tradition argument only if all precedent about common use is nullified. Even then, the State still does not carry its burden.

**B. Under *Bruen*'s test, and as applied in *Antonyuk*, analogs must burden Second Amendment rights in a similar manner and for similar reasons.**

Instead of performing the analysis required by *Bruen*, Vermont argues for nuance. But nuance does not apply here. Even with the benefit of nuance, the State does not carry its burden, because nuance only gets it so far. *Bruen* and *Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023), still require the how and why questions be answered (comparing the burden and justification of the analogs to the modern law). But Vermont did not do this.

Having failed to find suitable analogs, the State proposes that historical tradition be defined as what it calls a "well-worn historical 'pattern' of weapons invention,

7

military use, civilian use, use in crime, then regulation." ECF24 at 27. But none of its analogs support banning LCMs or even follow this pattern. The State cited to Spitzer's claims about state laws governing Bowie knives as an analog for the magazine ban. *Id.* at 27. Spitzer claimed that "15 states barred" the open or concealed carry of Bowie knives. ECF24-10 at 57. But on cross, Spitzer had to admit that four of those states were territories when the laws were enacted (an important distinction under *Heller* and *Bruen*), ECF62 at 47, and some of his claimed "state" laws were only local laws (another important distinction). ECF62 at 53, 59, 61, 81. In the end, almost none of the laws said what Spitzer claimed. ECF62 at 44-80

Boiled down, the State's proposed test for arms bans is this: If an arm goes into common use for self-defense, but is misused by a small minority of deranged users, then it can be banned. How do we know the State's public interest proposal is wrong? It is wrong because the may-issue permit regulations from *Bruen* would have survived this imagined test, as would the stun gun ban from *Caetano*, and the handgun ban from *Heller*. The *Heller* majority responded to arguments very much like the ones Vermont makes and said:

> We are aware of the problem of handgun violence in this country, and we take seriously the concerns raised … But the enshrinement of constitutional rights necessarily takes certain policy choices off the table.

*Heller*, 554 U.S. at 636. As the *Bruen* dissent complained, the *Bruen* test is a "history-only approach" in which governmental interests are irrelevant, no matter how compelling. *Bruen*, 128 S.Ct. at 2164 (dissent). As the *Bruen* and *Heller* majorities explained, "[t]he Second Amendment 'is the very product of an interest balancing by the people,' and it 'surely elevates above all other interests the right of law-abiding,

8

responsible citizens to use arms' for self-defense." *Bruen*, 142 S.Ct. at 2118 (quoting *Heller*, 554 U.S. at 635).

### C. The State's purposeless waiting period is at odds with *Antonyuk* and *Gazzola* and historical tradition.

New York's licensing regime was upheld only because the review of a license application did not cause "unnecessary delays" in the exercise of Second Amendment rights. *Antonyuk*, 89 F.4th at 331. *Antonyuk* expressly warned that if there were *unnecessary* delays, the court would have come down differently. In contrast, Vermont's waiting period is designed to cause *unnecessary* delays, because no delay is necessary to accomplish *any* governmental purpose. There is no separate state background check, additional licensing requirement, or any other government function that is performed during the wait. Therefore, despite having undergone and passed the federal instant background check, people are still prevented from possessing purchased firearms.

Similarly, Vermont's transfer restriction, which applies to "purveyors of arms," is not a "commercial" regulation outside the scope of the Second Amendment's protections, because restrictions on "purveyors of arms" have the ultimate effect of depriving the end user of a lawful product. *Gazzola v. Hochul*, 88 F.4th 186, 196 (2d Cir. 2023). The Second Amendment applies to Plaintiffs' proposed conduct because they seek to acquire arms in common use for self-defense. Together, *Gazzola* and *Antonyuk* make clear there is a right to acquire firearms and the Second Amendment prevents the State from imposing any "unnecessary delay" in the exercise of that right. These cases mean that Plaintiffs' proposed conduct is covered by the Second Amendment. Therefore, under *Heller* and *Bruen*, the State must carry its burden to prove an historical tradition of regulatory analogs justifying Vermont's waiting period law. The State failed to do so.

Spitzer, the State's only expert to testify as to the waiting period, analogized it to background check laws and intoxication laws, but admitted there were no historical waiting period regulations from the Founding era or during Reconstruction. ECF62 at 90:4. Worse, Spitzer opined that these were appropriate analogs, but repeatedly confessed he had no idea how Vermont law worked or how it differed from a background check. *Id.* at 96-98. By contrast, Bill Cleary testified about the workings of the law and how it applies not only to his customers, but also to himself. As a gun store owner, he is still required to abide by the waiting period for personally purchased guns, notwithstanding that he has passed a background check, that he already owns firearms, and that he has a key to his own storeroom. ECF59 at 74-82.

The waiting period is purposeless and arbitrary. Women who fear domestic violence (even those with court orders) must wait at least 72 hours to obtain a firearm. ECF59 at 74:7. Chris Bradley cannot take possession of a new firearm without a delay even though he already owns firearms. Bill Cleary cannot purchase a new shotgun for sporting purposes without waiting at least 72 hours, even though he has 1,600 firearms in stock. ECF59 at 61, 81. The waiting period also applies to customers who trade in a firearm for a replacement even though they owned a firearm before the transaction began and will own one when it is complete. *Id.* at 76:18 *et seq.* Vermont's waiting period deprives citizens of fundamental constitutional rights and cannot stand.

## Conclusion

Plaintiffs request that the preliminary injunctions as to the magazine ban and the waiting period be granted.

Dated: June 13, 2024

Respectfully submitted,

| | |
|---|---|
| HARDIN LAW OFFICE | DIGENOVA & TOENSING, LLP |
| By: /s/ *Matthew D. Hardin* <br>     Matthew D. Hardin, Vt. Bar. 5815<br>1725 Eye Street NW, Suite 300<br>Washington, DC 20006<br>Phone: (202) 802-1948<br>Email: Matt@MatthewHardin.com | By: */s/ Brady C. Toensing*<br>     Brady C. Toensing<br>1775 Eye Street NW, Suite 1150<br>Washington, DC 20006<br>Phone: (202) 289-7701<br>Email: brady@digtoe.com |
| *Attorney for Plaintiff* | *Attorneys for Plaintiff* |