UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

VERMONT FEDERATION OF SPORTSMEN'S CLUBS, *et al.*

    *Plaintiffs*,

    v.

MATTHEW BIRMINGHAM, et al.

    *Defendants*.

Case No. 2:23-cv-00710

**PLAINTIFFS' RESPONSE TO SUPPLEMENTAL MEMORANDUM**

**Introduction**

Vermont tries to evade the broadly applied, presumptive protections of the Second Amendment for both its waiting period and its ban on ammunition feeding devices. But the Constitution is clear, and these laws cannot stand.

Vermont claims the waiting period is merely a commercial regulation that enjoys no protections. But the entire purpose of the law is aimed at end-users to prevent them from obtaining firearms for at least 72-hours for the stated purpose of reducing suicides (for which there is no support). For the magazine ban, Vermont claims the law is not an arms ban, even though it bans arms capable of shooting more than 10 or 15 rounds without reloading. The State further argues the Second Amendment does not protect ammunition feeding devices, because firearms can still function with small capacity magazines. And even if covered by the Second Amendment, the State claims that the historical pattern, discerned by its political science expert, of the regulation of "dangerous aspects" of firearms, justifies its ban. This "dangerous aspects" test is

1

unsupported by any caselaw and would lead to unrestrained government regulation of firearms in contravention of *Heller* and its progeny.

The State has failed to carry its burden of overcoming the presumptive unconstitutionality of these laws and therefore failed to rebut Plaintiffs' showing that they are likely to prevail on the merits.

**1. The Waiting Period is unconstitutional.**

The State argues its waiting period is presumptively constitutional, either because it is a commercial regulation on the sale of arms (it is not) or under a line of precedents that allow states to conduct a background check or impose a licensing requirement (which Vermont does not do). Vermont has targeted end users of firearms and confesses it attempts to delay, prevent, or make difficult purchases it prefers people did not make (so-called "impulsive" purchases), and that the State performs no licensing or background check function during the wait. Thus, Vermont's law squarely targets ordinary citizens and their Second Amendment rights. Further illustrating this point is the fact that this restriction does not apply only to retail sales; Vermont also applied its waiting period to private transfers of ownership (by "sale, trade, or gift") which are required under 13 V.S.A. § 4019 to be conducted at a firearms dealer. Because there is no historical tradition to justify this purposeless regulation, it is unconstitutional.

**a. The 72-hour waiting period is presumptively *un*constitutional.**

The State's claim that its 72-hour waiting period is presumptively constitutional is based on an erroneous reading of *Gazzola v. Hochul*, 88 F.4th 186, 195 (2d Cir. 2023) and curated language from *Heller* relating to the "commercial sale of arms."

First, the State argues *Gazzola* requires a regulation so restrictive that it completely prohibits a citizen from acquiring arms before the Second Amendment is

2

implicated. Not so. As Plaintiffs pointed out at ECF67 at 9-10 and ECF No. 32-1 at 44-47, *Gazzola* stands for exactly the opposite proposition, especially when read together with *Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023). *Gazzola* stands for the unremarkable proposition that the Second Amendment is meaningless unless it conveys rights on "purveyors of firearms and ammunition." 88 F.4th at 194. Similarly, *Antonyuk* allows the State to delay acquisition of a firearm for a reasonably necessary period to complete a background check, but expressly condemns and forbids unnecessary delay. 89 F.4th at 302.

By the State's logic, Vermont could impose a 72-hour waiting period on the delivery of newspapers, so long as it did not completely forbid the expression of First Amendment activity. That is not the law as it relates to fundamental constitutional rights, including the Second Amendment, as the Supreme Court has made clear: "The constitutional right to bear arms ... is not a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2156 (2022).

The courts that have upheld so-called "commercial regulations" have taken care not to conflate a commercial regulation with a regulation that impacts retail "end-users" and their rights. See, e.g., *Gazzola*, 88 F.4th at 196 (collecting cases), *B & L Prods., Inc. v. Newsom*, Nos. 23-55431, 23-3793, 2024 U.S. App. LEXIS 14144 (9th Cir. June 11, 2024) (prohibiting sale on state property), *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 688 (9th Cir. 2017) (collecting cases and noting that some zoning regulations may be upheld while others burden Second Amendment rights of citizens). Therefore, because Vermont targets end-users seeking exercise their Second Amendment rights, it is no defense to call the 72-hour waiting period a "commercial" regulation. Further

3

undermining the State's "commercial sales" argument is the fact that the law also bans private firearm transfers between individuals, even gifts. 13 V.S.A. § 4019 (private individuals may only transfer firearms at a licensed dealer).

**b. The 72-hour waiting period burdens Second Amendment rights.**

The State absurdly argues that the 72-hour waiting period does not burden Second Amendment rights at all. The right to possess a firearm means little or nothing without the right to acquire it. It is no answer to say that a regulation targets only the purveyor instead of his customer: as the Second Circuit noted in *Gazzola* with reference to abortion restrictions, regulations facially applicable only to abortion providers had the impermissible effect of abrogating abortion rights. *Gazzola*, 88 F.4th at 196. Plaintiffs surveyed cases at ECF44 at 43-44 finding the exercise of fundamental constitutional rights cannot be subject to purposeless delays.

The testimony in this case further established that the burdens imposed by the State target the end-user. The VTFSC and Powderhorn testified to numerous harms to their members and customers, which are neither financial nor remediable in the absence of an injunction. For example, Chris Bradley testified that VTFSC members cannot compete with firearms due to the waiting period, and that members are prevented from having firearms immediately available for self-defense, and that prior to the passage of the waiting period law, none of VTFSC's members voluntarily elected to delay the exercise of their Second Amendment rights. ECF59 at 41:10 *et seq*. Similarly, Bill Cleary testified that only one customer, in over thirty years of business, had ever delayed transfer of a firearm (only for about an hour), indicating that all of Powderhorn's customers have had their rights forcibly curtailed by the waiting period. *Id.* at 76:12 *et seq*. But the harms also impact Cleary and Bradley personally: Cleary

testified that he is forced to store firearms, even those purchased for himself, in his back room prior to transfer. *Id.* at 81 *et seq*. Bradley testified that he must travel (even if there are dangerous winter conditions) twice to purchase a firearm, despite not being suicidal and being eligible to possess a purchased firearm immediately. *Id.* at 39-41.

**2. Vermont's law bans a class of firearms and the plain text of the Second Amendment covers magazines and magazine capacity.**

The State claims its magazine ban, which bans firearms that can shoot more than 10 or 15 rounds without reloading, is not a ban on a type of arm.[1] This claim defies logic and attempts to escape *Heller*'s broad definition of what is presumptively protected under the Second Amendment – "all instruments that constitute bearable arms" – and its ruling that arms in common use cannot be banned. *District of Columbia v. Heller*, 554 U.S. 570, 582, 625, 627, 629 (2008). It also ignores *Heller*'s ruling that it is not the State's place to tell Americans what weapons they choose for self-defense. *Id.* at 629. *Heller* asks only which weapons are "chosen" and possessed by the people. *Id.* ("It is no answer to say" that other arms are available).

The State argues its magazine ban is just a regulation of a feature of a firearm that is unprotected by the Second Amendment. ECF66 at 7. The State claims Plaintiffs must show not only that the Second Amendment applies to ammunition and magazines, but also specifically to the banned magazines, which it says are unprotected because they "were unknown at the Founding." ECF66 at 7. That is not how the Supreme Court says to approach this case. Plaintiffs have shown ammunition feeding devices are bearable arms, which means they are presumptively protected, even if they were unknown at the

---

[1] The statute is not limited to detachable ammunition feeding devices. It also applies to integrated magazines and only allows integrated tubular devices that are used "with .22 caliber rimfire ammunition." 13 V.S.A. § 4021(e).

Founding (which they were not). *Heller*, 554 U.S. at 581 (modern arms presumptively protected). The burden then shifts to the State to satisfy its heavy burden of proving that history and tradition support its ban. That test requires Vermont to prove the banned magazines are dangerous *and* unusual. See *Bruen*, 142 S.Ct. at 2128 (the "historical tradition" of prohibiting the carrying of "dangerous and unusual weapons" supports the protection of the possession and use of weapons in common use); and *Id.* at 2143 ("historical tradition" leads to finding Second Amendment protects the carrying of weapons "in common use at the time.") (quoting *Heller*, 554 U.S. at 627).

Even if this Court does not view the magazine ban as a ban on arms in common use, the State must still prove that its regulation is supported by appropriate historical analogs, a task it has been unable to fulfill. There simply are no regulations from the Founding or the Reconstruction era that limit ammunition capacity. Indeed, as Plaintiffs previously explained, the closest analogs are laws imposing ammunition minimums on citizens turning out for militia service. ECF32-1 at 44-45. These ammunition minimum laws were known to the State's expert, but ignored in his report. ECF62 at 35-37.

In the end, the State argues that magazines and, by logical extension, firing capacities, are not governed by the text of the Second Amendment. ECF66 at 7. This argument would mean that it was free to regulate the firing capacity or the load limit of firearms without governance of the Second Amendment. But this position is precluded by *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015). In its opinion denying Plaintiffs' motion to exclude expert testimony, this Court interpreted *Cuomo* as having not settled the question of whether LCMs are arms because of a footnote declining to resolve the issue. ECF10 at 10 (citing *Cuomo*, 804 F.3d at 263 n. 127). However, in this context, where this Court must determine whether the plain text

6

of the Second Amendment applies, there is no distinction between a load limit or a capacity restriction. *Cuomo* distinguished between magazine capacities and load limits because it deemed load limits to be futile and incapable of furthering the stated goal of the statute, which were relevant factors pre-*Bruen*. It could not have found New York's load limit was unconstitutional without finding that magazines and the firing capacities of firearms are governed and protected by the Second Amendment. *Id*. at 264. *Cuomo*'s holding precludes a ruling by this Court that regulations limiting magazine capacity are not covered by the text of the Second Amendment. To find otherwise would mean that any capacity limit is acceptable, including the load limit from *Cuomo* or any other restriction on firing capacity.

**3. Vermont's proposed unbounded test is unsupported by precedent.**

When evaluating firearms restrictions, Vermont poses a test that recognizes an "historical tradition" of government regulation of dangerous aspects of arms. ECF66 at 7-8. This "dangerous aspects" test does not come directly from the Supreme Court's Second Amendment jurisprudence, but was instead divined from those opinions and other "relevant historical information" by Professor Robert Spitzer, the State's political science expert, ECF62 at 23-25, who also testified to his own hostility to *Heller* and *Bruen* and his wish to see those precedents overturned. ECF62 at 98-99 (Spitzer testifying that the Second Amendment does not provide an individual right to self-defense, and *Heller* and *Bruen* wrongly decided and should be reversed).

Spitzer's "dangerous aspects" test, however, improperly frames what an historical tradition is under *Bruen*. It asks only whether a feature of a firearm has been "particularly associated with dangerousness and offensive, assaultive uses." ECF66 at 7. If so, then, according to the test, the State may regulate those aspects as it pleases. The

7

test ignores the analysis required by *Bruen*, comparing the burden and justification of the proposed analogs to the modern regulation. Instead, the "dangerous aspects" test permits unbounded regulation of any governmentally-perceived dangerous feature of a firearm. For instance, it would mean the State could ban detachable magazines entirely, or the semiautomatic (self-loading) capabilities of modern firearms. ECF62 at 29 (Spitzer concedes the government could ban semiautomatic firearms or the carry of them under his test). It could even ban the breechloading feature of "modern" firearms, as a dangerous aspect that makes these types of firearms especially pernicious, leaving us with only muzzleloaders. These unconstitutional outcomes belie the fault in this test.

4. **The Plaintiffs have established constitutional harms.**

The State claims Plaintiffs have not made a "strong" showing of irreparable harm. ECF66 at 8 *et seq*. But in the context of a preliminary injunction addressing a constitutional issue, Plaintiffs need not show harm other than to their rights. ECF2 at 23 (collecting cases showing that a constitutional injury is presumed to be an irreparable harm). What's more, the mere *allegation* of a constitutional harm gives rise to the presumption of an irreparable injury. *Id*. at 6 (citing *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996). Thus, this presumption means Plaintiffs need not specifically prove any injury, much less an irreparable injury. Nevertheless, they have done so.

a. **Irreparable harm is presumed for constitutional injuries.**

The State argues that Plaintiffs' injuries are not irreparable in large part because it characterizes those injuries as "monetary." ECF66 at 8. But constitutional injuries are inherently and always irreparable. ECF2 at 22 *et seq*. and ECF42 at 49 *et seq*. Financial injury matters for a standing analysis, but for this analysis the important issue is whether a gun store's customers have a right to buy and possess a firearm and the seller

8

has a right to sell that firearm. By the State's logic, there would similarly have been no irreparable harm in the seminal case *CBS v. Davis*, 510 U.S. 1315, 1315 (1994), which held that delay of a broadcast constitutes irreparable harm under the First Amendment. After all, CBS was free to broadcast anyway (just not on a particular topic), and might also have broadcast on its preferred topic at some later date. Constitutional harms have never been measured in financial terms, and it would be error to do so here.

b. **Plaintiffs have shown actual harm, even though they are not required to do so.**

The State focuses on Plaintiffs' monetary harms because it theorizes that those harms can be repaired at some later date (and conveniently casts aside any immunity arguments it might later use to prevent entry of a monetary judgment). The State's focus on monetary harms is notable because it concedes that such harms do exist, and that the State is actively enforcing the laws at issue in this case.

Leaving aside monetary harms, Plaintiffs offered abundant testimony of actual and ongoing constitutional harms, which necessarily cannot be reduced to monetary amounts. Bradley testified that members have an inability to compete in events and to defend themselves due to the waiting period. ECF59 at52:14-18. He also testified that the magazine ban puts competitive shooters on an uneven footing, as not all competitors can shoot with the same equipment. Id. at 41:11 *et seq*. Similarly, Cleary testified that he cannot transfer a firearm *from the business that he owns* to *himself*, *id*. at 80:17 *et seq*., and that the law forces him to disarm his customers when they conduct a trade in. *Id*. at 76:18 *et seq*. Law-abiding citizens are also unable to "keep and bear" firearms they have already purchased for at least 72 hours, despite having passed a federal background check. They are also unable to acquire or possess arms that are in common use. These

9

harms are not merely theoretical: Bradley testified that VTFSC members cannot obtain sought-after and common firearms because of Vermont's magazine ban. ECF 59 at 41:10 *et seq*. He said this law prevents members from obtaining arms for self-defense and the waiting period prevents members from exercising their rights. Similarly, Cleary testified that his customers previously chose to buy now-banned weapons because those customers believed LCMs to be ideal for self-defense. *Id*. at 64:16 *et seq*.

Plaintiffs cannot put a price on their constitutional rights, and the law presumes that constitutional harms are irreparable. The Court should therefore reject the State's argument that Plaintiffs have not made a "strong" showing that this Court should award them constitutional redress.

## Conclusion

The State has not carried its heavy burden to sustain its laws. It has not shown there is a historical tradition that supports giving the government the power to deprive law-abiding citizens of their Second Amendment rights for 72 hours, during which no governmental activity occurs. Nor has it shown that the weapons it has banned are dangerous and unusual, or that there is any relevant historical tradition of banning or even regulating them. This Court should therefore grant the preliminary injunction.

Dated: June 18, 2024

Respectfully submitted,

| | |
|---|---|
| HARDIN LAW OFFICE | DIGENOVA & TOENSING, LLP |
| By: */s/ Matthew D. Hardin* | By: */s/ Brady C. Toensing* |
| Matthew D. Hardin, Vt. Bar. 5815 | Brady C. Toensing |
| 1725 Eye Street NW, Suite 300 | 1775 Eye Street NW, Suite 1150 |
| Washington, DC 20006 | Washington, DC 20006 |
| Phone: (202) 802-1948 | Phone: (202) 289-7701 |
| Email: Matt@MatthewHardin.com | Email: brady@digtoe.com |
| *Attorney for Plaintiff* | *Attorneys for Plaintiff* |