UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| VERMONT FEDERATION OF SPORTSMEN'S | ) | |
| CLUBS; POWDERHORN OUTDOOR SPORTS | ) | |
| CENTER, INC.; JPC, INC. (d/b/a BLACK DOG | ) | |
| SHOOTING SUPPLIES; PAULE DAME; and | ) | |
| MARSHA J. THOMPSON; | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 2:23-cv-710 |
| | ) | |
| MATTHEW BIRMINGHAM, Director of the | ) | |
| Vermont State Police, in his Official and Personal | ) | |
| Capacities; CHARITY CLARK, Attorney General | ) | |
| of the State of Vermont, in her Official and | ) | |
| Personal Capacities; and SARAH GEORGE, | ) | |
| State's Attorney for Chittenden County, in her | ) | |
| Official and Personal Capacities; | ) | |
|     Defendants. | ) | |

## DEFENDANTS' FURTHER SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

### INTRODUCTION

Defendants briefly respond to Plaintiffs' supplemental filing (Doc. 67).

**1.** Contrary to Plaintiffs' assertion, there is no evidence that Vermont's restriction on

large-capacity magazines "renders common handguns and rifles illegal for sale." Doc. 67 at 1.

The overwhelming evidence is that handguns and rifles that can be used with large-capacity

magazines can also be used with compliant magazines. What Plaintiffs refer to as a

"configuration" (*id.*) is just a ten-cent word for the magazine sold with a particular firearm.

Before the LCM restriction, a customer could buy a new AR-15 that came with a 20-round

magazine. Now, they can buy a new AR-15 that comes with a 10-round magazine. Plaintiffs

offered no evidence of any commonly used firearm that is manufactured in such a way that it

cannot be used with a compliant magazine. Plaintiffs' claims of "configuration" and "factory-

design" (*id.* at 1, 7) mean nothing more than "some firearms used to be packaged for sale with LCMs." Now they are packaged for sale with compliant magazines. It's still the same firearm that works the same way.

**2.** Plaintiffs' criticisms of Lucy Allen misstate her testimony. She did not say that her analysis contains methodological flaws. She testified that her analysis of news stories about the use of firearms in self-defense was based on appropriate statistical sampling. Tr. 5/29 at 103-04, 134-35. Her analysis of police data did not require statistical sampling because she reviewed all of the available data during the time period studied. *Id.* at 107-08 (of 4000 shooting incidents, identified 398 that involved more than 10 ammunition casings; in none of those 398 incidents did a defender fire more than 10 shots). And she fully addressed Plaintiffs' somewhat unexpected argument that the NRA data is biased, explaining that given its source, it would tend to overstate the use of firearms In self-defense. *Id.* at 100, 122-23. Plaintiffs did not present any evidence of an available data source that Allen did not review.

Plaintiffs' argument that Allen's data do not capture the alleged deterrent effect of firearms, separate from their use in self-defense, is a non sequitur. Allen analyzed available data about the use of firearms in self-defense. *Id.* at 138 ("So the question I was asked to answer is: What are the number of shots fired in self-defense?"). Defendants proffered that analysis because it shows individuals using firearms in self-defense very rarely fire more than 10 bullets. *Id.* at 105. Plaintiffs could have offered evidence regarding the deterrent effect of firearms if they believed it to be helpful to their case. They did not, nor have they explained why such evidence would be relevant.

**3.** Plaintiffs' criticisms of Dr. Spitzer all rest on their flawed premise that banning magazines of a certain size is equivalent, for Second Amendment purposes, to a complete ban on

handguns. *See, e.g.,* Doc. 67 at 8 (analogizing LCM restrictions to the complete ban on possession and carry of handguns that was at issue in *District of Columbia v. Heller*, 554 U.S. 570).[1] Vermont's LCM restriction is not a ban on *any* class of firearms. Dr. Spitzer's historical analysis of firearm regulations is material and relevant. He demonstrated an established tradition of restrictions on the use and carry of firearms—directed at offensive, assaultive, and criminal uses—that emerged as the danger of those weapons became apparent. Those historical restrictions are analogous to restrictions on LCMs, because LCMs are commonly used in mass shootings and associated with more deaths and injuries. *E.g.,* Tr. 5/29 at 133.

4. The 72-hour waiting period is not "purposeless," as Plaintiffs repeatedly argue. Doc. 67, at 9-10. It is a cooling-off period intended to save lives by putting a short pause between purchasing and taking possession of a firearm, to deter suicides and other firearms violence. Mr. Bradley admitted that many firearms purchases are "impulsive." Tr. 5/23/24 at 42:3-10. The purpose served by this short waiting period is directly analogous to the purposes served by background checks and licensing and training requirements: it is aimed at preventing acquisition of guns by people who will mis-use them. And the delay itself—72 hours—is far shorter than the delays involved in licensing schemes like the one upheld in *Antonyuk*. *See* Defs. Opp, Doc. 24, at 27-28; *Antonyuk*, 89 F.4th at 312, 315 n.24. Other than falsely claiming that the waiting period doesn't serve any purpose—a claim that disregards legislative intent and the evidence—Plaintiffs

---

[1] The Second Circuit distinguished between firearms and ammunition in *Gazzola*, where it explained that States cannot circumvent the holdings in *Heller* and *Bruen* "by banning outright the sale or transfer of common-use weapons and *necessary* ammunition." *Gazzola v. Hochul*, 88 F.4th 186, 195 (2d Cir. 2023) (emphasis added), *cert. denied*, 2024 WL 3014531 (U.S. June 17, 2024).

have no cognizable legal theory for why a 72-hour waiting period violates the Second

Amendment, but a license requirement that takes weeks does not.

5. In any event, *Gazzola* controls here and requires the Court to uphold the waiting period

as a presumptively constitutional regulation of the transfer of firearms. *Gazzola v. Hochul*, 88

F.4th 186, 195 (2d Cir. 2023). Plaintiffs mis-read *Gazzola* and mis-understand Defendants'

argument on this point. Defendants do not contend that regulations on the commercial transfer of

firearms (on "purveyors of arms," to use Plaintiffs' term, Doc. 67 at 9) are entirely outside the

scope of the Second Amendment. *See* Defs. Supp. Mem., Doc. 66, at 4-5, 7. Such regulations are,

however, presumptively constitutional under *Heller* and *Gazzola*. Indeed, consistent with

*Gazzola*, the Ninth Circuit recently reiterated that "the right to *sell* firearms is not a protected

ancillary right" under the Second Amendment and that the Amendment's "plain text . . . only

prohibits meaningful constraints on the right to acquire firearms." *B & L Productions, Inc. v.

Newsom*, No. 23-3793, 2024 WL 2927734, at *7 (9th Cir. June 11, 2024). Plaintiffs have not

shown that the waiting period threatens their ability to acquire firearms in a manner or to a

degree that violates their Second Amendment rights. *See Gazzola*, 88 F.4th at 196.

6. *Gazzola*, *Oakland Tactical Supply, LLC v. Howell Twp., Michigan*, No. 23-1179, 2024

WL 2795571, at *5 (6th Cir. May 31, 2024), and *B&L Productions* all confirm a critical aspect of

the Second Amendment analysis: that not every firearms regulation satisfies step one of the

*Bruen* standard.  *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1*Gazzola* did not apply

the *Bruen* standard at all, instead holding that regulations on the commercial transfer of arms are

presumptively constitutional. The Ninth Circuit in *B&L Productions* likewise holds that the

"most reasonable interpretation" of *Heller's* discussion of "presumptively lawful" regulations "is

that commercial restrictions presumptively do not implicate the plain text of the Second

4

Amendment at the first step of the *Bruen* test." *B & L Productions,* 2024 WL 2927734, at *8. And both *B&L Productions* and *Oakland Tactical* require courts to consider the precise conduct at issue, and assess whether that specific conduct comes within the plain text of the Second Amendment. *See* Defs. Supp. Mem., Doc. 66, at 4-5, 7; *B & L Productions,* 2024 WL 2927734, at *7, n.17 (focusing on "the actual activity that the Challenged Statutes regulate: namely, the sale and purchase of firearms and ammunition on state property" and holding that the Second Amendment "says nothing about commerce, let alone firearm sales on state property"); *Oakland Tactical*, 2024 WL 2795571, at *5 ("proposed conduct must be closely tethered to the plain text of the Second Amendment").

The Second Amendment says nothing about acquiring or purchasing firearms, and says nothing about ammunition or magazine capacity either. That does not mean that the Second Amendment is simply irrelevant. What it does mean, however, is that Plaintiffs cannot claim the benefit of the presumption that applies at *Bruen's* step two.

## CONCLUSION

Plaintiffs' motion for a preliminary injunction should be denied.

DATED at Montpelier, Vermont, this 18th day of June 2024.

STATE OF VERMONT

CHARITY R. CLARK
ATTORNEY GENERAL

By:    */s/ David R. Groff*
       David R. Groff
       Assistant Attorney General
       Office of the Attorney General
       109 State Street
       Montpelier, VT 05609-1001
       (802) 828-1101
       David.Groff@vermont.gov

       Bridget Asay
       Michael Donofrio
       STRIS & MAHER LLP
       15 East State Street, Suite 2
       Montpelier, VT  05602
       (802) 828-4285
       basay@stris.com
       mdonofrio@stris.com

       Counsel for Defendants